

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

| | | |
|---|---|---|
| LINDA MARIE PRATHER, | § | |
| | § | MAR 0 5 2004 |
| *Plaintiff*, | § | |
| | § | Michael N. Milby |
| v. | § | Clerk of Court |
| | § | C. A. No. B-03-0136 |
| | § | |
| UTILIQUEST, LLC, MELANIE | § | |
| MCGINNESS AND SUE OBREGON, | § | |
| | § | |
| *Defendants*. | § | |

# DEFENDANT UTILIQUEST, L.L.C.'S
# MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

Kerry E. Notestine
State Bar No. 15116950
Fed. I.D. No. 2423
1301 McKinney, Suite 1900
Houston, Texas 77010
(713) 951-9400 (Telephone)
(713) 951-9212 (Telecopier)

Of Counsel:
LITTLER MENDELSON, P.C.
    and
J. BRADLEY SPALDING
1301 McKinney Street, Suite 1900
Houston, Texas 77010
Tel: 713.951.9400
Fax: 713.951.9212

Attorney-in-Charge for Defendants
UtiliQuest, LLC
Sue Obregon
Melanie McGinness

TABLE OF CONTENTS

I.      NATURE AND STAGE OF THE PROCEEDINGS ........................................... 1

II.     STATEMENT OF THE ISSUES AND STANDARD OF REVIEW ................... 2

III.    FACTUAL BACKGROUND .................................................................................. 2

        A.      Introduction .................................................................................................. 2

        B.      UtiliQuest's Policies and Practices Concerning Sick Leave and
                Leaves of Absence ....................................................................................... 3

        C.      Plaintiff Exhausts her Personal/Sick Time for the Year by August
                2001 and Before She Learns She is Pregnant ........................................... 4

        D.      By the End of 2001, Plaintiff had been Absent from Work at least
                16 Days or More Than Three Times her Allotted Number of
                Personal/Sick Days Under UtiliQuest's Policy .......................................... 5

        E.      Ms. Obregon Helps Plaintiff Obtain Short Term Disability
                Coverage ...................................................................................................... 6

        F.      Plaintiff Exhausts her Personal/Sick Time for the Year by March
                2002 .............................................................................................................. 7

        G.      Plaintiff is Administratively Terminated. .................................................. 9

IV.     SUMMARY OF THE ARGUMENT ................................................................... 10

V.      ARGUMENT ........................................................................................................ 10

        1.      Plaintiff's Failure to Exhaust her Administrative Remedies
                Deprives the Court of Jurisdiction to Hear Plaintiff's Claims for
                National Origin Discrimination under the TCHRA. ................................. 10

        2.      Plaintiff's Disparate Treatment Claims Based on National Origin
                and Sex Should Be Dismissed as a Matter of Law. ................................. 11

                A.      Plaintiff Cannot Establish the Elements of a Prima Facie
                        Case of Discrimination with Respect to Her Administrative
                        Termination. ................................................................................... 12

                B.      Plaintiff Has No Evidence of Pretext. ............................................ 15

        3.      Plaintiff Cannot Support a Claim for Retaliation Because She did
                Not Engage in Any Protected Activity. .................................................... 16

**TABLE OF CONTENTS**
(CONTINUED)

PAGE

    4.    Plaintiff's IIED Claim Fails as a Matter of Law. ...................................... 17

        A.    Plaintiff's Complaints With Regard to Her Employment Do Not Give Rise to a Claim of Intentional Infliction of Emotional Distress. ........................................................................ 17

        B.    There is No Evidence of Extreme and Outrageous Conduct. ...... 18

VI.    CONCLUSION .................................................................................................. 18

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| LINDA MARIE PRATHER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | C. A. NO. B-03-0136 |
| UTILIQUEST, LLC, MELANIE | § | |
| MCGINNESS AND SUE OBREGON, | § | |
| | § | |
| Defendants. | § | |

DEFENDANT UTILIQUEST, L.L.C.'S MOTION FOR SUMMARY JUDGMENT

COMES NOW the defendant UtiliQuest, L.L.C., (hereinafter "UtiliQuest") and pursuant to FED. R. CIV. P. 56 files this Motion for Summary Judgment.

I.
NATURE AND STAGE OF THE PROCEEDINGS

This lawsuit arises from the administrative termination of the plaintiff Linda Marie Prather's (hereinafter "the plaintiff") employment with UtiliQuest on May 14, 2002, when she took a maternity leave of absence for which she had no accrued time off. The plaintiff commenced this action on June 30, 2003, by filing Plaintiff's Original Petition in the 103rd Judicial District of Cameron County. In her Original Petition, the plaintiff asserts the following claims for relief: (1) national origin discrimination by UtiliQuest in violation of the Texas Commission on Human Rights Act ("TCHRA"), TEX. LAB. CODE ANN. §§ 21.001-21.556 (Vernon Supp. 2000); (2) gender discrimination by UtiliQuest in violation of the TCHRA; (3) retaliation by UtiliQuest in violation of the TCHRA; (4) negligent supervision, retention and

misrepresentation by UtiliQuest;[1] and (5) intentional infliction of emotional distress by UtiliQuest, McGinness and Obregon. (Petition, *generally*). On August 1, 2003, the defendant UtiliQuest removed the case on the grounds of diversity and fraudulent joinder. On or about August 18, 2003, the plaintiff filed her Motion for Remand.[2] On October 8, 2003, the defendants Melanie McGinness and Sue Obregon filed a Motion for Summary Judgment seeking the dismissal of all claims against them, which is still pending before the Court. This case is set for trial on May 6, 2004.

II.
## STATEMENT OF THE ISSUES AND STANDARD OF REVIEW

UtiliQuest requests that the Court grant summary judgment dismissing the plaintiff's lawsuit. Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2552 (1986).

III.
## FACTUAL BACKGROUND

A.    Introduction.

UtiliQuest contracts with local utility companies to provide "locate" services (i.e. to locate and accurately mark underground utilities with flags and paint) in areas where digging will be undertaken. UtiliQuest hired the plaintiff on or about February 27, 2001, as a dispatcher at its Harlingen, Texas facility. As a dispatcher, the plaintiff was responsible for receiving locate

---

[1] During the plaintiff's deposition on February 12, 2004, the plaintiff's counsel represented that he intended to amend the Petition to delete the claims for "negligence." (*See* Plaintiff's Depo., pp. 78 (line 25) – 79 (lines 1-5), attached hereto as Exhibit 1.) Although the plaintiff has not yet amended her Petition, based on the representations of the plaintiff's counsel, the defendant will not address the claims for negligent supervision, retention and misrepresentation in its Motion for Summary Judgment.

[2] Plaintiff's Motion to Remand is still pending before the Court.

orders (or "tickets") from the utility companies and assigning the ticket to one of the locate technicians (or locator) to complete.    The plaintiff reported to Sue Obregon, the office supervisor.

UtiliQuest has been and is fully committed to equal employment opportunity, both in principle and as a matter of policy.    The company's commitment to equal employment opportunity is set forth in its Employee Handbook, which is distributed to all UtiliQuest employees.  The Company's EEO Policy prohibits illegal discrimination of any kind. (*See* Equal Employment Opportunity ("EEO") Policy, p. 2, ¶ 1, of the UtiliQuest Employee Handbook, attached hereto as Exhibit 2.) The Company's anti-discrimination policy provides employees with alternative avenues for reporting alleged discrimination and assures employees that complaints of harassment and discrimination will be promptly addressed and remedied. (*See* Harassment Statement, page 3, ¶ "Complaint Procedure," of the UtiliQuest Employee Handbook, attached hereto as Exhibit 3.)  The company's anti-discrimination policy also expressly prohibits retaliation against an employee who has reported alleged harassment or discrimination. (Id.)

B.    UtiliQuest's Policies and Practices Concerning Sick Leave and Leaves of Absence.

When the plaintiff was hired she signed various documents in connection with the commencement of her employment.    Among the documents signed by the plaintiff was an Acknowledgment that she had received and reviewed UtiliQuest's Employee Handbook. (*See* Acknowledgement, attached hereto as Exhibit 4.) In addition to the company's EEO Policy and Harassment Policy, the Employee Handbook also outlines the company's policies concerning the accrual and use of sick time.  (*See* Personal/Sick Time Policy pp. 12-13, in the UtiliQuest Employee Handbook, attached hereto as Exhibit 5.)  Under the Personal/Sick Time Policy,

- 3 -

hourly employees like the plaintiff accrue <u>up to</u> six personal/sick days per calendar year.[3]

Employees who are in their first 90 days of employment, however, are not permitted to use any

personal/sick days.  UtiliQuest's Personal/Sick Time Policy states in pertinent part:

> Hourly employees are eligible for six (6) personal/sick days per
> calendar year. If you start after January 1st, the six days will be
> prorated.  You will begin accruing personal/sick time on your date
> of employment at .23 days per pay period.  <u>You are not allowed to
> use any personal/sick time accrued during the Introductory period</u>
> which is the first 90 days of employment.

(Id.) (emphasis added).

    As required by law, UtiliQuest also has a Family and Medical Leave Act Policy

("FMLA").  In those locations where UtiliQuest is covered by the FMLA (*i.e.*, where it employs

50 or more employees at a single worksite or within a 75 mile radius of a worksite), eligible

employees can take up to twelve weeks of qualifying unpaid FMLA leave and upon their return

to work have the right to be reinstated to their same or equivalent position. (*See* (First)

Declaration of Melanie McGinnis, attached hereto as Exhibit 6.)  In those locations which are not

covered by the FMLA because they employ fewer than 50 people (including the Harlingen,

Texas facility where the plaintiff worked), employees who need a leave of absence must use their

personal/sick time and vacation time to cover any leave. (*See* Second Declaration of Melanie

McGinness attached hereto.)   An employee who chooses to take a leave of absence but has no

sick time or vacation time available (either because they have not accrued the time or have

already exhausted their time), or whose leave of absence will exceed their sick and vacation

time, are subject to administrative termination. (Id.) When these employees are released to return

to work, they are eligible to be rehired by UtiliQuest if a position for which they are qualified is

available.  Employees can be administratively terminated irrespective of the nature of their leave

---

[3] Because the plaintiff commenced her employment after the start of the calendar year, the prorated amount of
personal/sick days she could accrue during 2001 was 5 days.

(*i.e.* personal illness, on-the-job injury, pregnancy, etc.) (Id.)

      C.    Plaintiff Exhausts her Personal/Sick Time *for the Year* by August 2001 and *Before* She Learns She is Pregnant.

Throughout her employment, the plaintiff's attendance at UtiliQuest was poor and her use of personal/sick time excessive. For example, despite UtiliQuest's policy that new employees were not permitted to take any personal/sick time during their first 90 days of employment, the plaintiff called in sick 3 days, left work early 2 days due to illness (missing up to half the day) and was late twice during this period. (*See* summary of attendance (Bates Stamp #0034), attached hereto as Exhibit 7.)[4] As a result, on May 23, 2001, Ms. Obregon and Tony Castillo, the General Manager, met with the plaintiff and issued her a verbal warning for excessive tardiness and absences during her Introductory Period. The plaintiff was advised that if her attendance did not improve she could receive a written warning or be terminated. (*See* Employee Consultation Report dated May 23, 2001, attached hereto as Exhibit 8.) Significantly, the plaintiff testified that she agreed with Ms. Obregon's assessment that her attendance was unacceptable. (*See* Plaintiff's Depo., pp. 20 (lines 22-25) – 21 (lines 1-13), attached hereto as Exhibit 1.)

Although the plaintiff's attendance briefly improved, she again called in sick to work on August 2 and 29, 2001. (*See* Exhibit 7 (Bates Stamp #0034).) These were her fifth and sixth absences since she began her employment and accordingly depleted (and exceeded) her allotted personal/sick days for the rest of the calendar year.

---

[4] Specifically, the plaintiff called in sick on April 23rd, and May 7th and 21st, went home sick on May 4th and May 22nd, and was two hours late on March 13th and one hour late on April 18th. (*See* summary of attendance (Bates Stamp #0034), attached hereto as Exhibit 7.)

D.     By the End of 2001, Plaintiff had been Absent from Work *at least* 16 Days or More Than *Three Times* her Allotted Number of Personal/Sick Days Under UtiliQuest's Policy.

In early November 2001, the plaintiff learned that she was pregnant.[5] (*See* Exhibit 1, p. 24 (lines 17-19)  Shortly thereafter, the plaintiff told Ms. Obregon that she was pregnant.  The plaintiff testified that Ms. Obregon's reaction to this news was positive and that thereafter she and Ms. Obregon (who had three children of her own) would have conversations about her pregnancy in which the plaintiff would ask questions and Ms. Obregon would give her advice. (*See* Exhibit 1, pp. 24 (lines 20-25) – 25 (lines 1-23).) As a result of some problems early on in her pregnancy, the plaintiff was placed on bed rest in November 2001, for 6 ½ days. (*See* doctor's excuse (Bates #0018 and 0019), attached hereto as Exhibit 9; *see also* Exhibit 7 (Bates Stamp #0034).) For the remainder of the year, the plaintiff called in sick one time, left work early due to illness and came in late one time. (*See* Exhibit 9 (Bates #0020); *see also* Exhibit 7 (Bates Stamp #0034).)  Accordingly, as of the end of 2001, the plaintiff had been absent at least 16 days due to illness, more than three times her allotted number of personal/sick days under UtiliQuest's policy.

E.     Ms. Obregon Helps Plaintiff Obtain Short Term Disability Coverage.

Shortly after the plaintiff announced she was pregnant, Ms. Obregon realized that the plaintiff had not elected any medical benefits when she began her employment.  Concerned that the plaintiff did not have any medical benefits to cover her during her pregnancy, Ms. Obregon met with the plaintiff in her office.[6]  In the course of this conversation, Ms. Obregon told the plaintiff that even though she had not elected any company medical benefits, she believed that

---

[5] The plaintiff had a doctor's appointment and took a half-day off on October 31, 2001, and then was absent the next two days, November 1 and 2, 2001. (*See* Exhibit 7 (Bates Stamp #0034).)

[6] During the meeting, the plaintiff told Ms. Obregon that she had medical coverage though Medicaid to cover her pregnancy. (*See* Exhibit 1, p. 33 (lines 11-25).)

the plaintiff would still be eligible for short-term disability benefits. (*See* Exhibit 1, pp. 31 (lines 20-25), 32 (lines 1-25), and 33 (lines 1-7).) The plaintiff expressed her appreciation that Ms. Obregon had pointed this out to her. (*See* Exhibit 1, p. 33 (lines 3-10).) Ms. Obregon also told the plaintiff that she would need to contact the corporate human resources department to determine how much time (if any) the plaintiff could take off work after she had her baby.

As a result of their conversation, Ms. Obregon sent an e-mail to Melanie McGinness, the benefits coordinator for UtiliQuest in Atlanta on January 7, 2002 inquiring whether the plaintiff was covered by the FMLA. (*See* Obregon Depo., p. 16 (lines 5-17), attached hereto as Exhibit 10; *see also* E-mail communications, attached hereto as Exhibit 11.) Over the course of several e-mail communications, Ms. McGinness and Ms. Obregon determined that the plaintiff was not covered by the FMLA because there were fewer than 50 employees at the Harlingen facility or within 75 miles of it, and accordingly the plaintiff would not be eligible for an FMLA leave of absence when she had her baby. (*See* Exhibit 10, pp. 16 (lines 18 – 25) – 17 (lines 1-22); *see also* Exhibit 11.) Ms. McGinness did confirm, however, that the plaintiff could elect short-term disability coverage even though she had not elected other medical benefits from the company. Shortly thereafter, Ms. Obregon met with the plaintiff and gave her a copy of the e-mail exchange between herself and Ms. McGinness to explain the company's policy on her leave of absence and short-term disability benefits. (*See* Exhibit 1, p. 27 (lines 2- 18).) The plaintiff testified that as a result of her conversation with Ms. Obregon she understood that since she was not eligible for FMLA and did not otherwise have any available vacation or personnel/sick time, she would be administratively terminated if she chose to take a leave of absence when she had her baby. (*See* Exhibit 1, p. 37 (line 5-21).) Ms. McGinness subsequently sent a follow-up memo to the plaintiff dated March 12, 2002, confirming this information (*See* McGinness Memo

with Attachments, attached hereto as Exhibit 12; Exhibit 1, pp. 37 (lines 5 – 21) – 38 (lines 1-14).)

       F.      <u>Plaintiff Exhausts her Personal/Sick Time *for the Year* by March 2002.</u>

       With the start of the new calendar, the plaintiff began accruing the six personal/sick days she was allotted for 2002. Unfortunately, the plaintiff continued have attendance problems and by the end of March 2002, had exhausted her personal/sick leave days for 2002 before she had even finished accruing them.[7]  Thereafter, the plaintiff was absent 7 more days in April and missed parts of other days due to doctor's appointments. (*See* Exhibit 13; *see also* Exhibit 7 (Bates Stamp #0034 and 0035); Exhibit 1, pp. 42 (lines 14 - 25) – 43 (lines 1-3).)  Accordingly, as of May 1, 2002, the plaintiff had been absent <u>at least</u> 12 full days from work and 7 partial days, thereby again far exceeding the allotted number of personal/sick days under the company's Personal/Sick Time Policy.  Significantly, the plaintiff conceded in her deposition that (1) her doctor treated her for conditions <u>other than</u> her pregnancy in 2002, (2) she was not having any particular complications with her pregnancy at this time and (3) at least 6 of the days she missed work at the end of April were <u>not</u> pregnancy-related but because she had the flu. (*See* Exhibit 1, pp. 42 (lines 14 - 25) – 43 (lines 1-3).)

       When the plaintiff returned to work on May 2, 2002, after recovering from the flu, Ms. Obregon met with her and issued her a written warning for unacceptable attendance.  The verbal warning states in pertinent part:

> Too many days off – unacceptable
> . . . .
> Describe the appropriate action or desired performance:
> Drastically Improve attendance record – starting today
> . . . .

---

[7] The plaintiff was absent from work due to illness on January 4, 8 (went home sick at 9:30 a.m.), and March 21, 28 (half day), 29, 2002, and missed up to a half day due to doctor's appointments on January 10, February 14, 28, and March 22, 2002. (*See* Exhibit 7 (Bates #0035), Exhibit 9; *see also* doctor's excuses, attached hereto as Exhibit 13.)

> Consequences of failure to improve the performance:
> <u>Will be terminated.</u>
>
> . . . .
> * Per [Plaintiff], she understands how important it is to make sure she is here when she is scheduled to work.
>
> Claims she has no complications with her pregnancy but that her doctor is going to give her Bed rest 1 month From now when she is 35 weeks.

(*See* Employee Consultation Report dated May 2, 2002, attached hereto as Exhibit 14) (emphasis in original) (emphasis added).

In her deposition, the plaintiff agreed (as she had when she was counseled in 2001 for her attendance problems <u>before</u> she was pregnant) that Ms. Obregon treated her fairly in raising her attendance problems with her. Significantly, the plaintiff also conceded that she did not believe that Ms. Obregon decision to counsel her was because of her pregnancy or national origin. (*See* Exhibit 1, p. 45 (lines 11-13; 18-22).)

G.    <u>Plaintiff is Administratively Terminated.</u>

Less than two weeks after she received the written warning, the plaintiff was placed on bed rest by her doctor for the one month remaining in her pregnancy, and elected to take short-term disability leave. (*See* Exhibit 1, p. 46 (lines 2-5).) Pursuant to UtiliQuest's practice, on May 15, 2002, the plaintiff was administratively terminated. (*See* Employee Separation Form, attached hereto as Exhibit 15.) At the time of her termination, the plaintiff had already substantially exceeded the allotted number of personal/sick days she was allowed <u>for the year</u> under the company's Personal/Sick Time Policy, and (according to her doctor) would remain on short-term disability leave (and out of work) for more than two and one-half more months until August 7, 2002. (*See* Disability Claim form dated May 15, 2002, attached hereto as Exhibit 16.)

On the Employee Separation form Ms. Obregon completed to terminate the plaintiff's employment, Ms. Obregon checked the box marked "eligible for rehire." (*See* Exhibit 15.) Although the plaintiff testified that she understood that she needed to reapply in order to be considered for re-hire, and that Ms. Obregon and Ms. McGinnis did nothing to discourage her from re-applying after she had her baby, the plaintiff did not reapply for her position at UtiliQuest after she was released by her doctor to return to work on or about August 7, 2002.[8] (*See* Exhibit 1, pp. 49 (lines 13-25) and 52 (lines 4 - 10).)

IV.
## SUMMARY OF THE ARGUMENT

1. Plaintiff's Failure to Exhaust her Administrative Remedies Deprives the Court of Jurisdiction to Hear Plaintiff's Claims for National Origin Discrimination under the TCHRA.

2. Plaintiff's Disparate Treatment Claims Based on National Origin and Sex Should Be Dismissed as a Matter of Law.

    A. Plaintiff Cannot Establish the Elements of a *Prima Facie* Case of Discrimination.

    B. Plaintiff Has No Evidence of Pretext.

3. Plaintiff's Retaliation Claim Fails as a Matter of Law Because She did Not Engage in Any Protected Activity.

4. Plaintiff's IIED Claim Fails as a Matter of Law.

    A. Plaintiff's Complaints With Regard to Her Employment Do Not Give Rise to a Claim of Intentional Infliction of Emotional Distress.

    B. There is no Claim of Extreme and Outrageous Behavior.

---

[8] In late September, Plaintiff visited UtiliQuest and inquired about possible openings. Ms. Obregon told the plaintiff that while the company did not have any current openings, one of the dispatchers was planning to move in December (thereby creating an opening), and encouraged the plaintiff to check back then. The plaintiff never returned. (*See* Exhibit 1, pp. 28 (lines 23-25) – 29 (lines 1-15).)

V.
## ARGUMENT

1.  Plaintiff's Failure to Exhaust her Administrative Remedies Deprives the Court of Jurisdiction to Hear Plaintiff's Claims for National Origin Discrimination under the TCHRA.

A prerequisite to bringing suit under the TCHRA is the filing of a timely charge of discrimination with the Equal Employment Opportunity Commission (hereinafter "EEOC") (or the Texas Commission on Human Rights (hereinafter "TCHR")), and the receipt of a notice of right to sue. *Texas Dept. of Public Safety v. Moore*, 985 S.W.2d 149, 152, n.2 (Tex. App. – Austin 1998, no writ). Indeed, Courts do not have jurisdiction to consider TCHRA claims unless an aggrieved party has not first exhausted her administrative remedies by filing a Charge. *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 485 (Tex. 1991).

In the present case, the plaintiff filed a Charge of Discrimination with the TCHR on or about October 24, 2002. In the section of the Charge titled "Cause of Discrimination based on," the plaintiff checked only those boxes marked "Sex," "Retaliation," "Disability" and "Other (Specify) Pregnancy." (*See* TCHRA Charge of Discrimination, attached hereto as Exhibit 17.) The plaintiff did not check the box marked "National Origin." On or about December 11, 2002, the plaintiff filed a Charge of Discrimination with the EEOC in which she alleged discrimination based only on sex. Again, the plaintiff did not check the box for discrimination based on "National Origin." (*See* EEOC Charge of Discrimination, attached hereto as Exhibit 18.) Because the plaintiff failed to file a Charge with either the TCHR or the EEOC alleging national origin discrimination, the plaintiff has failed to exhaust her administrative remedies. *Davis v. Education Service Center*, 62 S.W.3d 890, 894-895 (Tex. App.-Texarkana 2001, no pet.). Accordingly, the plaintiff is barred from pursuing a national origin claim in this lawsuit.

- 11 -

2.   <u>Plaintiff's Disparate Treatment Claims Based on National Origin and Sex Should Be Dismissed as a Matter of Law.</u>[9]

In her lawsuit, the plaintiff alleges that by administratively terminating her, UtiliQuest discriminated against on the basis of her sex, "ethnicity", and pregnancy. (Petition at ¶¶ 17 and Section XI; Exhibit 1, p. 9 (lines 6-22).) The TCHRA prohibits, *inter alia*, employers from discriminating against employees because of national origin or sex (including pregnancy, childbirth or a related medical condition).   TEX. LAB. CODE ANN. §§ 21.051, 21.055, 21.106 (Vernon Supp. 2000).[10]

Where there is no direct evidence of any discriminatory intent based upon the plaintiff's national origin or sex, the plaintiff must rely on circumstantial evidence and follow the three-part analysis articulated in *McDonnell Douglas Corp. v. Green*, 93 S. Ct. 1817, 1825-26 (1973): (1) the plaintiff must establish a *prima facie* case of discrimination; (2) UtiliQuest must offer a legitimate, non-discriminatory reason for its actions; and (3) the plaintiff must prove that these reasons were pretextual.   *St. Mary's Honor Center v. Hicks*, 113 S. Ct. 2742, 2747-48 (1993); *Reeves v. Sanderson Plumbing Products, Inc.*, 120 S. Ct. 2097, 2109 (2000).   It is critical to note, however, that the plaintiff at all times retains the ultimate burden of persuading the Court that she was the victim of unlawful discrimination. *Hicks*, 113 S. Ct. at 2747-48; *Quantum Chemical Corp. v. Toennies*, 47 S.W.3d 473, 480 (Tex. 2000).   In fact, the Fifth Circuit in its post-*Reeves* decisions has made it clear that although discrimination "plaintiffs need not always present evidence above and beyond their *prima facie* case and pretext, <u>discrimination suits still require</u>

---

[9] The plaintiff's petition asserts that she was subjected to "retaliation" based upon her pregnancy (Petition at ¶ 17.) The TCHRA provides a claim for retaliation in instances where a plaintiff suffers an adverse employment action after complaining of unlawful discrimination.   TEX. LAB. CODE ANN. § 21.055.   Here, the plaintiff's "retaliation" claim is clearly miscast, and is more accurately presented  in the context of her gender discrimination claim and UtiliQuest will accordingly address it in that matter.

[10] The plaintiff's intentional discrimination  and retaliation claims under the TCHRA follow the same analytical and burden-shifting framework as under Title VII.  *City of Austin v. Gifford*, 824 S.W.2d 735, 739 (Tex. App.—Austin, 1992, no writ).

evidence of discrimination." *Vadie v. Mississippi State Univ.*, 218 F.3d 365, 374-75 & n.23 (5th Cir. 2000), *cert. denied*, 531 U.S. 1113 (2001) (emphasis added) (citing *Reeves*, 120 S.Ct. at 2105-06); *see also Rubinstein v. Administrators of Tulane Educ. Fund*, 218 F.3d 392, 400 (5th Cir. 2000), *cert. denied*, 532 U.S. 937 (2001).

A.    Plaintiff Cannot Establish the Elements of a *Prima Facie* Case of Discrimination with Respect to Her Administrative Termination.

In order to establish a *prima facie* case of sex or national origin discrimination with regard to her administrative termination, the plaintiff must show: (1) that she is a member of a protected class; (2) that she was meeting her employer's legitimate expectations; (3) that she suffered an adverse employment action; and (4) that similarly situated, non-American, male or non-pregnant employees were treated more favorably. *Farrington v. Sysco Food Servs., Inc.*, 865 S.W.2d 247, 251 (Tex. App.—Houston [1st Dist.] 1993, writ denied).   The plaintiff's national origin and sex discrimination claims both fail, however, because the plaintiff cannot establish the final prong of her *prima facie* case.

The plaintiff is unable to demonstrate that others outside her protected class were treated more favorably. In her deposition, the plaintiff stated that her national origin is "American." (*See* Exhibit 1, pp. 8 (lines 10-15) and 9 (lines 1-5).)   Accordingly, in order to establish the fourth prong of her *prima facie* case of national origin or sex discrimination, the plaintiff must establish that similarly situated persons who are not of American origin or males, were treated more favorably than she was (i.e. that they were not administratively terminated). *Farrington*, 865 S.W.2d at 251. The plaintiff's Petition is silent on this issue and the plaintiff otherwise offers no evidence that other male employees, or non-American employees were not administratively

terminated when they took a leave of absence.[11]    In fact, since April 1, 1998 (the date that

UtiliQuest became a company), UtiliQuest has administratively terminated 4 employees

(including Plaintiff) at the Harlingen facility. (*See* Second Declaration of Melanie McGinness, at

¶ 4, attached hereto.) These employees had taken leaves of absence for the following reasons:

pregnancy/maternity (1),[12] on-the-job injury (1), personal illness (2), and did not have sufficient

vacation and personal/sick time to cover the leave. (Id.) Of the 4 employees administratively

terminated at the Harlingen facility, two were male and two were female. (Id.) Of the four

employees administratively terminated at the Harlingen facility three were of Hispanic national

origin, one (the plaintiff) was of "American" national origin. (Id.) Of the four employees

administratively terminated since April 1, 1998 two have applied and been rehired when they

were released from their leave.[13] (Id.)

Moreover, there is no evidence that the plaintiff was treated any differently than any

other non-pregnant employee faced with a leave of absence. It is well-settled in the Fifth Circuit

that strict attendance policies which are uniformly applied to all employees regardless of

protected class cannot form the basis of for a discrimination claim. *Stout v. Baxter Healthcare*

*Corp.*, 282 F.3d 856, 861 (5th Cir. 2002) ("The [Pregnancy Discrimination Act] does not protect

---

[11] Indeed, the only evidence the plaintiff offers is her personal opinion - which is not competent summary judgment evidence - that "as an American," she is entitled to have a baby and get her job back. (*See* Exhibit 1, 11 (lines 22-25).)

[12] This employee was the plaintiff.

[13] Company-wide, five employees who have taken leave of absence since April 1, 1998, were not covered by the FMLA based upon the number of persons employed at their respective facilities. (*See* Second Declaration of Melanie McGinness, at ¶ 6, attached hereto.) All of these non-FMLA covered employees were administratively terminated pursuant to company practice. (Id.) Two of these employees took their leaves of absence for pregnancy/maternity. (Id.) The other three were for non-pregnancy-related issues. Two of these employees were male, three were female. (Id.) Company-wide since April 1, 1998, 42 employees who took leaves of absence were not covered by the FMLA based upon their length of service (less than a year). (Id.) Each of these 42 employees were administratively terminated pursuant to company practice. (Id.) 16 of these employees took a leave of absence for personal illness, eight for pregnancy/maternity and 18 for unknown reasons. (Id.) Since April 1, 1998, 10 of these employees have applied and been rehired when they were released from their leave. (Id.)

- 14 -

a pregnant employee from being discharged for being absent from work even if her absence is due to pregnancy or to complications of pregnancy, unless the absences of non-pregnant employees are overlooked.") (citations omitted). Furthermore, there are examples of female employees, including Ms. Obregon and Ms. McGinness, who have become pregnant and have not been terminated. In fact, Ms. Obregon testified that she faced the possibility of being administratively terminated twice when she was pregnant and needed leave for the birth of her children. Faced with this alternative, Ms. Obregon declined to take a leave of absence and instead used her vacation time to cover her absences from work. (*See* Exhibit 10, pp. 22 (lines 17-25) and 23 (lines 1-9).) (*See* Second Declaration of Melanie McGinness, at ¶¶ 5 and 7, attached hereto.)

For the aforementioned reasons, the plaintiff cannot establish a prima facie case of discrimination based on national origin or sex.

B.    Plaintiff Has No Evidence of Pretext.

Even if the plaintiff was able to establish a *prima facie* case of discrimination (and she has not), UtiliQuest has articulated a legitimate, non-discriminatory reason which is not a pretext for discrimination for the alleged adverse employment actions (*i.e.* administratively terminating employees who are otherwise not covered by the FMLA when they take a leave of absence in excess of their vacation and personal/sick time is legitimate and business-related). *Texas Dep't of Community Affairs v. Burdine*, 101 S. Ct. 1089, 1095 (1981).

All employment discrimination statutes (including the FMLA) require that an employer meet a minimum threshold of employees in order to be covered by the statute. The rationale for requiring a minimum number of employees before coverage attaches is because to do otherwise would impose a hardship on small employers which, by their very nature, do not have the

- 15 -

capacity or resources to redistribute an absent employee's duties. Accordingly, holding positions open works a greater hardship on small employers than larger ones.

The Harlingen facility where the plaintiff worked is not subject to the FMLA and does not have sufficient numbers or depth of personnel to cover an absent employee's duties. UtiliQuest's practice of administratively terminating employees whose leave exceeds their vacation and personal/sick days is imposed without regard to the reason an employee needs a leave of absence (i.e. pregnancy, on-the-job injury, etc.). If the leave of absence can be accomplished within the employee's allotted vacation and personal/sick days – as Ms. Obregon was able to accomplish with both her pregnancies – the employee can take the leave and is not subject to being administratively terminated. It is only when the leave exceeds the employee's allotted vacation and personal/sick days that the employer's legitimate business needs with respect to the efficient operation of its business with a full compliment of employees require that it administratively terminate an employee who will be absent for an excessive period of time. As discussed above, the plaintiff had already significantly exceeded her personal/sick days when she took short-term disability in 2002. In addition, the plaintiff's doctor estimated that her leave of absence would exceed more than two and one-half months. Accordingly, UtiliQuest had a legitimate, non-discriminatory reason to administratively terminate the plaintiff's employment, and the plaintiff's sex and national origin claims should be dismissed as a matter of law.

3.   Plaintiff Cannot Support a Claim for Retaliation Because She did Not Engage in Any Protected Activity.

In order to establish a *prima facie* case of retaliation, the plaintiff must establish (among other things) that she engaged in "protected activity." *Graves v. Komet*, 982 S.W.2d 551, 554-555 (Tex. App.-San Antonio 1998, no writ). A person engages in protected activity if they: (1) oppose a discriminatory practice; (2) make or file a charge; (3) file a complaint or (4) testify,

- 16 -

assist or participate in any manner in an investigation.  TEX. LAB. CODE ANN. § 21.055 (Vernon Supp. 2000).

It is undisputed that the plaintiff made no complaints, internal or otherwise, about being discriminated against on the basis of her pregnancy until she filed her Charge of Discrimination after she was terminated.  Specifically, the plaintiff testified that she did not avail herself of the internal complaint procedure outlined in the anti-harassment and non-discrimination policy, and made no complaints to Ms. Obregon or anyone else at UtiliQuest about her belief that she was being discriminated against based on her pregnancy (or any other reason). (*See* Exhibit 1, pp. 67 (lines 2-25), 68 (lines 1-17), 78 (lines 11-20).)  Because she never reported the alleged discrimination, the plaintiff cannot establish a prima facie case of retaliation and her claim fails. *Cox & Smith, Inc. v. Cook,* 974 S.W.2d 217, 223 (Tex. App.—San Antonio 1998, pet. denied)

4.    Plaintiff's IIED Claim Fails as a Matter of Law.

  A.    Plaintiff's Complaints With Regard to Her Employment Do Not Give Rise to a Claim of Intentional Infliction of Emotional Distress.

The sole basis of the plaintiff's claim for intentional infliction of emotional distress is that she was terminated after taking short-term disability leave in connection with her pregnancy in May 2002.  (Petition at ¶¶ 11 and 19; Exhibit 1, pp. 80 (lines 5 – 25) – 81 (lines 1-10).)  The plaintiff, however, was administratively terminated per company practice when she took short-term disability leave, without any available vacation or personal/sick days and when she was not otherwise eligible for leave under the FMLA. (*See* (First) Obregon Declaration at ¶¶ 3-6, attached hereto as Exhibit 19; Exhibit 6.)

In order to prevail on a claim of intentional infliction of emotional distress, the plaintiff must prove, among other things, that UtiliQuest engaged in extreme and outrageous conduct. *Twyman v. Twyman*, 855 S.W.2d 619, 621-22 (Tex. 1993).  Texas courts have found liability for

- 17 -

"extreme and outrageous" behavior only where the "conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Horton v. Montgomery Ward & Co.*, 827 S.W.2d 361, 369 (Tex. App.—San Antonio 1992, writ denied).

The plaintiff's claims here fail because mere employment disputes will not support a claim for intentional infliction. *Miller v. Galveston/Houston Diocese*, 911 S.W.2d 897, 899 (Tex. App.—Amarillo 1995, no writ); *see also Prunty v. Arkansas Freightways, Inc.*, 16 F.3d 649, 654 (5th Cir. 1994). Here, the plaintiff's intentional infliction claim is clearly based only upon her belief that she was not treated fairly by UtiliQuest. Moreover, termination in and of itself does not constitute outrageous conduct as a matter of law. *Farrington*, 865 S.W.2d at 254; *Johnson v. Merrell Dow Pharmaceuticals, Inc.*, 965 F.2d 31, 34 (5th Cir. 1992) (an employer is not liable for exercising its legal right to terminate an employee, even if the employer recognizes that the employee will suffer emotional distress as a result of the termination).

B.    There is No Evidence of Extreme and Outrageous Conduct.

Finally, even if the plaintiff's allegations that she was terminated based upon her national origin, sex or pregnancy are true (which they are not), it is well-settled that wrongful termination in violation of anti-discrimination statutes, in the absence of extreme and outrageous conduct, does not give rise to an intentional infliction claim. *Ugalde v. W. A. McKenzie Asphalt Co.*, 990 F.2d 239, 243 (5th Cir. 1993). Here, there is no such evidence, because none exists, of any outrageous behavior by UtiliQuest.[14]    Accordingly, the plaintiff's allegations of intentional

---

[14] Ms. Obregon, for example, testifies that, far from engaging in any outrageous behavior with respect to the plaintiff's termination, she made inquiry to the company's human resources department regarding whether the plaintiff would be eligible for short-term disability benefits despite her failure to enroll in the company's health and long-term disability benefit program. (*See* Exhibit 19at ¶ 3.) Further, upon the plaintiff's administrative termination in May 2002, Obregon ensured that the plaintiff would be "eligible for re-hire" upon her reapplication for employment, and then encouraged the plaintiff to return in December to fill a vacancy, an invitation that the plaintiff

- 18 -

infliction of emotional distress do not rise to the level required to sustain a claim of intentional infliction of emotional distress as a matter of law, and the plaintiff's claim against UtiliQuest should be dismissed.

## VI.
## CONCLUSION

UtiliQuest, L.L.C. respectfully requests that the plaintiff Linda Prather's claims be dismissed with prejudice, that judgment be entered in favor of the defendant, and that the defendant be awarded its costs and all other and further relief to which it is justly entitled.

DATED: March 4, 2004.

Respectfully submitted,

JBS

Kerry E. Notestine
State Bar No. 15116950
Fed. I.D. No. 2423
1301 McKinney, Suite 1900
Houston, Texas 77010
(713) 951-9400 (Telephone)
(713) 951-9212 (Telecopier)

Of Counsel:
LITTLER MENDELSON, P.C.
   and
J. BRADLEY SPALDING
1301 McKinney Street, Suite 1900
Houston, Texas 77010
Tel: 713.951.9400
Fax: 713.951.9212

Attorney-in-Charge for Defendants
UtiliQuest, LLC
Sue Obregon
Melanie McGinness

---

declined. (*See* Exhibit 19 at ¶¶ 4, 5).  Similarly, Ms. McGinness, based in Atlanta, testified that her only role in the termination was to confirm that the plaintiff was not eligible for FMLA leave, and to provide the plaintiff with notice of her rights and obligations under the company's short-term leave policy. (*See* Exhibit 6 at ¶¶ 3-5).  None of the defendants behaved outrageously with respect to the plaintiff's termination—indeed, their only role was to do their jobs by applying the company's short-term disability policy and by keeping the plaintiff informed regarding the effects of that policy.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been forwarded to counsel of record by postage-prepaid, certified mail, return receipt requested, on this the _4th_ day of March 2004, addressed as follows:

Ruben R. Pena
222 W. Harrison
Harlingen, Texas 78550

ATTORNEY FOR PLAINTIFF
LINDA MARIE PRATHER

_____
J. Bradley Spalding

Houston:169891.2 035266.1021

# TABLE OF AUTHORITIES

PAGE

## CASES

*Celotex Corp. v. Catrett,*
  106 S. Ct. 2548, 2552 (1986)................................................................ 2

*City of Austin v. Gifford,*
  824 S.W.2d 735, 739 (Tex. App.—Austin, 1992, no writ)......................... 12

*Cox & Smith, Inc. v. Cook,*
  974 S.W.2d 217, 223 (Tex. App.—San Antonio 1998, pet. denied) ......... 17

*Davis v. Education Service Center,*
  62 S.W.3d 890, 894-895 (Tex. App.-Texarkana 2001, no pet.) ................ 11

*Farrington v. Sysco Food Servs., Inc.,*
  865 S.W.2d 247, 251 (Tex. App.—Houston [1st Dist.] 1993, writ denied) ........ 13, 18

*Graves v. Komet,*
  982 S.W.2d 551, 554-555 (Tex. App.-San Antonio 1998, no writ)........... 16

*Horton v. Montgomery Ward & Co.,*
  827 S.W.2d 361, 369 (Tex. App.—San Antonio 1992, writ denied)......... 18

*Johnson v. Merrell Dow Pharmaceuticals, Inc.,*
  965 F.2d 31, 34 (5th Cir. 1992) ............................................................ 18

*McDonnell Douglas Corp. v. Green,*
  93 S. Ct. 1817, 1825-26 (1973)............................................................ 12

*Miller v. Galveston/Houston Diocese,*
  911 S.W.2d 897, 899 (Tex. App.—Amarillo 1995, no writ)..................... 18

*Prunty v. Arkansas Freightways, Inc.,*
  16 F.3d 649, 654 (5th Cir. 1994) .......................................................... 18

*Quantum Chemical Corp. v. Toennies,*
  47 S.W.3d 473, 480 (Tex. 2000)........................................................... 12

*Reeves v. Sanderson Plumbing Products, Inc.,*
  120 S. Ct. 2097, 2109 (2000)........................................................... 12, 13

*Rubinstein v. Administrators of Tulane Educ. Fund,*
  218 F.3d 392, 400 (5th Cir. 2000), *cert. denied,* 532 U.S. 937 (2001)..................... 13

*Schroeder v. Texas Iron Works, Inc.,*
  813 S.W.2d 483, 485 (Tex. 1991).......................................................... 11

*St. Mary's Honor Center v. Hicks,*
  113 S. Ct. 2742, 2747-48 (1993)........................................................... 12

*Stout v. Baxter Healthcare Corp.,*
  282 F.3d 856, 861 (5th Cir. 2002) ........................................................ 14

*Texas Dep't of Community Affairs v. Burdine,*
  101 S. Ct. 1089, 1095 (1981)................................................................ 15

1       A.    They terminated me.

2       Q.    Any other ways other than just the fact that you were

3    terminated that you believe that you were discriminated

4    against?

5       A.    No.

6       Q.    So is it fair to characterize the basis of your

7    discrimination lawsuit, then, as your termination?

8       A.    Administrative termination.

9       Q.    Any other ways other than your termination that you

10   believe any of the defendants discriminated against you?

11      A.    No.

12      Q.    Now, as we mentioned at the beginning of the

13   deposition, you've also alleged in your lawsuit that you were

14   discriminated against by the defendants because of your

15   national origin, correct?

16      A.    Yes.

17      Q.    You're making that allegation, correct?

18      A.    Yes.

19      Q.    And we've established in the deposition that your

20   national origin is American, correct?

21      A.    Uh-huh.

22      Q.    In what way did any of the defendants discriminate

23   against you because you are an American?

24      A.    I believe that an American is -- they're entitled to

25   have a baby and guaranteed their job back, as an American.

1   herself, correct?

2       A.   Yes.

3       Q.   Did you and Ms. Obregon ever talk about pregnancy and

4   what it was like and any advice Ms. Obregon may have had for

5   you?

6       A.   Yes, we did.

7       Q.   Was she helpful?

8       A.   Yes.

9            MR. SPALDING:   Mark that as Exhibit No. 2,

10  please.

11           (Deposition Exhibit No. 2 was marked for

12  identification.)

13      Q.   (By Mr. Spalding)  Mrs. Prather, I've handed you a

14  document that's marked as Deposition Exhibit 2, and I just want

15  to go over this with you briefly, because it's part of your

16  personnel record.  Do you recognize this document?

17      A.   No.

18      Q.   Do you recall in May of 2001, before you became

19  pregnant, being counseled by either Ms. Obregon or Mr. Castillo

20  about absences?

21      A.   Yes.

22      Q.   Okay.  And was it your understanding that Ms. Obregon

23  felt that you had been late or absent an unacceptable number of

24  days for somebody in their first three months of work?

25      A.   Yes.

DEPOSITION OF LINDA PRATHER                                    2/12/2004

21

1    Q.   And did you at that time disagree with Ms. Obregon's

2  analysis of your absenteeism?

3    A.   No.

4           MR. PENA:  What do you mean by analysis?

5           MR. SPALDING:  That she had been late or absent

6  an unacceptable number of times.

7    Q.   (By Mr. Spalding)  And you didn't object or feel like

8  you were wrongfully counseled by Ms. Obregon at that time, did

9  you?

10   A.   Huh-uh.

11   Q.   And you were not pregnant at this time either, were

12  you?

13   A.   No.

14   Q.   And the dates on that document that refer to you being

15  late or absent occur in March, April, and May of 2001, correct?

16   A.   Yes.

17           (Deposition Exhibit No. 3 was marked for

18  identification.)

19   Q.   (By Mr. Spalding)  Mrs. Prather, I'll hand you what's

20  been marked as Deposition Exhibit No. 3.  Do you recognize this

21  document, Mrs. Prather?

22   A.   No.

23   Q.   I'm sorry?

24   A.   No.

25   Q.   Okay.  This is an employee consultation report dated

DEPOSITION OF LINDA PRATHER                                    2/12/2004

24

```
 1        Q.    But you had your son on June 17th?

 2        A.    Yes.

 3        Q.    And was it a regular nine-month pregnancy, or did he

 4   come late, or early?

 5        A.    Early.

 6        Q.    Early?

 7        A.    Uh-huh.

 8        Q.    How early?

 9        A.    About a week-and-a-half.

10        Q.    So it was about almost nine months, correct?

11        A.    Yes.

12        Q.    So we can estimate that you became pregnant in

13   September or so?

14        A.    Yes.

15        Q.    Of 2001?

16        A.    Yes.

17        Q.    But you didn't learn about it until early November of

18   2001?

19        A.    Yes.

20        Q.    After you learned that you were pregnant, did you

21   inform the other people in the office at UtiliQuest that you

22   had become pregnant?

23        A.    Yes.

24        Q.    How did you tell them?

25        A.    I had told Sue that something was wrong and I had to
```

1  go see a doctor.  I went to go see the doctor and he told me

2  that I was pregnant.  When I got out of the doctor's office, I

3  went to the office and I let Sue know, and that's when I also

4  let her know that I was going to be taking a week off from

5  work.

6      Q.    What was Sue's reaction when you told her that you

7  were pregnant?

8      A.    She was happy.

9      Q.    And did you tell the other women and men in the office

10  there, as well?

11      A.    The girls there in the office were there when I told

12  Sue.

13      Q.    All right.  And did they seem happy for you?

14      A.    Yes.

15      Q.    After that initial point when you first learned that

16  you were pregnant and told Sue, I think that you testified

17  earlier that, occasionally, you and Ms. Obregon would have

18  conversations about your pregnancy, correct?

19      A.    Yes.

20      Q.    She would occasionally give you advice, correct?

21      A.    Yes.

22      Q.    And you would occasionally ask her questions?

23      A.    Yes.

24      Q.    At the time that you learned that you were pregnant,

25  what was your understanding at that time of what UtiliQuest's

1      A.    Yes.

2      Q.    Let me hand you Exhibit No. 2 that was marked in her

3   deposition.  And these are a series of e-mails that were sent

4   between Ms. Obregon and Ms. McGinness.  Where did you get this

5   document?

6      A.    Sue gave it to me.

7      Q.    Sue gave it to you?

8      A.    Yes.

9      Q.    When did she give it to you?

10     A.    I don't remember.

11     Q.    Is it your understanding that she gave it to you as a

12  way of explaining what the leave policy was?

13     A.    Yes.

14     Q.    And you don't recall exactly when that was?

15     A.    No, I don't recall exactly.

16     Q.    Looking at the dates on those e-mails, it looks like

17  they took place in January of 2002.

18     A.    Uh-huh.

19     Q.    So, clearly, they would have had to have been done --

20  this page would have had to have been given to you after that

21  date, correct?

22     A.    Yes.

23     Q.    Okay.  Can I have that back, please.

24     A.    (Hands document to counsel.)

25     Q.    So when Ms. Obregon gave you a copy of this e-mail

1    A.    No, it doesn't.

2    Q.    But you do recall having a conversation about that

3 with Sue?

4    A.    Yes, I do.

5    Q.    And this was before you reached the point where you

6 had to go on bedrest right before your pregnancy, correct?

7    A.    Yes.

8    Q.    And it was -- we can assume that it was after the

9 January time frame when Ms. Obregon gave you this e-mail from

10 Melanie McGinness?

11    A.    Yes.

12    Q.    So we can assume that it was sometime between January

13 2002 and May 2002 when you had this conversation about the

14 benefits with Ms. Obregon, correct?

15    A.    Yes.

16    Q.    Would you agree that that conversation was also likely

17 to have taken place sometime between January and this March

18 12th, 2002 memo that Ms. McGinness sent you?

19    A.    Yes.

20    Q.    Now, when you had this conversation, whenever it was,

21 with Ms. Obregon about the benefits that would be available to

22 you during your pregnancy, who initiated that conversation?

23 Was it Ms. Obregon, or was it you, or do you remember?

24    A.    To start the conversation?

25    Q.    Yes.

DEPOSITION OF LINDA PRATHER                                    2/12/2004

32

```
 1      A.    She did.

 2      Q.    Did she call you into her office?

 3      A.    Yes, she did.

 4      Q.    And you were sitting out at the dispatcher's desk at

 5  the time?

 6      A.    I don't remember where I was.

 7      Q.    But she did call you into the office?

 8      A.    Yes, she did.

 9      Q.    What do you recall Ms. Obregon saying to you in that

10  meeting to start with?

11      A.    To start with?  I don't remember.

12      Q.    Do you recall Ms. Obregon mentioning she was concerned

13  that you had not elected any medical benefits through

14  UtiliQuest's HMO program?

15      A.    Yes.

16      Q.    Okay.  And, in fact, that's true that you had not

17  elected any benefits; is that right?

18      A.    When I first was hired, yes.  That's true.

19      Q.    Now, you didn't elect any benefits through the health

20  plan with UtiliQuest at any point in your employment with

21  UtiliQuest, did you?

22      A.    I asked, but after I was pregnant.

23      Q.    After you were pregnant?

24      A.    Uh-huh.

25      Q.    This was after you had been administratively
```

1    terminated, then?

2        A.    No.  Before.

3        Q.    And in that meeting, did Ms. Obregon tell you that

4    even though you had not elected any medical benefits, that she

5    believed that you might still be eligible for short-term

6    disability benefits?

7        A.    Yes.

8        Q.    Were you appreciative that she pointed that out to

9    you?

10       A.    Yes.

11       Q.    What were you going to do or how were you paying for

12   your pregnancy, since you didn't have medical benefits through

13   the company?

14       A.    I was on Medicaid.

15       Q.    And at that time, you were engaged to your current

16   husband, or had you-all already gotten married at that point?

17       A.    No.  We were living together.

18       Q.    And where was he employed at that time?

19       A.    At the INS Detention Center.

20       Q.    And the benefits that he may have had, medical

21   benefits from his employer, were not applicable to you?

22       A.    No.

23       Q.    So Medicaid was your sole source of money to pay for

24   your pregnancy at that time?

25       A.    Yes.

1  that law, the company did not qualify, the Harlingen office did

2  not qualify, was not covered by that law because of the number

3  of employees in the office, correct?

4      A.   Yes.

5      Q.   And then the memo closes by telling you that since

6  you're not eligible for FMLA, that the company practice is that

7  you would be administratively terminated if you were to take --

8  if you were to take a leave of absence, correct?

9      A.   Yes.

10      Q.   And you understood that?

11      A.   Yes.

12      Q.   And was this information that you were getting for the

13  very first time, or did you understand this to be the case

14  based on your earlier conversations with Ms. Obregon?

15      A.   It was earlier when I was talking to Ms. Obregon about

16  this FMLA.

17      Q.   So, really, this memo served as confirmation to you

18  that you were not covered by FMLA and that you would be

19  administratively terminated in the event you were to take a

20  leave of absence?

21      A.   Yes.

22      Q.   The only new information that you were getting here

23  for the first time is that you would, in fact, be eligible for

24  short-term disability benefits, correct?

25      A.   I'm sorry?

DEPOSITION OF LINDA PRATHER                                   2/12/2004

38

1     Q.   The only new information that you were getting in this
2  memo was that you would definitely be eligible for short-term
3  disability benefits, correct?  That was information that you
4  were getting for the first time; is that right?
5     A.   On the short-term disability?
6     Q.   Yes.
7     A.   No.
8     Q.   You knew that beforehand, as well?
9     A.   Sue had let me know about the short-term disability.
10    Q.   So, essentially, then, most, if not all, of the
11 information in this memo are things that you already knew?
12 This was just being confirmed for you, right?
13    A.   Yes.  With the application that I was supposed to send
14 to Melanie.
15    Q.   You testified earlier that at some point after you
16 received this memo, you had a conversation with Ms. McGinness;
17 is that right?
18    A.   Before this memo?
19    Q.   No, after you received the memo?
20    A.   After, yes.
21    Q.   I take it that was a telephone conversation?
22    A.   Yes.
23    Q.   How long after you received this memo did you have
24 that telephone conversation?  Do you remember?
25    A.   It was shortly after.  Because I had a question on the

1    Q.    And in March of 2002, you were not having any

2  particular complications with your pregnancy, correct?

3    A.    As in with the baby?

4    Q.    Right.

5    A.    No.

6    Q.    Okay.

7          (Deposition Exhibit No. 6 was marked for

8  identification.)

9    Q.    (By Mr. Spalding)  Mrs. Prather, I've handed you

10  Exhibit 6.  These are some additional notices from Dr.

11  Benavides.  There's one date that you missed work dated April

12  9th, 2002, correct?  That's the first page, right?

13    A.    Yes.

14    Q.    The second page is a doctor's notice that states that

15  you would be restricted to bedrest from April 23rd through May

16  1st, 2002.  Do you recall that week, when you were restricted

17  to bedrest?

18    A.    Yes, I do.

19    Q.    Now, was that particular bedrest and that particular

20  week off due to pregnancy-related issues, or were you having

21  other health problems that you were talking to Dr. Benavides

22  about?

23    A.    Health problems.

24    Q.    What kind?

25    A.    I was very sick that week.  I had the flu, headaches,

1  everything.

2     Q.    And he just recommended that you take a week off work?

3     A.    Yes.

4     Q.    And you brought in these notices to Ms. Obregon?

5     A.    Yes.

6     Q.    And you told her what they were for?

7     A.    Yes.

8           (Deposition Exhibit No. 7 was marked for

9  identification.)

10    Q.    (By Mr. Spalding)  Mrs. Prather, I've handed you

11 what's been marked as Deposition Exhibit No. 7.  And this is an

12 employee consultation report dated May -- it's kind of hard to

13 read the date -- I believe it's May 2nd, 2002.  Is that your

14 understanding of what the date was?

15    A.    Yes.

16    Q.    Would you agree that on the third line, it says, "Date

17 of Incident, March 23rd, 2002 through May 1st, 2002"?

18    A.    Yes.

19    Q.    And that's your signature on the bottom of this page,

20 correct?

21    A.    Yes.

22    Q.    Do you recall having this conference with Ms. Obregon?

23    A.    Yes, I do.

24    Q.    And was Tony Castillo sitting on this meeting, as

25 well?

1   the page are typewritten notes by Ms. Obregon and on the bottom

2   of the page are handwritten notes that Ms. Obregon prepared.

3   The handwritten notes at the bottom read, "Per Linda, she

4   understands how important it is to make sure she is here when

5   she is scheduled to work.  Claims she has no complications with

6   her pregnancy, but that her doctor is going to give her bedrest

7   one month from now when she is 35 weeks."  Do you recall having

8   that conversation with Ms. Obregon -- or rather, do those notes

9   refresh your recollection as to what was said in that meeting?

10      A.   If I remember the conversation?  No, I don't.

11      Q.   Do you believe Ms. Obregon treated you unfairly when

12  she consulted with you on this day?

13      A.   No.

14      Q.   And you don't believe that this write-up was in -- was

15  motivated by Ms. Obregon discriminating against you because of

16  your gender or your pregnancy or your national origin, do you?

17      A.   Can you repeat the question.

18      Q.   You don't believe that Ms. Obregon having this

19  counseling session with you was motivated by her discriminating

20  against you because of your gender or your pregnancy or your

21  national origin, do you?

22      A.   No.

23      Q.   Now, it looks like this consultation report occurred

24  on May 2nd, 2002.  Do you have any reason to disagree that

25  that's the date that this happened?

```
 1      A.    No.
 2      Q.    Okay.  Now, it looks like you actually took your
 3   bedrest from Dr. Benavides a couple of weeks later, May 15th;
 4   is that correct?
 5      A.    Yes.
 6      Q.    Now, when Dr. Benavides gave you a -- prescribed
 7   bedrest for you on May 15th, was that a date that you requested
 8   that he put you on bedrest, or was it his idea to put you on
 9   bedrest beginning on May 15th?  Do you recall how that meeting
10   with Dr. Benavides went?
11      A.    No, I don't recall.
12      Q.    All right.  When you went to see Dr. Benavides over
13   the course of your pregnancy, did you typically ask him if you
14   could get a doctor's slip to be off work for a day or two days
15   whenever you were off, or was it always the doctor's idea for
16   you to stay home?
17      A.    It was always the doctor's idea.
18      Q.    Okay.  Now, beginning on May 15th -- and you had your
19   baby on June 17th, correct?
20      A.    Yes.
21      Q.    From May 15th to June 17th, were you actually, most of
22   the time, confined to bed during that month period of time, or
23   were you able to perform at least some normal daily activities
24   during that month?
25      A.    I was mainly at home.  I would go to the grocery store
```

1  be able to return to work full time on August 7th, 2002,

2  correct?

3       A.   Yes.

4       Q.   And that's what Dr. Benavides told you, correct?

5       A.   Yes.

6       Q.   And when you handed the form to Ms. Obregon, did she

7  -- did you talk about your expected return date at that point?

8       A.   No.

9       Q.   Other than just handing her the form with this date on

10 it, you didn't say, "Well, I expect to be back on August 7th"?

11      A.   I was administratively terminated.  I didn't think

12 that I could come back.

13      Q.   You didn't think that you would be eligible to come

14 back at all?

15      A.   Well, I knew that I had to re-apply and that I would

16 -- if a position was open, that I would be able to -- if they

17 wanted to hire me back.

18      Q.   So you knew that you would have the opportunity to

19 return once you were eligible to come back off bedrest,

20 correct?

21      A.   Uh-huh.  Yes.

22      Q.   You would have the opportunity to apply, and if a

23 position was open, that you would be eligible for re-hire?  You

24 understood that, correct?

25      A.   Yes.

1    A.    No.

2    Q.    They did not?

3    A.    No.

4    Q.    Did Ms. Obregon or Ms. McGinness ever tell you or

5    discourage you from coming back, that it wouldn't be worth your

6    time to come back once you had had your baby?

7    A.    Did they discourage me?  No, they didn't.

8    Q.    And they told you that you would be eligible for

9    re-hire once you were able to come back medically, correct?

10   A.    Yes.  If the position was open.

11   Q.    If the position was open.  Correct.  Mrs. Prather, I'm

12   going to hand you a document.  I don't have an extra copy, so I

13   can't give you a copy.  This is a disability claim form that's

14   Bates stamped UtiliQuest 0047.  And this is the same form that

15   you gave to Dr. Benavides originally, correct?

16   A.    Yes.

17   Q.    And I think, if you refer back to whichever exhibit it

18   is there in front of you that I first marked, Exhibit No. 8,

19   this form differs from Exhibit No. 8 in that it looks like Dr.

20   Benavides has gone back and added "bedrest" under

21   "restrictions," correct?

22   A.    Yes.

23   Q.    And he's also added some information related to your

24   symptoms?

25   A.    Yes.

1    A.    Yes.

2    Q.    And you recall there was an anti-harassment and

3 discrimination policy in that handbook, don't you?

4    A.    Do I recall that?  No.

5    Q.    You don't recall it?

6    A.    No.  It was a long time ago.

7    Q.    But you did receive a copy of the handbook, right?

8    A.    Yes, I did.

9    Q.    If you look on Page 2 of Exhibit 10, it references a

10 complaint procedure when you feel like you've experienced

11 harassment or discrimination based upon sex or any other

12 factor, correct?

13    A.    Yes.

14    Q.    And it sets forth a procedure whereby if you feel like

15 you've been discriminated against, you should basically report

16 it to somebody within the company, correct?

17    A.    Yes.

18    Q.    Whether it be the Human Resources Department, a

19 supervisor, or somebody else, correct?

20    A.    Yes.

21    Q.    And on the front page, under "Equal Employment

22 Opportunity Statement," it states that the company believes

23 that employment should be handled without respect to race,

24 religion, sex, color, national origin, age, disability, and

25 other protected classes, correct?

1      A.    Yes.

2      Q.    And when you met with Ms. Obregon in September, having

3  already decided that you believed the company had discriminated

4  against you, you didn't mention anything to her about how you

5  believed that you were being discriminated against, did you?

6      A.    No.

7      Q.    And you didn't follow the complaint procedure outlined

8  in this handbook, did you?

9      A.    No.

10     Q.    So until you filed your charge of discrimination with

11  the EEOC, you never gave anyone at UtiliQuest the opportunity

12  to remedy what you felt like was discrimination against you,

13  did you?

14     A.    No.

15     Q.    Because you never brought it to their attention, did

16  you?

17     A.    No.

18     Q.    When Ms. Obregon told you in September that she

19  recommended that you come back in a couple of months, did you

20  have any reason to doubt that she was being sincere, that she

21  would offer you a position if one came open in a couple of

22  months?

23     A.    I'm not really sure.

24     Q.    Do you believe that Ms. Obregon is an honest person?

25     A.    Yes, I do.

DEPOSITION OF LINDA PRATHER                                          2/12/2004

78

1      A.    Yes, I do.

2      Q.    And in what way did they get back at you that you

3 believe is illegal?

4      A.    They fired me.

5      Q.    And what is it about your termination that you believe

6 constitutes retaliation?

7      A.    Repeat it.

8      Q.    In your lawsuit here, you allege that you were

9 retaliated against because you were pregnant.

10     A.    Uh-huh.

11     Q.    Is it your allegation here that you believe Ms.

12 McGinness, Ms. Obregon, and the company fired you because you

13 were pregnant and that that constitutes retaliation?

14     A.    Yes.

15     Q.    Okay.  And we've established in this deposition that

16 at no point during your employment or at any time leading up to

17 the date that you filed your charge of discrimination did you

18 actually complain to anybody at the company about

19 discrimination, correct?

20     A.    That's correct.

21     Q.    Also in your lawsuit, Mrs. Prather, you have alleged

22 that the company was negligent and that they were negligent in

23 supervising -- Ms. McGinness and Ms. Obregon -- that they were

24 negligent in --

25            MR. PENA:  Brad, let me go ahead and stop you

1  there.  Let me put on the record, I think the Texas Supreme

2  Court has addressed the negligence issues in investigation or

3  supervision, and we are going to amend our petition and delete

4  the negligence claims.

5           MR. SPALDING:  Great.  Thank you.

6      Q.   (By Mr. Spalding)  The final claim that you've made in

7  this lawsuit, Mrs. Prather, is you are claiming that the

8  defendants intentionally inflicted emotional distress upon you.

9  Let's take Ms. Obregon first.  How is it that you claim that --

10  well, I'll withdraw that.  What did Ms. Obregon do to

11  intentionally inflict emotional distress upon you?  What act

12  did she take that inflicted emotional distress upon you?

13      A.   She didn't do anything or say anything.

14      Q.   I'm sorry?

15      A.   She didn't do anything.

16      Q.   Meaning she did not inflict emotional distress upon

17  you, or her actions in not rehiring you constitutes intentional

18  infliction of emotional distress?

19      A.   By not rehiring me.

20      Q.   You believe that that act constitutes intentional

21  infliction of emotional distress?

22      A.   Yes.

23      Q.   That Ms. Obregon intended to cause you emotional

24  anguish because of that?

25      A.   Essentially, no, I don't think so.

80

1      Q.    Is there any act that you believe Ms. Obregon took

2  which was done intentionally to inflict emotional distress upon

3  you?

4      A.    No.

5      Q.    Let's go to Ms. McGinness.  Is there any act that you

6  allege Ms. McGinness took with respect to your employment that

7  was done to intentionally inflict emotional distress upon you?

8      A.    She terminated me.

9      Q.    So you're maintaining the claim against Ms. McGinness,

10  but not against Ms. Obregon?

11     A.    Well, actually, both of them, because all three of

12  them, they all fired me.  I was terminated.  I didn't have a

13  job anymore.

14     Q.    When you say, "all three of them," are you referring

15  to the company, as well?

16     A.    Yes.

17     Q.    Is there anything that anyone at the company other

18  than Ms. Obregon or Ms. McGinness did, any act other than the

19  two of them took, to inflict emotional distress upon you?

20     A.    What do you mean?

21     Q.    You are alleging that the fact that you were

22  terminated constitutes intentional infliction of emotional

23  distress upon you by Ms. Obregon and Ms. McGinness, if I

24  understand your testimony correctly.

25     A.    Yes.

DEPOSITION OF LINDA PRATHER                                    2/12/2004

1    Q.    Is there anyone else at the company whom you believe

2  intentionally inflicted emotional distress upon you?

3    A.    Well, the manager.  He fired me also.

4    Q.    Tony Castillo?

5    A.    Yes.

6    Q.    And when you say the manager fired you, you're

7  referring to your termination from the company, the

8  administrative termination that we've referred to earlier in

9  this deposition, correct?

10    A.    Yes.

11    Q.    When did you first learn that you were going to be

12  administratively terminated?

13    A.    When I first -- when I was given -- or when Sue talked

14  to me before Melanie had sent me the letter.

15    Q.    Either in that conversation or in any subsequent

16  conversation that you had with Sue, did she treat you poorly

17  when she discussed these things with you?

18    A.    No.

19    Q.    Did she yell at you?

20    A.    No.

21    Q.    Did she -- in the meetings where she discussed your

22  administrative termination and your short-term disability

23  benefits, were there any witnesses present during those

24  meetings?

25    A.    No.  There wouldn't -- I couldn't remember.

```
 1                    CORRECTIONS AND SIGNATURE

 2   PAGE/LINE        CORRECTIONS              REASON

 3

 4

 5

 6

 7

 8
     I, LINDA PRATHER, have read the foregoing deposition and hereby
 9   affix my signature that same is true and correct, except as
     noted above.
10

11                          LINDA PRATHER

12   THE STATE OF              )

13   COUNTY OF                 )

14      Before me,              , on this day personally appeared

15   LINDA PRATHER, known to me (or proved to me on the oath of

16              or through            ,) to be the person

17   whose name is subscribed to the foregoing instrument and

18   acknowledged to me that he/she executed the same for the

19   purposes and consideration therein expressed.

20      Given under my hand and seal of office this    day of

21         , A.D., 2004.

22

23                  NOTARY PUBLIC, STATE OF TEXAS

24

25
```

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                   BROWNSVILLE DIVISION

 3   LINDA MARIE PRATHER            )
                                    )
 4   VS.                           )C.A. NO. B-03-0136
                                    )
 5   UTILIQUEST, L.L.C., MELANIE    )
     McGINNESS AND SUE OBREGON      )
 6

 7                   REPORTER'S CERTIFICATE
               ORAL DEPOSITION OF LINDA PRATHER
 8                  TAKEN FEBRUARY 12, 2004

 9        I, Sindy Sanders, Certified Shorthand Reporter in and for
     the State of Texas, hereby certify to the following:
10
          That the witness, LINDA PRATHER, was duly sworn by the
11   officer and that the transcript of the oral deposition is a
     true record of the testimony given by the witness;
12
          That the deposition transcript was submitted on
13      02-18-04        , 2004, to the witness or to the attorney for
     the witness for examination, signature, and return to me by
14        03-11-04        , 2004;

15        That the amount of time used by each party at the
     deposition is as follows:
16
     Mr. J. Bradley Spalding            -- 1 Hour:59 Minutes
17
          That pursuant to information given to the deposition
18   officer at the time of taking the deposition, the following
     includes all parties of record:
19
      Mr. Ruben Pena, Attorney for the Plaintiff;
20
      Mr. J. Bradley Spalding, Attorney for Defendants.
21
          I further certify that I am neither counsel for, related
22   to, nor employed by any of the parties or attorneys in the
     action in which this proceeding was taken, and further that I
23   am not financially or otherwise interested in the outcome of
     the action;
24

25
```

DEPOSITION OF LINDA PRATHER                                    2/12/2004

90

1        Further certification requirements pursuant to FRCP will
be certified to after they have occurred.

2
        Certified to by me on this  17    day of

3        February         , 2004.

4

5

6        Sindy Sanders, Tx CSR #5974
         Expiration Date:  12/31/2004

7        CRCB No. _____
         U.S. LEGAL SUPPORT, INC.

8        500 N. Water Street
         Suite 500-S

9        Corpus Christi, Texas  78471
         (361) 883-1716

10       Facsimile (361) 888-6550

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              FURTHER CERTIFICATION UNDER FRCP

 2       The original deposition was/was not returned to the
     deposition officer on                        ;

 3
         If returned, the attached Changes and Signature page
 4   contains any changes and the reason therefor;

 5       If returned, the original deposition was delivered to J.
     Bradley Spalding, Custodial Attorney;

 6
         That $              is the deposition officer's
 7   charges to the Defendants for preparing the original deposition
     transcript and any copies of exhibits;

 8
         That the deposition was delivered in accordance with the
 9   Rules, and that a copy of this certificate was served on all
     parties shown herein and filed with the Clerk.

10
         Certified to by me on this        day of
11                  , 2004.

12

13
                     Sindy Sanders, Tx CSR #5974
14                   Expiration Date:  12/31/2004
                     CRCB No. _____
15                   U.S. LEGAL SUPPORT, INC.
                     500 N. Water Street
16                   Suite 500-S
                     Corpus Christi, Texas  78471
17                   (361) 883-1716
                     Facsimile (361) 888-6550
18

19

20

21

22

23

24

25
```

# UTILIQUEST

# EMPLOYEE HANDBOOK

**AUGUST 1, 1999**



*Obregon*
EXHIBIT NO. _____
Shelley Stingley

# EQUAL EMPLOYMENT OPPORTUNITY STATEMENT

UtiliQuest believes employment and advancement opportunities should be offered to the most qualified individual regardless of race, religion, sex, color, national origin, age, disability or veteran status. We believe equal employment opportunity is a fundamental principle of sound business management. It is our practice to provide fair and equitable treatment to all qualified applicants and employees.

## HARASSMENT STATEMENT

UtiliQuest is committed to maintaining a work environment free from harassment of any type. This policy prohibits any type of harassment by co-workers, supervisor/managers, vendors, clients, or company agents such as independent contractors or consultants.

Harassment refers to verbal or physical behavior which interferes with, disrupts or intimidates another employee, client employee or which creates an intimidating, offensive or hostile work environment. It includes unwelcome physical, visual, or verbal behavior directed against you because of your race, religion, sex, color, national origin, age, status as a disabled person or veteran which creates a hostile or offensive work environment.

With respect to sexual harassment, UtiliQuest specifically prohibits:

1.  Unwelcome sexual advances, requests for sexual favors, and all other verbal or physical conduct of a sexual or otherwise offensive nature, especially where:

o   Submission to such conduct is made either explicitly or implicitly a term or condition of employment;
o   Submission to or rejection of such conduct is used as the basis for decisions affecting an individual's employment; or
o   Such conduct has the purpose or effect of creating an intimidating, hostile or offensive working environment.

2.  Offensive comments, jokes, innuendoes, and other sexually-oriented statements.

Other examples of harassing conduct which are prohibited include but are not limited to:

o   Obscene language.
o   Verbal abuse which denigrates someone's race, religion, sex, color, national origin, age or disability.
o   Graphic or suggestive comments about an individual's clothing or body.
o   Degrading words to describe an individual.
o   The circulation or display of written materials, pictures or emails which are demeaning to an individual's race, religion, sex, color, national origin, age, veteran status or disability.
o   Electronic mail and voice mail are not to be used to create, access or distribute any offensive or disruptive messages including text, images or pictures which contain sexual innuendoes, racial, ethnic or religious slurs, gender-specific comments or any other statements that offensively address someone's race, religion, sex, color, national origin, age, veteran or disability status.

Members of management are responsible for creating and maintaining an atmosphere free of discrimination and harassment. You are responsible for respecting the rights of your co-workers.



EXHIBIT
10
L. PRATHER

UtiliQuest Employee Handbook

UTILIQUEST 0065

2

# UTILIQUEST

# EMPLOYEE HANDBOOK

**AUGUST 1, 1999**

_Obregon_
EXHIBIT NO. 1
Shelley Stingley

# EQUAL EMPLOYMENT OPPORTUNITY STATEMENT

UtiliQuest believes employment and advancement opportunities should be offered to the most qualified individual regardless of race, religion, sex, color, national origin, age, disability or veteran status. We believe equal employment opportunity is a fundamental principle of sound business management. It is our practice to provide fair and equitable treatment to all qualified applicants and employees.

# HARASSMENT STATEMENT

UtiliQuest is committed to maintaining a work environment free from harassment of any type. This policy prohibits any type of harassment by co-workers, supervisor/managers, vendors, clients, or company agents such as independent contractors or consultants.

Harassment refers to verbal or physical behavior which interferes with, disrupts or intimidates another employee, client employee or which creates an intimidating, offensive or hostile work environment. It includes unwelcome physical, visual, or verbal behavior directed against you because of your race, religion, sex, color, national origin, age, status as a disabled person or veteran which creates a hostile or offensive work environment.

With respect to sexual harassment, UtiliQuest specifically prohibits:

1.  Unwelcome sexual advances, requests for sexual favors, and all other verbal or physical conduct of a sexual or otherwise offensive nature, especially where:

*   Submission to such conduct is made either explicitly or implicitly a term or condition of employment;
*   Submission to or rejection of such conduct is used as the basis for decisions affecting an individual's employment; or
*   Such conduct has the purpose or effect of creating an intimidating, hostile or offensive working environment.

2.  Offensive comments, jokes, innuendoes, and other sexually-oriented statements.

Other examples of harassing conduct which are prohibited include but are not limited to:

*   Obscene language.
*   Verbal abuse which denigrates someone's race, religion, sex, color, national origin, age or disability.
*   Graphic or suggestive comments about an individual's clothing or body.
*   Degrading words to describe an individual.
*   The circulation or display of written materials, pictures or emails which are demeaning to an individual's race, religion, sex, color, national origin, age, veteran status or disability.
*   Electronic mail and voice mail are not to be used to create, access or distribute any offensive or disruptive messages including text, images or pictures which contain sexual innuendoes, racial, ethnic or religious slurs, gender-specific comments or any other statements that offensively address someone's race, religion, sex, color, national origin, age, veteran or disability status.

Members of management are responsible for creating and maintaining an atmosphere free of discrimination and harassment. You are responsible for respecting the rights of your co-workers.

## CONSENSUAL RELATIONSHIPS

Supervisors and/or supervisor/managers are prohibited from engaging in consensual romantic or sexual relationships with direct reports. At times, consensual romantic or sexual relationships between co-workers may occur. When such a relationship occurs between an employee and someone in a management position, it affects the Company's ability to enforce its sexual harassment policy. Therefore, if such relationships arise, they will be reviewed carefully by Company officials and appropriate action will be taken. Such action may involve a change in responsibilities of the individuals involved or a transfer of location within the Company, if available. Any supervisory employee involved in such a relationship is required to report the relationship to his or her supervisor/manager or Human Resources immediately. Failure to report such a relationship will be subject to disciplinary action, up to and including discharge.

## COMPLAINT PROCEDURE

If you experience any job-related harassment based on your sex or any other factor, your first step should be to talk with the person who is making you uncomfortable. It is best to try to handle the situation on a one-on-one basis, if possible. If it is not possible for you to talk with the person making you uncomfortable, promptly report the incident to your supervisor/manager **and** Human Resources who will investigate the matter and take appropriate action. If you believe it would be inappropriate to discuss the matter with your supervisor/manager, you may bypass your supervisor/manager and report it directly to Human Resources and any other member of management. Someone will be designated to undertake an investigation. To the extent possible, your complaint will be kept confidential.

**Any member of management who, either by report from an employee or by other means, becomes aware of conduct that may constitute harassment must immediately report such conduct to Human Resources.**

If the Company determines that you are guilty of harassing another employee, appropriate disciplinary action will be taken, up to and including termination of employment.

UtiliQuest prohibits any form of retaliation against an employee for filing a complaint under this policy or for assisting in the investigation of a complaint. However, if after investigating any complaint of harassment, the Company determines that the complaint is not bona fide or that you have provided false information regarding the complaint, disciplinary action may be taken against the individual who filed the complaint or who gave false information.

## SUBSTANCE ABUSE POLICY

It is UtiliQuest's intention to provide a drug-free, healthful, safe and secure workplace. You are expected and required to report to work in an appropriate mental and physical condition.

Specifically, the unlawful manufacture, distribution, dispensation, possession, or use of drugs or alcohol on UtiliQuest's premises, in Company vehicles or while conducting business off Company premises is prohibited. If you are taking prescription or non-prescription drugs that may cause adverse side effects in the performance of your job responsibilities, you are encouraged to report this use to your supervisor/manager. Violations of this policy will result in disciplinary action, up to and including termination. Alcohol served at Company functions on or off Company premises is exempted from this policy.

# UTILIQUEST

## ACKNOWLEDGMENT SHEET

I HEREBY ACKNOWLEDGE that I have received a copy of UtiliQuest's Employee Handbook dated August 1, 1999 and that it is my responsibility to read this document. I further understand that this Handbook supersedes and replaces all prior published or unpublished policies, handbooks or other publications or oral representations related to personnel matters.

I understand that neither the Handbook nor any provision of the Handbook constitutes an express or implied contract of employment or any other type of contract and that UtiliQuest reserves the right to change, revise, withdraw or deviate from the provisions of this Handbook without notice.


*Linda M. Prather*
Employee's Signature

*02/27/01*
Date

*Linda M. Prather*
Employee Name (Print)

EXHIBIT
11
L PRATHER

UtiliQuest 0007

Rev 6/99

# UTILIQUEST

# EMPLOYEE HANDBOOK

**AUGUST 1, 1999**

Obregon

EXHIBIT NO. 1

Shelley Stingley

VACATION ACCRUAL WHILE ON LEAVE OF ABSENCE (LOA)

You must work a full pay period in order to accrue any vacation. If you begin leave of absence and work less than a full pay period, you will not accrue vacation for that pay period or for the rest of the leave of absence period. When you return from leave of absence, you must work one full pay period to earn vacation.

VACATION PAY

Vacation will be paid at the regular base rate of pay at the time vacation is taken.

VACATION PAY AT TERMINATION

You will be paid for unused vacation which will be calculated by Payroll. Any vacation time carryover which has been grandfathered will be paid to the employee in the final paycheck.

## PERSONAL/SICK TIME

**HOURLY EMPLOYEES**

POLICY

Hourly employees are eligible for six (6) personal/sick days per calendar year. If you start after January 1st, the six days will be prorated. You will begin accruing personal/sick time on your date of employment at .23 days per pay period. You are not allowed to use any personal/sick time accrued during the Introductory period which is the first 90 days of employment.

ELIGIBILITY

Full-time nonexempt (eligible for overtime) employees are eligible for this benefit. Part-time employees and temporary individuals are not eligible for this benefit. Employees on leave of absence are not eligible for personal/sick time.

CARRYOVER

Unused personal/sick time will be paid out at the end of the calendar year.

SCHEDULING

Personal/sick time may not be taken during the Introductory period and it should be scheduled and approved, in advance (48 hours), with your supervisor/manager. In the case of illness, injury or an emergency situation, you should notify your supervisor/manager prior to the start of each work day. Failure to notify your supervisor/manager affects the planning and scheduling of work in your area.

PERSONAL TIME PAY AT TERMINATION

You will be paid for any unused personal/sick time earned but not used when you leave the Company. If you have used personal/sick time and not earned it, it will be deducted from your final pay check.

**SALARIED EMPLOYEES**

Full-time exempt (not eligible for overtime) employees are eligible for up to ten (10) paid sick days per calendar year. In the case of illness, injury or an emergency situation, you should notify your supervisor/manager prior to the start of each work day.

There is no carryover of this time from year to year and exempt employees will not be paid for this time if they leave the company. Salaried employees on leave of absence are not eligible for this benefit.

## LEAVE OF ABSENCE

A leave of absence may be authorized as paid or unpaid by UtiliQuest for personal or military reasons. In addition, you are eligible for disability or family leave under the Family Medical Leave Act of 1993. A leave of absence must be requested in writing and approved by your supervisor/manager and Human Resources. Following is a brief description of the four types of leave.

If you are eligible for a bonus check, you will be paid for appropriate earnings through the last full month worked prior to a leave of absence or termination or in accordance with the Company's written incentive plan. Employees on leave of absence status are not eligible for any bonus.

PERSONAL LEAVE OF ABSENCE

Personal leave is authorized due to special personal needs for other than illness or emergency in your immediate family and will be unpaid. Personal leave begins on the first day of absence and is normally granted for a maximum period of thirty (30) days. An extension may be granted based on the nature of the individual's situation. Personal leave will be granted at the discretion of management. Approval of a personal leave request will depend upon the circumstances of the request, length of employment, attendance, work performance and workload. If you are enrolled in the Group Insurance Plan, while on personal leave, you will be responsible for paying your own medical coverage, as well as that of dependents (if applicable). You must have completed one (1) year of employment to be eligible for this leave.

Full-time employees are eligible for this benefit. Part-time employees and temporary individuals are not eligible for this benefit.

MILITARY LEAVE OF ABSENCE

If you are inducted into or enlist in the Armed Forces of the United States, you may request an unpaid leave of absence. You will be eligible for re-employment according to federal law.

Full-time and part-time employees are eligible for this benefit. Temporary individuals are eligible for this benefit if they are directly on the Company's payroll.

PERSONAL DISABILITY - FAMILY MEDICAL LEAVE ACT

A personal disability leave is authorized for up to 12 weeks in situations where your own serious health condition prevents you from performing the essential functions of your job provided you meet the eligibility requirements. Examples of disability include maternity, heart attack, cancer, multiple sclerosis, etc. This leave will be unpaid unless you have elected short term disability coverage.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

LINDA MARIE PRATHER,              §
                                  §
        PLAINTIFF,                §
                                  §
v.                                §        C.A. No. B-03-0136
                                  §
UTILIQUEST, L.L.C., MELANIE       §
MCGINNESS AND SUE OBREGON,        §
                                  §
        DEFENDANTS.               §

<u>DECLARATION OF MELANIE MCGINNESS</u>

1.      "My name is Melanie McGinness. I am over the age of twenty-one years and am otherwise competent to testify to the facts set forth in this Declaration. All statements contained in this Declaration are true and correct and are based upon my personal knowledge.

2.      I have been employed with UtiliQuest, LLC (and, as it was previously known, Byers Engineering Company) since 1986, and currently work out of the Atlanta office. My current title is human resources/benefits coordinator, and I held that position at all times relevant to the facts giving rise to this litigation.

3.      As benefits coordinator, I am one of the individuals responsible for ensuring that UtiliQuest's employees are compensated and provided benefits in accordance with company policy and applicable state and federal laws. Pursuant to company policy, the administrators in each UtiliQuest office around the country are required to contact me in the event that a benefits issue arises with an employee. On or about March 12, 2002, I received a telephone call from Sue Obregon, the office administrator for UtiliQuest's Harlingen office. Ms. Obregon told me that Linda Prather, a dispatcher in her office, had informed her that she was pregnant and would eventually need to take time off work. Ms. Obregon informed me that Ms. Prather had not

elected health benefits or long-term disability benefits, and inquired as to whether she would still be eligible for short-term disability benefits. I confirmed to Ms. Obregon that Ms. Prather would be eligible for short-term disability benefits and informed her I would provide Ms. Prather with the necessary information.

4.     I first determined that, since the Harlingen office did not house at least 50 employees within a 75-mile radius, Ms. Prather was not eligible for leave under the Family and Medical Leave Act ("FMLA"). Since the FMLA did not apply, Ms. Prather would then be eligible for short-term disability benefits upon missing 10 consecutive business days of work. Those benefits are paid for 90 days. However, under the company's leave policy, any employee who takes short-term disability, but who is not otherwise qualified for leave under the FMLA, is administratively terminated effective on the last day worked. An employee who is administratively terminated under this scenario is then free to apply for re-hire in the event that they are released to return to work by their physician and the employee's former position has not been filled. I sent a memorandum to Ms. Prather on March 12, 2002, informing her of her FMLA rights, the circumstances under which she would qualify for short-term disability benefits, and the fact that she would be administratively terminated once she took disability leave, a true and correct copy of which is attached as Defendants' exhibit 3.

5.     Ms. Prather was, in fact, administratively terminated per company policy upon taking leave. Aside from my March 12, 2002 memorandum to Ms. Prather, I do not recall having any communications with her regarding her termination. I have never worked in the Harlingen office, have never met Ms. Prather personally, and do not recall ever speaking to her on the phone. Ms. Prather's pregnancy was irrelevant to her termination. The only reason for her termination was her status on short-term disability leave, and the fact that she did not

otherwise qualify for FMLA leave.  The company's leave policy is applied to all employees, regardless of the medical condition which requires them to take leave.  I did not intend to inflict emotional distress upon Ms. Prather.

6.    I declare under penalty of perjury that the foregoing is true and correct."

Executed on October ⌐ , 2003.


                              Melanie McGinness
                              Melanie McGinness



500 Northridge Road, Suite 300
Atlanta, GA 30350
Phone: (678) 461-3900
Fax: (678) 461-3902

# Memo

**To:**  Linda Prather

**From:**  Melanie McGinness — HR/Benefits Coordinator

**Cc:**  Tony Castillo

**Date:**  3/12/2002

**Re:**  Short Term Disability and Family Medical Leave Act

---

Linda this is in response to a phone conversation with Sue Obregon  UtiliQuest has a program to help you during this time.

Short Term Disability benefits are available to all full-time employees after they have missed ten consecutive business days of work and cover the employee for up to 90 days of disability.  The maximum benefit is $250 per week before taxes.  Attached please find a UNUM Claim for Disability Benefits Application for Short Term Disability. Please note that you need to sign the bottom of Page 3 and fill out Page 2 of the application.  Page 1 of the application needs to be filled out by your physician.  Print clearly and use black ink if possible.  Please return the form to me:  UtiliQuest, Attn: Melanie McGinness, 500 Northridge Road, Suite 300, Atlanta, GA 30350.

Also, attached is a standard notice regarding an employee's rights under the Family and Medical Leave Act of 1993.  In order to qualify for this benefit, an employee must work in an office that has 50 people within a 75 mile radius because of this you are not eligible for FMLA.

Unfortunately, we will not be able to hold your position open for the time that your are out on disability.  You will be administrative terminated as of your last day worked.  This will not affect your disability benefits.  If you desire to return to work at UtiliQuest and there is an open position, you are welcome to reapply.

If you have any questions regarding this Memorandum or the attachments, please do not hesitate to call me at 678-250-2651.

2001 Late/OFF   Linda Prather

3/13/01 2 hrs late
4/18/01 1 hr late
4/23/01 called in sick -off
 5/4/01 left 3 hrs early -sick
 5/7/01 called in sick -off
5/21/01 off -called in sick
5/22/01 went home sick 1/2 day

5/23/02 had consultation with her about all the days she had been off
         and had not gone past her 90 probation period.   Tony Castillo and
         Sue Obregon present.

 6/29/01 called in sick -off
  8/2/01 called in sick -off
 9/25/02 took day off
10/31/01 Dr appt 1/2 day off
11/1/01 sick -day off
11/2/01 sick day off
11/8/01 Dr appt 1/2 day off
11/9/01 sick
11/12/01 sick
11/13/01 sick
11/14/01 sick
11/15/01 sick
11/18/01 sick
11/28/01 sick
12/7/01 day off
12/13/01 left 2:30 sick
12/14/01 cme in late 9:30

SEE SHEET 2 FOR 2002

UTILIQUEST 0034

Linda Prather 2002    off/sick/late

1/3/02 WENT HOME SICK 9:30 A.M.
1/4/02 CALLED IN SICK
1/10/02 1/2 day off Dr.s apt
1/31/02 day off Drs appt.
2/14/02 came in late - Drs appt  ✓
2/22/02 day off
2/26/02 1/2 day off Dr.s apt  ✓
3/7/02 day off
3/21/02 day off      sick
3/22/02 1/2 day off sick
3/28/02 sick 1/2 day
3/29/02 sick all day off
4/2/02 came in late - Drs appt
4/9/02 not feeling well- sick day
4/17/02 Drs apt 1/2 day
4/23/02 went to dr 1/2 day
4/24/01 sick
4/25/02 sick
4/26/02 sick
4/29/02 sick
4/30/02 sick
5/1/02 sick

UTILIQUEST 0035

*Verl Discussion*
*Tony Castillo Present*

# UTILIQUEST

## EMPLOYEE CONSULTATION REPORT

Employee Name: Linda Prather          Date: 5/23/01

SSN: 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          Location: Harlingen

NATURE OF WARNING: (Check)     Date of Incident: 3/13, 4/16, 4/23, 5/4, 5/7, 5/21, 5/22

|   | | | | |   |
|---|---|---|---|---|---|
|   | Unreported Absence | X | Insubordination |   | Violations of Safety Rules |
| X | Tardiness |   | Violation of Company Policy |   | Violation of Damage Policy |
|   | Violation of Fleet Rules | X | Absence |   |   |

TYPE OF WARNING: (Check)

|   | | | | |   |
|---|---|---|---|---|---|
| X | Verbal Warning |   | Written Warning |   | Termination |

**Describe specifically what occurred, or describe the unacceptable performance:**

Employee has not completed 90 day probation and has been late + absent too many days

**Describe the appropriate action or desired performance:**

Needs to be a dependable Employee and come to work on time and not call in sick when its something she can control. — 3/13/01 late

**Has the employee received feedback concerning this issue before? If so, state date and type of feedback (i.e., verbal, written):**

No

4/18-1 late
4/23-1 -52
5/4-1-52
5/7-1 52
5/21-52
5/22-521

**Is follow-up necessary?** _____ Yes (what time period must employee correct this performance? _____
✓ No.

**Consequences of failure to improve the performance:**

written write up up to termination.

Receiving feedback on required job improvement or company policy violations is never easy. However the intent of this Consultation is to give you the information necessary to help you improve performance to a satisfactory level. Failure to improve performance to an acceptable level within a reasonable time or repeated violations of company policy may result in further disciplinary action, up to an including termination.

Employee Signature to verify discussion was held: _____

Supervisor Signature: _____

Manager Signature: _____

Employee, please write any comments on reverse side as needed

EXHIBIT 2
L. Prather

UTILIQUEST 0014

*8 days*

# HENRY BENAVIDES, M.D.
## Obstetrics and Gynecology
*Valley Professional Building*

2121 Pease St. Suite 2D
Harlingen, Texas 78550

Office: 428-6601
Answering: 399-1868

Name _Kenda Prather_ Date _11/8/01_

has been under my care from _11/8/01_ to

and is able to return to work/school on _11/16/01_

Nature of illness or injury_____

Restrictions_____ light work_____ other_____

Physical education_____may take_____limited_____

_____may not take_____

_____
Signature of Physician

EXHIBIT

_Prather_

UtiliQuest 0018

4 day

# HENRY BENAVIDES, M.D.
## Obstetrics and Gynecology
*Valley Professional Building*

2121 Pease St. Suite 3D
Harlingen, Texas 78550

Office: 428-6601
Answering: 399-1868

Name: Prather, Linda    Date: 11-15-01

has been under my care from 11-15-01 to 11-18-01

and is able to return to work/school on 11-19-01

Nature of illness or injury _____

Restrictions _Bedrest_

Light work _____ other _____

Physical education _____ may take _____ limited _____

_____ may not take _____

_____
Signature of Physician

UtiliQuest 0019

# HENRY BENAVIDES, M.D.
## Obstetrics and Gynecology
*Valley Professional Building*

2121 Pease St. Suite 3D
Harlingen, Texas 78550

Office: 428-6601
Answering: 399-1868

Name _Linda Prattler_ Date: _12/13/01_

has been under my care from _12-13-01_ to

and is able to return to work/school on _12-14-01_

Nature of illness or injury_____

Restrictions_____

Light work_____other_____

Physical education_____may take_____limited_____

_____

_____may not take_____

_Signature_

Signature of Physician

UtiliQuest 0020

# HENRY BENAVIDES, M.D.
## Obstetrics and Gynecology
*Valley Professional Building*

3 days

2121 Pease St. Suite 3D
Harlingen, Texas 78550

Office: 428-6601
Answering: 399-1868

Name _____  Date _1/4/02_

has been under my care from _1/4/02_ to _1/6/02_

and is able to return to work/school on _1/7/02_

Nature of illness or injury _____

Restrictions _____ light work _____ other _____

Physical education _____ may take _____ limited _____

_____ may not take _____

_____
Signature of Physician

UtiliQuest 0021

Sent By: UTILIQUEST;    956 428 6108;    Apr-30-02   .57AM;

COPY

# HENRY BENAVIDES, M.D.
## Obstetrics and Gynecology

*Valley Professional Building*

2121 Pease St. Suite 3D
Harlingen, Texas 78550

Office: 428-8801
Answering: 399-1888

Name _Linda M. Prather_ Date _1-10-02_

has been under my care from _1-10-02_ to

and is able to return to work/school on _1-11-02_

Nature of illness or injury _____

Restrictions _____ light work _____ other _____

Physical education _____ may take _____ limited

_____ may not take _____

_Signature of Physician_

UTILIQUEST 0022

```
        IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF TEXAS
              BROWNSVILLE DIVISION

LINDA MARIE PRATHER            X
                               X
                               X
                               X
VS.                            X CASE NO. B-03-0136
                               X
                               X
UTILIQUEST, L.L.C., MELANIE    X
McGINNESS AND SUE OBREGON      X


- - - - - - - - - - - - - - - - - - - - - - - - - - - -

             DEPOSITION OF SULEMA OBREGON
                  FEBRUARY 12, 2004

- - - - - - - - - - - - - - - - - - - - - - - - - - - -


             REPORTED BY SHELLEY STINGLEY
               CERTIFIED COURT REPORTER
```

<u>APPEARANCES</u>



```
COUNSEL FOR PLAINTIFF:

    RUBEN R. PENA
    LAW OFFICES OF RUBEN R. PENA
    222 West Harrison
    Harlingen, Texas  78550

COUNSEL FOR DEFENDANTS:

    J. BRADLEY SPALDING
    LITTLER MENDELSON
    1301 McKinney Street, Suite 1900
    Houston, Texas  77010


ALSO PRESENT:  Linda Marie Prather
```

09:41 1      Q.   And the original message that you sent to, I

09:42 2  guess, Nadine Litton -- can you tell me who Nadine

09:42 3  Litton is?

09:42 4      A.   She is a payroll clerk.

09:42 5      Q.   Okay.  That was sent on Monday January the 7th

09:42 6  at 5:40 p.m. and you asked her, "If an employee does

09:42 7  not have medical insurance through the company but will

09:42 8  be off due to pregnancy, if this office does not meet

09:42 9  the standards for FMLA due to lack of employees, how

09:42 10 much time can she be off?"

09:42 11          And you state, "I was under the impression

09:42 12 that it was four weeks, with no leave or vacation left.

09:42 13 Can you clarify that?"

09:42 14          Is that what you -- it's from you, right?

09:42 15     A.   Yes.

09:42 16     Q.   All right, did I read that accurately?

09:42 17     A.   Yes.

09:42 18     Q.   And she responded I guess on Tuesday, January

09:42 19 8th at 7:07 a.m., but it just says "Subject:  Leave of

09:43 20 absence."  I guess it was just a -- she might have hit

09:43 21 the return and not put anything on there because

09:43 22 there's nothing underneath there, correct?

09:43 23     A.   Uh-huh.

09:43 24     Q.   Am I right?

09:43 25     A.   You're right.

Q.   Okay.  I do that sometimes.  I inadvertently hit something back and so -- the next line going up is apparently a message from Melanie McGinness on January 8th at 7:53 a.m. to you regarding leave of absence and she states that "She would not be eligible for any time.  You don't have 50 employees within a 75-mile radius now?  Melanie," right?

A.   Right.

Q.   Now, my reading of that is she is not eligible for any time.  Is that -- I mean --

A.   That she is not eligible under the Family Medical Leave Act, which is what I was asking.

Q.   Oh, all right, all right.  And then the next one from you to Ms. McGinness, again dealing with leave of absence, is you state, "No, we only have 45, and that includes Corpus Christi office, which is the nearest office and that is over 130 miles away.

     "So when she requests her leave of absence, is her job secure or can I terminate her if I need to replace her at any time after that?"

     Is that accurate?

A.   Yes.

Q.   And I guess to put this in context, I guess Ms. Prather had informed you or the company that she was pregnant and she was going to have to take a leave

09:45  1   11:35 a.m. from Melanie McGinness to you regarding

09:46  2   leave of absence, and it says, "If you don't have 50,

09:46  3   she will be terminated, and if you have an opening she

09:46  4   can be rehired."  Do you see that?

09:46  5        A.   Yes.

09:46  6        Q.   So what was your understanding in regards to

09:46  7   Ms. Prather taking time off for her pregnancy then,

09:46  8   given these e-mails that you received?

09:46  9        A.   That she didn't qualify for the Family Medical

09:46  10  Leave Act.

09:46  11       Q.   And that she would be terminated upon, I guess

09:46  12  -- I guess immediately upon her leaving?

09:46  13       A.   When she took her leave of absence that she

09:46  14  requested, then, yes.

09:46  15       Q.   Okay.  I'm going to mark this one as Obregon 3.

09:47  16  This is a memorandum from Melanie McGinness.

09:47  17  Incidentally, who is Melanie McGinness?

09:47  18       A.   She is the benefits coordinator.

09:47  19       Q.   For UtiliQuest?

09:47  20       A.   UtiliQuest.

09:47  21       Q.   And where is she located or headquartered?

09:47  22       A.   Atlanta.

09:47  23       Q.   Has she ever come down here?

09:47  24       A.   No.

09:47  25       Q.   She's never been to South Texas?

22

09:50 1    Q.   Is it something -- is it a disability that

09:50 2    would be covered by short term disability?  And, of

09:51 3    course, the reason I'm asking you that is because it's

09:51 4    not defined in that paragraph.

09:51 5            MR. SPALDING:  And he's asking you to

09:51 6    answer to the best of your ability.  If you know the

09:51 7    answer, go ahead and answer.  If you don't, that's

09:51 8    fine.

09:51 9    A.   I'm not sure.

09:51 10   Q.   Okay, you're not sure, that's fine.  Let me ask

09:51 11   you a followup question.  Where would I go to find a

09:51 12   document that defines short term disability?  Do you

09:51 13   know?

09:51 14   A.   No.

09:51 15   Q.   Would Melanie McGinness know?

09:51 16   A.   I do not know if she would.

09:51 17   Q.   All right.  Have other employees -- well,

09:52 18   strike that.  Other than you and Ms. Prather, were

09:52 19   there other female employees employed by UtiliQuest

09:52 20   here in the Valley?

09:52 21   A.   Yes.

09:52 22   Q.   Any of them -- I guess that includes you --

09:52 23   ever become pregnant?

09:52 24   A.   Yes.

09:52 25   Q.   Were they also -- were any of them terminated

09:52 1    in regards to their pregnancy?

09:52 2         A.   I went through it twice.

09:52 3         Q.   Okay.

09:52 4         A.   I was given the option, as well, that if I did

09:52 5    take a leave of absence, I would be administratively

09:52 6    terminated and when I decided to come back, if there

09:52 7    was an opening, I would be rehired.  So taking that

09:52 8    into consideration, I declined to take a leave of

09:53 9    absence and just used up my vacation time.

09:53 10        Q.   Any other -- so I guess you were pregnant at

09:53 11   some point.  How many children do you have?

09:53 12        A.   Three.

09:53 13        Q.   Three children.  How old are they?

09:53 14        A.   11, 8 and 4.

09:53 15        Q.   And I should have asked you this earlier.  Your

09:53 16   husband, what is his name?

09:53 17        A.   Alvaro.

09:53 18        Q.   Alvaro.  And what does Mr. Obregon do?

09:53 19        A.   He's a utility locator.

09:53 20        Q.   Oh, he works --

09:53 21        A.   He works for the same company, yes.

09:53 22        Q.   Okay, cool.  And how long has he been employed

09:53 23   with UtiliQuest?

09:53 24        A.   Nine years, four months.

09:53 25        Q.   Same as you?

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

LINDA MARIE PRATHER          X
                             X
                             X
VS.                          X CASE NO. B-03-0136
                             X
                             X
UTILIQUEST, L.L.C., MELANIE  X
McGINNESS AND SUE OBREGON    X

REPORTER'S CERTIFICATE

I, SHELLEY STINGLEY, Certified Court Reporter, certify that the witness, SULEMA OBREGON, was duly sworn by me, and that the deposition is a true and correct record of the testimony given by the witness on FEBRUARY 12, 2004; that the deposition was reported by me in stenograph and was subsequently transcribed under my supervision.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, nor am I financially interested in the action.

WITNESS MY HAND on this the 18th day of February, 2004.

SHELLEY STINGLEY, CSR NO. 5725
Expiration Date: 12/31/04
Bryant & Stingley, Inc.
2010 East Harrison
Harlingen, Texas 78550

BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956)618-2366  (956)428-0755  (956)542-1020

## Sue Obregon

**From:** Melanie McGinness
**Sent:** Tuesday, January 08, 2002 11:35 AM
**To:** Sue Obregon
**Subject:** RE: leave of absence

If you don't have 50 she will be terminated and if you have an opening she can be rehired.

Melanie

> -----Original Message-----
> **From:** Sue Obregon
> **Sent:** Tuesday, January 08, 2002 12:04 PM
> **To:** Melanie McGinness
> **Subject:** RE: leave of absence
>
> NO, WE ONLY HAVE 45 AND THAT INCLUDES CORPUS CHRISTI
> OFFICE WHICH IS THE NEAREST OFFICE AND THAT IS OVER 130
> MILES AWAY.
> SO, WHEN SHE REQUESTS HER LEAVE OF ABSENCE , IS HER JOB
>  SECURE OR CAN I TERMINATE HER IF I NEED TO REPLACE HER
> AT ANYTIME AFTER THAT
> SUE
>
> > -----Original Message-----
> > **From:** Melanie McGinness
> > **Sent:** Tuesday, January 08, 2002 7:53 AM
> > **To:** Sue Obregon
> > **Subject:** RE: leave of absence
> >
> > She would not be eligible for any time.  You don't have 50 employees within a 75 mile radius now?
> >
> > Melanie
> >
> > > -----Original Message-----
> > > **From:** Nadine Litton
> > > **Sent:** Tuesday, January 08, 2002 7:07 AM
> > > **To:** Melanie McGinness
> > > **Subject:** FW: leave of absence
> > >
> > > > -----Original Message-----
> > > > **From:** Sue Obregon
> > > > **Sent:** Monday, January 07, 2002 5:40 PM
> > > > **To:** Nadine Litton
> > > > **Subject:** leave of absence
> > > >
> > > > Nadine,
> > > > If an employee does not have medical insurance thru the Company
> > > > but will be off due to pregnancy, if this office does not meet the
> > > > standards for FMLA due to lack of emplyees, how much time can
> > > > she be off ?  I was under the impression that
> > > > it was 4 weeks, with no leave or vacation left.  Can you clarify that?
> > > > Thanks,
> > > > sue


Obregon
EXHIBIT NO. 2
Shelley Stingley

1

 **TILIQUEST**

500 Northridge Road, Suite 300
Atlanta, GA 30350
Phone: (678) 461-3900
Fax: (678) 461-3902

# Memo

**To:**　　Linda Prather

**From:**　Melanie McGinness -- HR/Benefits Coordinator

**Cc:**　　Tony Castillo

**Date:**　3/12/2002

**Re:**　　Short Term Disability and Family Medical Leave Act

---



Linda this is in response to a phone conversation with Sue Obregon UtiliQuest has a program to help you during this time.

Short Term Disability benefits are available to all full-time employees after they have missed ten consecutive business days of work and cover the employee for up to 90 days of disability. The maximum benefit is $250 per week before taxes. Attached please find a UNUM Claim for Disability Benefits Application for Short Term Disability. **Please note that you need to sign the bottom of Page 3 and fill out Page 2 of the application. Page 1 of the application needs to be filled out by your physician. Print clearly and use black ink if possible. Please return the form to me: UtiliQuest, Attn: Melanie McGinness, 500 Northridge Road, Suite 300, Atlanta, GA 30350.**

Also, attached is a standard notice regarding an employee's rights under the Family and Medical Leave Act of 1993. In order to qualify for this benefit, an employee must work in an office that has 50 people within a 75 mile radius because of this you are not eligible for FMLA.

Unfortunately, we will not be able to hold your position open for the time that your are out on disability. You will be administrative terminated as of your last day worked. This will not affect your disability benefits. If you desire to return to work at UtiliQuest and there is an open position, you are welcome to reapply.

If you have any questions regarding this Memorandum or the attachments, please do not hesitate to call me at 678-250-2651.

```
EXHIBIT
  4
L. PRATHER
```

UTILIQUEST 0023



500 Northridge Road, Suite 300
Atlanta, GA 30350
Phone: (678) 461-3900 x 16
Fax: (678) 461-3902

# Family and Medical Leave Act of 1993

**NOTICE**

Date: **3-12-02**

TO _Linda Prather_

FROM _Melanie McGinness_

SUBJECT Request for Family/Medical Leave

On **3-1-02**, you notified us of your need to take family/medical leave due to:

_✓_ the birth of your child, or the placement of a child with you for adoption or foster care; or

___ a serious health condition that makes you unable to perform the essential functions of your job; or

___ a serious health condition affecting your _ spouse, _ child, _ parent, for which you are needed to provide care

You notified us that you need this leave beginning on _____ and that you expect to leave to continue until on or about _____.

Except as explained below, you have a right under the FMLA for up to 12 weeks of unpaid leave in a 12 month period for the reasons listed above. The 12 month period is defined as a rolling calendar year, starting on the first day of leave. Also, your health benefits must be maintained during any period of unpaid leave under the same conditions as if you continued to work, and you must be reinstated to the same or an equivalent job with the same pay, benefits, and terms and conditions of employment on your return from leave. If you do not return to work following FMLA leave for a reason other than: (1) the continuation, recurrence, or onset of a serious health condition which would entitle you to FMLA leave; or (2) other circumstances beyond your control, you may be required to reimburse us for our share of health insurance premiums paid on your behalf during your FMLA leave.

This is to inform you that: (check the appropriate boxes, explain where indicated)

1. You are ___ eligible _✓_ not eligible for leave under the FMLA.

2. The requested leave ___ will ___ will not be counted against your annual FMLA leave entitlement.

3. You ___ will ___ will not be required to furnish medical certification of a serious health condition. If required, you must furnish certification by _____ (must be at least 15 days after you are notified of this requirement) or we may delay the commencement of your leave until the certification is submitted.

4. You may elect to substitute accrued paid leave for unpaid FMLA leave. We ___ will ___ will not require that you substitute accrued paid leave for unpaid FMLA leave. If paid leave will be used the following conditions will apply: (Explain)

UTILIQUEST 0024

5(a). If you normally pay a portion of the premiums for your health insurance, these payments will continue during the period of FMLA leave. Arrangements for payment have been discussed with you and it is agreed that you will make premium payments as follows: Call me and I will tell you when this amount is due.

| Benefits | Premium |
|---|---|
| Health Insurance | |
| Long Term Disability | |
| Group Term Life | |
| Total | |

(b). You have a minimum 30-day (or, indicate longer period, if applicable) grace period in which to make premium payments. If payment is not made timely, your group health insurance may be cancelled, provided we notify you in writing at least 15 days before the date that your health coverage will lapse, or, at our option, we may pay your share of the premiums during FMLA leave, and recover these payments from you upon your return to work. We ___ will ___ will not pay your share of health insurance premiums while you are on leave.

(c). We ___ will ___ will not do the same with other benefits (e.g., life insurance, disability, insurance, etc.) while you are on FMLA leave. If we do pay your premiums for other benefits, when you return from leave you ___ will ___ will not be expected to reimburse us for the payments made on your behalf.

(6). You ___ will ___ will not be required to present a fitness-for-duty certificate prior to being restored to employment. If such certification is required but not received, your return to work may be delayed until the certification is provided.

7(a). You ___ are ___ are not a "key employee" as described in §825.218 of the FMLA regulations. If you are a "key employee," restoration to employment may be denied following FMLA leave on the grounds that such restoration will cause substantial and grievous economic injury to us.

(b). We ___ have ___ have not determined that restoring you to employment at the conclusion of FMLA leave will cause substantial and grievous economic harm to us (Explain (a) and/or (b) below. See §825.219 of the FMLA regulations).

8. While on leave, you ___ will ___ will not be required to furnish us with periodic reports every 14 days of your status and intent to return to work (see §825.309 of the FMLA regulations). If the circumstances of your leave change and you are able to return to work earlier than the date indicated on the reverse side of this form, you will be required to notify us at least two work days prior to the date you intend to report for work.

9. You ___ will ___ will not be required to furnish recertification relating to a serious health condition. (Explain below, if necessary, including the interval between certifications as prescribed in §825.308 of the FMLA regulations).

If you have any questions, please do not hesitate to call Melanie McGinness, HR/Benefits Manager at the number below.

*Melanie McGinness*

UtiliQuest, LLC
500 Northridge Road, Suite 300
Atlanta, GA  30350
(678) 461-3900



**DISABILITY CLAIM** (PLEASE HAVE ALL SECTIONS COMPLETED)
Mail to: Unum, Chattanooga Customer Care Center, P.O. Box 12030, Chattanooga, TN 37401-3030
Claim Questions: 800.633.7479   Fax To: 423.755.3009

**EMPLOYMENT STATEMENT** (PLEASE PRINT)

Type of Coverage (CHECK ALL THAT APPLY)
☐ Short Term Disability ☐ Long Term Disability ☐ Individual Disability ☐ Waiver of Premium (Life Insurance) ☐ Voluntary Benefits/Payroll Deduction

Employer Name: **UtiliQuest**
Employer's Phone Number: **(678) 461-3900**

Employer Address (Street, City, State, Zip): **500 Northridge Rd, Suite 300 Atlanta Ga. 30350**

Policy Numbers: **128413**
Division Number / Class Number:
Division / Class Description:

Claimant's Name: **Linda Prather**

Claimant's Address (Street, City, State, Zip): **PO Box 42 La Feria, Tx 78559**

| Claimant's Home Phone | Date of Birth | Social Security Number | Date of Hire | Effective Date of Insurance | Date Last Worked |
|---|---|---|---|---|---|
| **956-797-9301** | **6-30-80** | **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** | **2-27-01** | **5-27-01** | |

Claimant's Work Status: ☑ Full Time ☐ Part Time ☐ Exempt ☐ Non-exempt ☐ Bargaining ☐ Non-Bargaining

Has the claimant's employment been terminated? ☐ Yes ☐ No  If yes, please provide termination date:

General Information About the Claimant's Job

Job Title: **Dispatcher**
Minimum education or training required: **High School**

Has the claimant perform supervisory function? ☐ Yes ☐ No  If yes, how many people are supervised?

Describe job duties:

| Duty | # of Weekly Hours Spent at Duty |
|---|---|
| **Dispatching** | **40** |
| | # of Weekly Hours Spent at Duty |
| | # of Weekly Hours Spent at Duty |
| | # of Weekly Hours Spent at Duty |

Name of Direct Supervisor:
Telephone Number of Direct Supervisor: ( )

Please attach a copy of the claimant's job description.

How was claimant paid? (please check one)
☐ Hourly ☐ Commissions ☐ Salaried ☐ Salary and Bonus ☐ Commissions Only ☐ Salary and Commissions

What is the earnings figure you use to compute premium payments for this claimant? $ **8.00/hr**

Salary/Wage prior to date last worked (refer to Earnings definition in your contract).

| Weekly ☑ Bi-Weekly ☐ Semi-Monthly | Bonuses (per week) | Overtime (prior year) | Commissions (per week) | W-2 Earnings |
|---|---|---|---|---|
| **640.00** | $ | $ | $ | $ **11,673.00** |

Does the claimant contribute toward the premiums? (Complete all that apply)

| | | | % paid by employer | % paid by claimant |
|---|---|---|---|---|
| LTD: | ☐ Yes ☑ No: If yes:☐ Pre-Tax ☐ Post-Tax  If Post Tax: | | % paid by employer | % paid by claimant |
| Life Plans: | ☐ Yes ☐ No: If yes:☐ Pre-Tax ☐ Post-Tax  If Post Tax: | | % paid by employer | % paid by claimant |
| STD: | ☐ Yes ☐ No: If yes:☐ Pre-Tax ☐ Post-Tax  If Post Tax: | | % paid by employer | % paid by claimant |
| : | ☐ Yes ☐ No: If yes:☐ Pre-Tax ☐ Post-Tax  If Post Tax: | | % paid by employer | % paid by claimant |
| : | ☐ Yes ☐ No: If yes:☐ Pre-Tax ☐ Post-Tax  If Post Tax: | | % paid by employer | % paid by claimant |

Year to Date Earnings as of Date of Disability (For FICA % Deductions) $ **3/12**

Financial Documentation (please refer to your contract for your Earnings definition and attach the appropriate documentation).
Salary Only/Current Earnings definition: Attach copy of payroll records or paystubs for 2 periods just prior to disability.
Bonus/Commissions Included: Attach copy of payroll records for the 12 or 24 months (see definition) just prior to disability.
W-2 earnings definition: Attach referenced document per Earnings definition (W-2, K-1's, Schedule C's, teacher's contract, etc.).

Claimant Pre-Tax Withholdings: Indicate pre-tax withholdings in effect just prior to disability:
☐ 403(b) ___%;  Pre-tax medical and other insurance $ ___ /week;  Flexible spending account $ ___ /week

UTILIQUEST 0026

 **UNUM**

## DISABILITY CLAIM (PLEASE HAVE ALL SECTIONS COMPLETED)
Mail to: Unum, Chattanooga Customer Care Center, P.O. Box 12030, Chattanooga, TN 37401-3030
Claim Questions: 800.633.7479   Fax To: 423.755.3009

### C. EMPLOYMENT STATEMENT (continued)

10. Date of last Salary/Wage Increase 2-15-02  Work Schedule at time last worked: 5 Days/Week  8 Hours/Day  40 Hours/Week

Check off regular work days: ☐ Sun ☑ Mon ☐ Tues ☑ Wed ☑ Thurs ☑ Fri ☐ Sat.  Number of hours on date last worked:

Date paid through:  For: ☐ Salary Continuation ☐ Vacation Pay ☐ Accrued Sick Pay ☐ Other

11. Has claimant returned to work? ☐ Yes ☐ No  If yes, date:  ☐ Full Time ☐ Part Time  Hours Per Week

12. Does the claimant have an ownership interest in this business? ☐ Yes ☑ No  If yes, what is the % of ownership?  %
Type of business entity? ☐ Regular Corporation ☐ S corporation ☐ Partnership ☐ Sole Proprietorship

13. If this is a Flexible Benefits Plan, indicate which option of coverage this claimant has chosen.
Previous Plan Year - Date of Open Enrollment:        Option        Current Plan Year - Date of Open Enrollment:        Option

14. Prior LTD Carrier Name                                        Effective Date

Address (Street, City, State, Zip)                                Termination Date

| 15. Is claimant eligible for: | Yes | No | If yes, weekly or monthly amount | Weekly | Monthly | When do benefits begin? | When do benefits end? |
|---|---|---|---|---|---|---|---|
| Salary Continuation | ☐ | ☐ | $ | ☐ | ☐ | | |
| State Disability | ☐ | ☐ | $ | ☐ | ☐ | | |
| Other Disability Benefits | ☐ | ☐ | $ | ☐ | ☐ | | |
| Social Security | ☐ | ☐ | $ | ☐ | ☐ | | |
| Worker's Compensation | ☐ | ☐ | $ | ☐ | ☐ | | |

Is the claim the result of a work related injury or sickness? ☐ Yes ☐ No

Has Workers' Compensation claim been filed? ☐ ☐  If yes, Name and Address of Carrier

Health Insurance ☐ ☐  If yes, Name and Address of Carrier

Life Insurance ☐ ☐  If yes, please provide the amount of coverage: $

If Workers' Compensation claim has been denied, please submit a copy of denial with this claim.

16. If New York DBL or New Jersey TDB applies, complete this question.

Earnings 8 weeks prior to disability

| | Week Ending | | | No. Days Worked | Amount | | Week Ending | | | No. Days Worked | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mo. | Day | Yr. | | | | Mo. | Day | Yr. | | |
| 1 | | | | | | 5 | | | | | |
| 2 | | | | | | 6 | | | | | |
| 3 | | | | | | 7 | | | | | |
| 4 | | | | | | 8 | | | | | |

17. Information about your pension plan (Please send copy of Plan Summary) (Do not complete for maternity claim)

Do you have a pension plan?  If yes, what type?
☑ Yes ☐ No  ☐ Defined benefit ☐ Defined contribution ☑ 401(k)/403(b) ☐ Profit Sharing ☐ Other: (specify)

Is claimant eligible for your pension plan?  If eligible, does the claimant participate?  What % does claimant contribute?
☑ Yes ☐ No  ☐ Yes ☑ No

If the claimant is participating, when is he or she eligible for benefits under the plan?

### FRAUD NOTICE:
Any person who knowingly files a statement of claim containing any false or misleading information is subject to criminal and civil penalties. This includes Employer and Attending Physician portions of the claim.

UTILIQUEST 0027

The above statements are true and complete to the best of my knowledge and belief.

Name of Person Completing Form  Telephone Number
Melanie McGinness  (678) 250-0245

Title of Person Completing Form  Fax Number
HR Benefits  (678) 461-3902

Signature  Date Signed
Melanie McGinness  3-12-02

Sent By: UTILIQUEST;                858 423 8109;          Apr-30   8:58AM;      Page 11/13
MAR-22-02 01:25 PM HENRY BENAVIDES                         9564123352           P.01

# HENRY BENAVIDES, M.D.
## Obstetrics and Gynecology
### Valley Professional Building

2121 Pease St. Suite 3B                              Office: 423-6601
Harlingen, Texas 78550                              Answering: 399-1362

Name _Linda Prather_ Date _3/22/02_                    26

has been under my care from _3/22/02_

and is able to return to work/school on _3/23/02_

Nature of illness or injury _____

Restrictions _____ light work _____ other _____

Physical education _____ may take _____ limited _____

_____ may not take _____

_Signature of Physician_

EXHIBIT
5
L. PRATHER

UTILIQUEST 0028

EXHIBIT

L. PRATHER

# HENRY BENAVIDES, M.D.
## Obstetrics and Gynecology
*Valley Professional Building*

2121 Pease St. Suite 3D
Harlingen, Texas 78550

Office or
Answering: 956

Name *Linda Prather*  Date 4-9-02

has been under my care from 4-9-02 to

and is able to return to work/school on 4-10-02

Nature of illness or injury

Restrictions_____ light work_____ other_____

Physical education_____ may take_____ limited_____

_____ may not take_____

Signature of Physician

UtiliQuest 0031

956+1233352

## HENRY BENAVIDES, M.D.
### Obstetrics and Gynecology
*Valley Professional Building*

2121 Pease St. Suite 3D    Office: 423-6601
Harlingen, Texas 78550    Answering: 399-1866

Name: _Linda Prather_    Date: 4-23-02

has been under my care from 4-23-02 5-1-02

and is able to return to work/school on 5-2-02

Nature of illness or injury _____

Restrictions: _Bedrest_

Light work _____    other _____

Physical education _____ may take _____ limited _____

_____ may not take _____

_____

Signature of Physician

UTILIQUEST 0032

# UTILIQUEST

## EMPLOYEE CONSULTATION REPORT

COPY

Employee Name: _Linda Prather_     Date: _5/22/02_

SSN: _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_     Location: _Harlingen_

**NATURE OF WARNING:** (Check)     Date of Incident: _4/23/02 - 5/1/02_

| | | | | | |
|---|---|---|---|---|---|
| | Unreported Absence | | Insubordination | | Violations of Safety Rules |
| | Tardiness | | Violation of Company Policy | | Violation of Damage Policy |
| | Violation of Fleet Rules | X | Absence | | |

**TYPE OF WARNING:** (Check)

| | | | | | |
|---|---|---|---|---|---|
| | Verbal Warning | X | Written Warning | | Termination |

**Describe specifically what occurred, or describe the unacceptable performance:**

_too many days off - unaceptable_

**Describe the appropriate action or desired performance:**

_drastically Improve attendance record, starting today_

**Has the employee received feedback concerning this issue before? If so, state date and type of feedback (i.e., verbal, written):**

_YES   5/22/01_

**Is follow-up necessary?** _____ Yes (what time period must employee correct this performance? _____

_✓_ No .

**Consequences of failure to improve the performance:**

_Will be terminated._

EXHIBIT

L PRATHER

> Receiving feedback on required job improvement or company policy violations is never easy. However the intent of this Consultation is to give you the information necessary to help you improve performance to a satisfactory level. Failure to improve performance to an acceptable level within a reasonable time or repeated violations of company policy may result in further disciplinary action, up to an including termination.

ployee Signature to verify discussion was held: _Linda Prather_

upervisor Signature: _Sue Obregon_     _Witness: Andrea Zapata_

Manager Signature: _Maria C_

UTILIQUEST 0042

Employee, please write any comments on reverse side as needed

5/2/02

I have reviewed your attendance record, and this is not something that has come about suddenly, but has been a continous routine. In reviewing your record, I find that you have been absent too many times.
I want to stress to you, that this has nothing to do with your pregnancy, this has to do with your work history.     This position requires someone there at all times.     (EXPLAIN)   allow her to comment;  (ask her what do think)?

This is not fair to everyone else that shows up for work everyday. I really need someone I can rely on.

This will be your last warning - if you do not improve your attendance record drastically, starting today,   I will have no choice but to let you go.

Have her respond to warning

Do you have any issues, comments, questions, anything that you feel that you need to tell me.?

Again,  this will be your last warning

notes:  this does not mean you can't go to Dr. when you are sick, or you have a Drs/ appt.

* per linda, she understands how important it is to make sure she is here when she is scheduled to work.

claims she has no complications with her pregnancy but that her Dr is going to give her Bed rest 1 month from now when she is 35 weeks.

* *Andrea Zapata*

UTILIQUEST 0043

Dr. ___ ___ ___ Gene Friedman   5/11/__



# UTILI**Q**UEST

## *EMPLOYEE SEPARATION FORM*

Employee Number **6680**    Social Security Number **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**

Employee Name: **Linda Prather**    Office Code **0**

Occupation: **Dispatcher**    Location **Harlingen, TX**

Current Hire Date: **2/27/01**    Last Day Worked: **5/14/02**

Date of Separation: **5/14/02** *(If Different from Last Day Worked)*

Separation Code: **V 39**    *(See back of form for codes)*

Separation Reason **V 39**    **leave of Absence - Maternity**
*(Must Agree to Separation Code)*

Violation of Standards of Conduct # _____    *(From Employee Handbook)*

Separation Circumstances: **RELEASED From DR BED REST**

_____

_____

_____

_____

Witness Name(s) and Title(s)_____

Completed By: Name **Sue Obregon**    Signature: **Sue Obregon**
                *(Please Print Clearly)*

Recommended for Rehire   ☑ Yes   ☐ No   (Check One)
                **Marco A. Castillo**

Center Manager Name: **Marco Ctl.**    Signature: **Marco Ctl.**
                *(Please Print Clearly)*

                Date: **6-10-02**

PAYROLL/HUMAN RESOURCES DEPARTMENT USE ONLY

| Type of Compensation | Date Paid | Period Covered | Amount Paid |
|---|---|---|---|
| Vacation | | | |
| Severance | | | |
| Personal Leave | | | |

c:\temp\separation form.doc    Rev 11/00

EXHIBIT
**9**
L. TKATACR

UtiliQuest 0048



**DISABILITY CLAIM** (PLEASE HAVE ALL SECTIONS COMPLETED)
Mail to: Unum, Chattanooga Customer Care Center, P.O. Box 12030, Chattanooga, TN 37401-3C
Claim Questions: 800.633.7479  Fax To: 423.755.8009

### ATTENDING PHYSICIAN'S STATEMENT (PLEASE PRINT)

**1. Name of Patient** Linda Prather  **Date of Birth** 10-30-80  **Social Security Number** 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?

**2. Diagnosis** - Please include the primary diagnosis and list any secondary conditions.

| Date of Last Examination | Diagnosis (including any complications) Include ICD9 and/or DSM IV Multi Evaluation Nomenclature and Code Number |
|---|---|
| 5/1/02 | V22.2 Pregnancy |

Objective findings (including current x-rays, EKGs, psychiatric testing, laboratory data and any clinical findings)

Symptoms

Is this condition due to ☐ an Accident ☐ a Sickness?    Date symptoms first appeared or accident occurred:

Is the accident or sickness related to the patient's employment? ☐ Yes ☒ No  ☐ Unknown

Date restrictions and limitations began. 5/15/02    Has patient ever been treated for the same or similar condition? ☐ Yes ☒ No  If yes, state when and describe.

**3. Information About the Patient's Ability to Work - this information is critical to understanding your patient's condition**

Has patient been released to work in his/her occupation? ☐ Yes ☒ No  In any occupation? ☐ Yes ☒ No

If the patient has demonstrated a loss of function, please provide restrictions and limitations and the date they began in the space provided below.
Fully describe restrictions and limitations.
RESTRICTIONS (What the patient should not do)

LIMITATIONS (What the patient cannot do)

on should the patient be able to return to work?  Full Time: 8/7/02  Part Time:

| Height/Weight: 115/80 | Blood Pressure Last Visit | If Pregnancy, Expected Delivery Date 6-26-02 | If Delivered, Actual Delivery Date | Delivery Type ☒ Normal ☐ C-Section |
|---|---|---|---|---|

| Date of first visit for this illness or injury 11/5/01 | Date of next visit 5/16/02 | Date of last visit 5/1/02 | Frequency of visits 11 visits w/ |
|---|---|---|---|

Is patient: ☐ Ambulatory ☐ Bed Confined ☐ House Confined ☐ Hospital Confined    Has patient been admitted to hospital? ☐ Yes ☒ No  Confined From:  To:

If Hospital Confined, give name and address of hospital

Have you completed claim forms regarding this patient for other insurance carriers? ☐ Yes ☒ No  If yes, state date and name of insurance company:

**4. Names and Addresses of Other Treating Physicians**

Referring physician or other treating physicians (names, address, phone #'s):

### REQUIRED ATTACHMENTS AND SIGNATURES
**Please make sure that office notes, test results, and discharge summaries are attached. This will help reduce additional requests.**
**FRAUD NOTICE:** Any person who knowingly files a statement of claim containing false or misleading information is subject to criminal and civil penalties. This includes Employer and Attending Physician portions of the claim form.
The above statements are true and complete to the best of my knowledge and belief.

| Print or Type Name Henry Benavides | Degree MD | Medical Specialty OB/GYN |
|---|---|---|
| Street Address 3131 Pease St 3D | | Phone Number (956) 428-1060 |
| Harlingen | State TX | Zip Code 78550 | Fax 956-412-3352 |
| Signature of Physician | | Date 5/15/02 |

SSN or Employer's ID Number: 742599965

EXHIBIT
8
L. PRATHER

# DISABILITY CLAIM (PLEASE HAVE ALL SECTIONS COMPLETED)

**UNUM.**

Mail to: Unum, Chattanooga Customer Care Center, P.O. Box 12030, Chattanooga, TN 37401-303
Claim Questions: 800.633.7479  Fax To: 423.755.3009

## ATTENDING PHYSICIAN'S STATEMENT (PLEASE PRINT)

**1. Name of Patient** Linda Prather  **Date of Birth** 10-30-80  **Social Security Number** 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

**2. Diagnosis** - Please include the primary diagnosis and list any secondary conditions.

| Date of Last Examination | Diagnosis (including any complications) include ICD9 and/or DSM IV Multi Evaluation Nomenclature and Code Number |
|---|---|
| 5/1/02 | V22.2 Pregnancy |

Objective findings (including current x-rays, EKGs, pyschiatric testing, laboratory data and any clinical findings)

Symptoms  Pregnant @ 33 w ? edema

Is this condition due to ☐ an Accident ☐ a Sickness?  Date symptoms first appeared or accident occurred:

Is the accident or sickness related to the patient's employment? ☐ Yes ☒ No ☐ Unknown

Date restrictions and limitations began: 5/15/02  Has patient ever been treated for the same or similar condition? ☐ Yes ☒ No  If yes, state when and describe.

**3. Information About the Patient's Ability to Work - this information is critical to understanding your patient's condition**

Has patient been released to work in his/her occupation? ☐ Yes ☒ No  In any occupation? ☐ Yes ☒ No

If the patient has demonstrated a loss of function, please provide restrictions and limitations and the date they began in the space provided below.

Fully describe restrictions and limitations.

**RESTRICTIONS** (What the patient should not do)

Bedrest

**LIMITATIONS** (What the patient cannot do)

Would the patient be able to return to work? Full-Time: 8/7/02  Part Time:

| Height/Weight | Blood Pressure Last Visit 112/80 | If Pregnancy, Expected Delivery Date 6-30-02 | If Delivered, Actual Delivery Date | Delivery Type ☒ Normal ☐ C-Section |
|---|---|---|---|---|

| Date of first visit for this illness or injury 11/15/01 | Date of next visit 5/16/02 | Date of last visit 5/1/02 | Frequency of visits 17 visits total |
|---|---|---|---|

| Is patient: ☐ Ambulatory ☐ House Confined ☐ Bed Confined ☐ Hospital Confined | Has patient been admitted to hospital? ☐ Yes ☒ No  Confined From:  To: |
|---|---|

If Hospital Confined, give name and address of hospital

Have you completed claim forms regarding this patient for other insurance carriers? ☐ Yes ☒ No  If yes, state date and name of insurance company:

**4. Names and Addresses of Other Treating Physicians**

Referring physician or other treating physicians (names, address, phone #'s):

## REQUIRED ATTACHMENTS AND SIGNATURES

Please make sure that office notes, test results, and discharge summaries are attached. This will help reduce additional requests.

**FRAUD NOTICE:** Any person who knowingly files a statement of claim containing false or misleading information is subject to criminal and civil penalties. This includes Employer and Attending Physician portions of the claim form.

The above statements are true and complete to the best of my knowledge and belief.

Print or Type Name  Henry Benavides  **Degree** MD  **Medical Specialty** OB/GYN

Street Address  2137 Pease St 3D  **Phone Number** (956) 428-1060

City  Harlingen  **State** TX  **Zip Code** 78550  **Fax** (956) 412-3352

Signature of Physician  **Date** 5/15/02

Employer's ID Number: 742599965

# CHARGE OF DISCRIMINATION

| | Agency | Charge Number |
|---|---|---|
| This forms is affected by the Privacy Act of 19..    ..ee ..rivacy Act Statement before completing this form. | X FEPA<br>_ EEOC | |

| Texas Commission on Human Rights | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)* | Home Telephone *(include Area Code)* |
|---|---|
| Ms. Linda Marie Prather | 956-428-6016 |

| Street Address | City, State and Zip Code | Date of Birth |
|---|---|---|
| 1722 Warren St. | Harlingen, Texas 78550 | 06/30/80 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| Name | Number of Employees, Members | Telephone *(include Area Code)* |
|---|---|---|
| Utiliquest | 15 + | 678-461-3900 |

| Street Address | City, State and Zip Code | County |
|---|---|---|
| 500 Northridge, Suite 300 | Atlanta, GA 30350 | |

Cause of Discrimination Based on *(check appropriate box(es))*

| | | | | | Date Discrimination Took Place |
|---|---|---|---|---|---|
| | | | | | Earliest    Latest |
| _ Race | ___ Color | X Sex | ___ Religion | __National Origin | Sept. 2001    5/15/02 |
| X Retaliation | _ Age | X Disability | X Other *(Specify)* Pregnancy | | ____ Continuing Action |

The Particulars Are *(If additional space is needed, attach extra sheet(s)):*

...eel I was wrongfully terminated by Melanie McGinness, Human Resources Benefits Coordinator and Sue Obregon, my supervisor of Utiliquest, because I was pregnant.    Since these ladies were aware that I could not continue working unt... my due date due to my feet swelling and my doctor putting me on bedrest, they retaliated and terminated my employment because of my pregnancy.  They offered me short term disability but would not assure me that my job would be available after my delivery.  In fact, they said I was administratively terminated whenever I had to leave, which was on May 15, 2002.

NORA ELIA ZAMORA
Notary Public, State of Texas
My Commission Expires
6-25-2005

EXHIBIT
12
L. PRATHER

| ___X___ I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State, and Local Requirements)<br>Nora Elia Zamora<br>I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
|---|---|

| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT<br>*Linda Prather* |
|---|---|
| *Linda Prather*<br>Date 10/24/02   Charging Party *(Signature)* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(Day, month, and year)<br>24 October 2002 |

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| | AGENCY | CHARGE NUMBER |
|---|---|---|
| ☐ FEPA ☒ EEOC | | 360A300400 |

Texas Commission on Human Rights _____ and EEOC
*State or local Agency, if any*

| NAME *(Indicate Mr.. Ms., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Ms. Linda Marie Prather | (956) 428-6016 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 1722 Warren Street, Harlingen, TX 78550 | | 06/30/1980 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| Utilquest | Cat A (15-100) | (956) 423-8473 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 1806 West Jefferson, Harlingen, TX 78550 | | 061 |

| NAME | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER*(Specify)*

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST | LATEST |
| 09/01/2001 | 05/15/2002 |
| ☐ CONTINUING ACTION | |

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s)):*

On or about May 15, 2002, I was administratively terminated by Melanie McGinness, Human Resources Benefits Coordinator and Sue Obregon, my supervisor.

These ladies were aware that I was pregnant and that I could not continue working up to my due date. My doctor placed me on bed rest due to my feet swelling. I was offered short term disability but was not assured that my job would be available after my delivery.

I believe I was discriminated against because of my sex, female/pregnancy, in violation of Title VII of the Civil Rights Act of 1964, as amended.

2002 DEC 18 P 12:57

NORA ELIA ZAMORA
Notary Public, State of Texas
My Commission Expires
6-25-2005

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - *(When necessary for State and Local Requirements)* |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT ✗ *Linda Prather* |
| 12-11-02 Date | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(Month, day and year)* |
| *Linda M. Prather* Charging Party *(Signature)* | 12-11-02 |

EEOC FORM 5 (Rev. 07/99)                    **RESPONDENT'S COPY**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

LINDA MARIE PRATHER,                    §
                                        §
    PLAINTIFF,                          §
                                        §
                                        §
V.                                      §            C.A. No. B-03-0136
                                        §
UTILIQUEST, L.L.C., MELANIE             §
MCGINNESS AND SUE OBREGON,              §
                                        §
    DEFENDANTS.                         §

### DECLARATION OF SUE OBREGON

1.    "My name is Sue Obregon. I am over the age of twenty-one years and am otherwise competent to testify to the facts set forth in this Declaration. All statements contained in this Declaration are true and correct and are based upon my personal knowledge.

2.    I have been employed by UtiliQuest, LLC (and, as it was previously known, Byers Engineering Company) since 1994. My current title is administrative assistant in the Harlingen office, and I held that position at all times relevant to the facts giving rise to this lawsuit. One of my administrative responsibilities is to coordinate our office's payroll practices with UtiliQuest's human resources department in Atlanta, Georgia.

3.    In late 2001, Dispatcher Linda Prather informed her co-workers, and me, that she was pregnant. Over the following months I became concerned about Ms. Prather because she had not elected to receive health insurance through UtiliQuest's medical benefit plan. On or about March 11, 2002, I met with Ms. Prather to inform her that even though she was not enrolled in the company's benefits plan, she would still be entitled to short-term disability benefits in the event that she would have to take a leave of absence due to her pregnancy. Subsequent to that conversation with Ms. Prather, I telephoned Melanie McGinness, UtiliQuest's

human resources/benefits coordinator in Atlanta to confirm that short-term disability benefits would be available to an employee who takes leave even though that employee had not elected medical coverage (including long-term disability benefits). Ms. McGinness confirmed that the benefits were available and stated that she would inform Ms. Prather of the availability of these benefits.

4.    Ms. Prather did in fact begin her leave on May 15, 2002 under orders from her physician. Under UtiliQuest's leave policy, any employees who require short-term disability leave are administratively terminated at the time leave begins. Once they present evidence that they are medically able to resume their duties, the company will return the employee to his or her position if it was not filled in their absence, or to another vacant position for which they are qualified. On June 10, 2002, I prepared an Employee Separation Form confirming that Ms. Prather had been administratively terminated due to her leave of absence, a true and correct copy of which is attached hereto as Defendants' Exhibit 1. On that form, I noted that Ms. Prather was "Recommended for Rehire."

5.    In June 2002, Ms. Prather personally brought me her short-term disability claim paperwork, in which Ms. Prather's physician stated that she would be able to resume her duties on August 7, 2002. A true and correct copy of this document is attached hereto as Defendants' Exhibit 2. However, Ms. Prather did not contact me to inquire about resuming her employment on August 7, 2002, and did not contact me or anyone else at the company until late September 2002, four months after she had originally taken leave. At that time, Ms. Prather visited me at the office and inquired about returning to work. I informed Ms. Prather that we had filled the dispatcher position but requested that she return in December because we expected a dispatcher

2


to resign at the beginning of January. Ms. Prather never returned, and never called me about the dispatcher position.

6.    Ms. Prather was administratively terminated pursuant to the company's short-term leave policy. My only role in the termination was to forward the information to our human resources department and to fill out the Employee Separation Form (on which I recommended that she be re-hired upon application). Ms. Prather was treated exactly as any other non-pregnant employee would be treated under the policy. I did not intentionally inflict emotional distress upon Ms. Prather.

7.    I declare under penalty of perjury that the foregoing is true and correct."

Executed on September 22, 2003.

Sue Obregon

SUE OBREGON

3

# UTILIQUEST

## *EMPLOYEE SEPARATION FORM*

Employee Number **6680**                    Social Security Number **458 - 51 - 6405**

Employee Name: **Linda Prather**                    Office Code  **0**

Occupation: **Dispatcher**          Location  **Harlingen, TX**

Current Hire Date: **2/27/01**          Last Day Worked: **5/14/02**

Date of Separation: **5/14/02**   *(If Different from Last Day Worked)*

Separation Code: **V 39**          *(See back of form for codes)*

Separation Reason  **V 39**      **leave of Absence - Maternity**
*(Must Agree to Separation Code)*

Violation of Standards of Conduct # _____          *(From Employee Handbook)*

Separation Circumstances: **Released From Dr Bed Rest**
_____
_____
_____
_____

Witness Name(s) and Title(s)_____

Completed By: Name **Sue Obregon**          Signature: **Sue Obregon**
*(Please Print Clearly)*

Recommended for Rehire     ☑ Yes       ☐ No     (Check One)
                          **Marco A. Castillo**

Center Manager Name: **Marco A. Cstl.**          Signature: **Marco Cstl.**
*(Please Print Clearly)*

                                        Date: **6-10-02**

PAYROLL/HUMAN RESOURCES DEPARTMENT USE ONLY

| Type of Compensation | Date Paid | Period Covered | Amount Paid |
|---|---|---|---|
| Vacation | | | |
| Severance | | | |
| Personal Leave | | | |

c:\temp\separation form.doc                    Rev 11/00


**UNUM.**

## DISABILITY CLAIM (PLEASE HAVE ALL SECTIONS COMPLETED)
Mail to: Unum, Chattanooga Customer Care Center, P.O. Box 12030, Chattanooga, TN 37401-303
Claim Questions: 800.633.7479    Fax To: 423.755.3009

### A. ATTENDING PHYSICIAN'S STATEMENT (PLEASE PRINT)

**1. Name of Patient** Linda Prather    **Date of Birth** 6-30-80    **Social Security Number** 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

**2. Diagnosis** - Please include the primary diagnosis and list any secondary conditions.

| Date of Last Examination | Diagnosis (including any complications) include ICD9 and/or DSM IV Multi Evaluation Nomenclature and Code Number |
|---|---|
| 5/1/02 | V22.2  Pregnancy |

Objective findings (including current x-rays, EKGs, pyschiatric testing, laboratory data and any clinical findings)

Symptoms  Pregnant w 33 w  c edema

Is this condition due to ☐ an Accident ☐ a Sickness?    Date symptoms first appeared or accident occurred:

Is the accident or sickness related to the patient's employment? ☐ Yes ☒ No  ☐ Unknown

Date restrictions and limitations began: 5/15/02    Has patient ever been treated for the same or similar condition? ☐ Yes ☒ No  If yes, state when and describe.

**3. Information About the Patient's Ability to Work - this information is critical to understanding your patient's condition**

Has patient been released to work in his/her occupation? ☐ Yes ☒ No  In any occupation? ☐ Yes ☒ No

If the patient has demonstrated a loss of function, please provide restrictions and limitations and the date they began in the spaces provided below.

Fully describe restrictions and limitations.
**RESTRICTIONS** (What the patient should not do)  Bedrest

**LIMITATIONS** (What the patient cannot do)

When should the patient be able to return to work?  Full Time: 8/7/02    Part Time:

| Height/Weight | Blood Pressure Last Visit 112/80 | If Pregnancy, Expected Delivery Date 6-26-02 | If Delivered, Actual Delivery Date | Delivery Type ☒ Normal ☐ C-Section |
|---|---|---|---|---|

| Date of first visit for this illness or injury 4/15/01 | Date of next visit 5/16/02 | Date of last visit 5/1/02 | Frequency of visits 17 visits wk |
|---|---|---|---|

Is patient: ☐ Ambulatory ☐ Bed Confined  ☐ House Confined ☐ Hospital Confined    Has patient been admitted to hospital? ☐ Yes ☒ No  Confined From:    To:

If Hospital Confined, give name and address of hospital.

Have you completed claim forms regarding this patient for other insurance carriers? ☐ Yes ☒ No  If yes, state date and name of insurance company.

### 4. Names and Addresses of Other Treating Physicians

Referring physician or other treating physicians (names, address, phone #'s):

### REQUIRED ATTACHMENTS AND SIGNATURES
Please make sure that office notes, test results, and discharge summaries are attached. This will help reduce additional requests.
**FRAUD NOTICE:** Any person who knowingly files a statement of claim containing false or misleading information is subject to criminal and civil penalties. This includes Employer and Attending Physician portions of the claim form.
The above statements are true and complete to the best of my knowledge and belief.

| Print or Type Name Henry Benavides | Degree MD | Medical Specialty OB/GYN |
|---|---|---|
| Street Address 3121 Pease St 3D | | Phone Number (956) 428-0601 |
| City Harlingen  State TX  Zip Code 78550 | | Fax (956) 412-3352 |
| Signature of Physician | | Date 5/15/02 |

SSN or Employer's ID Number: 742599965

1326-99 (12/00)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

LINDA MARIE PRATHER,               §
                                   §
        PLAINTIFF,                 §
                                   §
v.                                 §          C.A. No. B-03-0136
                                   §
UTILIQUEST, L.L.C., MELANIE        §
MCGINNESS AND SUE OBREGON,         §
                                   §
        DEFENDANTS.                §

SECOND DECLARATION OF MELANIE MCGINNESS

1.      "My name is Melanie McGinness.  I am over the age of twenty-one years and am otherwise competent to testify to the facts set forth in this Declaration.  All statements contained in this Declaration are true and correct and are based upon my personal knowledge.

2.      I have been employed with UtiliQuest, LLC ("UtiliQuest") (and, as it was previously known, Byers Engineering Company) since 1986, and currently work out of the Atlanta office.  My current title is human resources/benefits coordinator, and I held that position at all times relevant to the facts giving rise to this litigation.

3.      UtiliQuest has a Family and Medical Leave Act ("FMLA") Policy that by law covers those locations where it employs 50 or more employees at a single worksite or within a 75-mile radius of a worksite.  Some company locations (including the Harlingen, Texas facility), are not covered by the FMLA because the company employs fewer than 50 people.  At these locations, employees who want to take a leave of absence, for whatever reason, must use their personal/sick time and vacation to cover any leave.  An employee who chooses to take a leave of absence but has no sick time or vacation time available (either because they have not accrued the time or have already exhausted their time), or whose leave of absence will exceed their sick and

vacation time, are subject to administrative termination. UtiliQuest's practice of administratively terminating employees who take a leave of absence but do not have sufficient vacation and personal/sick time to cover the leave and are not otherwise not eligible for FMLA leave applies irrespective of the reason the leave is needed (i.e. personal illness, on-the-job injury, pregnancy, etc.).

4.      Since April 1, 1998 (the date that UtiliQuest became a company), UtiliQuest has administratively terminated 4 employees at the Harlingen facility. These employees had taken leaves of absence for the following reasons: pregnancy/maternity (1), on-the job injury (1), personal illness (2), and did not have sufficient vacation and personal/sick time to cover the leave. Of the 4 employees administratively terminated at the Harlingen facility two were male and two were female. Of the four employees administratively terminated at the Harlingen facility three were of Hispanic national origin, one was of "American" national origin. Of the four employees administratively terminated since April 1, 1998 two have applied and been rehired when they were released from their leave.

5.      Since April 1, 1998 two women at the Harlingen facility have become pregnant. UtiliQuest administratively terminated one of these female employees (Linda Prather) when she chose to take a maternity leave of absence but did not have sufficient vacation and personal/sick time to cover the leave. One of these female employees (Sue Obregon, Ms. Prather's supervisor), used her vacation and personal/sick days to cover her leave rather than take a leave of absence and be administratively terminated.

6.      Company-wide, five employees who have taken leave of absence since April 1, 1998, were not covered by the FMLA based upon the number of persons employed at their respective facilities. All of these non-FMLA covered employees were administratively

terminated pursuant to company practice. Two of these employees took their leaves of absence for pregnancy/maternity. The other three were for non-pregnancy-related issues. Two of these employees were male, three were female. Company-wide since April 1, 1998, 42 employees who took leaves of absence were not covered by the FMLA based upon their length of service (less than a year). Each of these 42 employees were administratively terminated pursuant to company practice. 16 of those employees took a leave of absence for personal illness, eight for pregnancy/maternity and 18 for unknown reasons. Since April 1, 1998, 10 of these employees have applied and been rehired when they were released from their leave.

7.    In addition, I have become pregnant while employed at UtiliQuest and was eligible for FMLA leave. I returned to work at the conclusion of my FMLA leave, and was therefore not terminated.

8.    I declare under penalty of perjury that the foregoing is true and correct."

Executed on March 4, 2004

Melanie McGinness