34

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

MAY 2 6 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| LINDA MARIE PRATHER, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | C. A. NO. B-03-0136 |
| UTILIQUEST, LLC, MELANIE | § | |
| MCGINNESS AND SUE OBREGON, | § | |
| | § | |
| *Defendants.* | § | |

DEFENDANT UTILIQUEST'S SUPPLEMENTAL BRIEF
ON *DESERT PALACE, INC. V. COSTA*

Based on the Court's April 27, 2004 Order, Defendant UtiliQuest LLC ("Defendant" or

"UtiliQuest") files this its Supplemental Brief on *Desert Palace, Inc. v. Costa*, 539 U.S. 90

(2003), and respectfully states:

I.     INTRODUCTION

The Court, in an order dated April 26, 2004 requested an analysis of the U.S. Supreme

Court's holding last year in *Desert Palace*, subsequent interpretations of that decision by the

Firth and other Circuits, and the impact of the decision on the present case.  Simply put, *Desert

Palace* has no impact on this case at the summary judgment stage.  The *McDonnell Douglas*

burden-shifting analysis that has been employed by federal courts for determining summary

judgment motions since 1973 still is the proper standard for analysis.  In fact, the *Desert Palace*

holding is a narrow one that only stands for the proposition that a plaintiff does not have to

produce direct evidence to obtain a mixed-motive jury instruction.  Regardless, even if this Court

were to apply the *Desert Palace* holding at the summary judgment stage and contrary to other

Texas federal courts, Defendant still would be entitled to summary judgment.

II.    ANALYSIS OF *DESERT PALACE* AND APPLICATION IN THE FIFTH CIRCUIT

The U.S. Supreme Court's holding in its *Desert Palace* decision in 2003 is a limited one. The Court held that a plaintiff does not have to present direct evidence of discrimination in order to obtain a mixed-motive jury instruction under Title VII.    *Desert Palace*, 539 U.S. at 92.    In analyzing the 1991 amendments to Title VII, the Court found that no heightened burden of proof for mixed motive cases exists and that the burden of proof in mixed motive cases is the same as other Title VII cases—*i.e.* the plaintiff must prove by a preponderance of either circumstantial or direct evidence that there is an inference of illegal discrimination.    *Id.* at 99—100.    Thus, in order to obtain a mixed motive jury instruction at trial, a plaintiff must only present sufficient direct or circumstantial evidence for a reasonable jury to conclude by a preponderance of the evidence that the plaintiff's membership in a protected group was a "motivating factor" for the alleged discriminatory employment practice.    *Id.* at 101.

This holding has no impact on a plaintiff's burden of proof at the summary judgment stage and Texas federal courts have acknowledged as much post-*Desert Palace*.    Several Texas federal district court cases have addressed whether *Desert Palace* has altered the *McDonnell Douglas* burden-shifting framework.    The answer has been an unqualified "no."

For example, in *Lall v. Perot Sys. Corp.*, 2004 WL 884438; No. Civ. A. 302CV2618-P at *5 (N.D. Tex. April 23, 2004) (Solis, J.)[1], the plaintiff argued that employment discrimination plaintiffs "are no longer bound" by the burden-shifting framework.    Judge Solis rejected the plaintiff's argument, granted summary judgment for the defendant, and stated:

> This narrow holding [of *Desert Palace*] has absolutely no bearing on the applicability of the *McDonnell Douglas* framework to Defendant's Motion for Summary Judgment.    The Supreme Court did not in any way suggest in *Desert Palace* that it intended to alter

---

[1] Electronically published cases are attached hereto under Tab A to this brief.

> the burden-shifting framework that it had established, upheld, and
> applied for over thirty years.

*Id.* at 5.

Similarly, other Northern District Court decisions have come to the same conclusion. *See*

*Winter v. Bank of Am., N.A.*, 2003 WL 23200278; No. Civ. A. 3:02-CV-1591-L (N.D. Tex. Dec.

12, 2003) (Lindsay, J.) (holding that burden-shifting framework still applies); *Owens v. Excel*

*Manag. Svcs., Inc.*, 2004 U.S. Dist. LEXIS 2887; Civ. A. No. 3:02-CV-0835-L (N.D. Tex. Feb.

13, 2004) (Lindsay, J.) (same); *Keelan v. Majesco Software, Inc.*, 2004 WL 370225; No. Civ. A.

3:02-CV-1670L (N.D. Tex. Feb. 26, 2004) (Lindsay, J.) (same).  In rejecting the assertion that

*Desert Palace* has altered the *McDonnell Douglas* framework, Judge Sam Lindsay noted:

> This would not be an evolution but a revolution in employment
> discrimination law.  If the Supreme Court were going to make a
> draconian departure from 30 years of well-established employment
> discrimination precedent, it would have done so with unmistakable
> clarity.  In *Desert Palace* the Supreme Court does not even
> intimate that it is overruling, restricting or clarifying *McDonnell
> Douglas*.

*See Winter*, 2004 WL 23200278 at *3.

The Fifth Circuit has not yet expressly addressed the effect, or lack thereof, of *Desert*

*Palace* on the *McDonnell Douglas* framework.  However, in the wake of *Desert Palace*, the

appeals court cited to *Desert Palace* in an unpublished opinion in which it applied the traditional

burden-shifting framework.  *See Read v. BT Alex Brown Inc.* 72 Fed. Appx. 112 (5th Cir. 2003),

*cert. denied*, 124 S. Ct. 1415 (2004) (unpublished) (affirming summary judgment for employer

on plaintiff's discrimination claim).  The court cited *Desert Palace* for the proposition that the

plaintiff bears the "ultimate burden of proving by a preponderance of the evidence, that her

employer intentionally discriminated against her because of her protected status."  *Id.* at 72 Fed.

Appx. at 115.  The Firth Circuit confirmed with a traditional summary of the *McDonnell Douglas-Burdine* burden-shifting framework.  *Id.*  Again, as noted by Judge Lindsay in *Winter*:

> If the Fifth Circuit believed that *Desert Palace* abrogated the burden-shifting framework set forth in *McDonnell Douglas*, it certainly would have deemed it necessary to elevate *Read* to the status of a published opinion, rather than making it an unpublished opinion having no precedential value.

*Winter*, 2004 WL 23200278 at *3 n4.

Finally, as further evidence that the *Desert Palace* holding is a limited one, it should be noted that, in an Americans With Disabilities Act discrimination case decided by the U.S. Supreme Court nearly six months after its *Desert Palace* decision, the Court employed the *McDonnell Douglas* burden-shifting analysis with no mention of its *Desert Palace* decision.  All justices, with the exception of Justices Souter and Breyer, who took no part in the decision, joined the opinion by Justice Thomas.  *Raytheon Co. v. Hernandez*, 124 S. Ct. 513 (2003).

As such, because *Desert Palace* does not affect analysis at the summary judgment stage, this Court should apply the traditional burden-shifting framework to plaintiff's discrimination claim and grant Defendant's Motion for Summary Judgment for the reasons stated therein.

III.    *DESERT PALACE* AS APPLIED IN OTHER CIRCUITS

Federal courts outside of Texas have come to varied conclusions as to the effect of *Desert Palace* at the summary judgment stage.  Many court decisions fall in line with Texas federal district courts and/or continue to apply the burden-shifting framework without comment on *Desert Palace*.  For example, in *Herawi v. State of Ala. Dept. of For. Sci.*,  --- F.Supp.2d ---, 2004 WL 728408; Civil Action No. 2:02cv1360-T (M.D. Ala. April 5, 2004), the district court granted summary judgment for the employer and stated that the *McDonnell Douglas* approach was a sensible way within which to evaluate discrimination evidence.

4

According to the Alabama district court, "there is nothing in *Desert Palace* that undermines the continued usefulness of *McDonnell Douglas* . . . . *McDonnell Douglas* is still good law, and it is the appropriate heuristic device to use in this case." *Id.* at *7-8; *see also, Bujnicki v. American Paving & Excavating, Inc.*, 2004 WL 1071674; No. 99-CV-646S (W.D.N.Y. March 30, 2004) (citing to *Desert Palace* and applying *McDonnell Douglas* burden-shifting analysis in determining defendant's summary judgment motion); *Hoyt v. Dept. of Children & Families*, 309 F. Supp.2d 299 (D. Conn. 2004) (same); *Flagg v. Collier Cty.*, 2003 WL 22350943; No. 2:02CV274FTM29DNF (M.D. Fla. Aug. 15, 2003) (same); *Vogan v. US Oncology, Inc.*, 301 F. Supp.2d 1038 (W.D. Mo. 2003) (questioning validity of *McDonnell Douglas* approach, but continuing to use analysis for summary judgment); *Rollins v. Missouri Dept. of Cons.*, --- F. Supp.2d ---; 2004 WL 944811; No. 02-4271-CV-C-NKL (W.D. Mo. April 14, 2004) (same).

Likely out of an abundance of caution, other federal courts have applied both the burden-shifting analysis and the mixed motive analysis at the summary judgment stage in their decisions. *See Allen v. City of Pocahontas, Ark.*, 340 F.3d 551 (8th Cir. 2003), *cert. denied*, 124 S. Ct. 1420 (2004) (refusing to determine whether *Desert* Palace alters burden-shifting analysis but stating that outcome of case remains same under both analyses); *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061 (9th Cir. 2004) (analyzing summary judgment motion under both *McDonnell Douglas* framework and mixed motive analysis); *Louis v. East Baton Rouge Parish Sch. Bd.*, 303 F. Supp.2d 799 (M.D. La. 2003) (same).

Finally, in the wake of *Desert Palace*, two other federal court trends have emerged. One line points to the demise of the burden-shifting analysis; the other finds that the third element of that analysis should be modified. In *Dare v. Wal-Mart Stores, Inc.*, 267 F. Supp.2d 987 (D.

5

Minn. 2003), the district court found that the *Desert Palace* holding applied to the plaintiff's single-motive Title VII claim because nothing in the "plain meaning" of 42 U.S.C. §2000e-2(m) and §2000e-5(g)(2)(b) expressly restricts the 1991 Civil Rights Act to mixed-motive cases. *Id.* at 990-991; *see also, Griffith v. City of Des Moines*, 2003 WL 21976027 at *17; No. 4:01-CV-10537 (S.D. Iowa July 3, 2003) (finding that plaintiff's retaliation claim "need not be analyzed under the *McDonnell Douglas* burden-shifting framework after *Desert Palace* ruling). The *Dare* court opines that "most employment decisions are the result of the interaction of various factors, legitimate and at times illegitimate, objective and subjective, rational and irrational," and, as such, urges abandoning the *McDonnell Douglas* analysis. *Id.* at 991-992. Thus, under the *Dare* theory, courts should employ the mixed motive analysis at the summary judgment stage to determine whether a plaintiff's protected class was a motivating factor in the complained-of employment decision.

The other line of cases, advocating that *Desert Palace* has modified the burden-shifting analysis, is typified by *Dunbar v. Pepsi-Cola Gen. Bot. Of Iowa, Inc.*, 285 F. Supp.2d 1180 (N.D. Iowa 2003). In *Dunbar*, the court rejected the *Dare* court's contention and found that *Desert Palace* only modifies the final stage of the burden-shifting analysis. *Id.* at 1197-98. Specifically, the *Dunbar* court held that once the defendant has produced its legitimate, nondiscriminatory reason then the plaintiff has two options by which to meet the ultimate burden of proving intentional discrimination and to survive summary judgment. According to the court:

> Under such a modified framework, to prevail after the defendant produces a legitimate, nondiscriminatory reason for its conduct, the plaintiff must prove by the preponderance of the evidence either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative), or (2) that the defendant's reason, while true, is only *one* of the reasons for its conduct, and another "motivating factor" is the plaintiff's protected

6

characteristic (mixed-motive alternative). The latter showing may
be made with either "direct" or "circumstantial" evidence.

*Id.* at 1198. (citations omitted); *see also, Lloyd v. City of Bethlehem*, 2004 WL 540452; No. Civ.

A. 02-CV-00830 (E.D. Pa.   March 3, 2004) (applying modified *McDonnell Douglas* test

espoused in *Dunbar*); *Rishel v. Nationwide Mut. Ins. Co.*, 297 F. Supp.2d 854 (M.D.N.C. 2003)

(same).   Thus, under the *Dunbar* rubric, both the pretext and the mixed motive analyses are

subsumed within the last step of the *McDonnell Douglas* framework.

IV.    REGARDLESS OF THE STANDARD, SUMMARY JUDGMENT IS APPROPRIATE

Even if this court concludes that the *McDonnell Douglas* analysis has been modified or is

no longer applicable, contrary to other Texas federal district courts, summary judgment is still

appropriate on Prather's gender/pregnancy discrimination claim in the present case.  Prather has

failed to produce sufficient evidence to create a genuine issue of material fact to survive

judgment under a pretext on mixed motive analysis.

Following the *Dare* analysis, Prather simply has failed to adduce any evidence that her

gender/pregnancy was a motivating factor, or played any part, in the decision to terminate her

employment.   *Dare*, 267 F. Supp.2d at 991. The undisputed facts are that Prather had used all

accrued vacation or sick leave, was ineligible for FMLA leave and had no choice but to take

short-term disability leave. As a result, UtiliQuest terminated her employment as provided in the

company's leave policy.  (*See* Exhibit 12 to Defendant's Motion for Summary Judgment).

Prather has offered no evidence to show that her employment was terminated for any other

reason, much less an impermissible one.

7

Moreover, under the *Dunbar* analysis, Prather's claim continues to fail because she still cannot meet her *prima facie* requirements.[2] Further, assuming that Prather could clear her *prima facie* hurdle (which she cannot), she cannot meet her ultimate burden of proving intentional discrimination by demonstrating either (i) that defendant's reason for her termination is false and a pretext for discrimination or (ii) that defendant's reason, while true, was only *one* of the reasons for its conduct, and another "motivating factor" was Plaintiff's gender/pregnancy. *Dunbar*, 285 F.Supp. 2d at 1198. Prather has neither "direct" or "circumstantial" evidence within which to meet her burden.    To the contrary, the evidence establishes that no discrimination occurred. The undisputed evidence demonstrates that UtiliQuest applied its leave policy uniformly throughout the company and terminated Prather's employment under that policy alone. As such, summary judgment is appropriate. *See, e.g., Rishel*, 297 F. Supp.2d at 873 (granting summary judgment that defendant's decision to terminate plaintiff's employment was not motivated by age-based bias and noting that the evidence showed that the defendant uniformly applied its bonding policy and terminated those employees who could not meet the bonding requirements).

## V.    CONCLUSION

For the reasons set forth above, Defendant UtiliQuest, LLC respectfully requests that its Motion for Summary Judgment be granted, that the plaintiff take nothing, and that it be awarded any other and further relief to which it may be entitled.

---

[2] For an analysis of Plaintiff's failure to meet the *prima facie* elements of her claim, Defendant incorporates herein the arguments it made in its Motion for Summary Judgment and its Reply to Plaintiff's Response.

Respectfully submitted,

Kerry E Notestine
State Bar No. 15116950
Fed. I.D. No. 2423
1301 McKinney, Suite 1900
Houston, Texas 77010
(713) 951-9400 (Telephone)
(713) 951-9212 (Telecopier)

Of Counsel:
LITTLER MENDELSON, P.C.
  and
J. BRADLEY SPALDING
1301 McKinney Street, Suite 1900
Houston, Texas 77010
Tel: 713.951.9400
Fax: 713.951.9212

Attorney-in-Charge for Defendants
UtiliQuest, LLC

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been forwarded to counsel of record by postage-prepaid, certified mail, return receipt requested, on this the 25th day of May 2004, addressed as follows:

Ruben R. Pena
222 W. Harrison
Harlingen, Texas 78550

ATTORNEY FOR PLAINTIFF
LINDA MARIE PRATHER
CMRRR# 7001 2510 0002 0562 9529

Kerry E Notestine

Houston:176443.1 035266.1021

Slip Copy                                                                    Page 18
(Cite as: 2004 WL 884438 (N.D.Tex.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. Texas, Dallas Division.

Hemant S. LALL, Plaintiff,
v.
PEROT SYSTEMS CORPORATION, Defendant.

No. Civ.A. 302CV2618-P.

April 23, 2004.

Joseph H. Gillespie, Gillespie Rozen & Watsky, David K. Watsky, Gillespie Rozen Watsky & Motley, Dallas, TX, for Plaintiff.

Angelina M. LaPenotiere, Jennifer Burr Altabef, Carrington Coleman Sloman & Blumenthal, Dallas, TX, for Defendant.

*MEMORANDUM OPINION AND ORDER*

SOLIS, J.

**\*1** Now before the Court is Defendant Perot Systems Corporation's Motion for Summary Judgment, filed on January 30, 2004. Plaintiff filed his Response on February 27, 2004, and Defendant filed its Reply on March 15, 2004. After considering the parties' arguments and briefing, and the applicable law, the Court GRANTS in part and DENIES in part Defendant's Motion for Summary Judgment.

I. Background and Procedural History

Plaintiff, Hemant S. Lall, is a 52 year-old male of Indian-Asian origin. Appendix to Plaintiff's Response to Defendant's Motion for Summary Judgment, Ex. 1 ("Pl.'s Decl."), p. 1. He holds bachelor's and master's degrees in engineering, as well as a master's degree in operations research, and has completed all course work for a doctorate degree in operations research. *Id.* at p. 1-2. Plaintiff has also refereed publications in trade journals within the energy industry. *Id.* at p. 2.

a. Plaintiff's Employment History at PSC

Plaintiff was originally hired by Defendant, Perot Systems Corporation ("PSC" or "Defendant"), on December 27, 1989 as an associate in its Houston

office. *Id.* According to Plaintiff, his primary concentration at the Houston office was to find new customers for PSC's fledgling energy division, start accounts with those customers, and develop those accounts until they were ready to be transferred to another PSC employee. *Id.* Plaintiff was transferred out of the Houston office in 1992, but he continued to work on the development of PSC's energy division. Initially, Plaintiff was transferred to Nottingham, England, where he was able to work in England's deregulated energy industry. *Id.* Subsequently, in July 1994, Plaintiff was involved in securing an account with Southern California Edison ("SCE") when California was making a transition to energy deregulation. *Id.* at p. 3. As the account manager for the SCE account, Plaintiff was responsible for developing SCE from one associate to over 55 associates, and brought in revenues in excess of $25 million from associated projects. *Id.* In 1997, Plaintiff was also involved in landing electricity projects and consulting engagements relating to deregulation with the California Independent System Operator, a deregulation entity, and the Los Angeles Department of Water and Power. *Id.* at p. 3-4.

b. iQOM

In December 1999, Russell Prentice began working on a business plan at PSC for a project called Powerstar, later renamed iQom. Appendix to Defendant's Motion for Summary Judgment, Ex. 4 ("Prentice Dep."), p. 158. iQom was to be a part of PSC's Emerging Industries division, which was comprised of PSC businesses that did not fit into its existing industry divisions. App. to Def.'s Mot. for Summ. J., Ex. 5 ("Scott Dep."), p. 184. In creating iQom, PSC hoped to take advantage of opportunities created by increasing deregulation in the energy industry. *Id.* at p. 181. PSC intended to create a system of energy management products to assist in monitoring and managing the use of energy, and market them to a variety of clients through iQom.App. to Def.'s Mot. for Summ. J., Ex. 1 ("Pl.'s Dep."), p. 12-14. Ken Scott was the head of the Emerging Industries division at PSC and, in April 1999, he hired Terry Ukrainetz to serve as Business Lead of iQom. Scott Dep. at p. 184. In late 1999, Plaintiff was transferred from California back to Texas to help with iQom. Pl.'s Decl. at p. 4. Plaintiff's role at iQom was to market iQom services to potential customers, work on the acquisition of new accounts, and perform relevant

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy
(Cite as: 2004 WL 884438, *1 (N.D.Tex.))

market analysis. *See* Pl.'s Decl. at p. 4; App. to Def.'s Mot. for Summ. J., Ex. 6 ("Ukrainetz Dep."), p. 239.

*2 From the beginning, iQom failed to meet its budgeting expectations, and PSC was reluctant to invest development funds into the division. Scott Dep. at p. 187; Prentice Dep. at p. 159-60. As a result, potential customers were required to provide substantial capital contribution, thereby sharing in the initial costs of iQom's services. *Id.* PSC now claims that this practice made it difficult for iQom to attract clients. As of August 2001, over two years after its inception, iQom had only one account, the Wyndham International account (the "Wyndham Account"), for which Prentice was the account manager. Ukrainetz Dep. at p. 202-03, 205, 214. Plaintiff was not involved in the signing, maintenance, or support of the Wyndham Account.

As a result of other PSC projects that were not meeting budgeting expectations, the Emerging Industries divisions reorganized in May 2001. App. to Def.'s Mot. for Summ. J., Ex. 2 ("Lang Dep."), p. 111-12. PSC's businesses involving travel and transportation, telecommunications, and energy were combined into a new organization called the Strategic Marketing Group ("SMG"). *Id.* Scott Lang was appointed Vice President of SMG, and was charged with increasing the profitability of the new group. *Id.* According to PSC, Lang decided that iQom would not be a primary area of focus for SMG in the future. *Id.* at p. 117-118. However, because of iQom existing business with Wyndham International, Lang decided not to eliminate iQom. *Id.* at p. 118-19. Lang later hired Eugene Pizinger to oversee both the Energy and Telecommunications groups for SMG. *Id.* p. 142. In this capacity, Pizinger was given oversight of iQom, which was part of the Energy group. Pizinger then asked Ukrainetz to serve as General Manager of the Energy group. *Id.* at p. 114.

Plaintiff claims that, in December 1999, he was told by Ukrainetz that he would take over as Business Lead of iQom once Ukrainetz was promoted. Lall Decl. at p. 5. Plaintiff also claims that, at about the same time, Ukrainetz sent an e-mail to Carl Young, acting Chief Financial Officer for iQom, to this effect. *Id.* However, when Ukrainetz was promoted to the General Manager position, Prentice, and not Plaintiff, was promoted to the Business Lead position. Ukrainetz Dep. at p.

222-24. Subsequently, on July 16, 2001, Plaintiff received an automated e-mail from PSC's intranet system ("TRAIN"), informing him the he had been designated team lead for the Market Analysis Team, a new position within iQom. Pl.'s Dep. at p. 34.

c. The Reduction in Force and Plaintiff's Termination

PSC claims that, in the summer of 2001, it was forced to implement a company- wide Reduction-In-Force ("RIF"). Lang Dep. at p. 121. Lang testified at his deposition that he and his team leaders identified positions that could be eliminated as part of the RIF based, in part, on whether they were directly billable or supporting a billable account. *Id.* at 123-24. Lang and Pizinger both testified that the primary concern in eliminating certain positions as part of the RIF was to reduce the number of employees who were non-billable· or not supporting a billable account, and to reduce overhead costs. *Id.;* App. to Def.'s Mot. for Summ. J., Ex. 3 ("Pizinger Dep."), p. 147-48. Plaintiff's position at iQom was neither directly billable to any account, nor did he support a billable account. As such, Plaintiff was selected for the RIF. On July 30, 2001, Ukrainetz went to Plaintiff's home and informed him that his position was being eliminated as part of the RIF. Ukrainetz Dep. at p. 224- 25.

*3 After receiving notification of the elimination of his position, Plaintiff was allowed thirty days to acquire an alternate position within PSC. Plaintiff's Complaint, ¶ 21. During this time period, Plaintiff remained a PSC employee, but ultimately bore the burden of finding an alternate position. Pl.'s Dep. at p. 36. In order to assist in his search for an alternate position at PSC, Plaintiff was assigned an internal recruiter. *Id.* at p. 101. According to Plaintiff, however, he was not provided a dedicated internal recruiter until August 13, 2001. Pl.'s Decl. at p. 7. Plaintiff requested a fifteen day extension to search for an alternate position because of this delay. *Id.* Plaintiff's request was denied. *Id.*

There is significant disagreement as to whether Plaintiff did in fact apply for any alternate positions at PSC. In his answers to PSC's interrogatories, Plaintiff claimed that he applied for any open position within PSC both directly through TRAIN and by e-mailing and contacting individuals at PSC. PSC contends, however, that Plaintiff failed to apply formally for a single open position at PSC. In

response to Plaintiff's claims that he did in fact apply to open positions worldwide at PSC, PSC notes that Plaintiff could not identify any of the positions that he allegedly applied for at his deposition. *See* Pl.'s Dep. at p. 58. Regardless of whether Plaintiff did apply for these positions, it is undisputed that Plaintiff was unsuccessful in finding an alternate position within PSC. As a final attempt to remain at PSC, Plaintiff sent a letter to H. Ross Perot, Sr., president of PSC, on August 20, 2001, offering to work for PSC for one dollar per year for the next four years. Pl.'s Decl. at p. 13. According to Plaintiff, he made this offer because "he had been told that his job was being eliminated due to an ongoing economic downturn, and if he could work essentially without a salary, that would directly resolve the reason he was being terminated." Pl.'s Resp., p. 12. As he had not received an immediate response from Perot, Plaintiff made the same offer to Lang, Ukrainetz, and Pizinger of August 24, 2001. Pl.'s Decl. at p. 14-16. Plaintiff's offer was subsequently rejected by Lang. *Id.* As Plaintiff had not obtained an alternate position at PSC, his position was officially eliminated as of August 30, 2001.

**II. Procedural History**

On April 19, 2002, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging claims of race, color, national origin, and age discrimination. After receiving his Notice of Right to Sue, Plaintiff filed his Original Complaint in this case on December 6, 2002. First, Plaintiff claims that Defendant discriminated against him on the basis of his age, in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), when he was denied promotion in June 2001, and when he was terminated on August 30, 2001. *See* 29 U.S.C. § 623, *et seq.* Plaintiff also asserts two claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), claiming that he was discriminated against on the basis of his race and national origin. *See* 42 U.S.C. § 2000e. *et seq.* Specifically, Plaintiff claims that he was discriminated against when (1) he was not promoted in July 2001, (2) his offer to work for Defendant for $1 a year for four years was rejected, and (3) he was terminated on August 30, 2001. Finally, Plaintiff asserts claims for unlawful race discrimination under 42 U.S.C. § 1981. Defendant now moves for summary judgment as to each of

these claims.

**III. Summary Judgment Standard**

**\*4** Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All evidence and the reasonable inferences to be drawn therefrom must be viewed in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). The moving party bears the burden of informing the district court of the basis for its belief that there is an absence of a genuine issue for trial, and of identifying those portions of the record that demonstrate such an absence. *Celotex,* 477 U.S. at 323.

Once the moving party has made an initial showing, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The party defending against the motion for summary judgment cannot defeat the motion unless she provides specific facts that show the case presents a genuine issue of material fact, such that a reasonable jury might return a verdict in her favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment. *Id.* at 248-50; *Abbott v. Equity Group,* 2 F.3d 613, 619 (5th Cir.1993). In other words, conclusory statements, speculation and unsubstantiated assertions will not suffice to defeat a motion for summary judgment. *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir.1996) (en banc). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to her case, and on which she bears the burden of proof at trial, summary judgment must be granted. *Celotex,* 477 U.S. at 322-23.

Finally, the Court has no duty to search the record for triable issues. *Ragas v. Tennessee Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir.1998). "The party

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which the evidence supports his or her claim." *Id.* A party may not rely upon "unsubstantiated assertions" as competent summary judgment evidence. *Id.*

### IV. *Desert Palace* and the *McDonnell Douglas* Framework

It is well settled that, in order to survive summary judgment in a Title VII discrimination claim, a plaintiff must first establish, by a preponderance of the evidence, a *prima facie* case of discrimination. *Shackelford v. DeLoitte & Touche, LLP,* 190 F.3d 398, 404 (5th Cir.1999). To establish a *prima facie* case of discrimination, a plaintiff may prove his claim through direct or circumstantial evidence of discrimination. In the absence of direct evidence, Title VII claims at the summary judgment stage are analyzed under the tripartite burden-shifting test established by the Supreme Court in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See also Urbano v. Continental Airlines, Inc.,* 138 F.3d 204, 206 (5th Cir.1998). The Supreme Court has applied the same burden-shifting framework to claims brought under the ADEA. *See O'Conner v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 311, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996); *Bodenheimer v. PPG Indus., Inc.,* 5 F.3d 955, 957 n. 4 (5th Cir.1993).

**\*5** In his Response to Defendant's Motion for Summary Judgment, Plaintiff argues that, after the Supreme Court's decision in *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), "plaintiffs [in employment discrimination cases] are no longer bound by the *McDonnell Douglas* framework." Pl.'s Resp. at p. 2. Plaintiff asserts that, "[b]ecause a jury can conclude from [his] direct and circumstantial evidence that his age, race, and/or national origin motivated PSC's actions towards him, [Plaintiff] is entitled to a mixed-motive instruction which shifts the burden of proof to PSC to prove that it would have taken the same actions towards [him] even in the absence of discriminatory motive." *Id.* Plaintiff's interpretation of *Desert Palace* is wholly incorrect, and the Court rejects his argument that the *McDonnell Douglas* framework is no longer applicable. In *Desert Palace,* the Supreme Court held that a plaintiff was not required to show direct evidence of discrimination in order to obtain a

mixed-motive jury instruction under 42 U.S.C. § 2000e-2(m). *See Desert Palace,* 539 U.S. at 95-96. This narrow holding has absolutely no bearing on the applicability of the *McDonnell Douglas* framework to Defendant's Motion for Summary Judgment. The Supreme Court did not in any way suggest in *Desert Palace* that it intended to alter the burden-shifting framework that it had established, upheld, and applied for over thirty years. Other courts in the Fifth Circuit to have addressed the issue have concluded that the applicability of the *McDonnell Douglas* framework has not been altered by *Desert Palace,* and this Court agrees. *See, e.g., Read v. BT Alex Brown Inc.,* 72 Fed. Appx. 112 (5th Cir.2003) (citing to *Desert Palace,* but applying the *McDonnell Douglas* framework to plaintiff's sex and age discrimination claims); *Winter v. Bank of America,* 2003 U.S. Dist. LEXIS 24790 (N.D.Tx.2003); *Owens v. Excel Management Services, Inc.,* 2004 U.S. Dist. LEXIS 2887 (N.D.Tx.2004).

### V. Plaintiff's Non-Promotion Claim

Plaintiff claims that he was discriminated against in violation of the ADEA and Title VII when he was not promoted in June 2001. *See* 29 U.S.C. § 621 *et seq.;* 42 U.S.C. § 2000e, *et seq.*

### a. The *McDonnell Douglas* Framework

Under the *McDonnell Douglas* framework, Plaintiff must first establish, by a preponderance of the evidence, a *prima facie* case of discrimination in order to survive PSC's Motion for Summary Judgment. [FN1] The *prima facie* case, once established, raises a presumption of discrimination which the defendant must rebut by articulating legitimate, nondiscriminatory reasons for the plaintiff's rejection. *See Medina v. Ramsey Steel Co.,* 238 F.3d 674, 680 (5th Cir.2001). This burden on the employer is only one of production, not persuasion, involving no credibility assessments. *See Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 222 (5th Cir.2000).

> FN1. As noted *supra,* the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas* for Title VII cases is applicable to claims brought under the ADEA. *See O'Conner v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 311, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996); *Bodenheimer v. PPG Indus., Inc.,* 5 F.3d

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

qualified' than the employee selected for the position at issue." *Celestine,* 266 F.3d at 356-57 (5th Cir.2001). The Fifth Circuit has made clear, however, that "the bar is set high for this kind of evidence because differences in qualifications are generally not probative evidence of discrimination unless those disparities are 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." ' *Id.* (quoting *Deines v. Dept. of Prot. & Regulatory Servs.,* 164 F.3d 277, 281 (5th Cir.1999) ; *see also EEOC v. Louisiana Office of Community Services,* 47 F.3d 1438, 1445 (5th Cir.1995) (difference in qualifications to that of the person selected must be "so apparent as to virtually jump off the page and slap us in the face."). The Court finds that Plaintiff has demonstrated a fact issue as to whether he was "clearly better qualified" than Prentice.

PSC does not appear to dispute that Plaintiff was an extremely well- credentialed, well-qualified candidate for the Business Lead position. Rather, PSC's contention is merely that Prentice was better suited for the position. PSC claims that the scope and purpose of iQom had changed substantially from the time of its inception. Specifically, PSC has established through Lang's deposition testimony that iQom was not going to be a major focus of either SMG or PSC in the future. Moreover, Lang testified that iQom was not eliminated earlier because of the Wyndham Account. Thus, PSC contends that it preferred Prentice for the Business Lead position because of his day-to-day experience with the Wyndham account. Moreover, with respect to the Golden, Subbarao, Holland, and Conrad declarations, PSC argues that they are not sufficient to create a fact issue as to whether Plaintiff was "clearly better qualified" because they were not familiar with the qualifications it was seeking for the Business Lead position. The Court does not agree. Golden, Subbarao, Holland, and Conrad each had several years of experience working with Prentice and Plaintiff, and were familiar with both of their work experiences and qualifications. Moreover, as noted by Plaintiff, Golden, Subbarao, Holland, and Conrad were founding members of iQom. Even if the scope and focus of iQom had changed, PSC has not presented any evidence to suggest that Golden, Subbarao, Holland, and Conrad were unaware of these changes, or even that they were not at iQom when these changes were made. More importantly,

it is undisputed that the Business Lead position was a management position, and Golden, Subbarao, Holland, and Conrad's declarations are certainly relevant to this issue. When viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to Plaintiff, the Court finds that Plaintiff has established a fact issue as to whether he was "clearly better qualified" than Prentice for the Business Lead position. Accordingly, PSC's Motion for Summary Judgment with respect to this claim is hereby DENIED.

IV. Plaintiff's Termination Claims

*8 Plaintiff also claims that he was discriminated on the basis of his age, race, and national origin when he was terminated as part of PSC's RIF in August 2001. [FN2] In order to establish a *prima facie* case of discriminatory discharge in connection with an RIF, a plaintiff must prove that (1) he is a member of a protected class, (2) he was qualified for the position he held, (3) he was discharged, and (4) after the discharge, other employees not a member of the plaintiff's protected class remained in similar positions. *See Vaughn v. Edel,* 918 F.2d 517, 521 (5th Cir.1990). With respect to Plaintiff's race and national origin discrimination claims, PSC contends that it is entitled to summary judgment because Plaintiff has not shown that other employees outside of his protected class were allowed to remain in similar positions.

> FN2. Plaintiff also asserts that his termination was, at least in part, a result of his allegedly discriminatory non-promotion. Plaintiff contends that Prentice was not terminated as part of the RIF, and claims that if he had been properly promoted to the Business Lead position, he also would not have been terminated. This claim is inexorably tied to the propriety of PSC's decision not to promote him, and the proper place for its determination is at the trial on Plaintiff's non-promotion claim.
> However, this section is limited to Plaintiff's separate claims of discriminatory termination, which are independent of his claims for discriminatory non-promotion. As discussed in more detail below, the Court finds that, to the extent that PSC's decision not to promote Plaintiff was proper, Plaintiff's separate claims for discriminatory termination fail as a matter of law.

a. Plaintiff's Title VII Claims

According to PSC, Plaintiff cannot satisfy the final element of the *prima facie* case because there were

no positions similar to his own at iQom. Ukrainetz testified at his deposition that, at the time of the RIF, Plaintiff's position was "the only entirely nonbillable role...." Plaintiff has not identified any other employees within iQom who were nonbillable or not supporting a billable account that were retained after the RIF, nor does Plaintiff dispute that he was in fact a nonbillable employee who was not supporting a billable account. [FN3] Thus, Plaintiff has not established a *prima facie* case of race or national origin discrimination with respect to his termination, and PSC is entitled to summary judgment with respect to these claims. However, even if the Court was to assume that a *prima facie* case of discrimination had been satisfied, PSC would still be entitled to summary judgment for the reasons stated below with respect to Plaintiff's termination- based age discrimination claim.

> FN3. Although Plaintiff states in his Response to Defendant's Motion for Summary Judgment that he "can easily establish that younger and non- Asian Indian employees were retained in the alleged RIF," nowhere in his brief does he actually identify any such employee.

b. Plaintiff's ADEA Claim

Defendant does not appear to contest that Plaintiff has established a *prima facie* case of age discrimination with respect to his termination claim. [FN4] Rather, Defendant contends that it is entitled to summary judgment because Plaintiff has failed to create a fact issue as to whether its stated legitimate, non-discriminatory reason for his termination was a pretext for age discrimination. PSC asserts that Plaintiff's termination was the result of a financially driven Reduction-In-Force ("RIF"). PSC claims that it implemented neutral criteria in determining what positions would be eliminated under the RIF. Specifically, PSC contends that the positions subject to the RIF were chosen on the basis of whether they were billable to or directly supporting a billable SMG account. As his position was neither billable nor supporting a billable account, Plaintiff's position was selected for the RIF. The Fifth Circuit has expressly held that a RIF "is itself a legitimate, nondiscriminatory reason for discharge." *EEOC v. Texas Instruments,* 100 F.3d 1173, 1181 (5th Cir.1996). Under the *McDonnell Douglas* framework, once the employer has articulated a legitimate, nondiscriminatory reason for the adverse employment action, the burden shifts back to the

plaintiff. In order to survive PSC's Motion for Summary Judgment, Plaintiff must raise a genuine issue of material fact as to whether the employer's proffered reason was merely a pretext for discrimination. [FN5]

> FN4. In its Motion for Summary Judgment, Defendant notes that it "will not address whether Plaintiff can prove a *prima facie* case of discrmination under the ADEA based upon his selection for the RIF...." Pl.'s Resp. at p. 12, n. 5.

> FN5. Plaintiff also argues that "[b]y definition, if [PSC] cannot identify the person who made the decision to include [Plaintiff] in the reduction in workforce, it is impossible for Defendant to shift the burden of proof by articulating a legitimate, non-discriminatory reason for choosing [Plaintiff] to terminate." Pl.'s Resp. at p. 33. The Court rejects this argument, as Plaintiff has cited to no legal authority in support of this sweeping proposition. Moreover, as noted in its Reply brief, PSC has presented competent evidence with regard to the individuals involved in the decisionmaking process for the RIF.

*9 Plaintiff contends that PSC's legitimate, nondiscriminatory reason for his termination was in fact a pretext for discrimination based on the statements made by Vicky Ponichtera and Sylvia Kent. Specifically, Plaintiff claims that Ponichtera stated that "if you were employed by PSC and you were over age 45, your job was in jeopardy," and Kent stated that she had noticed a pattern of layoffs of senior, highly paid employees at PSC. *See* Pl.'s Compl. at p. 3-4; Pl.'s Resp. at p. 32. Plaintiff makes clear that he is not relying on Ponichtera's and Kent's statements as direct evidence of discrimination. Rather, Plaintiff claims that the statements "constitute[ ] corroborative evidence that PSC was engaging in a pattern of systematically terminating older workers." At best, these statements constitute extremely weak corroborative evidence of discriminatory motive on the part of PSC. Plaintiff has provided no other evidence to corroborate the statements made by Ponichtera and Kent, and without more, their statements alone are not sufficient to raise a fact issue as to whether PSC's RIF was a pretext for discrimination. Moreover, as noted by PSC, the statements constitute inadmissible hearsay that the Court cannot consider as competent summary judgment evidence.

Plaintiff also argues that the rejection of his offer to work for $1 a year for four years is evidence of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

pretext. Plaintiff asserts that "by agreeing to work for $1, the reason for terminating [Plaintiff] (to cut costs) is taken completely out of the picture. This evidence clearly puts at issue whether reducing costs was the true reason for getting rid of [Plaintiff]." Plaintiff's argument is merely an attempt to impose his own business judgment on his employer. Plaintiff's argument is based on the assumption that the only cost that PSC was concerned with was that of his salary. However, Lang's deposition testimony makes clear that there were other associated costs that were obviously of concern to PSC management, including travel costs, overhead, and facility costs. Thus, contrary to Plaintiff's assertion, the fact that he was willing to work for $1 in no way removed the reason for the RIF and his termination "completely out of the picture." The denial of his offer in no way demonstrates that his termination under the RIF was a pretext for discrimination. Accordingly, the Court hereby GRANTS PSC's Motion for Summary Judgment with respect to Plaintiff's termination-based discrimination claims.

VI. Plaintiff's Claim Arising Out of the Rejection of His Reduced Salary Offer

Plaintiff also claims that PSC discriminated against him on the basis of his race and national origin when his offer to work for $1 a year for four years was rejected. Again, Plaintiff must first establish, by a preponderance of the evidence, a *prima facie* case of race discrimination in order to survive PSC's Motion for Summary Judgment. Under the *McDonnell Douglas* framework, a *prima facie* case of race discrimination is established by the plaintiff once he proves that: (1) he is a member of a protected class; (2) that he was qualified for his position; (3) that he suffered an adverse employment action; and (4) that others similarly situated were treated more favorably. *See generally Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 510 (5th Cir.2001); *Shackelford*, 190 F.3d at 404.

*10 PSC is entitled to summary judgment on Plaintiff's Title VII claims arising out of the rejection of his $1 a year, reduced salary offer because Plaintiff has not established a *prima facie* case of discrimination with respect to these claims. It is undisputed that, based on his race and national origin, Plaintiff was a member of a protected class. In addition, PSC has not contested the fact that Plaintiff was qualified for his position. With respect

to the third element of the *prima facie* case, the Court will assume for purposes of this Motion that PSC's rejection of Plaintiff's offer is an actionable adverse employment action. [FN6] Plaintiff has failed to establish a *prima facie* case of discrimination, however, because he has not presented any evidence to indicate that similarly situated employees outside of his protected class were treated differently than he. Plaintiff has not identified a single employee outside of his protected class that made a similar offer to work at a reduced salary to PSC, and whose offer was accepted. Without such a showing, Plaintiff has not established even a *prima facie* case of discrimination, and PSC is entitled to summary judgment.

> FN6. The Fifth Circuit has adopted a standard where only "ultimate hiring decisions, such as hiring, granting leave, discharging, promoting, and compensating satisfy the adverse employment action element." *Dollis v. Rubin*, 77 F.3d 777, 781-82 (5th Cir.1995) (citation omitted); *see also Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 708 (5th Cir.1997).

VII. Plaintiff's § 1981 Claims

Iit is well established that "claims of racial discrimination brought under § 1981 are governed by the same evidentiary framework applicable to claims of employment discrimination brought under Title VII." *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 n .2 (5th Cir.1996) (citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989)). As such, the Court finds that Plaintiff's § 1981 claims fail for the same reasons set forth above with respect to his Title VII claims.

VIII. Conclusion

Defendant's Motion for Summary Judgment is hereby GRANTED with respect to Plaintiff's § 1981 claims, his claims arising out of his termination as part of PSC's RIF, and his claims arising out of the rejection of his offer to work for a reduced salary. However, the Court finds that Plaintiff has created a fact issue with respect to his claims for discriminatory non-promotion. Accordingly, PSC's Motion for Summary Judgment is DENIED with respect to Plaintiff's non-promotion claims.

It is so ordered.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy
(Cite as: 2004 WL 884438, *10 (N.D.Tex.))

2004 WL 884438 (N.D.Tex.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy
(Cite as: 2003 WL 23200278 (N.D.Tex.))
C

Only the Westlaw citation is currently available.

United States District Court,
N.D. Texas, Dallas Division.

Nixon WINTER, Plaintiff,
v.
BANK OF AMERICA, N.A., Defendant.

No. Civ.A.3:02-CV-1591-L.

Dec. 12, 2003.

Heather N. Farris Bennett, Durwood D. Crawford, Goins, Underkofler, Crawford & Langdon, Dallas, TX, for Plaintiff.

Shannon D. Norris, Chad R. Neal, Apple & Norris, Coppell, TX, for Defendant.

*ORDER*

LINDSAY, J.

**\*1** Before the court are Defendant Bank of America, N.A.'s Motion for Summary Judgment, filed May 28, 2003; and Plaintiff's Motion for Partial Summary Judgment on Liability, filed September 19, 2003. After careful consideration of the motions, responses, replies, summary judgment evidence, record and applicable law, the court grants in part and denies in part Defendant Bank of America, N.A.'s Motion for Summary Judgment; and denies Plaintiff's Motion for Partial Summary Judgment on Liability.

*I. Factual and Procedural Background*

This is an employment discrimination and retaliation case. Plaintiff Nixon Winter ("Plaintiff" or "Winter") is a black male of Nigerian national origin. Winter was employed by Defendant Bank of America, N.A. ("Defendant," "Bank of America," or "the Bank") from April 1997 until October 29, 2001. During his employment with Bank of America, Winter was promoted to the position of banking center manager in January 1999 and to the position of assistant vice president in November 1999.

In March 2000, Winter applied for a position as a client manager in the Bank's Premier Banking group

("Premier Banking"). At that time, there were five openings for the position of client manager. Premier Banking provides high level service to customers with substantial financial relationships with the Bank or to customers who could potentially develop such relationships in the near future. Client managers were expected to develop one-on-one relationships with their customers to make banking easy and convenient and to understand their customers' financial goals and advise them of the appropriate resources and financial services offered by the Bank.

Christine Singh ("Singh"), a senior vice president who was the market manager for South Dallas Premier Banking, interviewed Winter for a client manager position. Although Singh was impressed with Winter in terms of his ability to produce results, she had some other concerns. Specifically, she received negative feedback regarding Winter's interpersonal skills from a co-worker. Additionally, Winter's manager expressed concern regarding his ability to build client relationships over the telephone because his accent might make it difficult for some customers to understand him; nonetheless, Singh wanted to offer Winter the position. Before doing so, however, she arranged for her manager and a few other executives to interview Winter so that they could provide their opinion of him. Singh ultimately decided to promote Winter. [FN1]

> FN1. Apparently, Winter was promoted to the client manager position later in March 2000. The record, however, does not reflect the exact date of the promotion.

On July 9, 2001, Singh met with Winter to address several customer complaints that had been filed against him. In response, Winter questioned the authenticity and the veracity of the complaints. Four days later, on July 13, 2001, Winter submitted a written complaint against Singh to the personnel supervisor, Mary Kanaga ("Kanaga") in which he claimed a hostile work environment. On July 16, 2001, Singh provided Winter with an updated coaching memorandum in which she explained the need to improve his customer satisfaction rating and warned that a failure to do so could result in termination. On October 24, 2001, Winter, Singh and a new personnel supervisor Rich Jiwanlal ("Jiwanlal") [FN2] met for a formal coaching session and final warning. Winter became upset during this meeting. Five days later, on October 29,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2001, Singh discharged Winter.

> FN2. Sometime after Winter filed his complaint against Singh but before the October 24, 2001 meeting, Jiwanlal replaced Kanaga.

**\*2** On November 19, 2001, Winter filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), contending race and national origin discrimination and retaliation. He received a right-to-sue letter from the EEOC on May 30, 2002. On July 26, 2002, Winter filed suit, contending violations of Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981. Specifically, Winter contends that Bank of America discriminated against him on the basis of his race and national origin when he was discharged. Winter also contends that his discharge was in retaliation for his discrimination complaints against Singh. Bank of America has filed for summary judgment, and Winter has filed for partial summary judgment on liability.

II. *Summary Judgment Standard*

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Ragas v. Tenneco Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir.1998). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Ragas,* 136 F.3d at 458. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Anderson,* 477 U.S. at 254-55.

Once the moving party has made an initial showing

that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita,* 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler,* 73 F.3d 1322, 1325 (5th Cir.1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Ragas,* 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment *Id.; see also Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915-16 & n. 7 (5th Cir.), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248. Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex,* 477 U.S. at 322-23.

III. *Analysis*

A. Defendant's Motion for Summary Judgment

1. Applicable Standard of Proof

**\*3** Winter and Bank of America disagree regarding the applicable standard of proof on Winter's discrimination claims. Winter maintains that the court should apply the "mixed-motives" analysis found in *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 2150, 156 L.Ed.2d 84 (2003). [FN3] A "mixed-motives" case is one in which the adverse employment decision is motivated by both legitimate *and* illegitimate, that is, discriminatory, reasons. *Waltman v. International Paper Co.,* 875

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

F.2d 468, 481 (5th Cir.1989).

> FN3. *Desert Palace* makes clear that direct evidence of discrimination is not necessary to obtain a mixed-motive jury instruction under Title VII. **539 U.S. at ----, ----, 123 S.Ct. at 2150, 2155.**

Bank of America counters that this is a pretext case, and therefore the court should follow the *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), burden-shifting framework. A pretext case is one in which the "employer has either a discriminatory *or* a non-discriminatory rationale for its actions." *Waltman,* 875 F.2d at 481. (emphasis in original).

As an initial matter the court declines to accept Winter's suggestion that the *McDonnell Douglas* burden-shifting paradigm no longer exists after *Desert Palace.* This would not be an evolution but a revolution in employment discrimination law. If the Supreme Court were going to make a draconian departure from 30 years of well-established employment discrimination precedent, it would have done so with unmistakable clarity. In *Desert Palace,* the Supreme Court does not even intimate that it is overruling, restricting or clarifying *McDonnell Douglas.* Moreover, no Fifth Circuit authority embraces Winter's interpretation of *Desert Palace. See Read v. BT Alex Brown Inc.,* 72 Fed. Appx. 112 (5th Cir.2003). [FN4]

> FN4. In *Read,* the Fifth Circuit cited to *Desert Palace;* however, it applied the *McDonnell Douglas* burden-shifting framework to the plaintiff's sex and age discrimination claims. If the Fifth Circuit believed that *Desert Palace* abrogated the burden-shifting framework set forth in *McDonnell Douglas,* it certainly would have deemed it necessary to elevate *Read* to the status of a published opinion, rather than making it an unpublished opinion having no precedential value.

The court must now determine which analysis applies here. *See Mooney v. Aramco Services Co.,* 54 F.3d 1207, 1217 (5th Cir.1995) (A case need not be labeled as a "mixed motives" case or pretext case from its inception; but at some point, the court must determine whether the case involves mixed motives.). Bank of America contends that this is a pretext case because there is no evidence that it had legitimate *and* illegitimate reasons for discharging Winter and because Winter does not concede that it

had any legitimate reason to terminate his employment. The court agrees. Accordingly, this case will be analyzed pursuant to the burden-shifting framework under *McDonnell Douglas.* Nevertheless, even if the court applied the "mixed motives" analysis, the ultimate burden of proving intentional discrimination remains with the plaintiff. *See Texas Dep't of Comty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *see also Read,* 72 Fed. Appx. at 115 (citing *Desert Palace,* 539 U.S. at ----, 123 S.Ct. at 2150).

1. Discrimination

Winter brings claims of race and national origin discrimination [FN5] under Title VII and § 1981. [FN6] Under the applicable burden-shifting paradigm for Title VII and § 1981 [FN7] discrimination claims, Winter must establish a *prima facie* case of discrimination; Bank of America must then articulate a legitimate, nondiscriminatory reason for its action; and finally, if the parties satisfy their initial burdens, the case reaches the "pretext stage," and Winter must then adduce sufficient evidence to permit a reasonable trier of fact to find pretext or intentional discrimination. *See McDonnell Douglas Corp.,* 411 U.S. at 802-04; *Burdine,* 450 U.S. at 252-53; *Byers v. Dallas Morning News, Inc. .,* 209 F.3d 419, 425-26 (5th Cir.2000). To establish a *prima facie* case of discrimination for a discharge, Winter must establish: (1) that he is a member of a protected class; (2) that he was qualified for the position; (3) that he was terminated from the position; and (4) that he was replaced by a person outside the protected group, or that he was discharged because of his national origin. *See Byers,* 209 F.3d at 426-27

> FN5. Although Winter contends that he was discriminated against because of his national origin (Nigerian) and color (black), his claims are indistinguishable. *See Bullard v. OMI Georgia, Inc.,* 640 F.2d 632, 634 (5th Cir. Unit B 1981) (In some contexts, national origin and racial discrimination are "so closely related ... as to be indistinguishable."). Therefore, the court finds that Winter's race and national origin are so closely related that a separate claim for race discrimination would merely duplicate the national origin discrimination claim. The summary judgment evidence make it unequivocally clear that national origin discrimination is being asserted, and the claims of racial discrimination are simply

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

superfluous. For this reason, the court does not consider them to be separate and distinct claims. Even if one could consider them as separate and distinct claims, the race discrimination claim necessarily fails for the same reasons that the national origin claim fails.

FN6. When they are urged as parallel causes of action, the same standard of proof applies to Winter's disparate treatment claims under both Title VII and § 1981. *Shackelford v. Deloitte & Touche, LLP.,* 190 F.3d 398, 403 n. 2 (5th Cir.1999); *Baltazar v. Holmes,* 162 F.3d 368, 373 (5th Cir.1998). For this reason, Winter's Title VII and § 1981 discrimination claims will be analyzed together.

FN7. The burden-shifting analysis prescribed in *McDonnell Douglas* for employment discrimination claims is also applicable in suits brought under § 1981. *See Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1047 (5th Cir.1996).

*4 Bank of America concedes that Winter can establish a *prima facie* case. Winter contends that this concession precludes summary judgment in favor of the Bank. Specifically, he contends that the existence of a *prima facie* case not only establishes sufficient evidence upon which a reasonable jury could find discrimination but also shifts the burden of proof. The court disagrees. While Winter is correct that a plaintiff can survive summary judgment if a *prima facie* case is established and the defendant does not rebut the presumption of discrimination created by the *prima facie* case, this is not the case here. Bank of America has proffered several reasons as legitimate, nondiscriminatory reasons for discharging Winter. Further, Winter bears the ultimate burden of proving, by a preponderance of the evidence, that the Bank intentionally discriminated against him because of his national origin." *Burdine,* 450 U.S. at 253; *Wallace v. Methodist Hosp. Sys.,* 271 F.3d 212, 219 (5th Cir.2001)).

The court now turns to whether Bank of America has articulated legitimate, nondiscriminatory reasons for terminating Winter's employment. Bank of America contends that it discharged Winter because of (1) an inordinate number of complaints; and (2) his unprofessional demeanor and insubordinate behavior. As these are legitimate, nondiscriminatory reasons to discharge an employee, Bank of America has met its burden. Now, the burden shifts back to

Winter to demonstrate that Bank of America's articulated reasons are a pretext for intentional discrimination.

After a Title VII case reaches the pretext stage, the question for summary judgment is whether a rational factfinder could find that Bank of America intentionally discriminated against Winter on the basis of his national origin. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). A "plaintiff can survive summary judgment by producing evidence that creates a jury issue as to the employer's discriminatory animus or the falsity of the employer's legitimate nondiscriminatory explanation." *Sandstad v. CB Richard Ellis, Inc.,* 309 F.3d 893, 897 (5th Cir.2002). "Pretext-plus" is not required to support an inference of retaliatory discrimination. *Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 223 (5th Cir.2000). "[A] plaintiff' prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminate," and may therefore be enough to prevent summary judgment or judgment as a matter of law. *See Reeves v. Sanderson Plumbing Prods. Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Sandstad,* 309 F.3d at 897. This showing, however, is not always enough to prevent summary judgment "if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves,* 530 U.S. at 148. On the other hand, in the context of an unlawful discrimination or retaliation claim, summary judgment is inappropriate "if the evidence taken as a whole (1) creates a fact issue as to whether each of the employer's stated reasons was what actually motivated the employer and (2) creates a reasonable inference that [national origin] was a determinative factor in the actions of which [a] plaintiff complains." *Vadie v. Mississippi State Univ.,* 218 F.3d 365, 373 n. 23 (5th Cir.), *reh'g denied,* 232 F.3d 212 (5th Cir.2000), *cert. denied,* 531 U.S. 1113, 121 S.Ct. 859, 148 L.Ed.2d 772 (2001) (quoting *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 994 (5th Cir.1996)) *(en banc* ).

*5 Winter contends that Bank of America's

proffered reasons for his discharge are false. In support of his argument that a pretext exists, Winter contends that (1) the complaints in question were fabricated or a result of misunderstandings; (2) his alleged unprofessional behavior was exaggerated; and (3) a litany of other acts [FN8] of alleged disparate treatment viewed as a whole support a finding of discrimination. The court determines that Winter has failed to establish that Bank of America's articulated reasons for his discharge were a pretext for intentional discrimination.

> FN8. Winter admits that "he does not seek a remedy for [these] acts, but tenders this evidence as background evidence to prove discrimination and retaliation in his discharge." Plaintiff's Brief Supporting His Response to Defendant's Motion for Summary Judgment ("Pl.Resp.") at 19-20. Therefore, the court need not address the Bank's arguments that some of these acts are time-barred or do not constitute adverse employment actions cognizable under Title VII.

First, with respect to the complaints, Winter mistakenly believes that a letter of commendation, dated October 26, 2001, [FN9] and a subsequent e-mail, dated October 31, 2001, detailing a complaint against Winter by the same customer who sent the letter of commendation call into question all of the complaints filed against him. Winter relies on the testimony of Jiwanlal who allegedly stated that based on these two documents he questions all of the complaints against Winter. Winter further contends that prior to the discrepancy illustrated by these two documents he informed the Bank of the questionable nature of all the other complaints previously filed against him in his July 19, 2001 complaint against Singh. He contends, however, that the Bank failed to properly respond to his concerns in that it did not reprimand Singh or otherwise document his complaint in Singh's personnel file, and the personnel manager, Kanaga, failed to conduct a follow-up meeting with him.

> FN9. Bank of America objects to the October 26, 2001 letter on the grounds of hearsay. The court overrules the objection.

Bank of America counters that Winter's termination was not based on either the October 26, 2001 letter or the October 31, 2001 e-mail as they were not received by the Bank until after his discharge. It discounts the testimony of Jiwanlal in which he allegedly states that these two documents call into question all the complaints against Winter. The Bank contends that Jiwanlal was confused and that his confusion is understandable, given that neither of these documents was considered at the time of Winter's termination. Bank of America also contends that these documents are not evidence of fraud as Winter implies but rather evidence of the fickle nature of that customer. Bank of America further counters that it conducted a reasonable review of Winter's complaint against Singh, including requiring her to address, in writing, each of his concerns. The Bank contends that after all the information was reviewed it concluded that no discrimination had occurred, and therefore no reprimand was necessary.

As an initial matter, the court notes that Winter misconstrues Jiwanlal's testimony and takes it totally out of context. The court does not know whether this was done inadvertently or intentionally; however, the effect is the same. Jiwanlal testified that, at best, the October 26, 2001 letter and October 31, 2001 e-mail would only call into question the reliability of the October 31, 2001 complaint. He specifically states that these documents do not create any doubt as to the reliability of all the other complaints. Appendix to Plaintiff's Brief Supporting His Response to Defendant's Motion for Summary Judgment ("Pl.App.") at 270 (59:10-18). [FN10] Contrary to Winter's representations to the court, Jiwanlal testified as follows: "But I would *not* say that I'm going to question--I would personally question all of the complaints because of these two letters." Pl.App. at 271 (60:1-3) (emphasis added).

> FN10. Jiwanlal testified as follows when questioned about the October 26, 2001 letter and the October 31, 2001 e-mail:
> Q. Does that obvious conflict within two or three days of each other cause you any concern about the reliability of alleged customer complaints that you were hearing about?
> A. This one it does but -
> Q. Does it create any doubt about any of the others?
> A. No, sir, not all of them because I've read several of them and as I indicated before, they all can't be -
> Q. They all can't be bogus?
> A. Yeah, or manufactured or whatever. I mean, I just -
> Pl.App. at 270 (59:10-18).

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                       Page 6
(Cite as: 2003 WL 23200278, *6 (N.D.Tex.))

**\*6** The Bank offers no evidence to support its contention that the October 26, 2001 letter and October 31, 2001 e-mail were not considered when the decision to discharge Winter was made. Nonetheless, even if these documents create a fact question, they do so only as to the validity of this customer's complaint. Winter has offered no competent summary judgment evidence [FN11] to dispute the existence of the other documented complaints lodged against him in the six months preceding his termination. An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio,* 738 F.2d 1181, 1187 (11th Cir.1984) (citing *Megill v. Board of Regents,* 541 F.2d 1073, 1077 (5th Cir.1976)). "[E]ven an incorrect belief that an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason. We do not try in court the validity of good faith beliefs as to an employee's competence. Motive is the issue.... [A] dispute in the evidence concerning job performance does not provide a sufficient basis for a reasonable factfinder to infer that [the] proffered justification is unworthy of credence." *Mayberry v. Vought Aircraft Co.,* 55 F.3d 1086, 1091 (5th Cir.1995) (quoting *Little v. Republic Refining Co., Ltd.,* 924 F.2d 93, 97 (5 th Cir.1991). Further, there is no competent summary judgment evidence that he was treated differently than other similarly situated employees. Accordingly, Winter has not established the existence of a fact question regarding whether the complaints upon which his termination was based were merely a pretext for discrimination.

> FN11. Bank of America objects on the grounds of hearsay to the allegations in paragraphs 12 and 13 of Winter's affidavit relating to his alleged conversations with customers regarding their complaints. The court sustains the objection, and such statements will not be considered. *See Eason,* 73 F.3d at 1325.

Second, Winter contends the characterizations of his demeanor and behavior are not credible because the only "witnesses" are Singh and Jiwanlal and because the Bank did not offer any evidence that his former supervisor considered his demeanor or behavior problematic. [FN12] Bank of America counters that Winter's unprofessional behavior and demeanor were witnessed by more people than just Singh and Jiwanlal, including a co-worker who had

personal knowledge of his "belligerent" attitude with a customer and Singh's assistant and two other employees who were frightened by Winter's conduct towards them. Indeed, the Bank notes that during the unemployment compensation process, Winter admitted that at the October 24, 2001 meeting he became upset and angry and walked out of the room. It further contends that it need not present any evidence that his former supervisor experienced problems with his demeanor and behavior because such evidence is irrelevant. The court agrees. The court determines that Winter has offered no competent summary judgment evidence to establish pretext, or create a genuine issue of material fact, with respect to the Bank's characterization of his behavior as insubordinate and unprofessional; nor has he offered any evidence that he was treated differently than other similarly situated employees.

> FN12. Winter contends that his former supervisor, Joyce Condit, attempted to rehire him after his discharge. Bank of America objects on the grounds of hearsay to the references in paragraph 18 of Winter's affidavit relating to any alleged out-of-court statements by his former supervisor, Joyce Condit. The court overrules the objection.

**\*7** Third, Winter's reliance on the other acts of alleged disparate treatment is misplaced. Winter contends that pretext is established because the following acts constitute disparate treatment: (1) he was not assigned to work in the Bank's Park Cities branch office; (2) he received substandard portfolios; (3) he was given accent management classes; (4) he was without an office for five weeks; and (5) he was not promoted to the position of vice president.

With respect to the Park Cities' assignment, Winter contends that the fact that he was not given this assignment is evidence of discrimination. Bank of America offers evidence that the employee selected for the assignment was better qualified than Winter in that the employee had previously worked in that location and thus had experience with the clientele. The Bank also contends that Winter offers no evidence to dispute its reason for not selecting him for the assignment. The court agrees. Winter's conclusory assertion that he was not selected for the assignment because of his national origin is not competent evidence of discrimination. *See Forsyth,* 19 F.3d at 1533.

With respect to the substandard portfolios, Winter

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                          Page 7
(Cite as: 2003 WL 23200278, *7 (N.D.Tex.))

states in his affidavit that he was the only client manager who did not receive a portfolio of existing customers. Winter, however, testified in his deposition that he received a portfolio of at least 260 *existing customers*. Winter does not explain why his affidavit varies from his deposition testimony. Unexplained variances between statements in an affidavit and sworn testimony cannot create a fact question that precludes summary judgment. *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir.1996). Thus, the portions of Winter's affidavit that vary from his sworn deposition testimony are not competent summary judgment evidence, and the court will not consider them. *See id.* Even if Winter had received a less desirable portfolio, he has not presented any evidence to rebut the Bank's explanation for the manner in which portfolios were assigned the to client managers. Therefore, Winter's conclusory assertion that he was given a substandard portfolio because of his national origin is insufficient to establish or create a genuine issue of material fact regarding discrimination because of his national origin. *See Forsyth*, 19 F.3d at 1533.

With respect to the accent management classes, although Winter concedes that "he did not have a problem with the training" (Pl.App. at 48 (35:20-25)), he contends that "no other client managers, with heavy accents, had to attend the classes." Winter, however, does not identify "the other client managers with heavy accents" to which he refers. Thus, the court cannot determine if Winter compares himself to employees who are similarly situated. Further, there is no evidence that the classes were mandatory. Thus, it is conceivable that "the other client managers with heavy accents" to which Winter refers could be individuals of Nigerian descent who declined the opportunity to take these classes. Thus, Winter fails to make a showing that he was treated differently than other similarly situated employees.

**\*8** With respect to the office issue, Winter contends that he was without an office for five weeks after being promoted to client manager. Bank of America counters that Winter, who was the last person to be offered the position of client manager, was one of two who did not have the requisite licenses for the position. It contends that because of logistical problems, Winter and the other unlicensed client manager did not have permanent offices while they studied for their license examinations. The Bank further offers evidence that Winter received his permanent office before the other client manager. Even if Winter had received his office last, he has not presented any evidence to rebut the Bank's explanation for his not having received an office immediately upon his promotion to client manager. While it is true that he did not have an office for five weeks, Winter's conclusory assertion that the reason that he did not have one is because of his national origin is not competent summary judgment evidence. *See Forsyth*, 19 F.3d at 1533.

With respect to the vice president position, [FN13] Winter contends that he was treated differently than Derwood Richardson, a white client manager who was promoted to vice president. Bank of America counters that Winter and Richardson were not similarly situated because Richardson did not have as many complaints lodged against him as did Winter. [FN14] Winter provides no evidence that complaints were filed against Richardson as frequently as against him. *See also Telkamp v. Stein Mart, Inc.*, 2002 WL 324288 * 7 n. 4 (N.D.Tex.2002) (holding that the plaintiff who received a final warning as a result of a workplace incident was not similarly situated to the other employee involved in the incident who did not receive a final warning because the plaintiff had previous disciplinary complaints). "[T]he conduct at issue is not nearly identical when the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer." *Wallace*, 271 F.3d at 221 (citation omitted). Therefore, Winter failed to establish that he and Richardson were similarly situated.

FN13. Winter does not bring a failure to promote claim against Bank of America. Pl. Resp. at 20. Instead, he tenders this issue as "background evidence" to support his discriminatory discharge claim.

FN14. Bank of America also contends that the standards for promotion to the position of vice president changed after Richardson was promoted to vice president. Whether a fact question exists regarding promotion to vice president is of no moment because this issue is not before the court, as Winter does not allege in his complaint a failure to promote claim against the Bank. Thus, a fact question, if any, is not a *material* fact question that can preclude summary judgment. *See Anderson*, 477 U.S. at 248.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

The court has addressed and disposed of the arguments asserted by Winter for his belief that the stated reasons by Bank of America were a pretext for intentional discrimination. Bank of America, however, sets forth other evidence which negates the existence of pretext. First, Winter was not treated differently than any similarly situated employee. The undisputed evidence reveals that no other employee had the documented interpersonal and behavioral problems as did Winter. Second, Singh both promoted and fired Winter. Under the "same actor" doctrine, when the same individual makes the decision to hire the plaintiff and later to fire the plaintiff, there is an inference that [national origin] discrimination was not the motive behind [the] termination." *Brown v. CSC Logic, Inc.,* 82 F.3d 651, 658 (5th Cir.1996). The reason for the doctrine is that the decisionmaker's presumed animus against the protected class, as the motive for the termination, is inconsistent with the decision to hire the plaintiff in the first place. *Id.* The "same actor" doctrine creates only an inference, which can be overcome by sufficient evidence the that stated reason for the termination was pretext for discrimination. *Id.*

**\*9** Winter contends that whatever weight the same actor doctrine might have it is nullified by discriminatory comments allegedly made by Singh. Singh allegedly told Winter that (1) he should get his teeth fixed; (2) he should wear nicer work clothes; (3) his accent was too prominent; (4) rich white women in the Highland Park area did not like dealing with minorities, especially black men; and (5) she suspected a Nigerian client when she learned that the client's account had been the subject of a fraudulent wire transfer that originated in Nigeria.

With respect to the first two comments, the court determines that they do not even arguably involve discriminatory animus. To the court's knowledge, no racial or ethnic group has a monopoly on good teeth or nice clothes. Although these comments can be considered insensitive, offensive and rude, they are insufficient to infer national origin discrimination. *See Boyd v. State Farm Ins. Cos.,* 158 F.3d 326, 329-30 (5th Cir.1998) *cert. denied,* 526 U.S. 1051, 119 S.Ct. 1357, 143 L.Ed.2d 518 (1999) ("The mere utterance of a racial epithet is not indicia of discrimination under Title VII".). While the third comment could arguably involve discriminatory animus, the facts in this case negate such a finding. It is undisputed that Winter

acknowledged that his accent was prominent and appreciated being offered the accent management classes. Indeed, Winter admits that the classes assisted him in achieving one of his personal goals.

Bank of America contends that the last two comments amount to stray remarks. The court agrees. Stray remarks can be considered as evidence of pretext (as Winter argues), but only when accompanied by sufficient indicia of relevance-- essentially, the four-part test originated in *Brown* and still recognized by the Fifth Circuit post*Reeves:* For comments in the workplace to provide sufficient evidence of discrimination, they must be (1) related to the protected class of persons of which the plaintiff is a member; (2) proximate in time to the terminations; (3) made by an individual with authority over the employment decision at issue; and (4) related to the employment decision at issue. *Auguster v. Vermilion Parish Sch. Bd.,* 249 F.3d 400, 405 (5th Cir.2001) (citations, internal quotation marks, and internal brackets omitted). Given the state of the evidence, assuming Singh made the statements attributed to her, the court characterizes them as stray remarks which are offensive and rude but insufficient to infer discrimination. *See Boyd,* 158 F.3d at 329-30.

The evidence in this case clearly reveals that Winter was terminated, not for his national origin, but because of the number of complaints filed against him and his unprofessional and insubordinate behavior. The court will not second- guess the Bank's personnel decision. *See Walton v. Bisco Indus., Inc.,* 119 F.3d 368, 372 (5th Cir.1997). Moreover, no evidence in the record creates an issue of fact that Bank of America treated Winter differently from other similarly situated employees. Accordingly, summary judgment is appropriate on behalf of Bank of America on Winter's discrimination claims. [FN15]

> FN15. Winter's § 1981 claim fails for the same reason as does his Title VII claim. *See Shackelford,* 190 F.3d at 403 n. 2; *Baltazar,* 162 F.3d at 373.

2. Retaliation

**\*10** Winter also brings a retaliation claim. Specifically, Winter contends that he was discharged for submitting his July 13, 2001 complaint against Singh.

Title VII makes it "an unlawful employment practice for an employer to discriminate against any of his employee" who had either availed themselves of Title VII's protections or assisted others in so doing. *See* 42 U.S.C. § 2000e-3(a). Winter offers no direct evidence of retaliation. [FN16] The court therefore assesses his claims under the *McDonnell Douglas* framework. *See Montemayor v. City of San Antonio,* 276 F.3d 687, 692 (5th Cir.2001). To establish a *prima facie* case of retaliation under Title VII, a plaintiff must demonstrate that: (1) he engaged in a protected activity; (2) he experienced an adverse employment action following the protected activity; and (3) a causal link existed between the protected activity and the adverse employment action. *Id.; Mota v. University of Texas Houston Health Science Center,* 261 F.3d 512, 519 (5th Cir.2001). The burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action. *Id.* Once the defendant does so, the inference of discrimination created by the *prima facie* case disappears, and the ultimate question becomes whether the protected conduct was the "but for" cause of the adverse employment action. *Id.*

> FN16. As the court determines that *Desert Palace* is inapplicable to a retaliation case, it declines Winter's invitation to apply the holding of *Desert Palace* to his retaliation claim.

Bank of America has failed to establish that there is no evidence to support Winter's retaliation claim. Indeed, the Bank's entire brief, except for the legal standard for retaliation, is devoted to Winter's discrimination claims. Other than a recitation of the standard, there is no discussion or analysis of Winter's retaliation claim. The Bank appears to take the position that if no discrimination exists there can be no retaliation. Such a position does not correctly reflect the law. To prevail on a retaliation claim, one need not prove an underlying discrimination claim. *See Vadie,* 218 F.3d at 374 n. 24 (citing *Shackelford,* 190 F.3d at 405 n. 4). "Similarly, evidence sufficient to support a claim of retaliation is not necessarily sufficient to support a claim of discrimination." *Id.* Accordingly, Bank of America

is not entitled to judgment as a matter of law on Winter's retaliation claim.

B.  Plaintiff's Motion for Partial Summary Judgment on Liability

Winter moves for partial summary judgment on the issue of liability. Specifically, he contends that because Bank of America conceded the existence of a *prima facie* case of discrimination and it failed to assert a "mixed motives" defense, he is entitled to judgment as a matter of law pursuant to the holding in *Desert Palace.* Bank of America counters that Winter misconstrues the holding and applicability of *Desert Palace,* and in any event, it asserted an affirmative defense broad enough to invoke a "mixed motives" defense.

The court has already determined that this case is not a "mixed motives" case, and it has granted summary judgment on Winter's discrimination claims to Bank of America. The court has also determined that *Desert Palace* is inapplicable to a retaliation claim. Accordingly, the court determines that Plaintiff is not entitled to judgment as a matter of law on the issue of liability.

IV. *Conclusion*

*11 For the above stated reasons, genuine issues of material fact exist with respect to Winter's retaliation claim. Therefore, summary judgment is denied with respect to this claim. No genuine issues of fact exist with respect to Winter's discrimination claims. Thus, the court grants summary judgment on these claims. Accordingly, the court grants in part and denies in part Defendant Bank of America, N .A.'s Motion for Summary Judgment; and denies Plaintiff's Motion for Partial Summary Judgment on Liability. Plaintiff's discrimination claims under Title VII and § 1981 are dismissed with prejudice, and Plaintiff's retaliation claim remains for trial.

2003 WL 23200278 (N.D.Tex.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

BRENDA J. OWENS, Plaintiff, v. EXCEL MANAGEMENT SERVICES,INC. and VARTEC TELECOM, INC., Defendants.
Civil Action No. 3:02-CV-0835-L

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OFTEXAS, DALLAS DIVISION

2004 U.S. Dist. LEXIS 2887

February 13, 2004, Decided
February 13, 2004, Filed

**PRIOR HISTORY:** *Owens v. Excel Mgmt. Servs., 2003 U.S. Dist. LEXIS 20296 (N.D. Tex., Nov. 10, 2003)*

**DISPOSITION:** [*1] Defendants' Motions for Summary Judgment granted. Action against Defendants dismissed with prejudice.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff terminated employee filed a lawsuit against defendant former employer claiming discrimination based on race, sex, and age, as well as a claim for retaliation against defendant prospective employer with whom she applied for a position that was given to another person. The former employer and the prospective employer filed motions for summary judgment directed at each of the respective claims filed against them.

**OVERVIEW:** The terminated employee, a 52-year-old African-American female, worked for the former employer for more than six years. The prospective employer then started to acquire the former employer. As a result, the former employer initiated a company-wide, reduction-in-force. The terminated employee's position was eliminated. She learned of a similar opening with the prospective employer, but it hired another person. After exhausting her administrative remedies, the terminated employee sued the former employer and the prospective employer alleging claims of race, sex, and age discrimination, and retaliation, in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e* et seq., the Age Discrimination in Employment Act, *29 U.S.C.S. § 621* et seq., and the Texas Commission on Human Rights Act, *Tex. Lab. Code Ann. § 21.001*, et. seq.. She also alleged a claim of "aiding and abetting" in violation of *Tex. Lab. Code Ann. § 21.056*. The former employer and prospective employee filed motions for summary judgment. The trial court granted those motions after concluding she could not show the reduction-in-force was a pretext for discrimination or a prima facie case of retaliation.

**OUTCOME:** The trial court granted the former employer's motion for summary judgment on the race, sex, and age discrimination claims against it. The trial court also granted the prospective employer's summary judgment motion with respect to the retaliation claim filed against it. The trial court dismissed the action against both employers with prejudice.

**CORE TERMS:** summary judgment, prima facie case, hire, pretext, retaliation, age discrimination, burden-shifting, sex, termination, protected activity, counter, nondiscriminatory reason, telecom, decisionmaker, terminated, discharged, hiring, intentional discrimination, similarly situated, causal connection, undisputed, matter of law, younger, company-wide, articulated, accounting, hired, reply, entitled to judgment, sufficient evidence

**LexisNexis (TM) HEADNOTES - Core Concepts:**

Civil Procedure: Summary Judgment: Supporting Papers & Affidavits
Civil Procedure: Summary Judgment: Summary Judgment Standard
[HN1] Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*.

Civil Procedure: Summary Judgment: Summary Judgment Standard
[HN2] A dispute regarding a material fact, for summary judgment purposes, is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. When ruling on a motion for summary judgment, the court is required to view all

2004 U.S. Dist. LEXIS 2887, *

inferences drawn from the factual record in the light most favorable to the nonmoving party. Further, a court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment.

**Civil Procedure: Summary Judgment: Burdens of Production & Proof**
[HN3] Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. Mere conclusory allegations are not competent summary judgment evidence, and thus, are insufficient to defeat a motion for summary judgment. Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim.

**Civil Procedure: Summary Judgment: Burdens of Production & Proof**
**Civil Procedure: Summary Judgment: Summary Judgment Standard**
[HN4] *Fed. R. Civ. P. 56* does not impose a duty on a court to sift through the record in search of evidence to support the nonmovant's opposition to the motion for summary judgment. Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment. Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted.

**Labor & Employment Law: Discrimination: Racial Discrimination**
**Labor & Employment Law: Discrimination: Gender & Sex Discrimination**
**Labor & Employment Law: Discrimination: Title VII**
**Labor & Employment Law: Discrimination: Age Discrimination: Proof of Discrimination**
[HN5] Direct evidence of discrimination is not necessary to obtain a mixed-motive jury instruction under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e* et seq.

**Labor & Employment Law: Discrimination: Racial Discrimination**
**Labor & Employment Law: Discrimination: Gender & Sex Discrimination**

**Labor & Employment Law: Discrimination: Title VII**
**Labor & Employment Law: Discrimination: Age Discrimination: Proof of Discrimination**
[HN6] The ultimate burden of proving intentional discrimination remains with a plaintiff.

**Labor & Employment Law: Discrimination: Racial Discrimination**
**Labor & Employment Law: Discrimination: Gender & Sex Discrimination**
**Labor & Employment Law: Discrimination: Title VII**
**Labor & Employment Law: Discrimination: Age Discrimination: Proof of Discrimination**
[HN7] Under the applicable burden-shifting paradigm for discrimination claims, a plaintiff must establish a prima facie case of discrimination; a defendant must then articulate legitimate, nondiscriminatory reasons for its actions; and finally, if the parties satisfy their initial burdens, the case reaches the "pretext stage," and the plaintiff must then adduce sufficient evidence to permit a reasonable trier of fact to find pretext or intentional discrimination.

**Labor & Employment Law: Discrimination: Title VII**
**Labor & Employment Law: Discrimination: Age Discrimination: Proof of Discrimination**
**Labor & Employment Law: Discrimination: Disparate Treatment: Burden Shifting Analysis**
[HN8] The same standard of proof, the burden-shifting paradigm, applies to disparate treatment claims under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e* et seq. and *42 U.S.C.S. § 1981* when they are urged as parallel causes of action. Similarly, claims under Texas Commission on Human Rights Act, *Tex. Lab. Code Ann. § 21.001*, et seq. and Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e* et seq. are governed by identical law. Further, the McDonnell Douglas burden-shifting analysis is also applicable to Age Discrimination in Employment Act, *29 U.S.C.S. § 621* et seq. discrimination claims.

**Labor & Employment Law: Discrimination: Title VII**
**Labor & Employment Law: Discrimination: Age Discrimination: Proof of Discrimination**
[HN9] In a reduction-in-force case, a prima facie case under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e* et seq. (Title VII), is established by showing that: (1) a plaintiff is a member of a protected class, (2) she was qualified for the position that she held, (3) she was discharged, and (4) after her discharge, others who were not members of the protected class remained in similar positions. The first three elements of a prima facie case under the Age Discrimination in Employment Act, *29 U.S.C.S. § 621* et seq. (ADEA) are identical to those of a prima facie case under Title VII. For the fourth element in an ADEA case, the plaintiff

2004 U.S. Dist. LEXIS 2887, *

must show that she was otherwise discharged because of her age.

Labor & Employment Law: Discrimination: Age Discrimination: Proof of Discrimination
[HN10] A plaintiff who has brought an Age Discrimination in Employment Act, *29 U.S.C.S. § 621* et seq. case, can establish that he was otherwise discharged because of his age by showing evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue.

Labor & Employment Law: Discrimination: Title VII
Labor & Employment Law: Discrimination: Age Discrimination: Proof of Discrimination
[HN11] While the evidentiary burdens of an Age Discrimination in Employment Act, *29 U.S.C.S. § 621* et seq. (ADEA), case and a Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. 2000e* et seq. (Title VII), are the same, the elements of a prima facie case under each statute are not identical. A fourth element exists in a prima facie ADEA case; no such element exists in a prima facie Title VII case.

Labor & Employment Law: Discrimination: Age Discrimination: Proof of Discrimination
[HN12] Employees may be considered "similarly situated" to a plaintiff if their circumstances are nearly identical.

Labor & Employment Law: Discrimination: Age Discrimination: Proof of Discrimination
[HN13] Employees with different responsibilities, different supervisors, different capabilities, different work rule violations, or different disciplinary records are not considered to be "nearly identical."

Labor & Employment Law: Discrimination: Age Discrimination: Proof of Discrimination
[HN14] As for a prima facie case of age discrimination, a plaintiff need only show evidence that a defendant intended to discriminate in reaching its decision to eliminate her position during a reduction-in-force. That requires only a minimal showing.

Evidence: Procedural Considerations: Inferences & Presumptions
Labor & Employment Law: Discrimination: Age Discrimination: Proof of Discrimination
[HN15] The rebuttal of a presumption created by the prima facie case requires only a minimal showing, as does the prima facie case itself.

Labor & Employment Law: Discrimination: Age Discrimination: Defenses & Exceptions

[HN16] A reduction in force is itself a legitimate, nondiscriminatory reason for discharge.

Civil Procedure: Summary Judgment
Labor & Employment Law: Discrimination: Age Discrimination: Proof of Discrimination
[HN17] A plaintiff can survive summary judgment by producing evidence that creates a jury issue as to the employer's discriminatory animus or the falsity of the employer's legitimate nondiscriminatory explanation. "Pretext-plus" is not required to support an inference of discrimination. A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated, and may therefore be enough to prevent summary judgment or judgment as a matter of law. That showing, however, is not always enough to prevent summary judgment if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue, and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

Labor & Employment Law: Discrimination: Age Discrimination: Defenses & Exceptions
[HN18] A court cannot and will not second-guess a company's decision to undergo a reduction-in-force.

Labor & Employment Law: Discrimination: Racial Discrimination
Labor & Employment Law: Discrimination: Gender & Sex Discrimination
Labor & Employment Law: Discrimination: Age Discrimination: Proof of Discrimination
[HN19] In a failure to hire case, a prima facie case is established by showing that: (1) a plaintiff is a member of a protected class, (2) she applied for a position, (3) she was qualified for the position for which she applied, (4) she was not selected for the position, and (5) after a defendant declined to hire her, the position either remained open or someone outside the protected group was selected to fill it.

Labor & Employment Law: Discrimination: Age Discrimination: Defenses & Exceptions
Labor & Employment Law: Discrimination: Racial Discrimination: Defenses & Exceptions
Labor & Employment Law: Discrimination: Gender & Sex Discrimination: Defenses & Exceptions
[HN20] The term "qualified" simply means an essential ability to perform the job, not that a plaintiff met the job description required by the employer.

Labor & Employment Law: Discrimination: Age Discrimination: Defenses & Exceptions
Labor & Employment Law: Discrimination: Racial Discrimination: Defenses & Exceptions
Labor & Employment Law: Discrimination: Gender & Sex Discrimination: Defenses & Exceptions
[HN21] See *Tex. Lab. Code Ann. § 21.056* (1996).

Labor & Employment Law: Discrimination: Racial Discrimination
Labor & Employment Law: Discrimination: Gender & Sex Discrimination
Labor & Employment Law: Discrimination: Retaliation
Labor & Employment Law: Discrimination: Age Discrimination: Proof of Discrimination
[HN22] The McDonnell Douglas burden-shifting framework is applicable to retaliation claims. To establish a prima facie case of retaliation, a plaintiff must demonstrate that: (1) she engaged in a protected activity, (2) she experienced an adverse employment action following the protected activity, and (3) a causal link existed between the protected activity and the adverse employment action. The burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action. Once the defendant does so, the inference of discrimination created by the prima facie case disappears, and the ultimate question becomes whether the protected conduct was the "but for" cause of the adverse employment action.

Labor & Employment Law: Discrimination: Racial Discrimination
Labor & Employment Law: Discrimination: Gender & Sex Discrimination
Labor & Employment Law: Discrimination: Retaliation
Labor & Employment Law: Discrimination: Age Discrimination: Proof of Discrimination
[HN23] The "but for" standard is the correct standard for claims brought under *Tex. Lab. Code Ann. § 21.055*.

Labor & Employment Law: Discrimination: Disparate Treatment
Labor & Employment Law: Discrimination: Racial Discrimination
Labor & Employment Law: Discrimination: Gender & Sex Discrimination
Labor & Employment Law: Discrimination: Age Discrimination: Proof of Discrimination
[HN24] The lack of knowledge on the part of particular individual agents is admissible as some evidence of a lack of causal connection, to counter a plaintiff's circumstantial evidence of proximity or disparate treatment.

Labor & Employment Law: Discrimination: Racial Discrimination
Labor & Employment Law: Discrimination: Gender & Sex Discrimination
Labor & Employment Law: Discrimination: Retaliation
Labor & Employment Law: Discrimination: Age Discrimination: Proof of Discrimination
[HN25] Even in the absence of direct knowledge by individual agents, a jury can still find retaliation if, for example, it finds that circumstances evidence knowledge of the protected activities or the jury concludes that an agent is acting explicitly or implicit upon the orders of a superior who has the requisite knowledge.

Labor & Employment Law: Discrimination: Age Discrimination
Labor & Employment Law: Discrimination: Racial Discrimination
Labor & Employment Law: Discrimination: Gender & Sex Discrimination
Labor & Employment Law: Discrimination: Retaliation
[HN26] Temporal proximity between the protected activity and the adverse employment action may be a significant factor in showing a causal connection. A plaintiff must still, however, demonstrate that the decision not to hire her was based in part on knowledge of her complaints of discrimination. If the decisionmakers were completely unaware of the plaintiff's protected activity, then it could not be said, even as an initial matter, that the decisionmakers might have been retaliating against the plaintiff for having engaged in that activity.

COUNSEL: For Brenda J Owens, Plaintiff: Hal K Gillespie, Gillespie Rozen & Watsky, Dallas, TX. Susan D Motley, Gillespie Rozen & Watsky, Dallas, TX.

For Excel Management Service, Inc., VarTec Telecom Inc, Defendants: Ann Marie Painter, Littler Mendelson, Dallas, TX. Brian D Johnston, Littler Mendelson, Dallas, TX. Ronald Eugene Manthey, Littler Mendelson, Dallas, TX.

JUDGES: Sam A. Lindsay, United States District Judge.

OPINIONBY: Sam A. Lindsay

OPINION: MEMORANDUM OPINION AND ORDER

   Before the court are Excel Management Services, Inc.'s Amended and/or Supplemental Motion for Summary Judgment, filed October 31, 2003; and VarTec Telecom, Inc.'s Amended and/or Supplemental Motion for Summary Judgment, filed October 31, 2003. n1 After careful consideration of the motions, responses, replies, summary judgment evidence, record and applicable law,

the court grants Excel Management Services, Inc.'s Amended and/or Supplemental Motion for Summary Judgment; and grants VarTec Telecom,[*2] Inc.'s Amended and/or Supplemental Motion for Summary Judgment.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n1 The history related to the motions for summary judgment is tortuous and reminiscent of the labyrinths referenced in Greek mythology. Defendants filed their motions for summary judgment and appendices on August 29, 2003. Plaintiff filed her appendix to her response on September 18, 2003 and her response on September 19, 2003. On September 22, 2003, Plaintiff filed a supplement to her appendix in which she attached two pages of deposition testimony that were inadvertently omitted from her appendix. On October 3, 2003, Defendants filed their replies. On October 7, 2003, Defendant Excel Management Services, Inc. supplemented its appendix by attaching the corrigenda page of a deposition used by Plaintiff in her response. On October 31, 2003, Defendants filed amended motions for summary judgment to correct an "administrative oversight" in which they failed to move for summary judgment on Plaintiff's state law discrimination and retaliation claims in their original motions. Defendants also filed supplemental appendices in which they attached the evidence necessary to support their amended motions. On November 4, 2003, Defendant Excel Management Services, Inc. filed a corrected copy of its amended summary judgment brief. On November 13, 2003, Plaintiff filed her response to Defendants' amended motions for summary judgment. On November 21, 2003, Plaintiff filed an amended response in which she attached a table of contents and a table of authorities that were inadvertently omitted from her response of November 13, 2003. On November 26, 2003, Defendants filed their amended replies.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*3]

I. Factual and Procedural Background

This is an employment discrimination and retaliation case. Plaintiff Brenda J. Owens ("Plaintiff" or "Owens"), a 52 year-old n2 African-American female, worked as Director of Corporate Tax for Defendant Excel Management Services, Inc. ("Excel") from March 13, 1995 until October 19, 2001. As such, Owens managed Excel's tax department and provided other tax related services to Excel. Owens reported to Mike Lavey, a 43 year-old white male, who was the Vice President/Controller of Excel. In addition to the tax department, Lavey had supervisory authority over the departments of revenue accounting, revenue operations, and treasury. Lavey reported to Jim Timmer, a 42 year-old male, who was an Executive Vice President/Chief Financial Officer for Excel. In October 2001, Excel initiated a company-wide reduction in force ("RIF"). As part of the RIF, Lavey made the decision to eliminate two positions: Director of Tax, which was held by Owens, and Revenue Specialist, which was held by Kevin Crews ("Crews"), a 32 year-old white man. On October 19, 2001, Owens's employment with Excel was terminated.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n2 All references to age are calculated as of the date of Owens's termination, October 19, 2001.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*4]

During this same time period, VarTec Telecom, Inc. ("VarTec") was in the process of acquiring Excel. As Director of Corporate Tax, Owens worked with several VarTec employees, including Sonya Ayers ("Ayers"), regarding the impending acquisition. Ayers, a 41 year-old white female, was the Vice President of Finance Integration for VarTec. After hearing of Owens's termination, Ayers informed Owens of the vacant Director of Tax position at VarTec. Shortly thereafter, Owens applied for the position. Ayers, however, was not the final decisionmaker with respect to this position. Instead, VarTec's Chief Financial Officer Gary Egger ("Egger"), a 53 year-old white male, was the decisionmaker. Egger hired Neil Keeter, a 35 year-old white male, for the vacant position. n3

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n3 The title of the vacant position was changed to Senior Director of Tax in order to accommodate Keeter's salary requirements. The primary duties and responsibilities of the position were not affected.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

After exhausting her administrative remedies, Owens[*5] filed this lawsuit alleging claims of race, sex, and age discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, *42 U.S.C. § 2000e, et seq.*; the Age Discrimination in Employment Act ("ADEA"), *29 U.S.C. § 621, et seq.*; and the Texas Commission on Human Rights Act ("TCHRA"), *Tex. Lab. Code Ann. § 21.001, et. seq.*; and a claim of "aiding and abetting" in violation of *§ 21.056* of the Texas Labor Code. Excel and VarTec (collectively "Defendants") subsequently moved for summary judgment. The court now considers these motions.

II. Summary Judgment Standard

[HN1] Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*; *Celotex Corp. v. Catrett, 477 U.S. 317, 323-25, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*; *Ragas v. Tennessee Gas Pipeline Co., 136 F.3d 455, 458 (5th Cir. 1998).*[*6] [HN2] A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*; *Ragas, 136 F.3d at 458*. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000)*; *Anderson, 477 U.S. at 254-55*.

[HN3] Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita, 475 U.S. at 586*. Mere conclusory allegations are not competent summary judgment evidence, [*7] and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler, 73 F.3d 1322, 1325 (5th Cir. 1996)*. Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. See *Forsyth v. Barr, 19 F.3d 1527, 1533 (5th Cir.)*, cert. denied, *513 U.S. 871, 130 L. Ed. 2d 127, 115 S. Ct. 195 (1994)*. The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Ragas, 136 F.3d at 458*. *Rule 56* [HN4] does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; see also *Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 915-16 & n.7 (5th Cir.)*, cert. denied, *506 U.S. 832, 121 L. Ed. 2d 59 (1992)*. "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson, 477 U.S. at 248*. Disputed fact issues which are "irrelevant and unnecessary" will not be[*8] considered by a court in ruling on a summary judgment motion. Id. If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex, 477 U.S. at 322-23*.

III. Analysis

A. Applicable Standard of Proof

Owens and Defendants disagree regarding the applicable standard of proof on her discrimination claims. Owens maintains that the holding in *Desert Palace, Inc. v. Costa, 539 U.S. 90, 123 S. Ct. 2148, 2150, 156 L. Ed. 2d 84 (2003)* dictates that "summary judgment should only be granted in employment discrimination cases if an employer can demonstrate that the employee has failed to raise a genuine issue of material fact concerning whether or not a protected characteristic was a motivating factor in an employment decision." Pl. Am. Resp. at 8. In other words, Owens contends that the *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)* burden-shifting framework is no longer applicable.

Defendants counter that the *McDonnell Douglas*[*9] burden-shifting framework is applicable despite Desert Palace. The court agrees. Desert Palace simply makes clear that [HN5] direct evidence of discrimination is not necessary to obtain a mixed-motive jury instruction under Title VII. *123 S. Ct. at 2150, 2155.* If Owens's suggestion that the McDonnell Douglas burden-shifting paradigm no longer exists after Desert Palace is correct, such a change would constitute a revolution in employment discrimination law. If the Supreme Court were going to make a draconian departure from 30 years of well-established employment law precedent, the court believes it would have done so with unmistakable clarity. In Desert Palace, the Supreme Court does not even intimate that it is overruling, restricting or clarifying McDonnell Douglas. Moreover, no Fifth Circuit authority embraces Owens's interpretation of Desert Palace. See *Johnson v. Louisiana, 351 F.3d 616, 622 (5th Cir. 2003)* ("Resolution of a [Title VII discrimination] claim involves a three-step, burden-shifting analysis."); see also *Read v. BT Alex Brown Inc., 72 Fed. Appx. 112 (5th Cir. 2003).* n4 Accordingly, this case will be[*10] analyzed pursuant to the burden-shifting framework under McDonnell Douglas. Regardless of the standard applied, [HN6] the ultimate burden of proving intentional discrimination remains with the plaintiff. See *Texas Dep't of Comty. Affairs v. Burdine, 450 U.S. 248, 253, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)*; see also *Read, 72 Fed. Appx. at 115* (citing *Desert Palace, 123 S. Ct. at 2150).*

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - -
- - - -

n4 In Read, the Fifth Circuit cited to Desert Palace; however, it applied the McDonnell Douglas burden-shifting framework to the plaintiff's sex and age discrimination claims. If the Fifth Circuit believed that Desert Palace abrogated the burden-shifting framework set forth in McDonnell Douglas, it certainly would have deemed it necessary to elevate Read to the status of a published opinion, rather than making it an unpublished opinion having no precedential value.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - -
- - - -

B. Discrimination

Owens brings claims of race, sex, and age discrimination in violation of Title VII, [*11] § 1981, THCRA, and the ADEA. n5 [HN7] Under the applicable burden-shifting paradigm for discrimination claims, Owens must establish a prima facie case of discrimination; Defendants must then articulate legitimate, nondiscriminatory reasons for their actions; and finally, if the parties satisfy their initial burdens, the case reaches the "pretext stage," and Owens must then adduce sufficient evidence to permit a reasonable trier of fact to find pretext or intentional discrimination. See *McDonnell Douglas, 411 U.S. at 802-04; Burdine, 450 U.S. at 252-53; Byers v. Dallas Morning News, Inc., 209 F.3d 419, 425-26 (5th Cir. 2000).*

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - -
- - -

n5 [HN8] The same standard of proof applies to disparate treatment claims under Title VII and § 1981 when they are urged as parallel causes of action. *Shackelford v. Deloitte & Touche, LLP., 190 F.3d 398, 403 n.2 (5th Cir. 1999); Baltazar v. Holmes, 162 F.3d 368, 373 (5th Cir. 1998); Wallace v. Texas Tech Univ., 80 F.3d 1042, 1047 (5th Cir. 1996).* Similarly, claims under TCHRA and Title VII are governed by identical law. *Shackelford, 190 F.3d at 403 n.2* (citing *Colbert v. Georgia-Pacific Corp., 995 F. Supp. 697 (N.D. Tex. 1998)).* Further, the McDonnell Douglas burden-shifting analysis is also applicable to ADEA discrimination claims. See *O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 311, 134 L. Ed. 2d 433, 116 S. Ct. 1307 (1996).* As the underlying facts of Owens's Title VII, § 1981, TCHRA, and ADEA discrimination claims are the same, and the evidentiary burdens of these statutes are similar, her claims will be analyzed together.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - -
- - - -

[*12]

1. Discharge Claim

Owens contends that she was discharged because of her race, sex, and age. Excel counters that her race, sex, and age played no part in the decision to terminate her employment; instead, she was discharged pursuant to a company-wide RIF aimed at reducing costs.

[HN9] In a RIF case, a prima facie case under Title VII is established by showing that (1) the plaintiff is a member of a protected class; (2) she was qualified for the position that she held; (3) she was discharged; and (4) after her discharge, "others who were not members of the protected class remained in similar positions." *Bauer v. Albemarle Corp., 169 F.3d 962, 966 (5th Cir. 1999)* (quoting *Vaughn v. Edel, 918 F.2d 517, 521 (5th Cir. 1990)*). The first three elements of a prima facie case under the ADEA are identical to those of a prima facie case under Title VII. *Bauer, 169 F.3d at 966* (citing *Bodenheimer v. PPG Indus., Inc., 5 F.3d 955, 957 (5th Cir. 1993)*). For the fourth element in an ADEA case, the plaintiff must show that she was otherwise discharged because of her age. *Id.* (citing *Armendariz v. Pinkerton Tobacco Co., 58 F.3d 144, 150 (5th Cir. 1995)*).[*13]

(a) Prima Facie Case

Excel concedes that Owens can establish the first three elements of a prima facie case. The court, therefore, must determine whether evidence exists to establish the fourth element of Owens's race and sex claims, namely, that white males remained in similar positions, and of her age claims, namely, that she was otherwise discharged because of her age. *Meinecke v. H&R Block, 66 F.3d 77, 84 (5th Cir. 1995)*.

With respect to Owens's race and sex claims, Excel contends that she cannot establish that white males remained in similar positions because there were no employees who were similarly situated to her or in nearly identical circumstances to hers. In other words, Excel contends that because Owens was the only director-level employee, or "Grade-12" employee, in the tax department, she did not have a "nearly identical" comparator, and therefore cannot establish a Title VII prima facie case. Owens counters that she need not show that she was treated differently than a similarly situated individual; rather, she need only present evidence that Excel intended to discriminate in reaching the decision at issue. Owens relies on *Palasota v. Haggar Clothing Co, 342 F.3d 569 (5th Cir. 2003)*[*14] to support her position; her reliance on Palasota, however, is misplaced.

In Palasota, the plaintiff brought suit against his former employer alleging age discrimination in violation of the ADEA and sex discrimination in violation of Title VII. *Id. at 573*. The jury entered a verdict in favor of the plaintiff on the ADEA claim and in favor of the employer on the Title VII claim. *Id.* After the jury verdict, the district court granted a motion for judgment as a matter of law in favor of the employer on the ADEA claim. *Id.* The Fifth Circuit held that the district court erred in, among other things, holding that the plaintiff had to show that he was treated differently than similarly

situated employees who were younger than he. *Id. at 575*. The Palasota court reiterated that the fourth element of an ADEA prima facie case provides that a plaintiff must show that he was replaced by someone outside the protected class, replaced by someone younger, or otherwise discharged because of his age. *Id. at 576*. The court explained that [HN10] a plaintiff can establish that he was otherwise discharged because of his age by showing "evidence, [*15] circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue." Id. (quoting *Nichols v. Loral Vought Sys. Corp., 81 F.3d 38, 41 (5th Cir. 1996)*).

Owens contends that Palasota applies to Title VII cases. The court disagrees. [HN11] While the evidentiary burdens of the ADEA and Title VII are the same (*O'Connor, 517 U.S. at 311*), the elements of a prima facie case under each statute are not identical. *Bauer, 169 F.3d at 966*. The Palasota court specifically addresses the fourth element in a prima facie ADEA case; no such element exists in a prima facie Title VII case.

While Palasota is applicable to the court's determination of whether Owens can establish a prima face case of age discrimination, it has not yet reached this issue. At this point, the court must determine whether Owens has shown that Excel treated her differently than other similarly situated employees on the basis of race and sex. See *Vaughn, 918 F.2d at 522*. [HN12] Employees may be considered "similarly situated" to Owens if their circumstances[*16] are nearly identical. See *Okoye v. University of Texas Houston Health Sci. Ctr., 245 F.3d 507, 514 (5th Cir. 2001)*; *Little v. Republic Refining Co., Ltd., 924 F.2d 93, 97 (5th Cir. 1991)*.

Owens points to two other director-level employees, Debra Brandgard ("Brandgard") and Clarence Prestwood ("Prestwood"), who were treated differently than she. Brandgard, a 38 year-old white female, was the Director of Revenue Operations and reported to Lavey. Prestwood, a 49 year-old white male, was the Vice President of Finance and reported to Timmer. Neither Brandgard nor Prestwood worked in the tax department. Excel contends that Brandgard and Prestwood are not appropriate comparators because they were not supervised by the same person as Owens and they performed different job functions than Owens. The court agrees. See *Okoye, 245 F.3d at 514* (citing *Little, 924 F.2d at 97*) (Employees are not in nearly identical circumstances when their actions were reviewed by different supervisors.); *Hockman v. Westward Communications, L.L.C., 282 F. Supp.2d 512, 527-28 (E.D.Tex. 2003)* [HN13] ("Employees with different

responsibilities, [*17] different supervisors, different capabilities, different work rule violations or different disciplinary records are not considered to be 'nearly identical.'"); *Daniels v. BASF Corp., 270 F. Supp.2d 847, 854-55 (S.D.Tex. 2003)* (Circumstances were not nearly identical when employees did not perform the same functions.). Indeed, Owens failed to establish that she, Prestwood, and Brandgard performed the same or nearly identical functions. Moreover, it is undisputed that Prestwood and Owens were supervised by different persons. Accordingly, Owens cannot demonstrate that she was similarly situated to these employees and therefore cannot establish a prima facie case of sex and race discrimination. n6

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n6 Even assuming that Owens can establish a prima facie case, her race and sex discrimination claims fail for the same reasons her age discrimination claims fail. See § III.B(1)(c), infra.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - -

[HN14] As for a prima facie case of age discrimination, Owens need only show evidence that Excel intended[*18] to discriminate in reaching its decision to eliminate her position during the RIF. See *Palasota, 342 F.3d at 576; Nichols, 81 F.3d at 41.* This requires only a minimal showing. *Nichols, 81 F.3d at 41.* Excel contends that Owens cannot show evidence that it intended to discriminate by eliminating her position because Lavey also terminated a 32 year-old employee, Crews, and he retained an employee n7 who "was nearly as old as" Owens. Owens counters that (1) she was the oldest employee in the tax department and was the only employee from that department terminated; (2) she was the oldest employee who reported to Lavey; (3) Brandgard and Prestwood, both of whom are younger than she, were originally selected for termination in the RIF but were ultimately retained; (4) her performance evaluations were better than those of Brandgard and Prestwood; and (5) the costs savings associated with her termination would have been less than those costs savings associated with    Prestwood had he been terminated; and almost the same, albeit a little higher, than those costs savings associated with Brandgard had she been terminated. Evidence that younger

employees[*19] were treated more favorably is generally sufficient to shift the burden to the employer in the second stage of the McDonnell Douglas framework. The court therefore concludes that Owens has met her initial burden of establishing the elements of a prima facie age discrimination case.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - -
- - -

n7 The employee is Lewis Thomas. He was 52 years old.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - -
- - - -

(b) Legitimate, Nondiscriminatory Reason

Excel contends that its company-wide RIF, which affected 166 employees and was projected to save 17.2 million dollars in 2002, is a legitimate, nondiscriminatory reason for terminating Owens. Specifically, Lavey decided that "Excel could most safely eliminate Owens's management-level position to cut costs while utilizing the existing staff to maintain the same level of work." Excel. Am. Br. at 18-19. [HN15] The rebuttal of the presumption created by the prima facie case requires only a minimal showing, as does the prima facie case itself. *Amburgey v. Corhart Refractories Corp., 936 F.2d 805, 813.* The court concludes that Excel has set forth[*20] a legitimate, nondiscriminatory reason for terminating Owens. See *EEOC v. Texas Instruments, Inc., 100 F.3d 1173, 1181 (5th Cir. 1996)* ( [HN16] A reduction in force "is itself a legitimate, nondiscriminatory reason for discharge.").

(c) Pretext and Intentional Discrimination

Owens contends that Excel's proffered reason for eliminating her position in the RIF is a pretext. [HN17] A "plaintiff can survive summary judgment by producing evidence that creates a jury issue as to the employer's discriminatory animus or the falsity of the employer's legitimate nondiscriminatory explanation." *Sandstad v. CB Richard Ellis, Inc., 309 F.3d 893, 897 (5th Cir. 2002).* "Pretext-plus" is not required to support an inference of discrimination. *Russell v. McKinney Hosp. Venture, 235 F.3d 219, 223 (5th Cir. 2000).* "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification

is false, may permit the trier of fact to conclude that the employer unlawfully discriminated," and may therefore be enough to prevent summary judgment or judgment as a matter of law. See *Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 148, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000);*[*21] *Sandstad, 309 F.3d at 897.* This showing, however, is not always enough to prevent summary judgment "if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves, 530 U.S. at 148.*

To show pretext, Owens contends that (1) Excel's proffered reason for eliminating her position is different than the reason she was given at the time of her termination; (2) Excel's statements and actions are inconsistent with its financial condition; and (3) Excel's actions with respect to retention, hiring and compensation of employees before and after the RIF are inconsistent. Specifically, Owens avers that Lavey told her at the time of her termination that her position was being eliminated because of the VarTec acquisition. Owens offers Lavey's deposition, in which he denies such an assertion and concedes that such an assertion would be false. Further, Owens provides deposition testimony of Lavey and Timmer in which they contradict[*22] each other regarding the discussions leading up to the RIF. n8

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n8  The inconsistent testimony deals with the information allegedly given by Timmer to his direct reports, including Lavey, regarding the objective of the RIF and the directive to reduce costs; it does not deal specifically with the decision to eliminate Owens's position.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

Excel counters that summary judgment is appropriate because its proffered reason is the same reason Owens was given on the day of her termination, namely, that her position was no longer needed, and it is undisputed that Owens was terminated pursuant to a company-wide RIF.

The court agrees. Even assuming that Lavey told her that her position was being eliminated because of the VarTec acquisition and that Lavey and Timmer have different recollections of the discussions they had regarding the RIF, the record conclusively reveals a nondiscriminatory reason for Owens's termination, namely, the company-wide RIF.

Owens next attempts to show pretext by questioning the necessity of the RIF [*23]based on Excel's financial condition at that time and various personnel and compensation decisions made before and after the RIF. Specifically, she points to two internal documents issued shortly before the October RIF that state that Excel was on target to meet its business goals. Based on this evidence, Owens contends that "the evidence clearly shows that the RIF was not expected to solve [Excel's financial] problems." In this same vein, Owens points out that, even after the RIF, Excel continued to hire employees n9 and pay bonuses. Assuming that the RIF was an unwise and unnecessary business decision, [HN18] a court cannot and will not second-guess a company's decision to undergo a RIF. See *Walton v. Bisco Indus., Inc., 119 F.3d 368, 372 (5th Cir. 1997); Nieto v. L&H Packing Co., 108 F.3d 621, 624 (5th Cir. 1997).*

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n9  It is undisputed that none of these employees replaced Owens.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - -

Finally, Owens compares her treatment to that of Brandgard and Prestwood, both of whom are younger than[*24] she. Specifically, she questions why Brandgard and Prestwood, whose combined salaries were over $310,000, were not terminated, as their positions had been initially identified for elimination. She contends that if cost reduction were the true reason behind the RIF, the elimination of their positions would have saved more money than the elimination of her position. Owens further contends that her performance was superior to that of Brandgard, as Brandgard overstated Excel's revenue in 2000 by $136 million while she (Owens) brought in an additional $35 million in the same time period. Even if the terminations of

Brandgard and Prestwood would have saved Excel more money and if her performance was superior to that of Brandgard, Owens has not produced any evidence to dispute Lavey's reason for choosing to eliminate her position, namely, that he could cut costs while using the existing staff to maintain the same level of work. Indeed, it is undisputed that there was little to no disruption in the work performed within the tax department after Owens's termination. Furthermore, Owens has not disputed Lavey's reason for not eliminating Brandgard's position, namely, she was working on a project [*25]that needed to be completed before the position could be eliminated. Lastly, there is no evidence to suggest that Lavey had the authority to eliminate Prestwood's position, as they were both Vice Presidents of Excel. Thus, Owens has not presented sufficient evidence to create a genuine issue of material fact as to pretext. Accordingly, there is no genuine issue of material fact as to Owens's age discrimination claims based on her termination, and Excel is entitled to judgment as a matter of law as to those claims.

2. Failure to Hire

Owens contends that VarTec discriminated against her on the basis of race, sex, and age when it failed to hire her for the position of Director of Tax. VarTec counters that she was not hired for the position because she was not qualified.

[HN19] In a failure to hire case, a prima facie case is established by showing that (1) Owens is a member of a protected class; (2) she applied for a position; (3) she was qualified for the position for which she applied; (4) she was not selected for the position; and (5) after VarTec declined to hire her, the position either remained open or someone outside the protected group was selected to fill it. See *Davis v. Chevron U.S.A., Inc., 14 F.3d 1082, 1087 (5th Cir. 1994)*[*26] (citing *Plemer v. Parsons-Gilbane, 713 F.2d 1127, 1135 (5th Cir.1983)).* n10

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n10 The court will again analyze all of Owens's discrimination claims together. See n.5, supra.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - -

(a) Prima Facie Case

VarTec contends that Owens cannot establish that she was qualified for the Director of Tax position, as she was not a Certified Public Accountant ("CPA"). Specifically, VarTec's job description of the position at issue lists a CPA license as a requirement, and the individual, Keeter, who was selected for the position is a CPA. Owens concedes that she does not have a CPA license but counters that a genuine fact question exists as to whether she was qualified for the position because (1) two VarTec employees involved in the hiring process believed she was qualified; (2) she was granted an interview by a VarTec recruiter, which ordinarily does not happen unless the individual is qualified for the position; (3) the individual who held the position prior to the vacancy was not a CPA; and (4) [*27] she was never informed during the hiring process that she was not qualified.

VarTec does not contend that Owens "was not capable of performing the essential functions of the job." It contends that she did not meet the "facial requirements" of the job description for the position. The court therefore determines that VarTec's concession that Owens was capable of performing the essential functions of the job is sufficient to establish that she was qualified for the position. See *Smith v. Eastern Airlines, Inc., 651 F. Supp. 214, 219 n.1 (S.D.Tex. 1986)* ("Here [HN20] the term 'qualified' simply means an essential ability to perform the job, not that Plaintiff met the job description required by the employer.").

VarTec next contends that Owens cannot establish that she was rejected for the position because it did not make an affirmative decision not to hire her but rather it made an affirmative decision to hire Keeter. VarTec's contention is a "difference without a distinction." The fourth element of a prima facie case, as articulated earlier, requires a showing that Owens was not selected for the position. As Keeter was given the position, it is clear that Owens was not [*28]selected for the position. The court therefore concludes that Owens has met her initial burden of establishing the elements of a prima facie case.

(b) Legitimate, Nondiscriminatory Reason

VarTec contends that Egger, the ultimate decisionmaker, hired Keeter because of "his previous, positive work history with Keeter, Keeter's VarTec-specific experience, Keeter's "Big 5" accounting experience, and Keeter's otherwise exemplary qualifications and experience." VarTec Am. Reply at 4. Owens counters that VarTec has not articulated a

legitimate reason for not selecting her, as it never compared her qualifications to those of Keeter's. VarTec concedes that no comparison was done because "Keeter was not selected over Owens." VarTec Am. Reply at 5. Instead, the decision to hire Keeter, VarTec continues, was made before Owens could be considered for the position. Although it appears that Owens was not considered for the position, the court determines that VarTec has articulated legitimate, nondiscriminatory reasons for hiring Keeter. Cf. *Wheeler v. City of Columbus, 686 F.2d 1144, 1153-54 (5th Cir. 1982)* (court analyzed employer's refusal to interview the plaintiff[*29] thus barring her from consideration in the pretext stage of the burden-shifting framework). The burden now shifts back to Owens to demonstrate that VarTec's articulated reasons are a pretext for intentional discrimination.

(c) Pretext and Intentional Discrimination

Owens contends that VarTec's proffered reasons are pretext because she was never considered for the position and she is more qualified than Keeter for the position. VarTec counters that Owens was not considered for the position because Egger "was focused on the possibility of hiring Keeter." VarTec Am. Br. at 11. Owens contends that VarTec's explanation is disingenuous, as she applied for the position before Keeter. Although this may be unfair, it alone is insufficient to establish that VarTec's failure to hire her is based on impermissible discrimination. Indeed, it is undisputed that at the time the decision to hire Keeter was made, Egger was unaware of Owens's race or age.

VarTec further contends that it is entitled to summary judgment because Owens fails to establish that no reasonable person would have chosen Keeter over her for the position in question. The court agrees. At the time of his hire, Keeter had[*30] over 15 years of public accounting experience, including over 10 years in a manager or senior manager capacity; he has a B.B.A. in accounting; he is a CPA; he had 14 years of "Big 5" experience; and he had VarTec-specific telecom experience. On the other hand, Owens had over 30 years experience in corporate taxation, including 20 years in a supervisory position; she has a B.S. in accounting and an M.S. in taxation; she had seven years of experience in corporate tax in the telecom industry and worked in a regulated environment for 11 years; and she was the Director of Tax at Excel for over six and a half years. Obviously, both Keeter and Owens are well-qualified for the position at issue. The disparities in their qualifications are not of "such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen" Keeter over Owens for the

position. See *Deines v. Texas Dep't of Protective and Regulatory Servs., 164 F.3d 277, 280-81 (5th Cir. 1999).*

The court determines that Owens has failed to establish that VarTec's articulated reasons for its alleged discriminatory conduct were a pretext for intentional discrimination. Accordingly, [*31] VarTec is entitled to judgment on Owens's claims of race, age, and sex discrimination.

3. Aiding and Abetting

In her Second Amended Complaint, Owens alleges violations of *§ 21.056* of the *Texas Labor Code. Section 21.056* provides that [HN21] "an employer . . . commits an unlawful employment practice if the employer . . . aids, abets, incites, or coerces a person to engage in a discriminatory practice." *Tex. Labor Code Ann. § 21.056* (Vernon 1996). Excel and VarTec move for summary judgment on the basis that the record is devoid of any evidence to support a violation of *§ 21.056.* The court agrees. Moreover, Owens does not oppose summary judgment on her *§ 21.056* claims. See Pl. Am. Br. at 2 ("Owens had also alleged that Excel and VarTec aided and abetted each other in violation of *Tex. Labor Code § 21.056* ; however, Owens is not opposing summary judgment on the aiding and abetting claims."). Accordingly, Excel and VarTec are entitled to judgment as a matter of law on Owens's *§ 21.056* claims.

C. Retaliation

Owens brings a retaliation claim pursuant to Title VII, THCRA, ADEA, and *§ 1981* against VarTec. n11 Specifically, [*32] Owens contends that VarTec retaliated against her by failing to hire her for the Director of Tax position because she had previously complained to Excel regarding sex, race, and age discrimination. VarTec counters that Owens cannot establish a prima facie case or show that "but for" her protected activity, she would have been hired for the Director of Tax position.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n11 As the underlying facts of Owens's Title VII, *§ 1981*, TCHRA, and ADEA retaliation claims are the same, and the evidentiary burdens of these statutes are similar, her claims will be analyzed together. See n.5, supra.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - -
- - - -

[HN22] The McDonnell Douglas burden-shifting framework is also applicable to retaliation claims. *Montemayor v. City of San Antonio, 276 F.3d 687, 692 (5th Cir. 2001).* To establish a prima facie case of retaliation, a plaintiff must demonstrate that: (1) she engaged in a protected activity; (2) she experienced an adverse employment action following the protected activity; and (3) a causal link existed between[*33] the protected activity and the adverse employment action. *Id.; Mota v. University of Texas Houston Health Sci. Ctr., 261 F.3d 512, 519 (5th Cir. 2001).* The burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action. Id. Once the defendant does so, the inference of discrimination created by the prima facie case disappears, and the ultimate question becomes whether the protected conduct was the "but for" cause of the adverse employment action. n12 Id.

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - -
- - -

n12  Owens contends that the less stringent "motivating factor" test applies to her THCRA claim. She relies on *Quantum Chemical Corp. v. Toennies, 47 S.W.3d 473, 44 Tex. Sup. Ct. J. 519 (Tex. 2001);* her reliance on Toennies is misplaced. In *Pineda v. United Parcel Serv., Inc., 353 F.3d 414 (5th Cir. 2003),* the Fifth Circuit rejected this argument. Specifically, the Pineda court noted that the Toennies court "meant that the [motivating factor] standard was the applicable standard in both pretext and mixed motive employment discrimination cases where § 21.125(a) was applicable." *Id. at 419 n.4* (emphasis added). The Pineda court then held that [HN23] the "but for" standard is the correct standard for claims brought under § 21.055, as § 21.125(a), by its own terms, is not applicable to claims brought under § 21.055. *Id. at 419.* The court, therefore, applies the "but for" standard to Owens's THCRA claim.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - -
- - - -

[*34]

At issue here is the third element of the prima facie case -- the existence of a causal connection between the protected activity and the adverse employment action. VarTec contends that Owens cannot establish a causal connection because Egger, the ultimate decisionmaker, had no knowledge of her complaints of discrimination when he made his decision to hire Keeter. Owens contends that she need only establish general corporate knowledge of her protected activity, not specific knowledge by an individual employee of VarTec. She relies on *Gordon v. New York City Bd. of Educ., 232 F.3d 111 (2d Cir. 2000).* Owens's reliance on Gordon is misplaced.

First, Gordon is not binding on this court, as it was decided in another circuit. Second, the holding in Gordon actually supports VarTec's position that the lack of knowledge on the part of Egger is evidence of a lack of a causal connection. Specifically, the Gordon court held, among other things, that [HN24] "the lack of knowledge on the part of particular individual agents is admissible as some evidence of a lack of causal connection, countering plaintiff's circumstantial evidence of proximity or disparate treatment. [*35]" *Id. at 117* (emphasis in original). n13

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - -
- - -

n13 The Gordon court noted, however, that [HN25] even in the absence of direct knowledge by individual agents, a jury can still find retaliation if, for example, it finds that "circumstances evidence knowledge of the protected activities or the jury concludes that an agent is acting explicitly or implicit upon the orders of a superior who has the requisite knowledge." *232 F.3d at 117 .* No such evidence has been presented in this case.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - -
- - - -

Owens further contends that the timing of Keeter's hire is sufficient to establish a causal connection. Specifically, VarTec was notified of Owens's complaint on January 16, 2002, the same day that it sent Keeter a written offer of employment. Owens is correct that [HN26] temporal proximity between the protected activity and the adverse employment action may be a significant factor in showing a causal connection. See

*Evans v. City of Houston, 246 F.3d 344, 356 (5th Cir. 2001)*. She must still, however, demonstrate[*36] that the decision not to hire her was based in part on knowledge of her complaints of discrimination. See *Medina v. Ramsey Steel Co., 238 F.3d 674, 684 (5th Cir. 2001)* (citing *Sherrod v. American Airlines, 132 F.3d 1112, 1122 (5th Cir. 1998))*. "If the decisionmakers were completely unaware of the plaintiff's protected activity, then it could not be said (even as an initial matter) that the decisionmakers might have been retaliating against the plaintiff for having engaged in that activity." *Manning v. Chevron Chemical Co., 332 F.3d 874, 884 n.6 (5th Cir. 2003)*.

Here, it is undisputed that Eggers did not know of Owens's protected activity when he interviewed Keeter and that Eggers had decided as early as December 13, 2001 that he wanted to hire Keeter for the vacant position. Indeed, the hiring requisition form for the position in question, dated January 8, 2002, identifies Keeter and sets forth his salary requirements. Owens has not adduced any evidence that any VarTec decisionmaker had knowledge of her protected activity when she was not selected for the vacant position. As such, Owens has not established a prima facie case of[*37] retaliation. n14

- - - - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - -

n14 Even assuming Owens established a prima facie case of retaliation, VarTec provided a legitimate, nonretaliatory reason for not hiring her for the Director of Tax position, namely, the decision to hire Keeter was made before she could be considered for the position. See § III.B.2, supra. Owens has not offered sufficient evidence to demonstrate that the reason she was not hired was in retaliation for complaining to Excel regarding discrimination.

- - - - - - - - - - - - - - - - - End Footnotes - - - - - - - - - - - - -

### IV. Conclusion

For the above stated reasons, no genuine issues of material fact exist with respect to any of Owens's claims, and Defendants are entitled to summary judgment on these claims. Accordingly, the court grants Defendant Excel Management Services, Inc.'s Motion for Summary Judgment; and grants Defendant VarTec Telecom, Inc.'s Motion for Summary Judgment. The court dismisses with prejudice this action against Defendants. Judgment will issue by separate document as required by *Fed. R. Civ. P. 58*[*38] .

It is so ordered this 13th day of February, 2004.

Sam A. Lindsay

United States District Judge

### JUDGMENT

This judgment is issued pursuant to the court's Memorandum Opinion and Order of February 13, 2004. It is therefore ORDERED, ADJUDGED, and DECREED that this action is hereby dismissed with prejudice; that Plaintiff Brenda J. Owens ("Plaintiff") take nothing from Defendants Excel Management Services, Inc. and VarTec Telecom, Inc.; that all relief requested by Plaintiff is denied; that all relief not expressly granted herein is denied; and that all allowable and reasonable costs are taxed against Plaintiff.

Signed this 13th day of February, 2004.

Sam A. Lindsay

United States District Judge

Slip Copy
(Cite as: 2004 WL 370225 (N.D.Tex.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. Texas, Dallas Division.

Ivor KEELAN and David Sullivan, Plaintiffs,
v.
MAJESCO SOFTWARE, INC., Defendant.

No. Civ.A. 3:02-CV-1670L.

Feb. 26, 2004.

Durwood D. Crawford, Goins, Underkofler, Crawford & Langdon, Dallas, TX, for Plaintiffs.

John L. Ross, Lisa A. Royee, Thompson, Coe, Cousins & Irons, Dallas, TX, for Defendant.

Courtenay Lee Bass, Pro Se, Burdin Mediations, Dallas, TX, for Provider.

### MEMORANDUM OPINION AND ORDER

LINDSAY, J.

*1 Before the court is Defendant's Motion for Summary Judgment, filed October 3, 2003. After careful consideration of the parties' written submissions, [FN1] and the applicable law, the court, for the reasons herein stated, grants Defendant's Motion for Summary Judgment.

> FN1. The parties' written submissions include: Defendant's Brief in Support of Motion for Summary Judgment, filed October 3, 2003; Defendant's Appendix of Exhibits in Support of Its Motion for Summary Judgment Against David Sullivan and Ivor Keelan, filed October 3, 2003; Plaintiffs' Brief in Opposition to Defendant's Motion for Summary Judgment, filed October 31, 2003; Plaintiffs' Appendix in Support of Plaintiffs' Brief in Opposition to Defendant's Motion for Summary Judgment, filed October 31, 2003; Defendant's Reply Brief in Support of Defendant's Motion for Summary Judgment, filed November 18, 2003; Defendant's Supplemental Appendix of Exhibits in Support of Its Motion for Summary Judgment Against David Sullivan and Ivor Keelan, filed November 18, 2003; Defendant's Objections to Plaintiffs' Summary Judgment Evidence and Exhibits, filed November 18, 2003; Plaintiffs' Surreply Brief, filed December 9, 2003; and Defendant's Reply to Plaintiffs' Surreply Brief, filed December 12, 2003.

### I. Procedural History and Factual Background

This is an employment discrimination action. Plaintiffs Ivor Keelan ("Keelan") and David Sullivan ("Sullivan") (collectively "Plaintiffs") are former employees of Defendant Majesco Software, Inc. ("Defendant" or "Majesco"). Plaintiffs allege that Majesco discriminated against them on the basis of their national origin in the terms and conditions of their employment in violation of the Civil Rights Act of 1964, as amended (Title VII), 42 U.S.C. § 2000e et seq. Keelan alleges that he was discharged because of his national origin. Sullivan alleges that he was ultimately constructively discharged. Plaintiffs allege that they have been damaged as a result of Majesco's discriminatory actions and seek lost commissions, salary, back pay and benefits, front pay, punitive damages, attorney's fees and costs, and prejudgment interest on all sums recovered. Majesco denies making any employment decisions with respect to Plaintiffs' employment based on their national origin. Majesco asserts that Sullivan was a short-term employee who voluntarily resigned after approximately four months on the job. Majesco further asserts that Keelan worked for the company for slightly over a year, during which time he received several counselings, both orally and in writing, concerning his poor sales performance. Majesco further asserts that Keelan was ultimately discharged for poor sales performance. The court now sets forth the facts on which in relies to determine Defendant's summary judgment motion. [FN2]

> FN2. Other than Plaintiffs' statement that it was Defendant's objective to have an entire Indian workforce, Plaintiffs' Original Complaint ("Complaint") does not allege the specific facts that give rise to Plaintiffs' discrimination claims. The court therefore relies on the facts asserted in (1) Defendant's "Statement of Material Facts"; (2) Plaintiffs' response to Defendant's summary judgment motion; and (3) the deposition testimony, declarations, affidavits, and other exhibits contained in the parties' respective appendices. The relevant facts are for the most part undisputed. Any fact in actual dispute is of course presented in the light most favorable to Plaintiffs, as the nonmovants.

Majesco is a wholly owned subsidiary of Mastek Ltd., a foreign software/IT solutions outsourcing company headquarted in Bombay, India. Majesco is

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy
(Cite as: 2004 WL 370225, *1 (N.D.Tex.))

Page 11

primarily a sales organization, that is, a distributor of Mastek's products and services. Majesco's function is to generate sales of Mastek's technology products and services. Beginning in 2000, Majesco suffered a severe drop in its revenues and profitability. In particular, revenue declined from $42.1 million to $24.4 million, and net profit declined from $673,000 to a net loss of $1.4 million. Additionally, in 2000, shareholder equity decreased by almost $6 million. Following the events of September 11, 2001, and the slowdown in the U.S. economy, revenue fell again in 2002 to $14.8 million, resulting in another net loss of nearly a half million dollars. Thereafter, Majesco instituted an across-the-board pay cut. All rank and file employees earning more than $60,000 per year received a 10% pay cut, and senior management received an even larger percentage decrease. The company also modified its commission structure for salespersons across-the-board.

Keelan, is a citizen of the United Kingdom, born in Belfast, Northern Ireland. Keelan began his at-will employment with Majesco as Director, Central Region Outsource Sales, on or about August 7, 2000 at a base salary of $110,000, plus commissions. In this capacity, Keelan was required to seek out customers looking for technology products and services and then present those sales opportunities to senior Majesco management for consideration. During the first four months of his employment, Keelan did not generate any sales. On January 9, 2001, Keelan's supervisor, Gary Hart ("Hart"), who was not a native of India, counseled him concerning his sales performance and gave him specific goals and expectations. Thereafter, between February and April, 2001, Keelan generated sales to Sprint, TIG Insurance Company, and Foreign Trade Zone. In April, 2001, Hart resigned from Majesco, and he was replaced by Lokesh Bhagwat ("Bhagwat"), an Indian national. After Hart's resignation, Keelan failed to generate any further sales, even though he was subsequently counseled several times concerning his lack of sales. Keelan also received warnings concerning his failure to follow company policy of working from the office. On November 28, 2001, after repeated oral and written warnings, Majesco terminated Keelan's employment.

*2 In December 2001, Keelan's position was offered to a female Canadian national; however, she did not accept the position. In January 2002, Majesco terminated two salespersons, who were

Indian nationals, for poor sales performance. Approximately one year after Keelan's termination, in November and December 2002, Majesco hired three males as salespersons, all of whom are United States nationals.

Sullivan is a native of the United States, born in El Paso, Texas. In early 2001, Sullivan applied for work at Majesco. [FN3] The two most senior Majesco management officials, Chief Executive Officer Ketan Mehta and President Atul Vohra ("Vohra"), both of whom are natives of India, interviewed Sullivan for a position with the company. On February 15, 2001, Majesco offered Sullivan an at-will employment position of Director of Alliances at a base annual salary of $120,000, plus commissions. Sullivan accepted the position and began work on or about March 1, 2001. As Director of Alliances, Sullivan's job was to develop alliances with other computer-related companies to make joint proposals (as a team) to those companies' prospects. Through these alliances, Majesco and the allied company would "joint venture" a bid to do a software job for a client. On June 20, 2001, Sullivan filled out an application with a potential new employer, AppWorx Corporation ("AppWorx") as well as other papers relating to prospective employment with that company. Beginning in the first week of July 2001, without notifying his new supervisor or submitting any leave request, Sullivan went on an extended leave which he stated was previously approved by Hart. On July 10 and 18, 2001, Bhagwat, e-mailed Sullivan concerning his extended leave from work and failure to submit the necessary leave documentation. On July 16, 2001, Majesco announced a new Sales Compensation Plan. Keelan and Sullivan expressed their concerns to Majesco about the new compensation plan and how it adversely affected commissioned salespersons. On July 25, 2001, Majesco reiterated to its sales force the necessity to work out of the office, not from their homes. Keelan and Sullivan objected to these work conditions. On July 26, 2001, Sullivan submitted a letter of resignation to Majesco. On August 16, 2001, AppWorx accepted Sullivan's proposal to work for it.

> FN3. Sullivan states that he was first approached by Clay Hill, a consultant for Majesco, about a job opportunity with Majesco. Sullivan initially interviewed with Hart and, thereafter, with Mehta and Vohra. Sullivan was subsequently offered the job as Director of Alliances by Hart, both verbally and in writing.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Plaintiffs allege that Majesco underwent a management change in 2001, and its new President, Vohra, began a pattern of replacing non-Indian employees with individuals who were citizens of India. They also allege that Majesco arranged for Indian employees to be brought from India to the United States to replace non-Indian employees such as Plaintiffs, who were natives of the United States or nations other than India. Plaintiffs also allege that those non-Indian employees who were allowed to remain in Majesco's sales force had their sales opportunities and earnings restricted. They further allege that Indian employees were given preferential treatment in sales opportunities made available to them, and were given preferential treatment in other respects to make their working conditions more favorable than the working conditions of non-Indian employees. Because of these allegations, Plaintiffs contend that that they were discriminated against in their working conditions and in their terminations on the basis of their nationality.

*3 Plaintiffs timely filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"), and timely filed this lawsuit on August 6, 2002, after receiving right-to-sue letters from the EEOC. Majesco now moves for summary judgment on Plaintiffs' national origin discrimination claims.

II. *Summary Judgment Standard*

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Ragas v. Tennessee Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir.1998). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Ragas,* 136 F.3d at 458. Further, a court "may not

make credibility determinations or weigh the evidence" in ruling on motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Anderson,* 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita,* 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler,* 73 F.3d 1322, 1325 (5th Cir.1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Ragas,* 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment *Id.; see also Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915-16 & n. 7 (5th Cir.), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248. Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex,* 477 U.S. at 322-23.

III. *Analysis*

A. Defendant's Motion for Summary Judgment

1. *Applicable Standard of Proof*

*4 Plaintiffs and Defendant disagree regarding the applicable standard of proof on Plaintiffs' discrimination claims. Plaintiffs maintain that the

court should apply the "mixed-motive" analysis found in *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 2150, 156 L.Ed.2d 84 (2003). [FN4] A "mixed-motive" case is one in which the adverse employment decision is motivated by both legitimate *and* illegitimate, that is, discriminatory, reasons. *Waltman v. International Paper Co.,* 875 F.2d 468, 481 (5th Cir.1989). Majesco contends that this is a pretext case, and therefore the court should follow the *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), burden-shifting framework. A pretext case is one in which the "employer has either a discriminatory *or* a non-discriminatory rationale for its actions." *Waltman,* 875 F.2d at 481. (emphasis in original).

> FN4. *Desert Palace* makes clear that direct evidence of discrimination is not necessary to obtain a mixed-motive jury instruction under Title VII. 539 U.S. at ——, ——, 123 S.Ct. at 2150, 2155.

As an initial matter the court rejects Plaintiffs' suggestion that the *McDonnell Douglas* burden-shifting paradigm no longer exists after *Desert Palace.* This would not be an evolution but a revolution in employment discrimination law. If the Supreme Court were going to make a draconian departure from 30 years of well-established employment discrimination precedent, it would have done so with unmistakable clarity. In *Desert Palace,* the Supreme Court does not even intimate that it is overruling, restricting or clarifying *McDonnell Douglas.* Moreover, no Fifth Circuit authority embraces Plaintiffs' interpretation of *Desert Palace. See Read v. BT Alex Brown Inc.,* 72 Fed. Appx. 112 (5th Cir.2003). [FN5]

> FN5. In *Read,* the Fifth Circuit cited to *Desert Palace;* however, it applied the *McDonnell Douglas* burden-shifting framework to the plaintiff's sex and age discrimination claims. If the Fifth Circuit believed that *Desert Palace* abrogated the burden-shifting framework set forth in *McDonnell Douglas,* it certainly would have deemed it necessary to elevate *Read* to the status of a published opinion, rather than making it an unpublished opinion having no precedential value.

The court now determines which analysis applies here. *See Mooney v. Aramco Services Co.,* 54 F.3d 1207, 1217 (5th Cir.1995) (A case need not be labeled as a "mixed motive" case or pretext case from its inception; but at some point, the court must

determine whether the case involves a mixed motive.). The court determines that this is a pretext case because there is no evidence that Majesco had legitimate *and* illegitimate reasons for discharging Keelan and because Plaintiffs do not allege that it had any legitimate reason to terminate Keelan's employment. Accordingly, this case will be analyzed pursuant to the burden-shifting framework under *McDonnell Douglas.* Even if the court determined that a "mixed motive" analysis was appropriate, the ultimate burden of proving intentional discrimination remains with Plaintiffs. *See Texas Dep't of Comty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *see also Read,* 72 Fed. Appx. at 115 (citing *Desert Palace,* 539 U.S. at ——, 123 S.Ct. at 2150). The court now turns to Plaintiffs' claims of discrimination. [FN6]

> FN6. Keelan and Sullivan both bring claims of national origin discrimination under Title VII. Plaintiffs allege that Majesco discriminated against them in their terms and conditions of employment. In addition, Keelan alleges that Majesco discriminated against him in his termination, and Sullivan alleges that he was constructively discharged.

2. *Analytical Framework*

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). A plaintiff can prove a claim of intentional discrimination by either direct or circumstantial evidence. *Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 222 (5th Cir.2000) *Urbano v. Continental Airlines, Inc.,* 138 F.3d 204, 206 (5th Cir.), *cert. denied,* 525 U.S. 1000, ¶19 S.Ct. 509, 142 L.Ed.2d 422 (1998). "Direct evidence" is "evidence, which if believed, proves the fact [in question] without inference or presumption.' *Fabela v. Socorro Indep. Sch. Dist.,* 329 F.3d 409, 415 (5th Cir.2003) (citations omitted). Plaintiffs have presented no direct evidence of discrimination based on national origin; therefore, they must rely on the burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas* to create a presumption of intentional discrimination *See Russell,* 235 F.3d at 222; *see also Byers v. Dallas Morning News, Inc.,* 209 F.3d 419, 425 (5th Cir.2000). To create such a presumption, Plaintiffs must establish a *prima facie* case of discrimination.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

*McDonnell Douglas*, 411 U.S. at 802. If Plaintiffs succeed in demonstrating a *prima facie* case, Majesco must then provide a legitimate, nondiscriminatory reason for its action. *Id.* Finally, if the parties satisfy their initial burdens, the case reaches the "pretext stage," and Plaintiffs must then adduce sufficient evidence to permit a reasonable trier of fact to find pretext or intentional discrimination. *Id.* at 804; *see also Burdine*, 450 U.S. at 252-53; *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 425-26 (5th Cir.2000).

### 3. *Plaintiffs' National Origin Discrimination Claims*

**\*5** Plaintiffs' Complaint alleges that Majesco discriminated against them in their working conditions and in their terminations from employment because of their non-Indian nationality. [FN7] To establish a *prima facie* case of disparate treatment discrimination under Title VII, Plaintiffs must show that: (1) they are members of a protected class; (2) they were qualified for their positions; (3) they suffered an adverse employment action; and (4) others outside the class who were similarly situated were treated more favorably than they were treated. *Urbano*, 138 F.3d at 206; *see also Rutherford v. Harris County*, 197 F.3d 173, 184 (5th Cir.1999). Majesco does not dispute that Plaintiffs have satisfied the first two elements of their *prima facie* case; rather, it argues that Plaintiffs are unable to establish the remaining elements because (1) many of the actions about which they complain are not ultimate employment actions that would invoke the protection of Title VII and (2) they have not shown that they were treated less favorably than similarly situated employees. The court agrees.

> FN7. As the court understands Plaintiffs' allegations, they complain that Majesco discriminated against them on the basis of their national origin in two respects: (1) in their terms and conditions of employment and (2) in their terminations from employment. Although Plaintiffs' Complaint does not expressly contain the buzz words "disparate treatment," it is clear from the allegations and facts of this case that Plaintiffs' claims are brought under a theory of "disparate treatment," rather than "disparate impact." First, Plaintiffs' Complaint does not allege a facially neutral employment practice that produces a significantly adverse impact on the alleged protected class. *See Munoz v. Orr*, 200 F.3d 291, 299 (5th Cir.2000) ("Disparate impact claims ... focus on facially neutral employment practices that create such statistical disparities disadvantaging

members of a protected group that they are functionally equivalent to intentional discrimination.") (internal quotation marks and citations omitted). Additionally, to prevail under a disparate impact theory, Plaintiffs must identify specific practices as being responsible for any observed disparities, and must conduct a systemic analysis of those employment practices in order to establish their case. *See id.* (citations omitted). Plaintiffs have failed to do so. Moreover, Defendant in its summary judgment motion characterizes and analyzes Plaintiffs' claims as disparate treatment claims, and Plaintiffs neither object to this characterization nor have they sought to amend their complaint. The court therefore analyzes the evidence in this case under a disparate treatment theory.

> The court also notes that Plaintiffs in their response assert that they were subjected to a discriminatory or hostile environment; however, Plaintiffs' Complaint neither alleges a hostile environment claim nor seeks a remedy based on a hostile work environment. Because no claim of hostile environment has been pled, the court treats Plaintiffs' evidence regarding a hostile environment as additional evidence offered to prove disparate treatment discrimination, rather than a separate claim of relief.

To satisfy the "adverse employment action" prong of their *prima facie* case, Plaintiffs must show that Majesco took an "ultimate employment action" against them. *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 705-07 (5th Cir.), *cert. denied*, 522 U.S. 932, 118 S.Ct. 336, 139 L.Ed.2d 260 (1997). "Adverse employment actions include only ultimate employment decisions ... such as hiring, granting leave, discharging, promoting, and compensating. An employer's action does not rise to the level of an adverse employment action when it fails to have more than mere tangential effect on a possible future ultimate employment decision." *Mota v. University of Texas Houston Health Sci. Ctr.*, 261 F.3d 512, 519 (5th Cir.2001) (internal quotation marks, citation, and footnotes omitted). A tangential employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

Plaintiffs assert in their response to Defendant's summary judgment motion that Majesco (1) interfered with Keelan's ability to perform his job

within his geographic sales territory; (2) removed Sullivan's duties as Director of Alliances; [FN8] (3) impeded Plaintiffs' ability to conclude sales by staffing them with only Indian consultants; (4) failed to provide Plaintiffs with sales and marketing material, training, accounting, and administrative support; (5) curtailed Plaintiffs' role in developing, marketing and servicing prospective clients; and (6) refused to allow Plaintiffs to work from home, and forced its non-Indian staff to work in small windowless cubicles, or "work booths." [FN9] None of these asserted acts of discrimination rises to the level of an ultimate employment action for purposes of liability under Title VII. Plaintiffs therefore fail to satisfy the third prong of their *prima facie* case. Because Plaintiffs have failed to satisfy their *prima facie* case with respect to these claims, Majesco is entitled to judgment as a matter of law.

> FN8. Although Plaintiffs assert that Majesco *"removed Sullivan's duties* as Director of Alliances," they do not allege that Sullivan was removed or demoted from his position as Director of Alliances; that he was reassigned to another position with significantly different job duties and responsibilities; or that he received a significant change in benefits as result of this alleged removal of duties. Instead, Plaintiffs point to an incident in June 2001 where Majesco abruptly decided to substitute him as Majesco's representative on an overseas trip with a prospective client, Associated Computer Systems ("ACS"). Plaintiffs, however, point to no evidence which shows that Sullivan no longer served in his capacity as Director of Alliances. On the contrary, the record establishes that at or near the time Sullivan was removed from the ACS project, he traveled overseas to represent Majesco in connection with a business opportunity involving Oracle Corporation and another prospective client, Avery Dennison.

> FN9. Defendant in its summary judgment motion also points to the following allegations that Plaintiffs apparently raised in their depositions but chose not to address in their response to Defendant's motion: Majesco (1) refused to bid on certain prospective projects they presented to company management; (2) increased the price of a proposal above the price Sullivan thought was necessary in order to successfully obtain a contract; and (3) failed to provide Plaintiffs an effective Web site. Because Plaintiffs do not address these allegations in their response, the court assumes that they have abandoned them and does not use them as a basis to show discrimination. In any event, to the extent these allegations may be construed as being properly before the court, they are not

adverse employment actions and are, therefore, insufficient to support a Title VII claim.

*6 The remainder of Plaintiffs' national origin discrimination claims do encompass ultimate employment actions within the purview of Title VII, namely: compensation and termination. Plaintiffs' claims related to compensation fail because they have not set forth any competent summary judgment evidence showing that they were denied any compensation owed to them, or that Majesco treated similarly-situated Indian employees differently than non-Indian employees like Plaintiffs. On the contrary, the summary judgment evidence establishes that the compensation plan was applied across-the-board to all employees earning over $60,000, both sales and non-sales employees, Indian and non-Indian employees alike.

Keelan's claim of discriminatory discharge also fails, because he has not set forth any competent summary judgment evidence showing, or establishing, that similarly situated Indian sales employees were treated more favorably than he was treated. In other words, Keelan fails to produce competent summary judgment evidence that Majesco did not terminate similarly situated Indian salespersons with poor sales records, or who performed as he did. If Keelan had pointed to evidence showing that an Indian employee with a sales performance the same as his was neither counseled nor terminated, then Keelan would have raised a fact question regarding a *prima facie* case; however, he produces no such evidence.

Plaintiffs have failed to establish a *prima facie* case regarding their compensation claim, and Keelan has failed to establish a *prima facie* case regarding Keelan's discriminatory discharge claim. Majesco is therefore entitled to judgment as a matter of law on these claims. [FN10] The court next addresses Sullivan's claim of constructive discharge.

> FN10. Even if the court had determined that Keelan satisfied his *prima facie* case of discriminatory discharge, it would nevertheless grant summary judgment, because Majesco has articulated a legitimate, nondiscriminatory reason for Keelan's discharge, poor sales performance, and Keelan does not dispute this reason is true, or set forth competent summary judgment which shows that the stated reason is untrue. Even so, in an attempt to show pretext, Keelan points to several comments allegedly made by Majesco

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

personnel, including Vohra; Hart; Yvette Winfrey, an employee in Majesco's Human Resource office; Mehta; and other unidentified Majesco employees; however, he has not shown that any of these employees were involved in the decision-making process, or that the statements were made in connection with Keelan's discharge. As such, the alleged statements amount to nothing more than "stray remarks," which alone are insufficient to raise a genuine issue of material fact on the issue of pretext. *See Scales v. Slater,* 181 F.3d 703, 712 (5th Cir.1999) ("Stray remarks with no connection to an employment decision cannot create a fact issue regarding discriminatory intent and are insufficient to defeat summary judgment.").

Sullivan alleges that he suffered discrimination on the basis of his national origin, in that, his job duties and opportunities were changed so significantly that he was forced to resign in July 2001. Sullivan asserts that any reasonable person in his situation would probably have resigned sooner than July 26, 2001. He contends that the evidence clearly shows (or permits the inference) that Majesco wanted to force him to resign because no effort whatsoever was made to respond to his pleas and reassure him that he had a future with it. Sullivan contends that such resignation was in fact a constructive discharge by Majesco. Majesco responds that as a matter of law Sullivan cannot establish a *prima facie* case of constructive discharge, because (1) he was not subjected to objectively intolerable unlawful conditions; and (2) he left Majesco for what he perceived to be a better job, rather than intolerable working conditions.

An employee who resigns may satisfy the adverse employment action requirement by establishing a constructive discharge. To establish a constructive discharge "an employee must offer evidence that the employer made the employee's working conditions so intolerable that a reasonable employee would feel compelled to resign." *Brown v. Bunge Corp.,* 207 F.3d 776, 782 (5th Cir.2000). This standard necessarily requires an objective test. The question that must be determined is not whether the employee in question felt compelled to resign but whether a reasonable employee would have felt compelled to resign under such conditions. *Guthrie v. J.C. Penney Co.,* 803 F.2d 202, 207 (5th Cir.1986). To establish a constructive discharge, the "resignation must have been reasonable under all the circumstances." *Barrow v. New Orleans Steamship Ass'n,* 10 F.3d 292, 297 (5 th Cir.1997). In this respect, the Fifth Circuit has stated:

*7 [W]e consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement on terms that would make the employee worse off whether the offer was accepted or not.

*Brown v. Bunge Co.,* 207 F.3d at 782 (quoting *Barrow v. New Orleans Steamship Ass'n,* 10 F.3d at 297).

Sullivan has failed to satisfy the constructive discharge element of his *prima facie* case. Sullivan has not set forth any competent summary judgment evidence showing that his decision to resign was reasonable based on any of the factors identified in *Barrow.* For example, Sullivan has presented no evidence that Majesco demoted him or cut his salary; reassigned him to remedial or degrading work; badgered, harassed, or humiliated him to encourage his resignation; or offered him early retirement. *See Barrow,* 10 F.3d at 297; *see also Ward v. Bechtel Corp.,* 102 F.3d 199, 202 (5th Cir.1997). Although the list of factors in *Barrow* is not exclusive, Sullivan has failed to present other evidence sufficient to show that Majesco placed him in an intolerable work environment. [FN11] The court determines that a reasonable person in Sullivan's position would not have felt compelled to resign. Sullivan has failed to raise a genuine issue of material fact on his claim of constructive discharge; therefore, his discrimination claim fails as a matter of law, and Majesco is entitled to summary judgment on this claim. [FN12]

FN11. In an attempt to show intolerable working conditions, Sullivan points to the following: (1) he was required to work in small, windowless cubicles, or "work booths," (2) he was no longer allowed to work from his home; (3) he was replaced at the last minute by an Indian employee on his first major project with Majesco; (4) he received a cut in pay as a result of the new compensation plan; (5) he made suggestions and criticisms of the new compensation plan that were ultimately ignored; and (6) he was hindered in the execution of his responsibilities, in that, the company did not adequately support his sales efforts.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Although Sullivan contends that implementation of the new Sales Compensation Plan resulted in a in a pay reduction, he sets forth no competent summary judgment evidence that he was singled out or targeted for a salary cut. Instead, the record establishes that the pay reductions were applied uniformly, that is, the compensation plan resulted in a pay cut for all sales employees, regardless of their nationality. In addition, the conditions that he work in cubicles and at the office, rather than from home, were uniformly applied across-the-board to all affected employees, regardless of their national origin. Defendant contends that the remaining described instances amount to no more than the "ordinary trials and tribulations of the work place." The court agrees. As stated before, to establish constructive discharge, Sullivan must prove that the working conditions to which he was subjected were so difficult or unpleasant a *reasonable* employee in his shoes would have felt compelled to resign. The court determines that no reasonable employee would have felt compelled to resign under the circumstances presented here.

FN12. Even if the court were to determine that Sullivan was constructively discharged, Sullivan sets forth no competent summary judgment evidence which shows that similarly situated Indian employees were treated more favorably than he was treated during the short four months that he was employed by Majesco.

B. Majesco's Objections to Plaintiffs' Summary Judgment Evidence

Majesco has filed objections to certain summary judgment evidence produced by Plaintiffs. *See* Def.'s Objections to Plaintiffs' Summary Judgment Evidence and Exhibits; Def.'s Reply Brief in Support of Defendant's Motion for Summary Judgment. The court has previously set forth the applicable standard for competent summary judgment evidence. If the summary judgment evidence did not meet the standard, the court did not consider it, and such evidence played no part in the court's ruling. The court therefore overrules as moot Defendants Objections to Plaintiffs' Summary Judgment Evidence. Even if the court were to consider the objected to evidence, it would reach the same result.

IV. *Conclusion*

For the reasons herein stated, Plaintiffs have failed to establish a *prima facie* case of national origin discrimination, and Majesco is entitled to judgment as a matter of law on Plaintiffs' claims. [FN13] Accordingly, Defendant's Motion for Summary Judgment is granted, and Plaintiffs' discrimination claims under Title VII are hereby dismissed with prejudice. The court will issue judgment by separate document pursuant to Fed.R.Civ.P. 58.

FN13. Although the court has determined that Plaintiffs have failed to establish a *prima facie* case of national origin discrimination, it alternatively holds that Plaintiffs have failed to establish a pretext for intentional discrimination. *See* Footnotes 10 and 12, *supra*.

It is so ordered.

2004 WL 370225 (N.D.Tex.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

72 Fed.Appx. 112                                                                                          **Page 1**
(Cite as: 72 Fed.Appx. 112, 2003 WL 21754966 (5th Cir.(Tex.)))
**H**

Briefs and Other Related Documents

This case was not selected for publication in the Federal Reporter.

Please use FIND to look at the applicable circuit court rule before citing this opinion. Fifth Circuit Rule 47.5.4. (FIND CTA5 Rule 47.)

United States Court of Appeals,
Fifth Circuit.

Diana L. READ, Plaintiff-Appellant,
v.
BT ALEX BROWN INC., etc.; et al, Defendants,
BT Alex Brown Inc., doing business as Deutsche Banc Alex Brown, Defendant-Appellee.

No. 02-10191.

July 30, 2003.

Female employee sued employer alleging that employer discriminated against her, and ultimately terminated her employment, based on her age and sex. The United States District Court for the Northern District of Texas, 2002 WL 22060, granted employer's motion for summary judgment, and employee appealed. The Court of Appeals, Garwood, Circuit Judge, held that: (1) differential terms and conditions of employment were not imposed because of employee's age or sex; (2) comments made by employer were not probative of discriminatory animus; and (3) employer's proffered reasons for terminating employee were not pretextual.

Affirmed.

West Headnotes

[1] Civil Rights ☜═1168
78k1168

[1] Civil Rights ☜═1203
78k1203

Differential terms and conditions of employment to which employee was subjected by employer were not imposed because of employee's age or sex, for purposes of employee's claims against employer brought pursuant to Title VII and ADEA; although other employees received training opportunities that employee did not, employee was hired as an experienced employee and those who received the training lacked employee's level of experience, although employee was denied friends of the company referrals, only one employee in the office received such referrals, and although employee alleged that employer yelled at her on one occasion, employee failed to produce any evidence that the conduct was motivated by discriminatory animus. Age Discrimination in Employment Act of 1967. § 2 et seq., 29 U.S.C.A. § 621 et seq.; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[2] Civil Rights ☜═1551
78k1551

Comment made by employer concerning the need for the company to hire a young man out of college was not direct evidence of discrimination in employee's termination; the comment required an inference that the employer wanted to hire a young man out of college because of his sex, and not simply because employer believed that a recent college graduate would tend to work harder.

[3] Civil Rights ☜═1551
78k1551

Comment made by employer that brokers tend to slow as they age was not probative of discriminatory animus in employee's termination, where the comment was made almost three years prior to employee's termination.

[4] Civil Rights ☜═1137
78k1137

Employer's proffered reasons of employee's performance and cost reduction for terminating employee were not pretextual; employee was failing to reach break-even point in commissions, and those employees with low production numbers that the employer did retain were not similarly situated.
*113 Appeal from the United States District Court for the Northern District of Texas. (3:99-CV-1697-D).

Before GARWOOD, SMITH and BARKSDALE, Circuit Judges.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

GARWOOD, Circuit Judge. [FN*]

> FN* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

**1 Plaintiff-appellant Diana L. Read appeals the district court's grant of summary judgment in favor of her former employer, defendant-appellee BT Alex Brown, Inc. (Brown), on her claims of age and sex discrimination brought under Title VII, [FN1] the Age Discrimination in Employment Act (ADEA), [FN2] and the Texas Labor Code. [FN3] Because Read has not produced evidence sufficient to create a genuine issue of material fact, we conclude that summary judgment was appropriate and affirm.

> FN1. 42 U.S.C. § 2000e et seq.

> FN2. 29 U.S.C. § 623(a)(1).

> FN3. Tex. Labor Code Ann. § 21.001 et seq.

Facts and Proceedings Below

Brown, a financial management company, acting through Michael Crossley, the then manager of its Dallas office, hired Read, a female born in 1946, as an investment broker in the Private Client Division of Brown's Dallas office in April 1994. Prior to working for Brown, Read had been successfully employed as a broker with Merrill Lynch, where her performance, as measured by her "production"-an indicator comprising the gross sales commissions earned by a broker and the total customer assets under a broker's management-placed her in the top ten percent of all brokers working at Merrill Lynch. In fact, in her last year at Merrill Lynch, Read produced in excess of half a million dollars in gross sales commissions. The record thus reflects, and the parties do not dispute, that Read presented herself, and was hired by Brown, as an experienced broker, with the expectation that she would perform at Brown in a manner consistent with her prior performance at Merrill Lynch.

Shortly after Crossley hired Read, Jeff Rupp, who had participated in recruiting and hiring Read, replaced Crossley as the head of Brown's Dallas office. According to Read, her difficulties with her employer, discussed in more detail below, date from

this point. The first sign of discord appeared in January 1995 when, shortly after assuming responsibility for the Dallas office, Rupp attended a breakfast meeting with Read at which he told her that "when brokers get old, they slow down," and that although he considered Read to be "one of the old ones," he hoped that she would not begin to slow.

*114 Her initial difficulties with Rupp notwithstanding, Read continued to work in Brown's Dallas office until her termination at the end of 1998. For a variety of reasons, however, Read's production at Brown never approached the levels that she had achieved while employed as a broker with Merrill Lynch. [FN4] Indeed, Read's production at Brown was not only lower than the average level of production for Brown's brokers, [FN5] but at no point even approached Brown's "break-even point." [FN6]

> FN4. Read posted her highest production numbers while working at Brown in 1997 when she produced $383,624 in sales commissions with approximately $28 million in assets under her management.

> FN5. The average production of Brown brokers when Read started in 1994 was $500,000. At the time of her termination in December 1998, the average had increased to over $700,000.

> FN6. The break-even point represents the amount of gross sales commissions that a broker needs to earn before Brown will begin to make a profit on that broker's efforts. During the period of Read's employment, the break-even point increased from $350,000 to $467,000.

In the fall of 1998, Brown's then parent company, Bankers Trust, faced serious difficulties as a result of crises in the Russian and Latin American financial markets. In response, Bankers Trust directed all its subsidiaries, including Alex Brown, to retrench. To that end, Brown's Dallas office was initially instructed to submit a plan to reduce expenses by $384,000. [FN7] The reductions were to come from four areas: (1) communication and data services, (2) travel and entertainment expenses, (3) staff, and (4) new hires. Accordingly, Rupp submitted to Brown's Baltimore office a series of proposed expense reductions for the Dallas office, one of which was a proposal to terminate Read's employment. Thereafter, on December 1, 1998,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

72 Fed.Appx. 112                                                                    Page 3
(Cite as: 72 Fed.Appx. 112, *114, 2003 WL 21754966, **1 (5th Cir.(Tex.)))

Rupp discharged Read. Read, the only female broker in the Dallas office over the age of forty, was also the only broker in the Dallas office terminated in connection with the cost-savings program.

FN7. This target was later lowered to $274,000.

**2 On May 25, 1999, Read filed a charge of age and sex discrimination against Brown with the Equal Employment Opportunity Commission and, after obtaining a right to sue letter, commenced the present lawsuit.

Discussion

A. *Standard of Review*

We review a district court's grant of summary judgment *de novo, Bauer v. Albemarle Corp.*, 169 F.3d 962, 966 (5th Cir.1999), and in light of the now familiar framework announced in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), and more recently *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000).

B. *Age and Sex Discrimination*

Title VII and the ADEA prohibit an employer from discriminating against any individual, in hiring or discharge, or in the terms and conditions of employment, on the basis of sex or age. [FN8] 42 U.S.C. § 2000e- 2(a)(1); 29 U.S.C. § 623(a)(1). Where a plaintiff alleges discriminatory *115 hiring or discharge, or points to a tangible employment decision motivated by discriminatory animus, "the employment decision itself constitutes a change in the terms and conditions of employment that is actionable." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 2265, 141 L.Ed.2d 633 (1998). Where the plaintiff, however, cannot point to a specific tangible employment action, the conduct complained of, to constitute actionable discrimination, must be severe or pervasive. *See id.* Under either theory of discrimination, and under either Title VII or the ADEA, [FN9] it is the plaintiff who bears the ultimate burden of proving, by a preponderance of the evidence, that her employer intentionally discriminated against her because of her protected status. *Desert Palace, Inc. v. Costa*, --- U.S. ----, 123 S.Ct. 2148, 2150, 156 L.Ed.2d 84 (2003); *Wallace v. Methodist Hosp.*

*System,* 271 F.3d 212, 219 (5th Cir.2001).

FN8. Read's discrimination claim under Texas law need not be analyzed separately. Such claims are analyzed under our Title VII precedent. *Wallace v. Methodist Hosp. Sys.,* 271 F.3d 212, 219 n. 10 (5th Cir.2001); *Medina v. Ramsey Steel Co., Inc.,* 238 F.3d 674, 680 n. 1 (5th Cir.2001) (noting that "Texas courts also apply [the *McDonnell Douglas*] analysis to age discrimination cases.").

FN9. "The same evidentiary procedure for allocating burdens of production and proof applies to discrimination claims under both statutes." *Bauer v. Albemarle Corp.,* 169 F.3d 962, 966 (5th Cir.1999).

"A plaintiff can prove intentional discrimination through either direct or circumstantial evidence." *Wallace,* 271 F.3d at 219. Where a plaintiff, however, can only muster circumstantial evidence that discriminatory animus played a role in an employment decision, the plaintiff may rely on the *McDonnell Douglas-Burdine,* burden-shifting framework to create a presumption of intentional discrimination. *Id.* To create such a presumption, the plaintiff must first establish a prima facie case of discrimination. [FN10] Thereafter, the burden of production shifts to the defendant to produce evidence that the plaintiff was dismissed for a legitimate nondiscriminatory reason. *Reeves,* 120 S.Ct. at 2106. "If the defendant succeeds in carrying its burden of production, the presumption, having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture, and the trier of fact proceeds to decide the ultimate question of whether the plaintiff has proved that the defendant intentionally discriminated against her." *Bauer v. Albemarle Corp.,* 169 F.3d 962, 966 (5th Cir.1999). The plaintiff, thereupon, must produce substantial evidence that the defendant's nondiscriminatory reason is merely a pretext for impermissible discrimination. *Wallace,* 271 F.3d at 220. Where the plaintiff fails to produce substantial evidence of pretext, or produces evidence permitting only an indisputably tenuous inference of pretext, summary judgment in favor of the defendant is appropriate. *See West v. Nabors Drilling USA, Inc.,* 330 F.3d 379, 385 (5th Cir.2003); *Sandstad,* 309 F.3d at 894; *Brown v. CSC Logic, Inc.,* 82 F.3d 651 (5th Cir.1996).

FN10. The elements of a prima facie case of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

72 Fed.Appx. 112                                                                                      Page 4
(Cite as: 72 Fed.Appx. 112, *115, 2003 WL 21754966, **2 (5th Cir.(Tex.)))

discrimination are: "(1) the plaintiff was discharged; (2)[she] was qualified for the position at issue; (3)[she] was within the protected class; and (4)[she] was replaced by someone younger or outside the protected group." *Sandstad v. CB Richard Ellis, Inc.,* 309 F.3d 893, 897 (5th Cir.2002).

**3 We now turn our attention, in light of this analytical framework, to Read's claims of age and sex discrimination.

### C. *Read's Discrimination Claims*

Read's complaint charges Brown with impermissibly discriminating against her on the basis of age and sex both in the terms and conditions of her employment, and in the termination of her employment.

### 1. Terms and Conditions of Employment

First, Read argues that she produced sufficient evidence to create a genuine issue *116 of material fact regarding her claim that Brown discriminated against her in the terms and conditions of her employment.

[1] As an initial matter, we note that it is far from clear that the conduct of which Read complains was sufficiently severe or pervasive as to constitute actionable discrimination in the terms and conditions of her employment. *See Burlington Indus., Inc.,* 118 S.Ct. at 2265. We also note that many of the alleged acts of discrimination of which Read complains may well be barred by the applicable statute of limitations. [FN11]   Even assuming, *arguendo,* however, that Brown's treatment of Read does amount to actionable discrimination under Title VII and the ADEA, and that such conduct is not barred by limitations, we conclude that Read's claim must nevertheless fail as she cannot point to a genuine factual dispute concerning the central question of discriminatory animus. *See Reeves,* 120 S.Ct. at 2105 (noting that to impose liability under the ADEA, "the plaintiff's age must have 'actually played a role in [the employer's decisionmaking] process and had a determinative effect on the outcome.' ") (quoting *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993)). In other words, we cannot conclude that Read has raised a genuine factual dispute concerning whether the differential terms and conditions of employment to which she was subjected were

imposed because of her age or sex.

FN11. For cases arising in Texas, under both Tit. VII and the ADEA, the plaintiff must file a complaint with the EEOC within 300 days of the last act of alleged discrimination. 29 U.S.C. § 626(d)(2) (ADEA); 42 U.S.C. § 2000e-5(e), (e)(1) (Tit.VII). Read filed her complaint with the EEOC on May 25, 1999. Under *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 2071, 153 L.Ed.2d 106 (2002), where the plaintiff in a discrimination suit complains of a discrete act of discrimination, that act is barred unless the plaintiff files a charge with the EEOC within 300 days after the act occurred. Where, on the other hand, a plaintiff brings a claim of discrimination based on a hostile work environment, a court may consider "component acts of the hostile work environment [that] fall outside the statutory time period" so long as "an act contributing to the claim occurs within the filing period." *Id.* at 2074. Thus, any discrete acts of discrimination alleged by Read are barred if they occurred before July 29, 1998.   Any acts that are components of Read's hostile work environment claim, however, are actionable provided that *an act* contributing to that claim occurred after July 29, 1998.
Read's complaint is devoid of any reference to specific dates. And the only discriminatory act that Read identifies in her response to Brown's motion for summary judgment is her actual termination on December 1, 1998, a discrete act that constitutes a charge of discrimination separate from Read's claim that she suffered discrimination in the terms and conditions of her employment. Read's deposition testimony, however, does contain general and undated references to what Read perceived to be rude behavior exhibited toward her by Rupp. To conclude that Read's claim of discrimination in the terms and conditions of her employment is not time barred, therefore, requires us to accept the dubious assumption, based only on the vague references in Read's deposition testimony, that Rupp's allegedly rude behavior continued after July 29, 1998. We indulge Read with this generous supposition and assume arguendo, as did the district court, that Read's claim is not proscribed.

Read cites five incidents that she maintains establish that she was discriminated against in the terms and conditions of her employment with Brown. First, she alleges that she received less sales assistant support than her male or younger colleagues. Second, Read alleges that she received fewer training opportunities than male or younger brokers. Specifically, Read argues that younger brokers were

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

72 Fed.Appx. 112                                                    Page 5
(Cite as: 72 Fed.Appx. 112, *116, 2003 WL 21754966, **3 (5th Cir.(Tex.)))

sent to training workshops and were given opportunities to learn about the investment-banking business while she was not. *117 Third, Read maintains that she was not offered certain "friends of the company" referrals, [FN12] while younger brokers were. Fourth, she contends that Rupp did not assist her with prospective clients but did provide such assistance to younger brokers and to male brokers. And finally, Read argues that she was subjected to rude and condescending behavior because of her age and sex.

> FN12. The record reflects that "friends of the company" referrals occur where a Brown broker is recommended to manage newly-issued stock offered to the officers, directors, and employees of one of Brown's corporate clients.

Although this litany of Brown's alleged discriminatory behavior initially appears damning, it is evident upon closer examination that Read has failed to produce evidence sufficient for any reasonable jury to conclude that the above allegedly discriminatory terms and conditions, taken singly or together, were imposed because of Read's age or sex.

**4 Read's claim that a lack of sales assistant support suffices to prove age or sex discrimination is entirely without merit. Read shared a sales assistant with a male broker, and cannot claim, therefore, that she was treated any differently from similarly situated colleagues. Indeed, by her own admission Read was not entitled, under Brown's operating procedures, to her own sales assistant. Only a broker who produced in excess of $700,000 in commissions merited his or her own assistant. Moreover, after repeated complaints, Rupp actually assigned his own sales assistant to Read in 1997.

Read's evidence concerning training opportunities is equally unavailing. Read has adduced evidence that younger brokers received training opportunities where she did not. This fact, standing alone, however, cannot reasonably support an inference of discrimination. As noted above, Read was hired as an experienced broker. According to Read's deposition testimony, the brokers who received additional training were not experienced brokers, but were new to Brown. Absent additional evidence of discriminatory animus, it is not reasonable to infer that the newer brokers received training because they were young and male, and not because they

lacked Read's level of experience. Moreover, Read introduced no evidence that she ever requested additional training opportunities which she was denied. And although there is also no evidence that the younger male brokers requested additional training opportunities. Read has produced no evidence that those brokers *did not* request such opportunities.

Similarly, Read's complaint that she was denied friends of the company referrals cannot support a claim of age or sex discrimination. Unlike the training opportunities that she did not request but nevertheless maintains she was discriminatorily denied, Read does allege that she requested these referrals. She admitted, however, that she was inexperienced in the handling of such accounts. Moreover, she points to no evidence that tends to show that she was denied them because of her age or sex. On the contrary, Read can only point to one other broker in the Dallas office who did receive these types of referrals. No reasonable jury could infer from the fact that Read was denied these referrals, together with all but one of the young and male brokers in the Dallas office, that Read was the victim of impermissible age or sex discrimination in the terms or conditions of her employment.

Read's complaint that Rupp refused to assist her with developing her client base also fails to establish impermissible sex or age discrimination. Read points to the *118 testimony of two younger, male brokers, who stated that Rupp was always willing to assist them, when they *requested* such assistance, or was willing to accompany them to meetings with investors, also when they so requested. In contrast to this testimony, Read cites three incidents where she asked Rupp to assist her with an investor but he subsequently failed to do so. Read, however, also admits that Rupp did meet with several of her clients, and that after 1996, she stopped asking Rupp for his assistance. At most, this evidence shows that Rupp was less than cooperative on three occasions in four years; it is not, however, probative of discriminatory intent.

**5 Finally, Read alleges that Rupp treated her in a rude and condescending manner because of her age and sex. The only specific example of rude behavior that Read could recall in her deposition testimony, however, was an occasion where Rupp yelled at her when she could not locate a particular reference book. We remind Read that "Title VII is

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

not a general civility code for the American workplace." *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263 (5th Cir.1999). Rather, for offensive conduct to rise to the level of actionable discrimination, it must be sufficiently severe or pervasive so as to alter the actual terms or conditions of employment. *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 409 (5th Cir.2002).

However, even making the dubious assumption that Rupp's rude treatment met this high standard, we conclude that Read has failed to produce any evidence from which a reasonable jury could infer that the conduct to which she was subjected was motivated by discriminatory animus. Read admitted that Rupp also yelled at a male broker, a fact that belies her claim that Rupp's rudeness was motivated by antagonism based on her age or sex. Read did not testify, or otherwise adduce evidence, that Rupp was not similarly rude to others in the office, or that his rudeness was focused on those in a protected class. The remainder of Read's summary judgment evidence consists of the general averment that Rupp adopted a rude and condescending attitude toward her, and refused to return her phone calls. Such conclusory allegations are insufficient to defeat a properly supported motion for summary judgment. *Whelan v. Winchester Production Co.*, 319 F.3d 225, 230 (5th Cir.2003).

It is therefore clear that none of Read's evidence, taken individually or as a whole, concerning the five examples of discriminatory terms and conditions of employment, is sufficient to establish that Brown treated Read differently because of her age or sex. Accordingly, we conclude that the district court correctly awarded summary judgment to Brown on Read's first claim of age and sex discrimination.

2. Discriminatory Discharge

Read next contends that the district court erred in granting summary judgment to Brown on her claim of discriminatory discharge. First, Read maintains that the district court erred in finding that she offered no direct evidence that Brown's decision to discharge her was discriminatory. According to Read, the district court erroneously failed to treat three comments made by Rupp over the course of Read's four years with Brown as direct evidence of discrimination which allowed her to prevail apart from the *McDonald-Douglas-Burdine* burden shifting framework. We disagree.

Two of those comments are patently not direct evidence of discrimination. The first consists of a statement Rupp made in connection with the hiring of a new sales assistant. According to Read, in 1995 Rupp declared, "I think we need to change *119 the psychology around here. These girls back here are not working very hard and what I'd like to do is for us to hire a young man just out of college who will ... show these girls back here how to work." The second comment, made after Read had been discharged, was delivered in the context of Rupp's attempt to account for Read's discharge to a prospective employer. Rupp explained: "We [Brown] have very high standards here; we're like Goldman Sachs.... We don't hire someone like her; she doesn't fit the image...."

**6 [2] For this purpose, direct evidence is defined in this circuit as "evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir.2002). In other words, to qualify as direct evidence of discrimination, an employer's comment "must be direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that age was an impermissible factor in the decision to terminate the employee." *E.E.O.C. v. Texas Instruments Inc.*, 100 F.3d 1173, 1181 (5th Cir.1996). [FN13] Neither of these two comments, the 1995 sales-assistant comment or the Goldman Sachs comment, however, fits this definition as neither supports a claim of discrimination without the need for the drawing of an inference or the making a presumption. The first comment requires the jury to infer that Rupp wanted to hire a young man out of college because of his sex, and not simply because Rupp believed that a recent college graduate would tend to work harder. Even if such an inference were reasonable, it is nonetheless a necessary one if the statement is to be accepted as evidence of discriminatory intent. The sales-assistant comment, therefore, cannot qualify as direct (or meaningfully probative) evidence.

> FN13. In connection with her claim that the Goldman Sachs comment is direct evidence of discriminatory animus, Read also invites us to abandon this circuit's definition of direct evidence in favor of a definition announced by Judge Tjoflat of the Eleventh Circuit in *Wright v. Southland Corp.*, 187 F.3d 1287, 1288 (11th Cir.1999). We decline this invitation for two reasons. First, this

panel is without the authority to overrule the decision of another panel of this circuit. *See United States v. Taylor,* 933 F.2d 307, 313 (5th Cir.1991). Second, that portion of Judge Tjoflat's decision in *Wright* announcing Read's proposed definition of direct evidence is dictum and was not joined by the other two judges on the *Wright* panel. *See Wright,* 187 F.3d at 1306 (Judges Cox and Hull concurring in the judgment and result, respectively).

In any event, the result here would clearly be the same even absent the direct/circumstantial evidence distinction (or our court's definition of those terms for this purpose), for the three comments in question, taken together, are simply insufficiently probative of discriminatory intent in respect to Read's December 1998 termination, particularly in light of Brown's undisputed evidence of its nondiscriminatory reason for Read's termination. Nothing in our affirmance here is inconsistent with the result in *Wright.*

The Goldman Sachs comment also does not constitute direct evidence of discrimination. Indeed, as Read admits, to conclude that this comment evinces discriminatory intent requires the jury to assume that Goldman Sachs tends not to hire women, a fact for which Read offers no evidence aside from her own unsupported, conclusory assertion that Goldman Sachs is known for not hiring women. Accordingly, the district court did not err in refusing to treat either of these comments as direct (or otherwise meaningfully probative) evidence of discrimination in Read's termination.

Finally, Read points to a third comment, namely Rupp's 1995 comment to Read that brokers tend to slow as they age. This remark, unlike the other two, may arguably fall within the definition of direct *120 evidence of discrimination. However, given this comment's vintage, as well as Read's failure to identify any other like comments in the course of her four-year tenure with Brown, we cannot view this statement as anything more than a stray remark. It, considered in isolation or together with the other remarks, is simply not meaningfully probative of discriminatory animus in Read's termination.

[3] Mere stray remarks, however distasteful, do not demonstrate discriminatory animus. *E.E.O.C. v. Texas Instruments Inc.,* 100 F.3d 1173, 1181 (5th Cir.1996). Rather, "for comments in the workplace to provide sufficient evidence of discrimination, they must be '1) related {to the protected class of persons of which the plaintiff is a member]; 2) proximate in

time to the terminations; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue.' " *Krystek v. Univ. of S. Miss.,* 164 F.3d 251, 256 (5th Cir.1999) (quoting *Brown v. CSC Logic Inc.,* 82 F.3d 651, 655 (5th Cir.1996)) *see also Auguster v. Vermilion Parish Sch. Bd.,* 249 F.3d 400, 405 (5th Cir.2001) (noting that "this court already has interpreted Reeves not to overrule our stray remarks jurisprudence, at least where the plaintiff has failed to produce substantial evidence of pretext."). Rupp's comment, although not related to sex, was related to age. Rupp was also an individual with authority over Read's continued employment. The comment, however, was made at the beginning of Read's tenure with Brown, and almost three years prior to her termination. As the district court concluded, therefore, this comment cannot be viewed as proximate in time to the challenged employment decision, and cannot therefore be considered as meaningfully probative evidence that Read's termination was discriminatory.

**7 Having concluded that Read failed to produce adequate direct evidence of discrimination, the district court correctly analyzed Read's claim under the *McDonnell Douglas-Burdine,* burden-shifting framework sketched above. *See infra* Part II(B). Read's final arguments on appeal, therefore, challenge the district court's application of that framework to her claim.

It is undisputed that Read established the elements of a prima facie case of age and sex discrimination. It is also clear that Brown satisfied its burden of production, relying on affidavits and depositions to produce a legitimate, nondiscriminatory reason for Brown's discharge. Whether the district court's grant of summary judgment was in error, therefore, turns on whether Read introduced the requisite substantial evidence, direct or circumstantial, that such justification was pretextual. We conclude that she did not, and that summary judgement therefore was appropriate.

Brown maintains that Read was selected for termination, based on her performance as a broker, in connection with a wider effort to reduce costs. In an effort to show that this proffered reason was merely a pretext for impermissible discrimination, Read argues that Brown both offered inconsistent explanations for her termination, and retained male

and younger brokers with production levels lower than hers.

An inconsistent reason offered to explain an employee's termination may support a finding that the reason is mere pretext. *See Reeves,* 120 S.Ct. at 2108 ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."); *Thurman v. Yellow Freight Sys., Inc.,* 90 F.3d 1160, 1167 (6th Cir.1996) ("An employer's changing rationale for making *121 an adverse employment decision can be evidence of pretext."). The record, however, does not reveal any inconsistency in Brown's explanations for discharging Read.

[4] Read argues that both Rupp and Tim Schweizer, Rupp's supervisor in Brown's Baltimore office, initially told her that the reason for her termination was her failure to reach the $467,000 break-even point for 1998, while Brown's position in the present litigation is that Read was selected for discharge based on her overall performance. In support of this argument, Read cites the following portion of her deposition testimony:

"A: We sat down. The very first thing [Rupp] said, he said, we're doing some cost cutting and you and I are going to have to part company.
Q: Okay.
A: And I said, Well if you're doing cost cutting, why would you fire me if I'm bringing in 400,000? And [Rupp] said, the cutoff is 467 and you're not doing 467."

This testimony, however, does not establish that Brown terminated Read for failing to reach $467,000 in production, nor does it therefore establish that Brown dissembled or changed its reason for discharging Read from a failure to reach a particular production number to a general failure to perform. On the contrary, it serves to support Brown's position that it did not base its decision to discharge Read solely on production numbers, and that it instead raised the issue of the $467,000 production figure only in response to Read's implicit protestation that she should not be discharged because she was producing a profit for the firm.

**8 That Read was not discharged only for failing to reach the $467,000 break-even point also undermines her reliance on evidence that Brown retained other brokers who had not posted gross commissions in excess of $467,000. Brown did retain five brokers with production numbers below $467,000. *See Ramirez v. Landry's Seafood Inn & Oyster Bar,* 280 F.3d 576, 577 (5th Cir.2002) (noting that a presumption of discrimination is raised where an employer treats similarly situated employees differently under circumstances that are essentially identical). Read, however, has not refuted Brown's evidence that these five employees were not similarly situated. Brown produced evidence that one of the brokers retained was a part of a profitable team of brokers that specialized in serving clients in Mexico. Another was an older broker who was in the process of transferring his clients to other brokers in anticipation of retirement. The remaining three were all inexperienced brokers who had worked for Brown as brokers for less than a year. Indeed, Read failed to produce any evidence showing that any of these remaining five brokers was similarly situated. We cannot, therefore, conclude that the district court erred in finding that Read was unable to establish that Brown's proffered reason for selecting her for termination was pretextual.

Finally, Read advances the alternative argument that if Brown did not discharge her because of a production threshold, then the decision to discharge her must have been subjective, and that summary judgment was not, therefore, appropriate. *See Medina v. Ramsey Steel Co., Inc.,* 238 F.3d 674, 681 (5th Cir.2001) (noting that "it is inappropriate to decide as a matter of law that an employee is unqualified because he has failed to meet entirely subjective hiring criteria."). *Medina v. Ramsey Steel Co.,* however, is inapposite here. The reasons cited by Brown for Read's discharge are not primarily subjective. Read never achieved at Brown that same level of production that she had attained at *122 Merrill Lynch. Indeed, she never met Brown's break-even point, let alone the nationwide average production level of brokers at Brown.

Upon reviewing Brown's motion for summary judgment *de novo,* we conclude that the district court correctly awarded summary judgment to Brown both on Read's claim of discrimination in the terms and conditions of her employment and on her claim of discriminatory discharge. Read has not made the requisite showing that Brown's explanation for her termination was false, *see Reeves,* 120 S.Ct. at 2107, and has failed to produce sufficient evidence from which a reasonable jury could conclude that Brown intentionally discriminated

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

against her on the basis of either her age, her sex, or a combination of those two traits.

### D. *Motion to Alter or Amend the Judgment*

In her final point of error, Read argues that the district court erred in denying her Rule 59 motion to alter or amend the judgment. We generally review a decision on a motion to alter or amend judgment under Rule 59(e) for an abuse of discretion. *Fletcher v. Apfel,* 210 F.3d 510, 512 (5th Cir.2000). To the extent that a ruling on a Rule 59 motion is a reconsideration of a question of law, however, the standard of review is *de novo. Tyler v. Union Oil Co.,* 304 F.3d 379, 405 (5th Cir.2002).

**\*\*9** Read's Rule 59 motion did not seek to "correct manifest errors of law or fact or to present newly discovered evidence," *Waltman v. Int'l Paper Co.,* 875 F.2d 468, 473 (5th Cir.1989), but instead simply challenged the district court's application of the standard for granting summary judgment. [FN14] Since, in our *de novo* review of the summary judgment evidence, we find no error in the district court's grant of summary judgment to Brown, we likewise find no error in the district court's denial of Read's Rule 59 motion.

> FN14. The district court denied Read's Rule 59 motion on the grounds that she attempted to rely on new evidence not made a part of the original summary judgment record, without having demonstrated sufficient reason for her failure to introduce that evidence originally. Read, however, points out that the evidence appended to her Rule 59 motion was not new evidence, but consisted only of testimony that had been redacted from the

depositions that she had earlier introduced in support of her memorandum in opposition to summary judgment. According to Read, she appended this formerly redacted material in order to place in its appropriate context the summary judgment evidence that the district court had already reviewed. Read does not appeal the district court's refusal to consider this additional material as part of the summary judgment record. Rather, her only argument on appeal is that the district court misapplied the standard for granting summary judgment.

### Conclusion

Because we conclude that Read cannot point to any evidence in the record sufficient to raise a genuine issue of material fact concerning any discriminatory motive for her termination, we conclude that the district court properly awarded summary judgment to Brown. The district court's judgment is, accordingly, AFFIRMED.

72 Fed.Appx. 112, 2003 WL 21754966 (5th Cir.(Tex.))

Briefs and Other Related Documents (Back to top)

. 2002 WL 32330658T2 (Appellate Brief) Reply Brief of Appellant (Jul. 10, 2002)Original Image of this Document (PDF)

. 2002 WL 32330657T2 (Appellate Brief) Brief of Appellant (May. 08, 2002)Original Image of this Document (PDF)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2004 WL 728408
--- F.Supp.2d ---
(Cite as: 2004 WL 728408 (M.D.Ala.))

Only the Westlaw citation is currently available.

United States District Court,
M.D. Alabama,
Northern Division.

Mehsati HERAWI, Plaintiff,
v.
STATE OF ALABAMA DEPT. OF FORENSIC
SCIENCES, Defendant.

Civil Action No. 2:02cv1360-T.

April 5, 2004.

Background: Employee, an Iranian-born doctor training in United States as forensic pathologist, brought lawsuit against Alabama Department of Forensic Sciences alleging that Department terminated her because of her national origin and in retaliation for her complaints about discriminatory treatment, and that her direct supervisor harassed her based on her national origin. Department moved for summary judgment.

Holdings: The District Court, Myron H. Thompson, J., held that:
(1) direct supervisor's remarks on three occasions about doctor's national origin were sufficient to create inference of discrimination, thereby satisfying fourth element of prima facie case of discriminatory discharge under Title VII;
(2) Department's articulated reasons for its decision not to retain doctor, that she "had problems with autopsy procedures and with the chain of command," were legitimate and nondiscriminatory;
(3) genuine issue of material fact, as to whether discriminatory attitude evidenced in direct supervisor's comments motivated decision to fire her, precluded summary judgment on termination claim;
(4) doctor established elements of prima facie case of retaliation;
(5) Department's proffered reasons for terminating doctor were legitimate and nonretaliatory;
(6) genuine issue of material fact, as to whether those reasons were pretextual, precluded summary judgment on retaliation claim;
(7) employee failed to show that alleged harassment was sufficiently severe or pervasive to alter terms and conditions of employment and create discriminatorily abusive working environment, as

required to establish prima facie case on hostile work environment claim.

Motion granted in part and denied in part.

[1] Civil Rights ⬤⟿1537

78k1537

[1] Civil Rights ⬤⟿1549
78k1549

Under *McDonnell Douglas* burden-shifting approach, employee has initial burden of establishing prima facie case of unlawful sex discrimination by preponderance of the evidence; "prima facie case" requires evidence adequate to create inference that employment decision was based on illegal discriminatory criterion and raises presumption of illegal discrimination. Civil Rights Act of 1964, § 703(a)(1), as amended, 42 U.S.C.A. § 2000e- 2(a)(1).

[2] Civil Rights ⬤⟿1536
78k1536

[2] Civil Rights ⬤⟿1544
78k1544

If employee establishes prima facie case of discrimination, burden then shifts to employer to rebut presumption by articulating legitimate, nondiscriminatory reason for its employment action; this intermediate burden is exceedingly light and is one of production not persuasion, and employer does not have to persuade court that it was actually motivated by reason advanced.

[3] Civil Rights ⬤⟿1536
78k1536

[3] Civil Rights ⬤⟿1545
78k1545

Under *McDonnell Douglas*, once employer satisfies burden of producing evidence of legitimate, nondiscriminatory reason for its employment action, presumption of discrimination is eliminated and employee has opportunity to come forward with evidence, including previously produced evidence establishing the prima facie case, sufficient to permit reasonable fact finder to conclude that reasons given

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

by employer were not the real reasons for the adverse employment decision.

[4] Federal Civil Procedure ☞2497.1
170Ak2497.1

Under *McDonnell Douglas*, establishment of prima facie case of employment discrimination does not, in itself, entitle employee to defeat summary judgment motion; after employer proffers nondiscriminatory and legitimate reason for its actions, in order to avoid summary judgment, employee must produce sufficient evidence for reasonable fact finder to conclude that each of employer's proffered nondiscriminatory reasons is pretextual. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

[5] Civil Rights ☞1536
78k1536

Nothing in *Desert Palace* decision of United States Supreme Court undermines continued usefulness of *McDonnell Douglas* to trial courts, in either single or mixed-motive cases based on circumstantial evidence, of assessing Title VII liability by forcing employer, where prima facie-case threshold is met, to articulate each and every reason for its action and then requiring employee to show why each reason is pretext for impermissible discrimination. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

[6] Civil Rights ☞1122
78k1122

To establish prima facie case of discriminatory discharge under Title VII, employee must show that (1) she is member of protected class, (2) she was qualified for position at issue, (3) she was discharged despite her qualification, and (4) some additional evidence that would allow inference of discrimination. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

[7] Civil Rights ☞1545
78k1545

Iranian-born doctor training in United States as forensic pathologist met her prima facie burden under Title VII of producing evidence adequate to create inference that decision by Alabama Department of Forensic Sciences to terminate her was based on illegal discriminatory criterion, despite

absence of evidence she was replaced by someone who was not member of her protected class or that similarly situated department employee who was not member of protected class engaged in nearly identical conduct and was not discharged; direct supervisor's remarks on three occasions about doctor's Iranian origin were sufficient to create inference of discrimination. Civil Rights Act of 1964, § 703(a)(1), as amended, 42 U.S.C.A. § 2000e-2(a)(1).

[8] Civil Rights ☞1545
78k1545

As general rule, demonstrating prima facie case of employment discrimination is not onerous; it requires only that employee establish facts adequate to permit inference of discrimination.

[9] Civil Rights ☞1545
78k1545

Evidence of even isolated and stray remarks related to protected characteristic can be sufficient to create prima facie case of discrimination.

[10] Civil Rights ☞1544
78k1544

As general rule, remarks that show bias are particularly probative of discrimination when they are made by person charged with making employment decision at issue.

[11] Civil Rights ☞1128
78k1128

[11] Civil Rights ☞1536
78k1536

Reasons articulated by Alabama Department of Forensic Sciences for its decision not to retain Iranian-born pathologist, that she "had problems with autopsy procedures and with the chain of command," were legitimate and nondiscriminatory and shifted burden in Title VII case back to pathologist to show that asserted reasons were pretext for national origin discrimination. Civil Rights Act of 1964, § 703(a)(1), as amended, 42 U.S.C.A. § 2000e- 2(a)(1).

[12] Civil Rights ☞1544
78k1544

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Comments or remarks that suggest discriminatory animus can be sufficient circumstantial evidence to establish pretext; whether comments standing alone show pretext depends on whether their substance, context, and timing could permit finding that comments are causally related to adverse employment action at issue.

[13] Federal Civil Procedure ☞2497.1
170Ak2497.1

Genuine issue of material fact, as to whether discriminatory attitude evidenced in direct supervisor's comments about Iranian-born doctor's national origin motivated decision to fire her, precluded summary judgment on doctor's termination-based claim under Title VII against Alabama Department of Forensic Sciences. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.; Civil Rights Act of 1964, § 703(a)(1), as amended, 42 U.S.C.A. § 2000e-2(a)(1).

[14] Civil Rights ☞1243
78k1243

[14] Civil Rights ☞1252
78k1252

Individual alleging retaliation under Title VII must establish her prima facie case by demonstrating (1) that she engaged in statutorily protected activity, (2) that adverse employment action occurred, and (3) that adverse action was causally related to her protected activities; causal link element is construed broadly so that employee merely has to prove that protected activity and negative employment action are not completely unrelated. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

[15] Civil Rights ☞1252
78k1252

Iranian-born doctor recruited to work for Alabama Department of Forensic Sciences established elements of prima facie case of retaliation under Title VII; doctor was terminated only one week after her meeting with Department Director/Chief Medical Examiner and three days after her meeting with department chief of staff to complain about supervisor's hostility toward her. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

[15] States ☞53
360k53
in

Iranian-born doctor recruited to work for Alabama Department of Forensic Sciences established elements of prima facie case of retaliation under Title VII; doctor was terminated only one week after her meeting with Department Director/Chief Medical Examiner and three days after her meeting with department chief of staff to complain about supervisor's hostility toward her. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

[16] Civil Rights ☞1249(2)
78k1249(2)

[16] Civil Rights ☞1541
78k1541

Reasons proffered by Alabama Department of Forensic Sciences for terminating Iranian-born doctor who had complained of supervisor's national origin discrimination, her problems with autopsy procedure and with following chain of command, were legitimate and nonretaliatory and shifted burden back to doctor to show that asserted reasons were pretext for retaliation. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

[16] States ☞53
360k53

Reasons proffered by Alabama Department of Forensic Sciences for terminating Iranian-born doctor who had complained of supervisor's national origin discrimination, her problems with autopsy procedure and with following chain of command, were legitimate and nonretaliatory and shifted burden back to doctor to show that asserted reasons were pretext for retaliation. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

[17] Federal Civil Procedure ☞2497.1
170Ak2497.1

Genuine issue of material fact, as to whether legitimate, nonretaliatory reasons asserted by Alabama Department of Forensic Sciences for

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

terminating Iranian-born doctor who had complained of national origin discrimination were pretextual, precluded summary judgment on doctor's retaliation claim under Title VII. Fed.Rules Civ.Proc. Rule 56(c), 28 U.S.C.A.; Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

[18] Civil Rights ⊗══1252
78k1252

While temporal proximity, standing alone, may not be enough to create genuine issue of pretext, it is a relevant factor in analyzing retaliation claim under *McDonnell Douglas* burden-shifting framework. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

[19] Civil Rights ⊗══1147
78k1147

To establish prima facie case of harassment, employee must establish (1) that she belongs to protected group, (2) that she has been subjected to unwelcome harassment, (3) that harassment was based on protected characteristic, (4) that harassment was sufficiently severe or pervasive to alter terms and conditions of employment and create discriminatorily abusive working environment, and (5) that employer is liable for hostile environment under either theory of direct or vicarious liability.

[20] Civil Rights ⊗══1147
78k1147

Factors that can be considered in determining whether hostile work environment was created include frequency of discriminatory conduct, its severity, whether it is physically threatening or humiliating, or mere offensive utterance, and whether it unreasonably interferes with employee's work performance.

[21] Civil Rights ⊗══1147
78k1147

Iranian-born doctor failed to establish that harassment based on national origin was sufficiently severe and pervasive to alter terms and conditions of employment and create discriminatorily abusive work environment, as required to establish prima facie case of hostile work environment under Title VII, through evidence her supervisor yelled at her on number of occasions, told her that no one liked her, that she did not belong in Alabama Department of Forensic Sciences, and that people were calling to ask about her, threatened to report her to law enforcement, stared or smirked at her, and mocked her by repeating her in high-pitched voice; reasonable person would not objectively find those comments, though hostile and offensive, to be sufficiently hostile or abusive and pervasive. Civil Rights Act of 1964, § 703(a)(1), as amended, 42 U.S.C.A. § 2000e-2(a)(1).

Eileen L. Harris, Joseph (Jay) Brady Lewis, The Law Office of Jay Lewis, Montgomery, AL, Maury Steven Weiner, Wiggins Childs Quinn & Pantanzis, PC, Birmingham, AL, for Plaintiff.

John J. Park, Jr., Office of the Attorney General, Montgomery, AL, for Defendant.

ORDER

MYRON H. THOMPSON, District Judge.

*1 Plaintiff Mehsati Herawi, who is Iranian, brings this lawsuit alleging that defendant State of Alabama Department of Forensic Sciences discriminated against her because of her national origin in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e-17. Specifically, she claims that the department terminated her (1) because of her national origin and (2) in retaliation for her complaints about discriminatory treatment; she further claims (3) that a department employee harassed her based on her national origin. The court's jurisdiction is properly invoked pursuant to 42 U.S.C.A. § 2000e-5(f).

This case is now before the court on the Forensic Department's motion for summary judgment. For the reasons discussed below, the motion will be granted in part and denied in part.

I. SUMMARY-JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Where, as here, the non-moving party bears the burden of proof at trial, "the moving party, in order to prevail, must do one of two things: show that the non-moving party has no evidence to support ... [his] case, or present

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

'affirmative evidence demonstrating that the non-moving party will be unable to prove ... [his] case at trial.' " *Hammer v. Slater,* 20 F.3d 1137, 1141 (11th Cir.1994) (quoting *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1437-38 (11th Cir.1991) (en banc)). Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the non-moving party to demonstrate why summary judgment would be inappropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). To this end, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). In making its determination, the court must view all evidence and any factual inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## II. FACTUAL BACKGROUND

Herawi was born in Iran, and she trained as a doctor in Germany. She came to the United States in 1993 to train as a forensic pathologist. She is currently a legal resident of the United States and has applied to become a citizen. From 1993 to 1998, she was a resident in pathology at Texas Tech University, and, from 2000 to 2001, she was a forensic fellow in the office of the chief medical examiner in Baltimore, Maryland.

In the spring of 2001, Dr. J.C. Upshaw Downs, the Director of the Alabama Department of Forensic Sciences and the Chief Medical Examiner for Alabama, recruited Herawi to come to work for the department. Herawi began work at the department on July 23, 2001. At first, she worked in the Tuscaloosa office, but she was transferred to the Montgomery office effective October 1, 2001. During the relevant time period, Herawi's supervisor in the Montgomery office was Dr. Emily Ward; Ward's supervisor was Craig Bailey, the director of the Montgomery Regional Laboratory; and the department's director was Downs. Herawi, like all state employees, was a probationary employee for her first six months on the job.

*2 Ward was highly critical of Herawi almost immediately upon her arrival in the Montgomery office. On her first day at work, Ward accused

Herawi of being inconsiderate for not offering to help her. Ward looked at Herawi with a "hatred filled stare" and mocked her by repeating her in a high-pitched voice. [FN1] On or about October 22, 2001, Ward became enraged at Herawi, shouted at her, accused her of wrongdoing, and said she had had enough of Herawi and that Herawi was the rudest person she had ever met. When Herawi tried to explain her actions, Ward yelled louder and said that she did not like Herawi and that no one else liked her either.

On October 24, Herawi expressed to Craig Bailey, the office director, her concerns about the way Ward was treating her. Bailey later told Herawi that, after his conversation with her, he spoke to Ward to find out if she had a problem with people of Middle Eastern descent. Bailey told Herawi that people from the Middle East were perceived as rude and aggressive.

On November 7, Ward "implied" to Herawi that she was getting calls from people asking about Herawi's background and her accent, and she threatened to expose Herawi's nationality to law enforcement agencies. [FN2] Ward also said that she was getting calls from people asking who Herawi was, asking why she was there, and stating that she did not belong there.

Herawi had two more run-ins with Ward in December 2001, after Herawi had taken time off in November to visit her mother in California after the death of her father. On December 6, Ward called Herawi into her office, where Bailey yelled at Herawi, accusing her of neglecting the office after her father died and not performing enough autopsies. Bailey also questioned Herawi about whether she was looking for a job in California. On or about December 25, Herawi confronted Ward about whether Ward had spread a rumor that Herawi was looking for a job in California.

On January 2, 2002, Herawi received an "employee probationary performance appraisal" and an attached narrative performance appraisal, dated November 15, 2001. The narrative performance appraisal states that Herawi "appears to be a very intelligent and dedicated Forensic Pathologist" and that she "seems to have been well trained." [FN3] The narrative appraisal, however, goes on to state that "her performance has been problematic in four inter-related areas: expectations of co-workers,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

recognition of and subordination to authority, incessant inquisitiveness, and lack of organization." [FN4] It also states that Herawi "comes across as very self-centered and projects an 'entitlement complex' "; that she "has also refused to comply with departmental regulations and/or rules if she doesn't agree with them"; and that her "work habits leave room for improvement." [FN5] The narrative was signed by Ward and Downs as well as by Dr. Johnny R. Glenn, a Deputy Medical Examiner, for himself and for Dr Joseph H. Embry, another Regional Medical Examiner.

*3 The "employee probationary performance appraisal," signed by Ward and Herawi, gives Herawi an average rating of 1.57 out of four on seven "responsibilities," including "handles evidence/case materials," "analyzes evidence/case materials/gathers case history." [FN6] Based on this average score, the performance evaluation concludes that Herawi's work partially met standards.

On the day that Herawi received her performance evaluation, Ward again made reference to Herawi's national origin. Ward suggested that she was receiving calls about Herawi and that people wanted to know where Herawi was from and why she was there. Ward suggested that she was getting these calls because of Herawi's accent. At this meeting, Ward and Herawi also discussed Herawi's performance appraisal. Ward alluded to the fact that she knew people all over the country and that if Herawi left the department she would make sure Herawi would not get a job anywhere else.

Herawi brought her concerns about Ward to Downs on January 4, 2002. Herawi told Downs that Ward had threatened to expose her nationality; Herawi also told Downs that she felt confused and intimidated. Downs told Herawi that Middle Eastern people were generally facing troubles in the wake of the terrorist attacks on September 11, 2001, and that Herawi should turn the other cheek. However, Downs said he would speak to Ward.

On January 9, 2002, Downs wrote a letter to Thomas Flowers, the state personnel director, requesting that Herawi's probationary period be extended by three months. Downs wrote that Herawi "requires additional training in autopsy procedures to take a more organized approach to the process" and that she "must also learn to use the chain of command." [FN7]

The relationship between Ward and Herawi did not improve after Downs spoke to Ward. On January 3, Herawi accidently cut the carotid artery during an autopsy. A county coroner called her to report that the funeral home handling the body called him to complain because, due to the cut in the carotid artery, it had not been able to do a proper embalming and the family of the deceased was upset. Ward wrote a memorandum to Downs about this incident and noted that the coroner said to her that Herawi did not appear concerned about the inconvenience that she had caused. [FN8]

On January 14, Ward "smirked" at Herawi during a weekly meeting while Herawi presented an autopsy she had done on an apparent suicide. [FN9] The deceased had died of a drug overdose and had left a note describing her emotional pain. Ward again wrote a memorandum on this incident, noting that "Herawi was focusing more on the emotional state of the decedent than on the entire scenario of the death investigation." [FN10]

On January 30, Ward interrogated Herawi during her presentation of a homicide case. Ward, again, described this incident in a memorandum, writing that Herawi "has continued to be argumentative and responding [sic] angrily when questioned about her autopsy findings." [FN11]

*4 On February 5, 2002, in the course of an autopsy on a fire victim, Herawi, without asking Ward's permission, sent a blood sample to an outside laboratory for confirmation that the victim died of carbon dioxide inhalation. It was Herawi's understanding the cost of outside test was low enough that she did not need approval. The following day, Ward criticized Herawi for ordering the test without permission. Ward wrote a memorandum on this incident as well, stating that "Herawi defiantly refused to comply with department requests about outside laboratory tests." [FN12]

On February 13, Ward accused Herawi of causing problems because Herawi would not release information from an autopsy. When Herawi explained that she wanted to wait until she had complete information, Ward yelled that if she could not make a decision, she should leave. On February 19, Ward questioned Herawi in front of other

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

department employees about whether she would get her autopsies done in time.

Ward alluded to Herawi's nationality again on March 7, 2002. Ward told Herawi that nobody liked her, that everybody complained about her, that she did not belong there, that should leave, and that her English was bad. After this incident, Herawi complained to Downs again on March 21, about Ward's hostility. At this meeting, Downs told Herawi that he would start an investigation, and Herawi told Downs that she had contacted a lawyer. Herawi also complained to Samuel Mitchell, the department chief of staff, on March 25. [FN13]

Events came to a head on March 28, at a meeting attended by Herawi, Ward, Bailey and Steve Christian, the department's personnel Manager. Herawi claims that she was terminated during the meeting and that when she met with Christian shortly after the meeting, he told her it was unofficial policy that terminated employees could submit a letter of resignation. [FN14] Memoranda written by Ward, Bailey and Christian present slightly different accounts. According to Ward, she informed Herawi that the situation was not working out and that the department had not seen any improvement in the areas identified in Herawi's performance appraisal. [FN15] According to Ward, before she could finish, Herawi interrupted her to say she would quit. According to Bailey, Ward requested Herawi's resignation, and Herawi agreed. [FN16] According to Christian, Ward told Herawi that an offer of permanent employment would not be forthcoming and then told Herawi to speak with him later that day. [FN17] When they met, according to Christian, he told her it was the department's unofficial policy to allow employees to resign to make it easier to look for work in the future.

Herawi submitted a letter of resignation on April 1, 2002. [FN18] A letter from Downs, dated April 18, confirmed Herawi's "separation from employment" at the department effective April 19. [FN19] Downs's letter states that the reason for Herawi's separation is that she continued "to require additional training in autopsy procedures and failure to properly use the chain of command." [FN20]

*5 After Herawi's separation from the department, she was sent an offer of an employment contract by the department. [FN21] The contract called for Herawi to provide court testimony, to appear as an expert witness, to prepare and instruct scientific and law enforcement personnel, and to provide technical review of cases.

### III. ANALYSIS

Herawi claims that (1) she was terminated because of her Iranian origin; (2) she was fired in retaliation for her complaints about Ward; and (3) she was harassed because of her national origin. The Forensic Department has moved for summary judgment on the ground that its decision not to offer her a permanent position was based on legitimate, non-discriminatory reasons. The court will consider Herawi's claims in order.

### A. Termination

Herawi contends that the Forensic Department terminated her because of her national origin in violation of Title VII. [FN22] The department moves for summary judgment on the ground that it had a legitimate non-discriminatory reason for terminating her. The court finds that summary judgment is not appropriate because Ward's comments to Herawi are sufficient circumstantial evidence to create a genuine issue for trial as to whether Herawi's national origin was a motivating factor in the department's decision to terminate her.

i.

Title VII provides that, "[i]t shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... national origin." 42 U.S.C.A. § 2000e-2(a). "If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice ..., the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ..., or any other equitable relief as the court deems appropriate." 42 U.S.C.A. § 2000e-5(g)(1).

In 1991, Title VII was amended to expand the available remedies. The 1991 amendments provide, in relevant part, that "[i]n an action brought by a

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

complaining party ... against a respondent who engaged in unlawful intentional discrimination ... the complaining party may recover compensatory and punitive damages ..., in addition to any relief authorized by [42 U.S.C.A. § 2000e- 5(g) ], from the respondent." 42 U.S.C.A. § 1981a(a)(1).

The 1991 amendments further clarified or redefined when liability attaches under Title VII. The amendments provide that "an unlawful employment practice is established when the complaining party demonstrates that ... national origin ... was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C.A. § 2000e-2(m). In addition, the 1991 amendments provide that, "[o]n a claim in which an individual proves a violation ... and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court ... (i) may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e-2(m) ...; and (ii) shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment." 42 U.S.C.A. § 2000e-5(g)(2)(B).

ii.

*6 [1] The parties argued their positions on summary judgment in the terms of the burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the *McDonnell Douglas* approach, a plaintiff has the initial burden of establishing a prima-facie case of unlawful sex discrimination by a preponderance of the evidence. 411 U.S. at 802, 93 S.Ct. at 1824. A prima- facie case requires "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion." *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977). A plaintiff's prima-facie case raises a presumption of illegal discrimination. *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).

[2] If the plaintiff establishes a prima-facie case, the burden then shifts to the defendant to rebut the presumption by articulating a legitimate, non-

discriminatory reason for its employment action. *Holifield v. Reno,* 115 F.3d 1555, 1564 (11th Cir.1997). "This intermediate burden is exceedingly light." *Id.* (internal quotations and citations omitted). The defendant has a burden of production, not persuasion, and does not have to persuade a court that it was actually motivated by the reason advanced. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine,* 450 U.S. at 253-55, 258, 101 S.Ct. at 1093-94, 1096.

[3] Once the defendant satisfies this burden of production, "the presumption of discrimination is eliminated and 'the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima-facie case, sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.' " *Chapman v. AI Transp.,* 229 F.3d 1012, 1024 (11th Cir.2000) (en banc) (citations omitted).

[4] However, the establishment of a prima-facie case does not, in itself, entitle a plaintiff to defeat a summary-judgment motion. *Grigsby v. Reynolds Metals Co.,* 821 F.2d 590, 595 (11th Cir.1987); *Pace v. Southern Ry. System,* 701 F.2d 1383, 1389 (11th Cir.1983). After a defendant proffers a nondiscriminatory and legitimate reason for its actions, "[i]n order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable fact finder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual." *Chapman,* 229 F.3d at 1037.

iii.

At the court's request, the parties later briefed the question of whether the Supreme Court's recent decision in *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), modified, or even abrogated, the *McDonnell Douglas* framework or approach. In *Desert Palace,* the Court held that, in order to obtain a mixed-motive jury instruction under Title VII, 42 U.S.C.A. § 2000e-2(m), **"a plaintiff need only present sufficient evidence for a reasonable jury to conclude by a preponderance of the evidence, that 'race, color, religion, sex, or national origin' was a motivating factor for any employment practice"** and that a plaintiff need not present 'direct evidence' of discrimination to obtain the mixed-

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

motive jury instruction. *539 U.S. at 101, 123 S.Ct. at 2155.*

*7 Because the standard for when an issue can go to the jury is the same as the summary-judgment standard, *Anderson,* 477 U.S. at 251, 106 S.Ct. at 2513- 14, some courts have concluded that *Desert Palace* alters the summary- judgment analysis for every Title VII claim. *See, e.g., Dunbar v. Pepsi-Cola General Bottlers of Iowa, Inc.,* 285 F.Supp.2d 1180, 1196 (N.D.Iowa 2003) (Bennett, C.J.). Other courts have gone further to hold that *Desert Palace* spells the end of the *McDonnell Douglas* burden-shifting paradigm all together. *See, e.g., Dare v. Wal-Mart Stores, Inc.,* 267 F.Supp.2d 987, 990- 91 (D.Minn.2003) (Magnuson, C.J.).

For a number of reasons, to paraphrase Mark Twain, reports of the death of *McDonnell Douglas* are exaggerated. As stated, in *Desert Palace,* the Supreme Court merely held that a plaintiff need not present "direct evidence" to establish liability--partial or full--under Title VII, but that a plaintiff may do so by "using direct or circumstantial evidence." *539 U.S. at 99, 123 S.Ct. at 2154* (internal quotations and citations omitted). *Desert Palace* addressed whether direct evidence is necessary to establish Title VII liability.

*McDonnell Douglas,* in contrast, did not address the necessity of direct evidence but rather articulated one methodology for establishing liability through circumstantial evidence. The *McDonnell Douglas* approach is a "procedural device," *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 521, 113 S.Ct. 2742, 2755, 125 L.Ed.2d 407 (1993); "it is ... a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) (internal quotations and citations omitted). There is nothing in *Desert Palace* to undermine the usefulness of *McDonnell Douglas.*

As this court has observed before, cases of alleged discrimination "pose difficult and sensitive issues of subjective intent and objective action." *Hall v. Alabama Ass'n of School Boards,* 326 F.3d 1157, 1167 (11th Cir.2003) (adopting decision of district) (internal quotations and citations omitted). "The *McDonnell Douglas* analysis provides an invaluable method of progressively sharpening the inquiry into

the elusive factual question of intentional discrimination." *Id.* (internal quotations and citations omitted). "Positing such elementary *McDonnell Douglas* questions as whether the elements for a prima facie case are present ..., the clarity and nature of the employer's justification, and whether the justification is pretextual and, if so, whether it is a pretext for discrimination, would help to assure that, in resolving the Title VII claim ... the court arrives at its ultimate conclusions less through intuition and more through factual reasoning and analysis." *Id.*

However, because, as stated, "the *McDonnell Douglas* analysis is only a procedural device, it should not be applied too rigidly; nor should it be viewed as an end in itself.... [T]he mere disbelief of the employer's proffered reason does not compel a finding of discrimination." *Id.* (internal quotations and citations omitted) As the court, in *Hall,* cautioned, "the *McDonnell Douglas* approach should not be used by the court as a substitute for reaching the ultimate issue of whether the employee has, in fact, been a victim of discrimination." *Id.* (internal quotations and citations omitted).

*8 [5] With this understanding of *McDonnell Douglas's* benefits and limitations, there is nothing in *Desert Palace* that undermines the continued usefulness of *McDonnell Douglas* to trial courts, in either single- or mixed- motive cases based on circumstantial evidence, of assessing Title VII liability by forcing a defendant, where the prima-facie-case threshold is met, to articulate each and every reason for its action and then requiring a plaintiff to show why each reason is a pretext for impermissible discrimination. *McDonnell Douglas* is still good law, and it is the appropriate heuristic device to use in this case.

iv.

[6] Applying *McDonnell Douglas,* this court concludes that Herawi has met her prima-facie burden of producing "evidence adequate to create an inference that [the Forensic Department's] employment decision was based on a[n] [illegal] discriminatory criterion." *Int'l Bhd. of Teamsters,* 431 U.S. at 358, 97 S.Ct. at 1866. To establish a prima-facie case of discriminatory discharge, she must show the following: (1) she is a member of a protected class; (2) she was qualified for the position at issue; (3) she was discharged despite her

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

qualification; and (4) some additional evidence that would allow an inference of discrimination. *See Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185 (11th Cir.1984); *White v. Verizon South, Inc.,* 299 F.Supp.2d. 1235, 1241 (M.D.Ala.2003) (Thompson, J.).

[7] Herawi has sufficient evidence to establish the first three elements of the prima-facie case. First, as an Iranian, she is a member of a protected class. *See Moghadam v. Morris,* 87 F.Supp.2d 1255, 1263 (N.D.Fla.2000) (Vinson, C.J.) (undisputed that plaintiff of Iranian descent was within protected class based on national origin). Second, the record shows that she was qualified for her position: she is a doctor, she trained as a forensic pathologist, and she has experience in the field of forensic pathology. Third, she was terminated. The department does not dispute this much. [FN23]

Traditionally, to meet the fourth element of the prima-facie Title VII case, a plaintiff alleging discriminatory treatment was required to show that she was replaced by someone who was not a member of her protected class or that a similarly situated employee who was not a member of the protected class engaged in nearly identical conduct and was not discharged. *See Nix,* 738 F.2d at 1185. Herawi has neither evidence that she was replaced by someone who was not a member of her protected class nor evidence that a similarly situated department employee who was not a member of the protected class engaged in nearly identical conduct and was not discharged. The department goes further to argue that a Dr. Bristol, who is not a member of a protected class, had similar employment problems to Herawi's and was treated similarly. Whether or not Bristol is an appropriate comparator, Herawi has offered no evidence that her place in the department was taken by a non-protected individual and no evidence of a similarly situated non-protected department employee who was treated differently than she was. Under these circumstances, courts have frequently held that the plaintiff does not have a genuine issue of material fact fit to go to a jury. *See, e.g., Davis v. Qualico Miscellaneous Inc.,* 161 F.Supp.2d 1314, 1319 (M.D.Ala.2001) (Thompson, J.); *Keel v. United States Dept. of Air Force,* 256 F.Supp.2d 1269, 1286 (M.D.Ala.2003) (Fuller, J.).

*9 [8] The court is mindful, however, that, as a general rule, "[d]emonstrating a prima-facie case is

not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination," *Holifield,* 115 F.3d at 1562, and that there are ways to raise the inference of discrimination other than showing that a similarly situated individual from outside the protected class was treated differently, *see, e.g., id; Howard v. Roadway Exp., Inc.,* 726 F.2d 1529, 1534 (1984) (rejecting the argument that the black plaintiff could not establish a prima-facie case of discriminatory discharge because she was replaced by another black person). Indeed, as this court recently noted, "courts have rejected a rigid application of the prima-facie case." *White,* 299 F.Supp.2d. at 1241.

[9][10] The court finds that Ward's comments about Herawi's Iranian origin are sufficient to create the inference of discrimination. Evidence of even "isolated and stray remarks" related to a protected characteristic can be sufficient to create a prima-facie case of discrimination. *Dickson v. Amoco Performance Products, Inc.,* 845 F.Supp. 1565, 1569-70 (N.D.Ga.1994) (Hall, J.). In *Alphin v. Sears, Roebuck & Co.,* 940 F.2d 1497 (11th Cir.1991), the court held that the plaintiff had met his burden of establishing a prima-facie case of age discrimination by introducing evidence of his supervisor's comment to the effect that the plaintiff was too old. Furthermore, as a general rule, remarks that show bias are particularly probative of discrimination when they are made by the person charged with making the employment decision at issue. *See, e.g., Haynes v. W.C. Caye & Co., Inc.,* 52 F.3d 928, 931 (11th Cir.1995). *E.E.O.C. v. Alton Packing Corp.,* 901 F.2d 920, 924 (11th Cir.1990).

In this case, Ward made remarks related to Herawi's national origin on three occasions. On November 7, 2001, Ward threatened to report Herawi's national origin to law enforcement agencies. On January 2, 2002, Ward told Herawi that she was getting calls asking who Herawi was and why she was working there; Ward suggested that she was getting these calls because of Herawi's accent. Finally, on March 7, 2002, Ward told Herawi that no one liked her, that she did not belong at the department, that she should leave, and that her English was bad. It is undisputed that Ward was Herawi's direct supervisor when she made these remarks and that Ward had substantial input into the ultimate decision to terminate Herawi. In fact, Ward conducted Herawi's January 2002 performance

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

appraisal, and she wrote the four memoranda in February and March of 2002 documenting incidents involving Herawi. [FN24] Given this evidence, the court is satisfied that Herawi has raised the inference that her national origin was a motivating factor in the department's decision to terminate her.

[11] The burden thus shifts to the Forensic Department to articulate a legitimate non-discriminatory reason for its decision to fire Herawi. *Holifield,* 115 F.3d at 1564. The department has met this "exceedingly light" burden. *Id.* It asserts that Herawi was not retained because she "had problems with autopsy procedures and the chain of command." [FN25] Plainly, job performance, failure to follow instructions, and insubordination are all legitimate, non-discriminatory considerations. *See, e.g., Kelliher v. Glickman,* 134 F.Supp.2d 1264, 1274-75 (M.D.Ala.2001) (McPherson, M.J.), *aff'd,* 313 F.3d 1270 (11th Cir.2002).

***10** [12] Because the department has met its burden, Herawi must show that its asserted reasons are pretextual. *Chapman,* 229 F.3d at 1024. The court finds, again, that the evidence of Ward's comments about Herawi's national origin is sufficient for Herawi to meet her burden. Comments or remarks that suggest discriminatory animus can be sufficient circumstantial evidence to establish pretext. *Damon v. Fleming Supermarkets of Florida, Inc.,* 196 F.3d 1354, 1362 (11th Cir.1999) *Ross v. Rhodes Furniture, Inc.,* 146 F.3d 1286, 1291 (11th Cir.1998). "[W]hether comments standing alone show pretext depends on whether their substance, context, and timing could permit a finding that the comments are causally related to the adverse employment action at issue." *Bonham v. Regions Mortgage, Inc.,* 129 F.Supp.2d 1315, 1332 (M.D.Ala.2001) (Thompson, J.).

[13] In this case, Ward's comments "might lead a reasonable jury to disbelieve [the department's] proffered reason for firing" Herawi. *Ross,* 146 F.3d at 1292. Ward's threat that she would report Herawi's nationality to law enforcement makes it clear that she was antagonistic towards Herawi because of Herawi's Iranian origin. Ward's later comment that Herawi did not belong in the department, made at the same time she commented on Herawi's accent, further evinced discriminatory animus. Standing alone, this might not be enough evidence to establish a genuine question of pretext, but Ward was Herawi's supervisor, conducted her

performance appraisal, and wrote four memoranda containing negative evaluations of her. In this context, the evidence suggests that Ward's evident dislike for Herawi's national origin may have infected the process of evaluating Herawi. The timing of Ward's remarks reinforces this conclusion. The first incident in which Ward referred to Herawi's nationality occurred one week before the narrative performance appraisal of Herawi was written, the second incident occurred on the same day--January 2, 2002--that Ward completed the performance appraisal form, and her final remarks were made three weeks before Herawi was fired. Because of this close temporal proximity, a jury could reasonably conclude that discriminatory attitude evidenced in Ward's remarks motivated the decision to fire Herawi. *Damon,* 196 F.3d at 1363. Accordingly, the court finds that Herawi has met her burden and that summary judgment on her termination claim is not appropriate.

### B. Retaliation

Herawi contends that the Forensic Department retaliated against her for complaining to Downs and to Mitchell about Ward's conduct. The department has moved for summary judgment, again, on the basis that its employment decision was motivated by legitimate, non-discriminatory reasons.

Under Title VII, it is an unlawful employment practice for an employer to discriminate against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C.A.2000e-3(a). The same *McDonnell Douglas* burden-shifting framework that applies to claims of discriminatory discharge applies to claims for retaliation. *Williams v. Russell Corp.,* 218 F.Supp.2d 1283, 1295 (M.D.Ala.2002) (Thompson, J.).

***11** [14] The Eleventh Circuit has established broad standards for a prima-facie case of retaliation. An individual alleging retaliation under Title VII must establish her prima-facie case by demonstrating "(1) that she engaged in statutorily protected activity, (2) that an adverse employment action occurred, and (3) that the adverse action was causally related to [her] protected activities." *Coutu v. Martin County Bd. of County Comm'rs,* 47 F.3d 1068, 1074 (11th

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Cir.1995). "The causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Pennington v. City of Huntsville*, 261 F.3d 1262 (11th Cir.2001) (internal quotations and citations omitted).

[15] Herawi has established the elements of a prima-facie case of retaliation. First, she was engaged in protected activity on the two occasions that she spoke with Downs and on the one occasion she spoke to Mitchell. *See Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1201 (11th Cir.2001) (statutorily protected activities include internal complaints to supervisors about harassment). Second, Herawi was terminated. Third, Herawi satisfies the causality requirement because she was terminated only a week after her meeting with Downs and three days after her meeting with Mitchell. *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir.1999) (close temporal proximity between when a supervisor learns of protected activity and adverse employment action is enough to satisfy causality prong).

[16] Because Herawi has produced evidence sufficient to meet her prima-facie burden, the burden of production shifts to the Forensic Department to produce a legitimate, non-retaliatory reason for its decision. *Williams*, 218 F.Supp.2d at 1295. As discussed above, the department has offered legitimate reasons for its decision. The department contends that it fired Herawi because of her problems with autopsy procedure and her problems following the chain of command. The burden thus shifts to Herawi to come forward with evidence sufficient for a reasonable fact finder to conclude that the department's asserted reasons were pretext for retaliation.

[17][18] Herawi has met this burden. As discussed above, Herawi has presented substantial evidence of Ward's animus towards her and thus raised a very real question about the extent to which the department's assessment of her might have been influenced by Ward's attitude. There is also evidence from which a reasonable fact finder could conclude that Ward's assessment of Herawi was infected by a retaliatory motive. In October 2001, Bailey reported to Ward that Herawi had complained to him about her, and, in January 2002, Downs spoke to Ward about Herawi's complaints. Thus, at the same time that Ward was evaluating and

assessing Herawi's job performance in the fall of 2001, and the winter of 2002, she was aware that Herawi had gone to various supervisors to complain about her. The court also considers it relevant to determining pretext that Herawi was dismissed so soon after she complained to Downs and Mitchell. [FN26] While temporal proximity, standing alone, may not be enough to create a genuine issue of pretext, it is a relevant factor. *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 601 (11th Cir.1986); *see also Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 770 (2d Cir.1998). Thus, taking into consideration the evidence of Ward's discriminatory animus, her possible retaliatory motive, and the extreme closeness in time between Herawi's complaints and her dismissal, the court concludes that Herawi has evidence sufficient for a reasonable fact finder to conclude that the department's asserted reasons for her dismissal were pretextual.

### C. Hostile Environment

*12 Finally, Herawi contends that she was she was subjected to a hostile work environment because of her national origin, in violation of Title VII. The Forensic Department did not squarely address this issue in its summary-judgment brief, but neither did Herawi explicitly raise the claim in her complaint. Nevertheless, the court concludes that summary judgment is appropriate on this claim because Herawi does not have evidence of comments, remarks, or behavior that rise to the level of actionable harassment. As discussed above, the court is persuaded that Ward's comments are circumstantial evidence of discrimination, but it cannot find enough evidence that they created a hostile environment to take this issue to the jury.

[19] To establish a prima-facie case of harassment, an employee must establish (1) that she belongs to a protected group; (2) that she has been subjected to unwelcome harassment; (3) that the harassment was based on a protected characteristic; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is liable for the hostile environment under either a theory of direct or vicarious liability. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir.2002); *Gupta v. Florida Board of Regents*, 212 F.3d 571, 582-83 (11th Cir.2000). Here, the court need not address the other elements of the prima-facie case

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

because it finds that Herawi cannot meet the fourth requirement.

[20][21] A hostile environment is created when the workplace is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). Factors that can be considered in determining whether a hostile environment was created include: "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23, 114 S.Ct. at 371. Herawi's evidence shows that Ward yelled at her on a number of occasions; that Ward told her that no one liked her, that she did not belong in the department, and that people were calling to ask about her; that Ward threatened to report her to law enforcement; and that Ward stared or smirked at her and mocked her by repeating her in a high-pitched voice. The court cannot find that a reasonable person would objectively find that these comments, while hostile and offensive, were sufficiently hostile or abusive and pervasive to establish a Title VII hostile environment claim. For this reason, the court finds that summary judgment is appropriate in favor of the department on this claim.

## IV. CONCLUSION

For the reasons given above, it is ORDERED as follows:

*13 (1) The motion for summary judgment, filed by defendant Alabama Department of Forensic Sciences on November 12, 2003 (doc. no. 20), is granted with respect to plaintiff Mehsati Herawi's hostile-environment claim.

(2) Said motion is denied in all other respects.

DONE, this the 5th day of April, 2004.

FN1. Plaintiff's response, etc., filed January 12, 2004 (doc. no. 31) (plaintiff's response), exh. 1, declaration of Mehsati Herawi (Herawi decl.), at 3.

FN2. *Id.* at 5.

FN3. Plaintiff's response, exh. 5, performance appraisal, at 1.

FN4. *Id.*

FN5. *Id.* at 1, 2.

FN6. Plaintiff's response, exh. 5, employee probationary performance appraisal, at 2.

FN7. Memorandum in support of motion for summary judgment, filed November 12, 2003 (doc. no. 21) (defendant's memo.), exh. 3 to affidavit of Steven Christian, letter to Thomas G. Flowers, dated January 9, 2002, at 1.

FN8. Defendant's memo., exh. 6 to affidavit of Steven Christian, memorandum to Dr. J.C. Upshaw Downs, dated February 5, 2002, at 1.

FN9. Herawi decl. at 9.

FN10. Defendant's memo., exh. 4 to affidavit of Steven Christian, memorandum, dated January 14, 2002, at 1.

FN11. Defendant's memo., exh. 5 to affidavit of Steven Christian, memorandum, dated January 30, 2002, at1.

FN12. Defendant's memo., exh. 7 to affidavit of Steven Christian, memorandum to Dr. J C U Downs, at 1.

FN13. Plaintiff's response, exh. 4, memorandum to file from Samuel L. Mitchell, dated March 26, 2002, at 1.

FN14. Herawi decl. at 11.

FN15. Defendant's memo, exh. 9 to affidavit of Steven Christian, memorandum to file, at 1.

FN16. Defendant's memo., exh. 13 to affidavit of Steven Christian, memorandum to file, dated September 17, 2002, at 1.

FN17. Defendant's memo., exh. 10 to affidavit of Steven Christian, memorandum to file, dated March 28, 2002, at 1.

FN18. Plaintiff's response, exh. 10, letter to J.C. Upshaw Downs, M.D., dated April 1, 2002, at 1.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

FN19. Plaintiff's response, exh. 11, letter to Mehsati Herawi, M.D., dated April 18, 2002, at 1.

FN20. *Id.*

FN21. Plaintiff's response, exh. 13, contract review report and contract.

FN22. The record presents some question whether Herawi was terminated or she resigned. As discussed above, Herawi submitted a letter of resignation, but she alleges that she was terminated. Herawi decl. at 11. She claims that she submitted the letter of resignation only after she was told that it was the unofficial policy of the department that terminated employees could do so to improve their chances of finding a job in the future. *Id.* Neither party argues that this issue affects the outcome of the case, however, and, in any event, the court is required at this stage to construe the evidence in the light most favorable to Herawi.

FN23. The department's contention that Herawi was terminated because she "continue[d] to require additional training in autopsy procedures," Plaintiff's response, exh. 11, letter to Mehsati Herawi, M.D., dated April 18, 2002, at 1, could be characterized as an argument that Herawi has not established the second element of a prima-facie case. However, the department does not make that argument; rather, the department characterizes its rationale for terminating Herawi as being relevant to its legitimate non-discriminatory reason for terminating Herawi at the second *McDonnell*

*Douglas* step. Defendant's memo. at 8.

FN24. The fact that Ward was Herawi's supervisor and had direct input into the decision-making process distinguishes this case from *Jones v. Bessemer Carraway Medical Center,* 151 F.3d 1321, 1323 (11th Cir.1998), in which the Eleventh Circuit held that racist comments by one of the plaintiff's supervisors were not sufficient to establish a prima-facie case of discriminatory discharge. The court's rationale in *Jones,* however, was that the supervisor who made the remarks was not the same supervisor who referred the plaintiff to the discipline committee that ultimately terminated her and that the referring supervisor did not rely on the report by the supervisor who made the remarks. 151 F.3d at 1323. This case is different because, while Downs was the ultimate decision-maker in this case, there is evidence that Ward had substantial input in the decision by way of her performance appraisal and her memoranda.

FN25. Defendant's memo. at 8.

FN26. The court also notes that it was only five days after Herawi complained to Downs about Ward's conduct in January 2002, that Downs wrote his letter to Thomas Flowers, the director of the *state's personnel department,* requesting that Herawi's probationary period be extended.

2004 WL 728408, 2004 WL 728408 (M.D.Ala.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy
(Cite as: 2004 WL 1071674 (W.D.N.Y.))

Page 138

Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.

Diane BUJNICKI, Plaintiff,
v.
AMERICAN PAVING AND EXCAVATING,
INC., Guy Berbuick, and Michael Jancey,
[FN1] Defendants.

FN1. The correct spellings of the two individual defendants' names are Guy Berberich and Michael Jantzi. This Court will hereafter refer to Defendants Berberich and Jantzi by their correct names, not the names under which they were sued.

No. 99-CV-646S.

March 30, 2004.

Josephine A. Greco, Offerman, Cassano, Greco & Slisz LLP, Buffalo, NY, for Plaintiff.

Ginger D. Schroder, Esq., Schroder, Joseph & Associates, LLP, Krista Gottlieb, Mattar & D'Agostino, Buffalo, NY, for Defendants.

DECISION AND ORDER

SKRETNY, J.

I. INTRODUCTION

**\*1** On September 10, 1999, Plaintiff Diane Bujnicki filed her Complaint in this action alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), violations of the New York Human Rights Law ("NY HRL"), § 290 *et seq.,* as well as a New York state common law claim of intentional infliction of emotional distress. This Court has federal question jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over her state law claims pursuant to 28 U.S.C. § 1367.

On June 30, 2003, Defendants filed a Motion for Summary Judgment. [FN2] This Court heard oral argument on Defendants' motion on January 26, 2004, and reserved decision at that time. For the reasons discussed below, Defendants' Motion for Summary Judgment is denied in part and granted in part.

FN2. In support of their Motion for Summary Judgment, Defendants filed the following documents: a memorandum of law, the Affidavit of Guy Berberich, the Affidavit of Linda Joseph, Esq., with attached exhibits, a Rule 56 Statement of Undisputed Facts, and a reply memorandum of law. In opposition to Defendants' motion, Plaintiff filed the following documents: a memorandum of law, the Affidavit of Josephine A. Greco, Esq., the Affidavit of Diane Bujnicki, a Counterstatement of Undisputed Facts, and a packet of exhibits.

II. BACKGROUND

A. Procedural History

Plaintiff filed her Complaint in this action on September 10, 1999. On January 19, 2001, this Court granted Defendants' Motion to Dismiss without prejudice and remanded the case to the United States Equal Employment Opportunity Commission for further consideration because the 180-day administrative review period had not yet expired. On January 22, 2001, Plaintiff's case was closed.

On June 8, 2001, Plaintiff filed a Motion to Reopen, which this Court granted on June 29, 2001, after determining that the 180-day administrative review period had lapsed. Shortly thereafter, on July 27, 2001, Defendants filed a Motion to Dismiss Plaintiff's Complaint. In a Decision and Order filed on January 22, 2002, this Court granted Defendants' motion in part and denied it in part. What remains are the following claims: (1) Plaintiff's Title VII claims against Defendant American Paving and Excavating, Inc. ("American"), (2) Plaintiff's N.Y. HRL claims against all Defendants, and (3) Plaintiff's intentional infliction of emotional distress claim against all Defendants.

B. Facts

American is a corporation located in Clarence, New York, that is engaged in the business of paving and excavating driveways, parking lots and roads, as well as removing and plowing snow in the winter months. (Defendants' Rule 56 Statement of Undisputed Material Facts ("Defendants' Statement"), ¶ 2; Berberich Aff., ¶ 2; Plaintiff's Counterstatement to Defendants' Statement

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

("Plaintiff's Counterstatement"), ¶ 2.) Defendant Guy Berberich is the President of American and Defendant Michael Jantzi is employed as a supervisor with American. (Berberich Aff., ¶ 2; Plaintiff's Counterstatement, ¶ 2.) Plaintiff worked for American during the months of August and September in 1998. (Defendants' Statement, ¶ 1; Plaintiff's Counterstatement, ¶ 1.)

The parties heavily dispute Plaintiff's employment status with American, particularly the position she was hired for and the duties she was expected to perform. As will be discussed in further detail below, Plaintiff contends that she was hired by Defendants to perform the job of "flagperson," and the duties attendant to that position as she understood them. (Bujnicki Aff., ¶¶ 3-15.) Plaintiff described the job of flagging as follows:

*2 You have a walkie-talkie in your hand and you have to communicate with the other person on the other side. You have to - you're in charge of the stop and the flow of traffic so you have to communicate with the other person on the other side so that there aren't cars obviously running into each other. You have to keep in constant contact with the other person.

(Bujnicki Aff., p. 118.) Defendants' however, contend that Plaintiff was hired as a "trainee" or "laborer," and that she knew that her position would require her to perform difficult, physical tasks, such as the ones she complains of in this action. (Berberich Aff., ¶ 3.)

The remaining facts pertinent to this motion involve the manner in which Plaintiff was treated during her employment with American. As will be discussed further, Plaintiff alleges that she was required to perform physically arduous work involving such tasks as shoveling and raking asphalt, cleaning a paving machine, and using a pickax. (Bujnicki Aff., ¶¶ 22, 27; Bujnicki Dep., pp. 121-122.) These were tasks ordinarily performed by laborers on the paving crew, not by flagpersons, and Plaintiff contends that she did not expect to have to perform these functions at the time she accepted her employment as a flagperson. (Bujnicki Aff., ¶ 10.)

Not only was Plaintiff required to perform non-flagperson duties, but she was also allegedly subjected to discriminatory treatment because she is a woman. Plaintiff complains of being called "Dharma," "stupid," and "dumb blonde," and being berated for "shoveling like a woman." (Defendants' Statement, ¶ 7; Plaintiff's Counterstatement, ¶ 7; Bujnicki Aff., ¶¶ 17-21.) Plaintiff also contends that Defendant Jantzi treated her differently than he treated the men on the work site. She states that he yelled in her face, constantly screamed at her, made her the butt of his jokes, required her to get coffee for the crew in the morning, threw water in her face, refused to allow her to take breaks, forced her to do unnecessary work, and sexually harassed her. (Defendants' Statement, ¶ 7; Plaintiff's Counterstatement, ¶ 7; Bujnicki Aff., ¶¶ 22-30.)

On Plaintiff's final day of work with American, Defendant Jantzi assigned her the job of shoveling and spreading asphalt out of the arm of the sleeve of the paving machine. (Bujnicki Aff., ¶ 42.) Defendant Jantzi allegedly screamed at Plaintiff regarding the manner in which she was performing this job, and then refused to let her take a break while he ate his lunch and watched her work. (Bujnicki Aff., ¶¶ 44-45.) Later that day Defendant Berberich arrived on the scene and he too yelled at Plaintiff about the manner in which she was performing her job. (Bujnicki Aff., ¶ 47.) After working the day without a break, Plaintiff was completely exhausted and fell ill. (Bujnicki Aff., ¶¶ 49-50.)

Plaintiff experienced a severe headache and went to one of the trucks to lay down. (Bujnicki Aff., ¶ 52.) Plaintiff's husband was called, and after arriving at the job site, he took Plaintiff to the hospital. (Bujnicki Aff., ¶ 53.) Several days later, Plaintiff was diagnosed with a ruptured brain aneurism and underwent brain surgery. (Bujnicki Aff., ¶ 53-54.)

### III. DISCUSSION AND ANALYSIS
A. Summary Judgment Standard

*3 Federal Rule of Civil Procedure 56 provides that summary judgment is warranted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is "material" if it "might

affect the outcome of the suit under governing law."
*Id.*

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." *Addickes v. S.H. Kress and Co.,* 398 U.S. 144, 158-59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

In the context of employment discrimination cases, the United States Court of Appeals for the Second Circuit has explicitly cautioned district courts to use extra care when deciding whether to grant summary judgment in employment discrimination cases because "the ultimate issue to be resolved in such cases is the employer's intent, an issue not particularly suited to summary adjudication." *Eastmer v. Williamsville Cent. Sch. Dist.,* 977 F.Supp. 207, 212 (W.D.N.Y.1997) (quoting *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994)). Nonetheless, "[t]he summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). Indeed, the Second Circuit has noted that "the salutary purposes of summary judgment - avoiding protracted, expensive and harassing trials - apply no less to discrimination cases than to commercial or other areas of litigation." *Id.*

**B. Title VII Framework**

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1); *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 2150, 156 L.Ed.2d 84 (2003). It is now well settled that discrimination claims brought under Title VII are analyzed under the burden-shifting analysis first set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411

U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142-43, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000).

*4 The burden-shifting test first requires that the plaintiff establish a *prima facie* case of discrimination by showing that (1) she is a member of a protected class, (2) she is qualified for her position, (3) she suffered an adverse employment action, and (4) the circumstances of the adverse action give rise to an inference of discrimination. *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir.2000) (citing *McDonnell Douglas,* 411 U.S. at 802).

If the plaintiff meets this initial burden and establishes a *prima facie* case, a rebuttable presumption of discrimination arises, and the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action. *Texas Dep't of Comt'y Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)). If the defendant succeeds in making this showing, "the presumption of discrimination arising with the establishment of the *prima facie* case drops from the picture." *Weinstock,* 224 F.3d at 42 (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510-11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

Assuming that the defendant meets its burden at the second stage, the burden returns to the plaintiff to prove that the defendant's discrimination was intentional. In this regard, the plaintiff must produce "evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Weinstock,* 224 F.3d at 42. "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." *Id.* However, "[i]t is not enough ... to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination.' *Id.* (quoting *St. Mary's,* 509 U.S. at 519).

Plaintiff's employment discrimination claims, both state and federal, are subject to this analysis. *See id.* at 42 n. 1 (identical standards apply to employment discrimination claims brought under both Title VII and N.Y. HRL § 296) (citing cases).

**C. Plaintiff's Disparate Treatment Claims**

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

### 1. *Prima Facie* Case

A disparate treatment claim arises when an individual is treated less favorably than a member of the opposite gender under circumstances from which a gender-based motive could be inferred. *See Schwabenbauer v. Bd. of Ed. of City Sch. Dist. of City of Olean,* 667 F.2d 305, 309 (2d Cir.1981) *see also Ott v. Perk Dev. Corp.,* 846 F.Supp. 266, 275 (W.D.N.Y.1994). To establish a *prima facie* case of disparate treatment, the plaintiff must show that (1) she is a member of a protected class, (2) she was qualified for her position, (3) she was subjected to an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination. *See Terry v. Ashcroft,* 336 F.3d 128, 138 (2d Cir.2003). "The burden of establishing a *prima facie* case of disparate treatment is not onerous." *Burdine,* 450 U.S. at 253; *see also Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 134 (2d Cir.2000) (characterizing burden as "minimal").

**\*5** In this case, Defendants concede that Plaintiff is a member of a protected class and that she is qualified for the position. However, Defendants argue that they are entitled to summary judgment because Plaintiff cannot show that she suffered an adverse employment action, or that any such action was taken under circumstances giving rise to an inference of unlawful discrimination.

### a. Adverse Employment Action

The Second Circuit defines an adverse employment action as a "materially adverse change" in the terms and conditions of an individual's employment. *Sanders,* 361 F.3d 749, 2004 WL 504603, at *4; *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000).

> To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.

*Galabya,* 202 F.3d at 640 (quotations, citations and alterations omitted); *see also Sanders,* 361 F.3d 749, 2004 WL 504603, at *4; *Terry,* 336 F.3d at 138. However, because each case presents unique circumstances and there is no bright-line rule, "courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse'." *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 465 (2d Cir.1997).

Defendants argue that Plaintiff cannot establish an adverse employment action because Plaintiff was hired to perform construction work, and knew that she could be assigned various tasks, such as shoveling, flagging, and marking roads. As such, according to Defendants, the fact that Plaintiff was required to perform tasks other than flagging demonstrates, at most, non-actionable alterations of her job responsibilities. Because this argument assumes a disputed material fact, it cannot serve as a basis for summary judgment.

Defendants' argument assumes that Plaintiff was hired as a general "trainee" or "laborer," and not as a "flag person." As noted however, this is a heavily disputed fact. Plaintiff contends that at the end of July 1998, she was contacted by Carl Clark (whom Plaintiff knew as "Charlie Clark"), who was a supervisor with American. (Bujnicki Aff., ¶ 3.) Clark advised Plaintiff that Defendant Berberich was *immediately interested in hiring a female to fill the position of "flagperson" with American.* (Bujnicki Aff., ¶¶ 4, 5; Clark Dep., p. 24. [FN3]) Plaintiff expressed her interest in the position, and Clark advised her that if she was hired, she would earn approximately $24 per hour, and would be responsible for controlling traffic in work zones, possibly moving cones and signs, and painting lines. (Bujnicki Aff., ¶ 5; Clark Dep. pp. 25.)

> FN3. Excerpts of the Deposition of Carl Clark are provided as Plaintiff's Exhibit G.

Plaintiff discussed the job opportunity with her husband and determined that she would be able to perform the duties of a flagperson. (Bujnicki Aff, ¶ 7.) She therefore went to American's offices on or about July 29, 1998, to complete an application and meet with Defendant Berberich. (Bujnicki Aff., ¶ 8.) The record contains an application for employment completed by Plaintiff on July 29, 1998, that lists "flag girl" as the position for which she applied. (Plaintiff's Exhibit H.) Moreover, two records from the New York State Department of Transportation also list Plaintiff's position as "flagman." (Plaintiff's Exhibits P [FN4] and Q.) In addition, on the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                    **Page 142**
(Cite as: 2004 WL 1071674, *5 (W.D.N.Y.))

Employer's Report of Injury Form completed after Plaintiff was injured, Defendant Berberich listed Plaintiff's occupation as "flag girl." (Plaintiff's Exhibit R.) Plaintiff contends that she met with Defendant Berberich and he explained to her that she would be hired as a "flagperson," which might at times entail moving cones or signs. (Bujnicki Aff., ¶ 9.) Plaintiff agreed to those terms and accepted the position with American. (Bujnicki Aff., ¶¶ 9, 13.)

> FN4. This Court notes that the New York Department of Transportation document at Exhibit P contains a handwritten entry (made in a different color ink) adding "labor" to Plaintiff's job classification. Thus, the entry on that form reads: "flagman + labor." (Plaintiff's Exhibit P.)

*6 Defendants' version of these events is different. Defendant Berberich states that in July of 1998 American had a need to hire additional "laborers," and that Plaintiff came to his office to apply for a position. (Berberich Aff., ¶ 3.) Defendant Berberich contends that he interviewed Plaintiff, and explained to her that she would be hired as a "trainee" working on the paving crew. (Berberich Aff., ¶ 3.) As a "trainee," Defendant Berberich explained to Plaintiff that she would be taught (and presumably would be expected to perform) all aspects of the work performed by laborers on a paving crew, including flagging, and shoveling and raking asphalt. (Berberich Aff., ¶ 3.) According to Defendant Berberich, this is the position that Plaintiff accepted. (Berberich Aff., ¶ 3.)

As stated, Plaintiff denies being hired as a "trainee," and denies having been advised by Defendant Berberich that she would be trained as a member of a paving crew or that her duties would include tasks such as cleaning pavers or shoveling, raking, or pickaxing asphalt. (Bujnicki Aff., ¶ 10.) If a jury credits Plaintiff's account and finds that she was hired as a "flagperson" to perform "flagperson" duties, then being made to perform the duties of a laborer, such as to shovel and rake asphalt, use a pickax, and perform other strenuous physical labor, would be a change in Plaintiff's terms of employment that is more than a mere inconvenience or alteration of job responsibilities. [FN5] *See Galabya,* 202 F.3d at 640.

> FN5. The record does not contain any formal job descriptions for either a "flagperson" or "laborer."

There is, however, testimony in the record on this issue. Thus, it will be for the jury to determine the appropriate job descriptions after hearing and considering the testimony presented at trial.

Moreover, in this Court's view, even if it is established that Plaintiff performed some non-flagging activities in her first week of employment prior to being permitted to flag, that fact alone would not prevent a finding that Defendants' continuous refusal to permit Plaintiff to flag constitutes a materially adverse job change. Evidence in the record suggests that Plaintiff was permitted to flag when working on other crews, but not when working on Defendant Jantzi's crew. (Bujnicki Aff., ¶ 32-34; Clark Dep., p. 57.) This Court finds that an individual who is made to perform a job that is completely different from the one that the individual was hired to perform, especially when the different job·is more physically taxing, could constitute an adverse employment action as that term is defined in this circuit. *Sanders,* 361 F.3d 749, 2004 WL 504603, at *4. At the very least, given the factual disputes in the record, this is not a determination that this Court can make on summary judgment.

In sum, this Court finds that a reasonable jury weighing the evidence in this case could find that Plaintiff was hired as a flagperson and that Defendants' refusal to allow Plaintiff to flag and their requirement that she instead perform the duties of a paving crew laborer materially altered the terms and conditions of her employment. *Sanders,* 361 F.3d 749, 2004 WL 504603, at *4.

b. Inference of Unlawful Discrimination

Defendants next argue that Plaintiff cannot meet the final element of a *prima facie* case of disparate treatment, that is that the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination. *See Terry,* 336 F.3d at 138. Specifically, Defendants argue that Plaintiff cannot establish that similarly situated male laborers were permitted to choose their job assignments or were otherwise treated differently.

*7 Again, Defendants' argument is premised on their assumption of the fact that Plaintiff was hired as a laborer. That determination will be left to the jury. Moreover, the record is replete with evidence that could support a finding that Plaintiff was treated

differently than males on the crew, especially as it pertains to Defendant Jantzi's treatment of Plaintiff. For example, there is evidence that Defendant Jantzi permitted male crew members to take a break during down time, but would not allow Plaintiff that same opportunity to break. (Bujnicki Aff., ¶ 25.) Testimony from several male crew members indicates that they do not recall ever seeing Plaintiff take a break or recall being on a break with Plaintiff. (Dennis Dep., p. 32; [FN6] Moore Dep., p. 40. [FN7]) Moreover, there is testimony in the record that male members of the crew were not humiliated by Defendant Jantzi, such as having water thrown in their faces. (Hallett Dep., p. 73; [FN8] Raps Dep., p. 65. [FN9])

> FN6. Excerpts of the deposition of Michael Dennis are provided as Plaintiff's Exhibit X.

> FN7. Excerpts of the deposition of Dennis R. Moore are provided as Plaintiff's Exhibit W.

> FN8. Excerpts of the deposition of Thomas Hallett are provided as Plaintiff's Exhibit N.

> FN9. Excerpts of the deposition of Wilbur Raps, Jr. are provided as Plaintiff's Exhibit M.

In all, evidence in the record could support a finding that male crew members were not subjected to being called names that they found offensive (Jantzi Dep., p. 219; [FN10] Dirschedl Dep., pp. 113-114 [FN11]), were not required to get the crew coffee in the mornings (Bujnicki Aff., ¶ 29), were not leered at in a sexual manner (Bujnicki Aff., ¶ 28; Bujnicki Dep., pp. 182-183), were not denied the opportunity to take breaks (Bujnicki Aff.. ¶¶ 24-27, 45, 47; Dennis Dep., p. 32; Moore Dep., p. 40), and were not made to perform jobs that they were not hired to perform. As such, this Court finds that a reasonable jury could determine that Defendants' treatment of Plaintiff occurred under circumstances giving rise to an inference of unlawful discrimination.

> FN10. Excerpts of the Deposition of Michael Jantzi are provided as Plaintiff's Exhibit Y.

> FN11. Excerpts of the Deposition of Carl Dirschedl are provided as Plaintiff's Exhibit O.

2. Legitimate, Non-Discriminatory Reason

Having found the existence of proof that could support a *prima facie* case, this Court next examines whether Defendants have set forth a legitimate, non-discriminatory reason for their actions. *See Burdine,* 450 U.S. at 254. In this regard, this Court is mindful that Defendants are not required to prove that their articulated reason actually motivated their conduct. *See id.* Rather, Defendants must only state a "clear and specific" reason for their action. *Mandell v. County of Suffolk,* 316 F.3d 368, 381 (2d Cir.2003).

Defendants contend that Plaintiff's job assignment was consistent with American's common practice of assigning laborers to different jobs on a daily basis, based on the laborer's experience level and the needs of the job on the particular day. (Defendants' Statement, ¶ 33; Berberich Aff., ¶ 6.) Again, however, this only serves as a legitimate, non-discriminatory reason if the finder of fact determines that Plaintiff was hired as a laborer. If the jury determines that Plaintiff was hired as a flagperson, then the way in which American assigned laborers work would not justify Defendants' treatment of Plaintiff as it pertains to work assignments. In addition, the way in which job duties are assigned has no nexus to and does not serve as a legitimate reason for Plaintiff's other complaints of personal mistreatment. Thus, whether Defendants' have set forth a legitimate, non-discriminatory reason for their action turns on disputed issues of material fact, and resolution on summary judgment is therefore not possible.

3. Evidence of Pretext

**8** Defendants argue that even if it is found that Plaintiff established a *prima facie* case of disparate treatment and that Defendant articulated a non-discriminatory reason, Plaintiff nonetheless cannot carry her burden of establishing that Defendants' articulated reason is merely a pretext. In this regard, Defendants' simply argue that there is no evidence that Plaintiff's job assignment was motivated by discriminatory animus. This Court, however, views the record differently, and finds that evidence exists from which a jury could draw a reasonable inference of pretext, and ultimately, discrimination. *See Meiri v. Dacon,* 759 F.2d at 997 (summary judgment at the pretext stage is appropriate only when there is "no indication that any evidence exists that would permit the trier of fact to draw a reasonable inference of pretext")

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Defendants' Motion for Summary Judgment on Plaintiff's disparate treatment claims is therefore denied.

### D. Plaintiff's Hostile Work Environment Claims

The Supreme Court has held that Title VII's protection extends beyond "economic" or "tangible" discrimination. *Harris v. Forklift Sys.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (citing *Meritor Savings Bank, FSV v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) ). Rather, Congress enacted Title VII to "strike at the entire spectrum of disparate treatment of men and women in employment," including the requirement that employees work in a hostile or abusive environment. *Harris,* 510 U.S. at 21.

To survive a motion for summary judgment, a plaintiff claiming that she was the victim of a hostile work environment must produce evidence from which a reasonable trier of fact could conclude "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Mack v. Otis Elevator Co.,* 326 F.3d 116, 122 (2d Cir.2003) (quoting *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 436 (2d Cir.1999)). "The sufficiency of a hostile work environment claim is subject to both subjective and objective measurement: the plaintiff must demonstrate that she personally considered the environment hostile, and that the environment rose to some objective level of hostility." *Leibovitz v. New York City Transit Auth.,* 252 F.3d 179, 188 (2d Cir.2001).

Defendants argue that they are entitled to summary judgment because the evidence in the record cannot support a finding on either of the two prongs cited above.

1. Severity of Discriminatory Intimidation in the Workplace

Courts examine various factors to ascertain whether a work environment is sufficiently hostile or abusive to support a Title VII claim. These factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's performance." *Leibovitz,* 252 F.3d at 188 (citing *Harris,* 510 U.S. at 23); *Terry,* 336 F.3d at 147-48. Isolated and occasional instances of harassment do not ordinarily rise to this level. *See Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 270-271, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam). The appropriate test is whether the "harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse...." *Torres v. Pisano,* 116 F.3d 625, 632 (2d Cir.1997). The Second Circuit has recently stated:

> *9 The environment need not be unendurable or intolerable. Nor must the victim's psychological well-being be damaged. In short, the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases."

*Terry,* 336 F.3d at 147-48 (quotations, citation and alterations omitted).

This Court finds that there is sufficient evidence in the record from which a reasonable jury could find that Plaintiff was subjected to severe and pervasive discriminatory conduct that altered her work environment. The evidence supports such a finding on both the subjective and objective prongs. *Leibovitz,* 252 F.3d at 188.

During the course of Plaintiff's first week of work, Defendant Jantzi began treating her in a manner that she found objectionable. (Bujnicki Aff., ¶ 18.) Defendant Jantzi began calling Plaintiff "Dharma," a reference to the lead character on the television show "Dharma and Gregg." (Bujnicki Aff., ¶ 17; Jantzi Dep., p. 60.) Plaintiff was unfamiliar with the "Dharma" character, but took offense to the reference after watching the show and determining that "Dharma" was portrayed as a "stupid, dumb and flighty" woman. (Bujnicki Aff., ¶ 18.) Plaintiff told Defendant Jantzi that she did not like being called "Dharma" and that he should stop calling her by that name. (Bujnicki Aff., ¶ 18.) Defendant Jantzi allegedly responded that he had chosen that name for Plaintiff, and he continued to refer to Plaintiff as "Dharma" on a daily basis anywhere from 10-20 times a day. (Bujnicki Aff., ¶ 18.) Moreover, because Defendant Jantzi referred to Plaintiff as "Dharma," members of the crew began to do the same. (Bujnicki Aff., ¶ 19; Clark Dep., pp. 48-49.)

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Defendants argue that Defendant Jantzi also referred to male members of the crew by names other than their own. However, there is evidence that in those cases, the individuals either had nicknames, or did not object to the name that Defendant Jantzi called them. (Bujnicki Aff., ¶ 20; Jantzi Dep., p. 212.) For example, Mike Beavers was called "Beaves," Wilbur Raps was called "Billy," and Thomas Hallett was called "T." (Jantzi Dep., pp. 212-213; Bujnicki Aff., ¶ 20.) Further, there is evidence in the record that Defendant Jantzi at one time referred to a male employee, Carl Dirschedl, as "Spanky," but that Defendant Jantzi stopped using this name after Dirschedl objected. (Jantzi Dep., p. 219; Dirschedl Dep., pp. 113-114.) Plaintiff claims that Defendant Jantzi did not stop calling her "Dharma," even when she complained about it. (Bujnicki Aff., ¶ 18.) Continued use of a name that an individual finds objectionable is not "a nickname." It is an insult.

In addition to calling Plaintiff "Dharma," Plaintiff alleges that Defendant Jantzi referred to her as "stupid" and "dumb blonde," and told her that she "shoveled like a woman" and that if she wanted to earn a man's wage she needed to work a man's job. (Bujnicki Aff., ¶ 21.) Defendant Jantzi also screamed at Plaintiff only inches from her face. (Bujnicki Aff., ¶ 21). While Plaintiff admits that the work atmosphere was loud, especially when the paver was in use, she states that her co-employees were able to speak to her without approaching so closely or screaming at her. (Bujnicki Aff., ¶ 21.) Defendant Jantzi communicated with Plaintiff only by screaming at her. (Bujnicki Aff., ¶ 21.)

*10 There is also evidence in the record to suggest that Plaintiff was used by Defendant Jantzi as a source for entertaining the crew. (Bujnicki Aff., ¶ 22.) For example, on one particular day Plaintiff was informed that Defendant Jantzi wanted to speak to her by the truck. (Bujnicki Aff., ¶ 22.) When she approached, Defendant Jantzi, who had been hiding at the side of the truck, appeared and threw water in her face. (Bujnicki Aff., ¶ 22.) Defendant Jantzi did this to Plaintiff on three separate occasions that day. (Bujnicki Aff., ¶ 22.) When Plaintiff eventually threw water back at Defendant Jantzi, he ordered her to break asphalt with a pickax. (Bujnicki Aff., ¶ 22.)

On another occasion, Defendant Jantzi instructed another crew member to demonstrate to Plaintiff how to "throw the shovel" and "spread the shovel," two techniques for spreading asphalt. (Bujnicki Aff., ¶ 23.) Instead of demonstrating the proper techniques, the employee first threw the shovel in the air to demonstrate "throwing the shovel," and then spun the shovel in the air and let it fall to the ground to demonstrate "spreading the shovel." (Bujnicki Aff., ¶ 23.) Both men then laughed at Plaintiff and refused to train her on the proper techniques. (Bujnicki Aff., ¶ 23.)

On yet another occasion, Defendant Jantzi instructed Plaintiff to "mark the road" for the trucks that would be arriving to dump asphalt until he told her to stop. (Bujnicki Aff., ¶ 24.) Plaintiff adhered to Defendant Jantzi's instructions and began marking the road with paint. (Bujnicki Aff., ¶ 24.) Defendant Jantzi never told Plaintiff to stop. (Bujnicki Aff., ¶ 24.) Consequently, Plaintiff "marked the road" far beyond what was necessary, and when she turned to look for Defendant Jantzi, he and other employees were gathered and "laughing hysterically" at her. (Bujnicki Aff., ¶ 24.)

In addition, Defendant Jantzi made Plaintiff get the crew coffee in the mornings. (Bujnicki Aff., ¶ 29.) While this was not a particularly difficult or time-consuming job, no male members of the crew were required to get coffee in the morning, a time when going to get coffee would not serve as a break from work. (Bujnicki Aff., ¶ 29.) Moreover, Defendant Jantzi refused to reimburse Plaintiff for the money she spent on his coffee. (Bujnicki Aff., ¶ 29.)

Further, there is evidence in the record supporting Plaintiff's claim that she was treated differently by Defendant Jantzi with respect to taking breaks from work. (Dennis Dep., p. 32; Moore Dep., p. 40.) The nature of American's business is such that breaks are not regularly scheduled. (Defendants' Statement, ¶ 13; Berberich Aff, ¶ 8.) Therefore, the crew takes breaks and lunch during the down time between truckloads of asphalt and during the 30-60 minutes it takes to turn the paving machine around from one side of the street to the other. (Defendants' Statement, ¶ 13; Berberich Aff., ¶ 8; Bujnicki Aff., ¶ 25.) However, even during this down time, Defendant Jantzi refused to let Plaintiff take a break, and instead, found other tasks for her to do, such as marking roads and cleaning the paving machine. (Bujnicki Aff., ¶¶ 24-26.) On Plaintiff's final day of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                    **Page 146**
(Cite as: 2004 WL 1071674, *10 (W.D.N.Y.))

work, Defendant Jantzi assigned her the most difficult job available, and never let her take a break the entire day. (Bujnicki Aff., ¶¶ 27, 45, 47.)

*11 Moreover, there is sufficient information from which a reasonable jury could find that the treatment that Plaintiff was subjected to was sex or gender-based. Plaintiff was called "dumb blonde" and "Dharma" in reference to a "stupid, dumb and flighty" female television character. (Bujnicki Aff., ¶ 18.) She was also told that she needed to do a man's work to earn a man's wage. (Bujnicki Aff., ¶ 21.) Plaintiff also states that at least three times during her employment with American, Defendant Jantzi leered at her, and "checked her out from head to toe." (Bujnicki Aff., ¶ 28; Bujnicki Dep., pp. 182-183.) She also alleges that while Defendant Jantzi and another male employee were watching her clean the paving machine, Defendant Jantzi told the other male employee that "I just love to talk to her, look at her eyes, she's got the most beautiful eyes I've ever seen." (Bujnicki Aff., ¶ 46.)

This Court notes that Defendants' vehemently deny these allegations. However, these incidents viewed in their totality (if found by a jury to have occurred), are sufficiently pervasive, severe, and frequent, to support a finding that Plaintiff's workplace was altered for the worse. *See Torres,* 116 F.3d at 632; *Leibovitz,* 252 F.3d at 188. These were not merely isolated or occasional instances of harassment. *Cf. Breeden,* 532 U.S. at 270-271. Based on the existence of the above evidence in the record, this Court finds that a reasonable jury could conclude that Plaintiff's workplace, both objectively and subjectively, "was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment," *Mack,* 326 F.3d at 122, and that the discriminatory intimidation was due to Plaintiff's gender. Accordingly, summary judgment on this basis is not warranted.

2. Imputation of Conduct to the Employer

Because the alleged conduct at issue in this case relates to Plaintiff's treatment by her supervisor, Defendant Jantzi, American may be in a position to assert an affirmative defense to liability. In the normal course, an employer is subject to vicarious liability to a victimized employee for a hostile work environment created by a supervisor with immediate

authority (or successively higher) over the employee. *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 2292-93, 141 L.Ed.2d 662 (1998). However, in those cases where no tangible employment action is taken, the Supreme Court has recognized the existence of an affirmative defense for the employer. *See id.* at 807. A tangible action is defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Burlington Indus. v. Ellereth,* 524 U.S. 742, 76, 118 S.Ct. 2257, 141 L.Ed.2d 663 (1998).

There are two elements to the affirmative defense. First, the employer must show that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior." *Faragher,* 524 U.S. at 807. In meeting this burden, the Second Circuit has noted that

> *12 An employer need not prove success in preventing harassing behavior in order to demonstrate that it exercised reasonable care in preventing and correcting sexually harassing conduct. Although not necessarily dispositive, the existence of an anti-harassment policy with complaint procedures is an important consideration in determining whether the employer has satisfied the first prong of this defense.

*Caridad v. Metro-North Commuter R.R.,* 191 F.3d 283, 295 (2d Cir.1999).

Second, the employer must demonstrate that the employee "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher,* 524 U.S. at 807.

This Court finds that summary judgment on this ground would be inappropriate. First, whether Plaintiff suffered a "tangible employment action" is an inquiry that is similar to whether Plaintiff suffered an "adverse employment action" for purposes of her Title VII claims. As noted, that issue cannot be resolved on summary judgment. Second, even if it is assumed that Plaintiff did not suffer a "tangible employment action," there is competing evidence in the record regarding whether Plaintiff complained to Defendant Jantzi (Defendant's Statement, ¶ 30; Plaintiff's Counterstatement, ¶ 30), whether Defendant Berberich knew of the manner in which Plaintiff was

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

being treated (Defendant's Statement, ¶ 25; Plaintiff's Counterstatement, ¶ 35), whether Plaintiff received American's handbook containing its discrimination policies and procedures (Defendant's Statement, ¶ 31, Plaintiff's Counterstatement, ¶ 31), whether American properly disseminated and posted its discrimination policy at the work place (Plaintiff's Counterstatement, ¶ 31), whether Plaintiff complied with the policy (Defendant's Statement, ¶ 35; Plaintiff's Counterstatement, ¶ 35). All of these issues must be resolved by the trier of fact before it can be determined whether American can successfully assert this affirmative defense.

Accordingly, Defendants' motion seeking summary judgment on Plaintiff's hostile work environment claims is denied.

E. Plaintiff's Retaliation Claims

Title VII makes it unlawful for employers to retaliate against employees who participate in protected activities, such as challenging discriminatory practices or actions. 42 U.S.C. § 2000e-3(a); *Sanders v. New York City Human Res. Admin.,* No. 02-7624, 2004 WL 504603, at *3 (2d Cir. Mar.16, 2004). To establish a *prima facie* case of retaliation, Plaintiff must show that (1) she participated in a protected activity, (2) her participation was known to the defendant, (3) she suffered an adverse employment action, and (4) a causal connection exists between the protected activity and the adverse employment action. *Richardson,* 180 F.3d at 443; *Jones v. Smithkline Beecham Corp.,* No. 02-CV-1428, 2004 WL 569267, at *11 (N.D.N.Y. Mar.17, 2004).

Similar to its argument regarding Plaintiff's disparate treatment claim discussed at length above, Defendants argue that there is no evidence in the record from which a reasonable trier of fact could conclude that Plaintiff has set forth a *prima facie* case of retaliation. In particular, Defendants argue that there is insufficient evidence that Plaintiff complained to Defendants that her treatment was discriminatory and in violation of Title VII. Consequently, Defendants argue that Plaintiff cannot demonstrate that she engaged in a protected activity that was known to Defendants.

*13 It must be remembered that at the summary judgment stage, the function of the court is not "to weigh the evidence and determine the truth of the

matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249. It must also be remembered that as the non-moving party, all inferences are drawn in Plaintiff's favor. *Addickes,* 398 U.S. at 158-59. As noted throughout this decision, there are myriad factual issues that must be left for the jury to decide. Contrary to Defendants' argument, this Court finds that there is evidence in the record from which a jury could conclude that Plaintiff complained to Defendants about discriminatory conduct, and that Defendants understood or reasonably should have understood that Plaintiff's complaints were directed at conduct prohibited by law. *See Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.,* 136 F.3d 276, 292 (2d Cir.1998) ("implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII").

Plaintiff has stated that she complained to Defendant Jantzi about not being able to flag as she was hired to do (Bujnicki Aff., ¶ 34), complained about being called "Dharma," which she did not consider a nickname (Bujnicki Aff., ¶ 18), complained about having to pay for Defendant Jantzi's coffee (Bujnicki Aff., ¶ 31), complained about having water thrown in her face (Bujnicki Aff., ¶ 22), and rejected Defendant Jantzi's sexual advances toward her (Bujnicki Aff., ¶ 28). Plaintiff further asserts that her mistreatment escalated after she made these complaints. (Bujnicki Aff., ¶ 31.) For example, after Defendant Jantzi threw water in Plaintiff's face for a third time, Plaintiff complained and reciprocated by throwing water back at Defendant Jantzi. (Bujnicki Aff., ¶ 22.) As a consequence, Defendant Jantzi immediately ordered Plaintiff to pickax asphalt. (Bujnicki Aff., ¶ 22.) For these reasons, and those already discussed in this decision, this Court finds that there is evidence in the record from which a jury could conclude that Defendants' treatment of Plaintiff was gender-based, and that Plaintiff complained that she was being treated differently because she was a woman.

On the remaining elements of the *prima facie* test, this Court has already found that material issues of fact exist as to whether Plaintiff suffered an adverse job action. In addition, Plaintiff's testimony in the record that her mistreatment escalated after she

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

made complaints to Defendant Jantzi could support a finding that a causal connection exists between the protected activity and the adverse employment action. [FN12] See Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir.1990) (the causal connection requirement "can be established indirectly with circumstantial evidence, for example, by showing that the protected activity was followed by discriminatory treatment").

> FN12. This Court further notes that as a general matter, the record is poorly developed regarding the timing of events occurring in this case. There are no specific dates or order ascribed to the conduct that forms the basis of the Complaint. This uncertainty makes it difficult to definitively determine whether the conduct Plaintiff was subjected to increased in intensity due to her complaints, and is yet another reason that summary judgment is inappropriate.

*14 On the remaining factors of the applicable McDonnell-Douglas burden shifting analysis, this Court has already found that whether Defendants' proffered non-discriminatory reason for its actions is legitimate (i.e., that Plaintiff's job assignment was consistent with American's common practice of assigning laborers) turns on a disputed issue of material fact. Finally, this Court has also previously found that evidence in the record exists from which a reasonable fact-finder could conclude that Defendants' proffered non- discriminatory reason was simply a pretext for unlawful discrimination.

Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's retaliation claims is denied.

F. Plaintiff's Intentional Infliction of Emotional Distress Claim

To succeed on a claim of intentional infliction of emotional distress, a plaintiff must prove the following elements:
(1) Extreme and outrageous conduct;
(2) Intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress;
(3) A causal connection between the conduct and injury; and
(4) Severe emotional distress.
Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir.1999), citing Howell v. New York Post Co., Inc., 612 N.E.2d 699, 702, 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 353 (1993); see also Walker v.

New York City Transit Auth., No. 99 CIV. 3337(DC), 2001 WL 1098022 (S.D.N.Y. Sept.19, 2001). Liability can be found only where the conduct alleged is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." Howell, 81 N.Y.2d at 122, 596 N.Y.S.2d 350, 612 N.E.2d 699; see also Murphy v. Am. Home Products Corp., 448 N.E.2d 86, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 236 (1983).

In proving the fourth element-severe emotional distress-the plaintiff must support her contention with "medical evidence, not just the mere recitation of speculative claims." Walentas v. Johnes, 257 A.D.2d 352, 683 N.Y.S.2d 56, 58 (N.Y.App.Div.1999). The evidence must show that the plaintiff suffered severe psychological damage. Richard L. v. Armon, 144 A.D.2d 1, 536 N.Y.S.2d 1014, 1016 (N.Y.App.Div.1989). Here, this Court finds that Defendants are entitled to summary judgment on this claim because there is no evidence from which a reasonable finder of fact could conclude that Plaintiff suffered severe emotional distress. See Anderson, 477 U.S. at 249 ("There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.").

Plaintiff has come forward with no objective medical evidence to support her claim that she suffered any severe emotional distress. Plaintiff's opposition to Defendants' motion consists entirely of her own allegations that she was depressed, gained weight, lost energy and grew conscious about her surgical scar. (Bujnicki Aff., ¶ 59.) Plaintiff's subjective complaints of extreme emotional distress, however, are not enough. Walentas, 683 N.Y.S.2d at 58.

*15 Plaintiff's physician, Michael J. Michotek, M.D., is treating Plaintiff for depression, and has prescribed her medication for this condition. (Bujnicki Aff. ¶ 60; Michotek Dep., pp. 24-25. [FN13]) Dr. Michotek's opinions and findings regarding the cause of Plaintiff's depression, however, do not support a finding that Plaintiff at any time suffered from severe emotional distress: "My opinion was that [Plaintiff] is a very sensitive person who was overtaxed by the injury, the ensuing compensation, upcoming legal concerns, lack of income for her family, problems with her

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

marriage." (Michotek Dep., p. 29.)

> FN13. Excerpts of the deposition of Michael J. Michotek, M.D. are provided as Exhibit O of the Joseph Affidavit.

Moreover, it is undisputed that Plaintiff saw a psychiatrist, Dr. Andrew Reichert, on only one occasion. (Bujnicki Aff., ¶ 61; Reichert Dep., p. 7. [FN14]) Plaintiff failed to attend subsequent appointments, apparently due to her inability to pay Dr. Reichert. (Bujnicki Aff., ¶ 61; Reichert Dep., p. 7.) In any event, Dr. Reichert found no evidence that Plaintiff suffered from any cognitive defects. (Reichert Dep., p. 29.) He detected no deficits in Plaintiff's "attention, concentration, short-term memory, long-term memory, abstraction, calculating ability, [or] language functions." (Reichert Dep., p. 29.) Dr. Reichert testified at his deposition that Plaintiff had no deficits "substantial enough to cause her some type of functional impairment or substantial distress ." (Reichert Dep., p. 29.)

> FN14. Excerpts of the deposition of Andrew R. Reichert, M.D. are provided as Exhibit P of the Joseph Affidavit.

Nothing in the record supports Plaintiff's claim regarding the severity of her condition. As such, this Court finds that no reasonable jury could consider the evidence presented and conclude that Plaintiff suffered any severe emotional distress. *See Howell v. New Haven Bd. of Ed.,* No. 3:02CV736, 2004 WL 546829, at *2 (D.Conn. Mar.15, 2004) (" "In order to defeat summary judgment, the non- moving party must come forward with evidence that would be sufficient to support a jury verdict in his or her favor.") Defendants' Motion for Summary Judgment on this claim is therefore granted. *See Richard L.,*

536 N.Y.S.2d at 1016 (proof of severe emotional distress is required for liability, not just damages); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (moving party is entitled to judgment as a matter of law if the nonmoving party fails to make a sufficient showing on an essential element of the case on which it has the burden of proof).

## IV. CONCLUSION

"When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury." *Hoyt v. Dep't of Children and Families,* No. CIV.A.3: 02-CV-1758, 2004 WL 551240, at *4 (D.Conn. Mar.18, 2004) (citing *Sologub v. City of New York,* 202 F.3d 175, 178 (2d Cir.2000). Genuine issues of material fact abound in this litigation and they require resolution by the jury, not this Court. *See Anderson,* 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.") Summary judgment is therefore inappropriate on the majority of Plaintiff's claims. However, Defendants' motion seeking such relief on Plaintiff's intentional infliction of emotional distress claim is granted. In all other respects, Defendants' motion is denied.

## V. ORDER

*16 IT HEREBY IS ORDERED, that Defendants' Motion for Summary Judgment (Docket No. 111) is DENIED in part and GRANTED in part.

2004 WL 1071674 (W.D.N.Y.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
16 Fla. L. Weekly Fed. D 635
(Cite as: 2003 WL 22350943 (M.D.Fla.))

Page 108

United States District Court,
M.D. Florida.

Diane B. FLAGG, Plaintiff,
v.
COLLIER COUNTY, FLORIDA, a political
subdivision of the State of Florida,
Defendant.

No. 2:02CV274FTM29DNF.

Filed June 13, 2002.
Aug. 15, 2003.

Robert E. Weisberg, Kimberly A. McCoy, Law
Offices of Robert E. Weisberg, Coral Gables, FL,
Josephine Gagliardi, Law Office of Josephine
Gagliardi, Fort Myers, FL, for Diane B. Flagg,
plaintiff.

Mark E. Levitt, Allen, Norton & Blue, P.A.,
Tampa, FL, for Collier County, a political
subdivision of the State of Florida, defendant.

*ORDER*

STEELE, J.

**\*1** This matter comes before the Court on
Defendant's Case-Dispositive Motion for Summary
Judgment and accompanying Memorandum of Law
(Docs.# 35, # 36) filed on June 9, 2003. Plaintiff
filed a Response and Memorandum of Law in
Opposition (Docs.# 49, # 50) on June 30, 2003.
Both parties have filed numerous exhibits in support
of their respective positions (Docs.# 37-45, # 51-
56). In addition, the defendant has filed a Motion
Requesting Oral Argument (Doc. # 59) and the
Plaintiff has filed a Response (Doc. # 60).

Plaintiff's Amended Complaint (Doc. # 21) sets
forth claims against her employer for sex
discrimination under Title VII of the Civil Rights
Act of 1964, 42 U.S.C. § 2000e *ei seq.* (Title VII)
and the Florida Civil Rights Act, Fla. Stat. § 760.01
*et seq.* (FCRA) and to enforce her rights under the
Equal Protection Clause of the Fourteenth
Amendment to the United States Constitution, as
secured by 42 U.S.C. § 1983 (§ 1983). Defendant
seeks summary judgment as to all counts in the
Complaint.

I.

Summary judgment is appropriate only when the
Court is satisfied that "there is no genuine issue as
to any material fact and that the moving party is
entitled to judgment as a matter of law."
Fed.R.Civ.P. 56(c). An issue is "genuine" if there is
sufficient evidence such that a reasonable jury could
return a verdict for either party. *Anderson v. Liberty
Lobby, Inc.,* 477 U.S. 242, 248 (1986). A fact is
"material" if it may affect the outcome of the suit
under governing law. *Id.* The moving party bears
the burden of identifying those portions of the
pleadings, depositions, answers to interrogatories,
admissions, and/or affidavits which it believes
demonstrate the absence of a genuine issue of
material fact. *Celotex Corp. v. Catrett,* 477 U.S.
317, 323 (1986); *Rice-Lamar v. City of Ft.
Lauderdale, Fla.,* 232 F.3d 836, 840 (11th
Cir.2000), *cert. denied,* 534 U.S. 815 (2001). In
order to avoid the entry of summary judgment, a
party faced with a properly supported summary
judgment motion must come forward with extrinsic
evidence, i .e., affidavits, depositions, answers to
interrogatories, and/or admissions, which are
sufficient to establish the existence of the essential
elements to that party's case, and the elements on
which that party will bear the burden of proof at
trial. *Celotex Corp.,* 477 U.S. at 322; *Hilburn v.
Murata Elecs. N. Am., Inc.,* 181 F.3d 1220, 1225
(11th Cir.1999).

In ruling on a motion for summary judgment, the
Court is required to consider the evidence in the
light most favorable to the nonmoving party.
*Johnson v. Booker T. Washington Broad. Serv., Inc
.,* 234 F.3d 501, 507 (11th Cir.2000) *Jaques v.
Kendrick,* 43 F .3d 628, 630 (11th Cir.1995). The
Court does not weigh conflicting evidence or make
credibility determinations. *Hilburn,* 181 F.3d at
1225. "If the record presents factual issues, the
court must not decide them; it must deny the motion
and proceed to trial." *Tullius v. Albright,* 240 F.3d
1317, 1320 (11th Cir.2001), quoting *Clemons v.
Dougherty County,* 684 F.2d 1365, 1369 (11th
Cir.1982).

II.

**\*2** Plaintiff Diane B. Flagg (plaintiff or Flagg) has
been employed since 1981 by defendant Collier
County (defendant or County) in various positions in

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2003 WL 22350943, *3 (M.D.Fla.))

anyone who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The Eleventh Circuit has recognized that discrimination claims supported by circumstantial evidence under Title VII and § 1983 are to be construed by the framework set out by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). [FN2] *Koch v. Rugg*, 221 F.3d 1283, 1297 n. 31 (11th Cir.2000); *Harris v. Shelby County Bd. of Educ.*, 99 F.3d 1078, 1082-83 (11th Cir.1996).

> FN2. The Florida Civil Rights Act is modeled after Title VII, *Joshua v. City of Gainesville*, 768 So.2d 432, 435 (Fla.2000), and decisions construing Title VII are applicable to claims under the Florida Civil Rights Act. *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1387 (11th Cir.1998).

Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802; *Lubetsky v. Applied Card Sys., Inc.*, 296 F.3d 1301, 1305 (11th Cir.2002). To establish a prima facie case, a plaintiff must prove that: (1) she is a member of a protected minority; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside her classification more favorably; and (4) she was qualified to do the job. *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir.2003). By establishing a prima facie case, the plaintiff creates a rebuttable presumption that the challenged action was motivated by a discriminatory intent. *Equal Employment Opportunity Comm'n v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir.2002); *see also Burdine*, 450 U.S. at 254.

The burden then shifts to the defendant to produce a "legitimate, nondiscriminatory reason" for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802; *Lubetsky*, 296 F.3d at 1305. If the defendant articulates one or more such reasons, the presumption of discrimination is rebutted and the burden shifts back to the plaintiff to prove that the reasons offered by the defendant are a pretext for unlawful discrimination. *McDonnell Douglas*, 411 U.S. at 805; *Lubetsky*, 296 F.3d at 1305; *Chapman v. Al Transport*, 229 F.3d 1012, 1024 (11th Cir.2000). "Although the intermediate burdens of production shift back and forth, the ultimate burden

of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the plaintiff." *Joe's Stone Crabs*, 296 F.3d at 1273.

## IV.

*4 Flagg relies on the following actions by the County in support of her allegations of discrimination: (i) the County's failure to select her in 1998 and again in 2000 for the Administrator position (Counts VI and VII); (ii) the County's decision in 2001 to reorganize the EMS Department and change her position and responsibilities (Counts I, II, and III); and (iii) the County's removal of Flagg from the EMS Department in 2002 and her subsequent transfer to the Transportation Department (Count IX). [FN3] The Court will consider each of these actions in turn.

> FN3. The Court previously granted plaintiff's Unopposed Motion to Voluntarily Dismiss With Prejudice her Claims for Relief Which Allege Retaliation (Counts IV & V) and the Denial of an Interim Appointment to the Emergency Services Administrator Position in 2002 (Count VIII) on July 17, 2003. (Doc. # 58).

### A.
### 1.

As an initial matter, defendant contends that it cannot be held liable under § 1983 for then-County Manager Fernandez's decision not to select Flagg for the Administrator's position in 1998 because Fernandez was not the final policymaker with respect to making promotional decisions regarding administrator level positions. (Doc. # 36, pp. 15-17). Under § 1983, governmental entities may not be held liable under a theory of *respondeat superior*, but instead may only be held liable for the execution of a governmental policy or custom. *Quinn v. Monroe County*, 330 F.3d 1320, 1325 (11th Cir.2003), citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). "Municipal liability may arise with regards to an employment decision ... provided that the decisionmaker 'possesses *final authority* to establish *municipal policy* with respect to the action ordered.' ' *Quinn*, 330 F.3d at 1325, quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) (majority opinion) (emphasis original). The Eleventh Circuit has interpreted *Monell's* policy or custom requirement to mean that

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2003 WL 22350943, *4 (M.D.Fla.))

"[f]inal policymaking authority over a particular subject area does not vest in an official whose decisions in the area are subject to meaningful administrative review." *Scala v. City of Winter Park,* 116 F.3d 1396, 1401 (11th Cir.1997).

It is undisputed that pursuant to Collier County Ordinance No. 93-72, as amended by County Ordinance No. 95-49 (Doc. # 52, Ex. 46), the County Manager is the only individual with legal authority to select individuals for Board confirmation as Division Administrators and that the Board of County Commissioners may vote only on candidates that are selected by the County Manager. Thus, there is no dispute that Fernandez had final and nonreviewable policymaking authority with respect to the selection of candidates for appointment to the Administrator position. As a result, when Fernandez decided not to select Flagg for the Board's consideration, he was the final policymaker and his action is properly considered that of the County. [FN4] *See Purdy v. Town of Greenburgh,* 178 F.Supp.2d 439, 444-45 (S.D.N.Y.2002) (holding that sheriff, who had "final and incontestable" authority to make recommendations to Board was final policymaker under § 1983 with respect to those recommendations).

FN4. *This analysis applies equally to then-County Manager Olliff's decision to select Storrar for the Administrator position in 2000.*

2.

Defendant next argues that Flagg cannot establish a prima facie case of sex discrimination under the *McDonnell Douglas* framework outlined above because after the Board decided not to confirm Cook, the position remained open and, thus, Flagg cannot show that a male employee received the position in 1998. [FN5] (Doc. # 36, p. 17). Defendant misstates this requirement of plaintiff's prima facie case. In a failure-to-hire case, the plaintiff must establish, inter alia, that the position for which she applied was filled by another person outside of her protected class *or* that the position remained open. *Joe's Stone Crabs, Inc.,* 296 F.3d at 1273, citing *Schoenfeld v. Babbitt,* 168 F.3d 1257, 1267 (11th Cir.1999). It is undisputed that after the Board decided not to confirm Cook the position remained open. Thus, the plaintiff is able to establish this element of her prima facie case.

FN5. The defendant alternatively characterizes this as a failure to show that an adverse employment action occurred.

3.

**\*5** Finally, the defendant contends that it has offered legitimate, non- discriminatory business reasons for its decision not to select Flagg for the Administrator position in 1998 and 2000 and that Flagg cannot show that these reasons are pretextual. [FN6] Specifically, the defendant contends that Fernandez selected Cook rather than Flagg in 1998 for the Administrator position because (i) Cook was more qualified because he had a Master's Degree and experience with fire departments and emergency services, (ii) Cook was an external candidate, a trait Fernandez believed would be "a better fit" for the position, and (iii) Fernandez was concerned about "tensions" between certain fire districts in Collier County and the EMS Department, which Fernandez attributed at least in part to Flagg. (Doc. # 36, pp. 3, 19).

FN6. As discussed above, Flagg did not apply for the Administrator position in 2000 after being asked not to by then-County Manager Olliff. The defendant has assumed for purposes of its motion that Flagg would have applied and would not have been selected by Olliff for this position in 2000. In light of this, the Court will assume likewise.

Similarly, the defendant contends that Olliff selected Storrar rather than Flagg in 2000 for the Administrator position because (i) Storrar was more qualified because he had 25 years of experience as a law enforcement officer with the Collier County Sheriff's Office and detailed experience with emergency management, (ii) Olliff had similar concerns about the tensions between certain fire districts and the EMS Department, and (iii) this was Olliff's first appointment decision and he was concerned that Flagg might not be confirmed unanimously by the Board. (Doc. # 36, pp. 4-5, 19-20). The Court concludes that the County has met its burden of producing legitimate, nondiscriminatory reasons for its decisions. Thus, the relevant question is whether the plaintiff has met her burden of showing that these reasons are a pretext for unlawful discrimination.

"A plaintiff may show pretext and survive summary judgment by 'presenting evidence sufficient to

demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, nondiscriminatory reasons." ' *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1269 (11th Cir.1999), quoting *Evans v. McClain of Ga.*, 131 F.3d 957, 965 (11th Cir.1997). The Eleventh Circuit has explained that at this point in the inquiry, "[t]he district court must evaluate whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." ' *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1258 (11th Cir.2001), quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir.1997). The Eleventh Circuit has instructed further that, consistent with the summary judgment standard, the court "must avoid weighing conflicting evidence or making credibility determinations" and that "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir.1999) (internal quotation omitted).

*6 Flagg contends that the County's reasons for its decisions in 1998 and 2000 are pretextual because, inter alia, the County employed "shifting" qualifications in considering candidates in 1998 and 2000. Specifically, the County selected Cook in 1998, even though he lacked day-to-day experience in operating an EMS service, because he had a Master's Degree and was an external candidate who could work with the local fire departments. The County then selected Storrar in 2000, even though he lacked an advanced degree, because he had emergency management experience and was a local Collier County insider who could work with the local fire departments. Flagg also contends that the County violated its own policy of affording preference to internal candidates first by selecting an external candidate in 1998 and then by treating Storrar as an internal candidate in 2000 even though he was not.

Flagg further contends that the County's reasons are pretextual because there was no contemporaneous documentation of any deficiencies related to the alleged "tensions" with local fire departments in Flagg's performance reviews, and, in any event, these "tensions" pre-dated Flagg's tenure as the EMS Director and persist to date. Flagg also contends that to the extent that the County failed to

select Flagg because of Commission opposition based on her sex, its actions were impermissible and pretextual. [FN7] (Doc. # 49, pp. 16-21).

> FN7. Specifically, Flagg relies on evidence in the record that Fernandez did not select Flagg based, in part, on Commissioner John Norris' opinions about Flagg. (Doc. # 54, Ex. 4, Fernandez Depo., pp. 31-33, 44- 45). Flagg points to evidence in the record that Commissioner Norris had told others that he "didn't think women belonged in high positions in government." (*Id.*, Ex. 2, Biles Depo., pp. 56, 58). Flagg also relies generally on the fact that the County has never had a woman serve as an Administrator in a public safety position and on remarks allegedly made by certain fire chiefs that demonstrate bias towards her based on sex. (Doc. # 49, pp. 27-28).

The Court concludes that Flagg has met her burden of showing pretext. *Schoenfeld*, 168 F.3d at 1269. Flagg has presented evidence sufficient to demonstrate a genuine issue of material fact as to the truth of the County's proffered reasons for not selecting her for the Administrator position in 1998 and 2000. *See, e.g., Wascura v. City of South Miami*, 257 F.3d 1238, 1245 (11th Cir.2001) (lack of complaints or disciplinary reports in employee's personnel file may support finding of pretext); *Bass v. Board of County Comm'r*, 256 F.3d 1095, 1108 (11th Cir.2001) (employer's violation of normal hiring procedure may be evidence of pretext); *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 644 (11th Cir.1998) (stating that "it is even more suspicious where it is alleged that established rules were bent or broken to give a non-minority applicant an edge in the hiring process").

## B.

Defendant does not dispute that Flagg can establish a prima face of discrimination with respect to the County's decision to reorganize the EMS Department in 2001 and remove Flagg as the EMS Director. [FN8] Instead, defendant contends that it has offered legitimate, non-discriminatory business reasons for this decision and that Flagg cannot show that these reasons are pretextual. (Doc. # 36, pp. 22-26). Specifically, when the reorganization of the EMS Department was announced in 2001, the County's stated reason for the change was to "create a more efficient operation" and to improve "interfaces with other emergency service agencies in Collier County ." (Doc. # 52, Ex. 34). Subsequent

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

to that announcement, defendant has stated that its intent was to remove Flagg as the Director of the entire EMS Department based on concerns it had with (i) strained relationships between the EMS Department and certain fire departments in Collier County, which defendant attributed at least in part to Flagg, and (ii) issues related to Flagg's performance as Director. (Doc. # 36, pp. 22-23). The Court concludes that the County has met its burden of producing legitimate, nondiscriminatory reasons for its decisions. Thus, the relevant question again is whether the plaintiff has met her burden of showing that these reasons are a pretext for unlawful discrimination.

> FN8. Defendant assumes, for purposes of its motion, that plaintiff can establish a prima facie case with respect to the 2001 reorganization. (Doc. # 36, p. 22). Despite this stated assumption, defendant proceeds to suggest in a cursory manner in a footnote that Flagg cannot show she suffered an adverse employment action. (Id., n. 14). The Court disagrees and concludes that plaintiff has established a prima face with respect to the 2001 reorganization which, as explained above, resulted in Flagg's removal as EMS Director and her placement in a new position with significantly diminished responsibilities. Shannon v. Bellsouth Telecomm., Inc., 292 F.3d 712, 716 (11th Cir.2002); Davis v. Town of Lake Park, 245 F.3d 1232, 1239 (11th Cir.2001).

*7 Flagg contends that the County's reasons are pretextual because, inter alia, similar to the 1998 and 2000 Administrator position, there was no contemporaneous documentation of any deficiencies related to the alleged "tensions" with local fire departments in Flagg's performance reviews, and, in any event, these "tensions" pre-dated Flagg's tenure as the EMS Director and persist to date. Further, there was no contemporaneous documentation of any issues related to Flagg's performance as Director of the EMS Department. Flagg also argues that the decisionmaking with respect to the 2001 "reorganization" did not occur consistently with the activities that typically occurred regarding similar decisions. [FN9] (Doc. # 49, pp. 21-25).

> FN9. Similar to the Administrator position, Flagg also relies generally on the fact that the County has never had a woman serve as an Administrator in a public safety position and on remarks allegedly made by certain fire chiefs that demonstrate bias towards her based on her sex. (Doc. # 49, pp. 27-28).

The Court concludes that Flagg has met her burden of showing pretext. Schoenfeld, 168 F.3d at 1269. Flagg's performance evaluations, including one filled out by then-County Manager Storrar for the period immediately preceding the reorganization, contain no reference to the "tensions" with the local fire departments or the performance deficiencies alleged by the defendant as the reason for the reorganization. (Doc. # 52, Exs.1-8). In addition, it is undisputed that Flagg was recognized as "Administrator of the Year" by the Florida Association of County Emergency Medical Services in 1998. Further, it is undisputed that during her tenure as Director, the EMS Department was recognized in 1999 as the best EMS system in the State of Florida and in 2000 as the best EMS system in the United States. This evidence, along with that relied on by Flagg, is sufficient to demonstrate a genuine issue of material fact as to the truth of the County's proffered reasons for it reorganization in 2001, which resulted in Flagg being removed as Director of the EMS Department.

## C.

Defendant contends that it is entitled to summary judgment with respect to Flagg's transfer to the Transportation Department in 2002 because it has offered legitimate, non-discriminatory business reasons for this decision and Flagg cannot show that these reasons are pretextual. (Doc. # 36, pp. 28-29). Specifically, the County contends that County Manager Mudd transferred Flagg to the Transportation Department based on a recommendation by the Productivity Committee that the two EMS directors (Flagg and Page) be eliminated in favor of a single director. The County further contends that Mudd's decision to place Page in the EMS Director position rather than Flagg was based on the fact that Page had been serving as the operational director for the past one and a half years and that Mudd did not want to "create upheaval" by altering that. (Doc. # 36, p. 29). The County states that "Mudd took at face value Olliff's decision in April 2001 to remove Flagg from those duties and place Page into the position" and that "Mudd did not second guess that decision but rather decided that Page should continue to serve in the position." (Id., p. 29). The Court concludes that the County has met its burden of producing legitimate, nondiscriminatory reasons for its decisions. Thus, the relevant question again is whether the plaintiff

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2003 WL 22350943, *7 (M.D.Fla.))

has met her burden of showing that these reasons are a pretext for unlawful discrimination.

**\*8** Flagg argues that summary judgment should be denied because the County's decision to remove her from the EMS Department in 2002 was the direct consequence of the "sham reorganization" in 2001. (Doc. # 50, p. 4). While the issue is closer than the others, a reasonable jury could indeed conclude that this action was the culmination of the County's pattern of discrimination and was itself discriminatory. Therefore, the Court concludes that summary judgment is not appropriate as to Count IX.

Accordingly, it is now

ORDERED:

1. Defendant's Case-Dispositive Motion for Summary Judgment (Doc. # 35) is DENIED.

2. Defendant's Motion Requesting Oral Argument (Doc. # 59) is DENIED.

2003 WL 22350943 (M.D.Fla.), 16 Fla. L. Weekly Fed. D 635

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2004 WL 944811
--- F.Supp.2d ---
(Cite as: 2004 WL 944811 (W.D.Mo.))

Only the Westlaw citation is currently available.

United States District Court,
W.D. Missouri,
Central Division.

Mike ROLLINS, Plaintiff,
v.
MISSOURI DEPARTMENT OF
CONSERVATION, et al., Defendants.

No. 02-4271-CV-C-NKL.

April 14, 2004.

Background: Former employee sued state agency and supervisor for race discrimination and retaliation under Title VII, Missouri Human Rights Act (MHRA), and § 1983.

Holdings: On agency's and supervisor's motion for summary judgment, the District Court, Laughrey, J., held that:
(1) agency's reasons for terminating employee were not pretexts for race discrimination;
(2) alleged use of derogatory racial term , and agency's alleged failure to investigate employee's complaints, if proven, did not create hostile environment; and
(3) supervisor was qualifiedly immune from § 1983 claim.

Motion granted.

[1] Federal Civil Procedure ☞2539

170Ak2539

Sworn deposition testimony cannot be contradicted by a subsequent affidavit to create a genuine issue of material fact at the summary judgment stage. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

[2] Federal Civil Procedure ☞2462
170Ak2462

The main purpose of a motion for summary judgment is to identify factually unsupported claims. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

[3] Federal Civil Procedure ☞2544
170Ak2544

If a plaintiff has the burden of proof at trial on a claim and the defendant has filed a motion for summary judgment, the plaintiff must identify admissible evidence sufficient to make a submissible case at trial; if the plaintiff cannot identify such facts, the defendant is entitled to judgment as a matter of law. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

[4] Civil Rights ☞1101
78k1101

District Court would analyze race discrimination claims under Title VII and Missouri Human Rights Act (MHRA) using the same legal principles. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; V.A.M.S. §§ 213.010-213.137.

[5] Civil Rights ☞1544
78k1544

Direct evidence of discrimination is not required by the Title VII provision stating that an unlawful employment practice is established by demonstrating that an impermissible factor was a motivating factor for an employment practice even though other factors also motivated the practice; a plaintiff need only show, by direct or circumstantial evidence, that the defendant has engaged in a forbidden employment practice. Civil Rights Act of 1964, § 703(m), 42 U.S.C.A. § 2000e-2(m).

[6] Civil Rights ☞1137
78k1137

If an adverse employment action was motivated because of an impermissible factor, even in part, a Title VII plaintiff is entitled to judgment, at least on the issue of liability. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

[7] Civil Rights ☞1536
78k1536

[7] Civil Rights ☞1545
78k1545

If a Title VII plaintiff is not replaced, then he must present some other evidence that would give rise to an inference of unlawful discrimination, in order to establish a prima facie case under the *McDonnell*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

*Douglas* burden- shifting paradigm. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

[8] Civil Rights ☞1536
78k1536

A common form of evidence giving rise to an inference of unlawful discrimination, as required to establish a prima facie Title VII case under the *McDonnell Douglas* burden-shifting paradigm, is to show that similarly situated employees were more favorably treated. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

[9] Civil Rights ☞1536
78k1536

Under the *McDonnell Douglas* burden-shifting paradigm, a Title VII plaintiff has the burden of producing evidence that the defendants' proffered reason is merely a pretext for discrimination. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

[10] Civil Rights ☞1137
78k1137

[10] Civil Rights ☞1544
78k1544

To establish pretext under the *McDonnell Douglas* burden-shifting paradigm, a Title VII plaintiff must show by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination; that is, he may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

[11] Civil Rights ☞1137
78k1137

State agency's reasons for terminating employee, that he was unable to control his temper and unwilling to follow his supervisor's orders, were not pretexts for race discrimination, where employee's belief that supervisor was racist was subjective, record did not support employee's claim that supervisor was afraid of African Americans, employee's comparators were not similarly situated, and employee failed to connect alleged use of racial epithet to termination decision. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

[12] Civil Rights ☞1544
78k1544

A Title VII plaintiff's general, subjective belief that the defendants treated him differently because of his race is insufficient evidence to show, under the *McDonnell Douglas* burden-shifting paradigm, that the legitimate, nondiscriminatory reasons for terminating him were lies used to cover the real reason for the termination. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

[13] Civil Rights ☞1101
78k1101

Employers have wide latitude to make business decisions, and when federal courts examine an employer's articulated reasons in a Title VII action, they do not sit as super-personnel departments to second-guess the business decisions of employers. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

[14] Civil Rights ☞1137
78k1137

The threshold question in examining an employer's articulated reasons for its employment actions in a Title VII action is whether the employer's reasons are true, not if they are wise, fair, or correct. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

[15] Civil Rights ☞1137
78k1137

In a Title VII action, when an employer articulates a reason for disciplining a particular employee, it is not the court's province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

[16] Civil Rights ☞1138
78k1138

Similarly situated employees can form a basis for establishing pretext in a Title VII action, but they must be similarly situated in all relevant respects. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

[17] Civil Rights ☞1243
78k1243

To establish a prima facie case of retaliation under Title VII, a plaintiff must show: (1) he engaged in activity that is protected under Title VII; (2) an adverse employment action was taken against him; and (3) a causal connection between the two events. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

[18] Civil Rights ☞1147
78k1147
Frequency.

To establish a race based hostile environment harassment claim under Title VII, a plaintiff must demonstrate the following elements: (1) he is a member of a protected class; (2) he was subjected to unwelcome race-based harassment; (3) there is a causal nexus between the harassment and his race; and (4) the harassment affected a term, condition, or privilege of employment. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

[19] Civil Rights ☞1147
78k1147

To create a race based hostile environment in violation of Title VII, the complained of conduct must be sufficient to create a hostile environment, both as it would be viewed objectively by a reasonable person and as it was actually viewed subjectively by the victim. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

[20] Civil Rights ☞1147
78k1147
Frequency.

In a Title VII action for race based hostile environment, relevant factors for determining whether conduct rises to the level of abusiveness include: (1) the frequency of the conduct; (2) its severity; (3) whether the conduct is physically threatening or humiliating, or merely an offensive utterance; and (4) whether the conduct unreasonably interferes with an employee's work performance. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

[21] Civil Rights ☞1147
78k1147

[21] Civil Rights ☞1185
78k1185

In a Title VII action for race based hostile environment, the standards for judging the hostility of the working environment must be sufficiently demanding to filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

[22] Civil Rights ☞1147
78k1147

For a race based hostile environment to be established under Title VII, the evidence must establish more than a few isolated incidents, and there must be proof that the alleged harassing conduct was so intimidating, offensive, or hostile that it poisoned the work environment. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

[23] Civil Rights ☞1147
78k1147

[23] Civil Rights ☞1149
78k1149

Alleged use of derogatory racial term in workplace, and state agency's alleged failure to investigate its employee's complaints, if proven, did not create race based hostile environment in violation of Title VII, where offensive term was at most used once in way that employee overheard, and employee's complaints lacked specificity and support. Civil Rights Act of 1964, § 701 et seq., as amended, 42

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

U.S.C.A. § 2000e et seq.

[24] Constitutional Law ⚖➡215
92k215

[24] Constitutional Law ⚖➡224(1)
92k224(1)

The Fourteenth Amendment prohibits intentional discrimination on the basis of race or gender by a state actor. U.S.C.A. Const.Amend. 14.

[25] Civil Rights ⚖➡1118
78k1118

[25] Civil Rights ⚖➡1166
78k1166

The elements of a claim of intentional racial or gender discrimination are essentially the same under Title VII and the Fourteenth Amendment. U.S.C.A. Const.Amend. 14; Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

[25] Constitutional Law ⚖➡219.1
92k219.1

[25] Constitutional Law ⚖➡224(3)
92k224(3)

The elements of a claim of intentional racial or gender discrimination are essentially the same under Title VII and the Fourteenth Amendment. U.S.C.A. Const.Amend. 14; Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

[26] Civil Rights ⚖➡1376(10)
78k1376(10)

Supervisor's alleged actions against African American state agency employee, including criticizing him behind his back and making him do coemployee's work, if proven, did not violate clearly established statutory or constitutional right, and supervisor thus was qualifiedly immune from employee's § 1983 claim, where supervisor engaged in same behavior toward white employees. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

James N. Foster, Jr., McMahon, Berger, Hanna, Linihan, Cody & McCarthy, St. Louis, for Missouri Department of Conservation, Clarence Homan, Defendants.

Stephen B. Maule, McMahon, Berger, Hanna, Linihan, Cody & McCarthy, St. Louis, for Missouri Department of Conservation, Clarence Homan, Defendants.

David J. Moen, Law Office of David J. Moen, Jefferson City, for Mike Rollins, Plaintiff.

ORDER

LAUGHREY, District J.

*1 Pending before the Court are two motions. The first is Defendants Missouri Department of Conservation ("Department") and Clarence Hohman's ("Hohman") Motion for Partial Summary Judgment [Doc. # 21]. The second is the Defendants' Motion for Summary Judgment [Doc. # 25]. For the reasons stated below, the motion for summary judgment is granted while the motion for partial summary judgment is denied as moot.

I. Factual Background

Solely for the purpose of the Defendant's Summary Judgment Motions, the Court views the facts in a light most favorable to the Plaintiff, accepting as true Plaintiff Mike Rollins' ("Rollins") version of the facts when they are disputed.

The Department hired Rollins in 1995 to work in the Maintenance Department. (Rollins Dep. at p. 30.) Rollins worked the night shift, and his job responsibilities were primarily general cleaning. (Rollins Dep. at p. 31.)

Rollins' co-workers included the following: Joseph Johnson ("Johnson"), an African American male; [FN1] Melvin Beck ("Beck"), a Caucasian male; Mike Grellner ("Grellner"), a Caucasian male; Dennis Propst ("Propst"), a Caucasian male; and Dale Morris ("Morris"). Rollins' immediate supervisor throughout his employment with the Department was Clarence Hohman ("Hohman"), Lead Maintenance Tech. (Rollins Dep. at p. 36.) Hohman is a Caucasian male. Other supervisors include the following: Jerry Goff; Gary Hofstetter ("Hofstetter"); Dave Erickson ("Erickson"); Terry McDaniel ("McDaniel"); Jerry Conley ("Conley"). Jackie Jackson ("Jackson"), an African American female, and Debbie Goff work in the Department's Human Resources.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

A. Rollins' Disciplinary Record

1. July 19, 1996

On July 19, 1996, the Department placed Rollins on disciplinary probation for his behavior toward another employee. (Def. July 19, 1996, Memorandum (hereinafter "Ex. 1").) Rollins was supervising a summer employee. Rollins went to Hohman and informed him that the employee was not working. Hohman then went to talk to the employee. Rollins was initially standing outside the door listening and watching; the employee then closed the door in Rollins' face. "I was very angry at that point[,] and I went into the office and took off my belt and said something to the effect "If you don't show some respect I will whip your young ass." (Rollins Aff. ¶ 6.) Hohman told Rollins to leave the office. According to Rollins, he left and never came back to the office. (Rollins Aff. ¶ 6.) [FN2] As a result of the incident, Hohman sent Rollins home for the remainder of his shift. (Ex. 1; Hohman Aff. ¶ 7.)

The Department, acting through McDaniel, placed Rollins on disciplinary probation for three months and warned that his performance must improve immediately or further disciplinary action could occur, including termination. (Ex. 1.) It appears from the record that Rollins successfully completed the probation period.

2. November 19, 1998, Night Shift Meeting (Oral Warning on December 2, 1998)

*2 On November 19, 1998, Hohman was conducting a meeting with the night shift employees. Rollins lost his temper and raised his voice toward another employee, Morris. Rollins noticed that Morris was staring at him "in a very strange way." Rollins asked Morris why he was looking at him like that. According to Joseph Johnson ("Johnson"), Rollins' comment was insignificant. (Pl. [FN3] Johnson Aff. ¶ 12 ("Rollins said something to a co-worker that did not seem significant to me.").)

Other employees present during the meeting felt uncomfortable. (Hohman Aff. ¶ 9 ("Rollins' actions were from out of nowhere and made me and other employees feel uncomfortable."); Grellner Aff. ¶ 12 ("With respect to an incident in 1998 involving Mr. Rollins' conduct at a staff meeting, I was present

and observed Mr. Rollins become angry and raise his voice at another employee, Dale Morris. I felt uncomfortable with Mr. Rollins' conduct and believed he was out of line by his actions."); Goff Aff. ¶ 15 ("I spoke to the other employees who were present at the meeting and learned at least two of the employees were upset and uncomfortable about Rollins' behavior.").)

On December 2, 1998, [FN4] Jerry Goff, Assistant Operations Division Chief, issued Rollins an oral warning for his conduct during the meeting. Goff warned Rollins that further conduct of a similar nature would result in additional discipline, including discharge. (Def. Dec. 29, 1998, Memorandum (hereinafter "Ex. 2") ("At a night shift meeting, November 19, 1998, you were somewhat disruptive, as affirmed by all night shift employees, displaying traits of a temper control problem for which you were placed on disciplinary probation two years ago. The meeting ended without incident, but all present indicated your actions made them uncomfortable. Your actions were most upsetting to at least two employees who were present.").)

3. Sick Leave Memorandum

On July 24, 2000, Hofstetter, Maintenance General Supervisor, sent Rollins a memorandum laying out concerns regarding Rollins' use of sick leave and annual leave. Hofstetter wrote:
    In conjunction with the annual performance appraisals I review each employee's use of annual leave and sick leave. As a result of this review I have found what appears to be a pattern on your use of personal sick leave and/or family sick leave. You have used sick leave on several occasions the day before or the day after a holiday, the day before and/or the day after you go on vacation and numerous occasions on either a Monday or a Friday. When calculated, the percentage of sick leave you have used during these patterns amounts to approximately 60% of the total of your sick leave taken. Due to the pattern you have established in using your sick leave I find it necessary for you to begin providing me with a signed doctor's excuse for any personal sick leave and/or family sick leave which you desire to use for the next six months .... Failure to comply with this request will result in further progressive discipline action being taken which could possibly lead up to and include dismissal.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2004 WL 944811                                                    **Page 120**
(Cite as: 2004 WL 944811, *3 (W.D.Mo.))

*3 (Pl. July 24, 2000, Memorandum (hereinafter "Ex. C").)

4. August 24, 2000, Incident (Written Warning on September 12, 2000)

On September 12, 2000, Hofstetter issued a written warning to Rollins for ignoring his supervisor, Hohman, and calling Hohman a fool. (Def. Sept. 12, 2000, Memorandum (hereinafter "Ex. 3").)

The event leading to this written warning occurred on August 24, 2000. Hohman had instructed Rollins to close a door. Rollins did not close the door, although Hohman had told Rollins that he could set off the alarm by doing so. Rollins later called Hohman a fool. (Ex. 3.) Hohman responded by telling Rollins he looked silly.

Rollins' failure to follow his supervisor's order violated the Department's handbook that prohibits an employee from refusing to follow a supervisor's instructions. (Ex. 3.) His calling his supervisor a fool violated the Department's Code of Conduct that requires employees to treat co-workers with respect, courtesy, and dignity. (Ex. 3.)

Rollins wrote a reply to his written warning. He wrote on October 24, 2000:

On August 24, 2000, Dennis Propst and myself were walking towards the lobby and saw the door open. I looked outside and saw Marlyn Miller from Fisheries bringing in some boxes, so I held the door open for him. Clarence Hohman was coming from the Runge Center and saw me holding the door open. Clarence didn't say anything to me about closing the door. I had told him that Marlyn had the door propped open. That was the only thing said. After Marlyn brought the boxes in, the door was closed. At no time did Clarence tell me to close the door. Later as I was walking down the hall Clarence called me silly and I called him a fool.

Gary Hofstetter interviewed me about the incident. I explained the situation and he didn't pay attention to what I said. At the time I didn't think of Dennis Propst being there. Only after I showed Dennis the letter, he told me he heard the whole conversation between Clarence and I. He said he never heard Clarence say anything about closing the door. Not once did I tell Gary that I wanted to put this incident behind me. I said that I was fed up with them not listening to me. The written warning I

received was unwarranted because of the lack of information gathered ....
(Pl. October 24, 2000, Memorandum (hereinafter "Ex. A").)

In response to Rollins' memorandum, Hofstetter investigated the situation. (Def. Nov. 9, 2000, Memorandum (hereinafter "Ex. 4").) Hofstetter concluded that Rollins' additional evidence was insufficient to overturn the discipline. Hofstetter interviewed Dennis Propst. Propst said that he was present only for a short period of time and heard no words exchanged between Rollins and Hohman. Hofstetter concluded that there was "more than sufficient opportunity for [Hohman] to have discussed closing the door outside of [Propst's] direct presence." (Ex. 4.) Rollins contends that Hofstetter did not conduct a thorough investigation because he did not find the inconsistencies in Hohman's version of the events.

*4 Out of this incident, Hohman received an oral warning on September 13, 2000, for telling Rollins that he looked silly. [FN5] (Hofstetter Aff. ¶ 4; Def. September 13, 2000, Memorandum (hereinafter "Ex. 5").)

B. Rollins' Termination on July 9, 2001

On June 27, 2001, an incident occurred between Hohman and Rollins that led to Rollins' termination. According to Hohman, he was checking lights in the building, one of his job duties. Rollins stopped him and accused Hohman of checking Rollins' area. Hohman told Rollins that he was not checking his area. Rollins then jumped in front of Hohman and prevented him from getting past him to continue to perform his duties. Rollins then let Hohman pass. Hohman entered an office area, and Rollins turned off the lights on Hohman. Hohman reported this incident to his supervisor, Hofstetter. (Def. July 3, 2001, Memorandum (hereinafter "Ex. 6").)

On July 3, 2001, Hofstetter spoke with Rollins to obtain his version of the events. Rollins told Hofstetter that he was not aware of any incident that involved Hohman. After talking with Hohman and Rollins, Hofstetter then recommended to his supervisor, Dave Erickson ("Erickson"), Administrative Services Administrator, that Rollins be terminated. (Def. July 6, 2001, Memorandum (hereinafter "Ex. 7").) In making this recommendation, Hofstetter wrote:

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Over the past Mike [Rollins] has exhibited negative working conditions towards Clarence [Hohman] as well as his co-workers.

-In July of 1996 Mike was placed on "disciplinary probation" for an outburst of anger towards a summer employee;

-In December of 1998 Mike was given an "oral warning" for an outburst during a night shift meeting;

-In August of 2000 Mike was given a "written warning" regarding another incident involving his supervisor. Mike refused to obey a reasonable request to close the door at the front entrance to the Central Office. In addition to refusing to obey this request Mike also called his supervisor a "fool";

-There are other incidents where Mike challenged his supervisor, but was not disciplined including: January 2001, the night shift was asked to do additional work in the auditorium and Mike requested annual leave on the night the work was scheduled. In April of 2001 Mike was given the check off sheet for using the carpet cleaning machine. Mike indicated he could not read the sheet because he did not have his glasses. Mike has used this excuse on several occasions and his supervisor has offered to read the information to Mike but he walks off and does not listen;

-Mike has received performance appraisals in which he was marked "Below Normal" or "Inadequate" on "Getting along with fellow employees" and "Compliance with work instructions";

-In June of 2001, Mike refused to sign his performance appraisal and to date has not signed a Confidentially Statement that all of the night crew including Clarence, the day crew including Don Barns, and the Rupee Nature Center crew including Kent Fischer have all signed.

*5 Mike continues to fail to foster an attitude of teamwork and cooperation with other employees. He seems to continually look for ways to antagonize and be disrespectful of his supervisor. Therefore I am recommending that Mike be terminated immediately.

(Ex. 6.) Erickson agreed with Hofstetter's recommendation to terminate Rollins, Erickson forwarded the recommendation onto Director Conley. (Def. July 9, 2001, Letter (hereinafter "Ex. 8").) Conley agreed with the recommendation of termination. Rollins was terminated on July 9, 2001.

Rollins wrote a letter to Conley in response and requested a more complete investigation of the situation. (Def. July 12, 2001, Letter (hereinafter "Ex. 9").) Rollins' states that he had "information to offer Mr. Hofstetter with respect to what really occurred on the evening of June 2[7], 2001, but Mr. Hofstetter never let me know what Hohman had alleged against me." (Rollins Aff. ¶ 21.) Rollins says that on June 27, 2001, he did not block the hallway, and he was unaware Hohman was present when he turned off the lights. (Rollins Aff. ¶ 19.)

C. Allegations of Race Discrimination [FN6]

1. Melvin Beck's Use of a Racial Epithet

Grellner, a co-employee, told Rollins [FN7] that another employee, Beck, had used the word "nigger" on one occasion in 1994. Beck's statement was made before Rollins began working for the Department. (Grellner Aff. ¶¶ 3-7; Rollins Dep. at pp. 46-48. When it came to Jerry Goff's attention that Beck has used the derogatory word at work, Jerry Goff investigated by speaking with Beck and Grellner. (J. Goff Aff. ¶ 4.) Jerry Goff concluded that Beck did make the comment, and he admonished him for engaging in the conduct as it was strictly against the Department's policy. (J. Goff Aff. ¶ 5.) The outcome of this investigation was not reported to Rollins because he did not work for the Department at the time.

Rollins contends that the derogatory word was used more than once. For support, Rollins cites to his affidavit at paragraph 13. Paragraph 13 states, "No person ever got back to me about the statements of Melvin Beck using the word 'nigger' at work. As far as I knew, Beck was still making those statements." (Rollins Aff. ¶ 13.) He also cites to Johnson's affidavit at paragraph 4, which states, "Goff told me that he was aware that Rollins had complained about Beck using the word 'nigger' at work ...." (Pl. Johnson Aff. ¶ 4.)

In contrast, in Rollins' deposition, the Defendants' attorney twice, in questions, referred to Beck making the derogatory term on one occasion. (Rollins Dep. at pp. 46, 48.) Rollins did nothing to correct the assertion that Beck only used the term once. Also, Rollins never said that Beck used the word more than once throughout his deposition, even though the issue was discussed at length. (Rollins Dep. at pp. 52-57.) Grellner, the person

who told Rollins about Beck's comment, states under oath, "On one occasion, I heard another employee, Melvin Beck, use the "N" word at the workplace. This occurred before Mike Rollins became an employee with the Department, I believe in 1994. Melvin made this comment about another African-American employee, Cleveland Porter, who Melvin believed the Department had hired instead of him a few years prior. I told Mike Rollins about this comment years later. I never reported Melvin's statement to any supervisory or managerial representatives of the Department." (Grellner Aff. ¶ ¶ 3-7.)

*6 Rollins did nothing immediately after he learned of Beck's use of the derogatory term. However, Rollins did report the comment to Jackson, Employee Relationship Manager, in early fall 2000. According to Jackson, Rollins came to her with concerns that his supervisor, Hohman, was discriminating against him. Rollins based this on a comment that another employee, Beck, had made approximately five years prior to Rollins going to Jackson. Rollins provided Jackson with no other evidence of race discrimination.

Also, from the record it appears that Rollins complained to Erickson, "several years" prior to July 2002, that the same co-worker, Beck, had used a racial epithet "in a way that Rollins overheard." [FN8] (Pl. Questionnaire for Dave Erickson (hereinafter "Ex. E").)

Thus, the record supports, with all inferences in favor of the Plaintiff, that Beck used the racial epithet at least once prior to Rollins' employment and Beck later used the word again in a way that Rollins overheard. Both incidents were investigated by the Department.

2. Carpet Cleaning Checklist

At some point, the Department started requiring Rollins to complete a checklist when using the carpet cleaning machine. It took him quite a bit more time when he used the checklist. Rollins was the only one required to use the checklist. Grellner states that he was required to complete the same checklist. However, the Court accepts Rollins' version of the facts that only he had to do the cleaning checklist given the posture of the case.

3. Hohman Requiring Rollins to Complete Beck's

Work

In 1998, Hohman became Beck's brother-in-law. As a result, Hohman was required to seek an exception from the Department to the prohibition against supervision of an employee by a family member. The Department granted Hohman permission to continue to supervise Beck. Rollins was given Beck's work to do when Beck was absent. Rollins states that this was because Beck was Hohman's brother-in-law. Propst and Johnson also had to perform Beck's work when Beck was absent. Jerry Goff states that Rollins began accusing Hohman of favoring Beck over the others, based on the familial relationship.

4. 2000 [FN9] Christmas Party

In December 2000, Hohman asked Grellner and Propst, Caucasian employees, if they wanted to have a Christmas party with the night crew members. They did not want a party. Hohman did not ask Rollins or Johnson.

5. Discipline

Rollins believes that his discipline was based on his race and discriminatory.

D. Rollins' Complaints [FN10]

1. Complaint to Hohman in 1995

[1] Within the first several weeks of beginning his job, Rollins told Hohman, that he was discriminating against him because of Rollins' race. Rollins did not explain to Hohman why he thought that. (Ex. F.)

2. Complaint to John Hoskins in Late 1997 or Early 1998

In late 1997 or early 1998, Rollins complained to John Hoskins ("Hoskins"), the Deputy Division Director. Rollins complained about racial discrimination by Hohman., but there is no evidence in the record documenting any examples of race discrimination or the reasons given by Rollins for his conclusion. Rollins gave of discrimination. After this meeting, no one reported back to Rollins about the result of any investigation of his complaint.

3. Complaint to Erickson Several Years Prior to July 2002

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

*7 Rollins complained to Erickson, "several years" prior to July 2002, that a co-worker had used the word "Nigger" "in a way that Rollins overheard." (Pl. Questionnaire for Dave Erickson (hereinafter "Ex. E").) Erickson asked supervisors to investigate, which they did. The co-worker denied making such a reference in Rollins' presence. (Ex. E.)

### 4. Complaint to Jackie Jackson in Early Fall 2000

According to Jackson, Employee Relationship Manager, Rollins came to her with concerns that Hohman was discriminating against him. Rollins based this on a comment that another employee, Beck, had made approximately five years prior to Rollins going to Jackson. (Jackson Aff. ¶ 4; Pl. Questionnaire for Jackie Jackson (hereinafter ("Ex.G").) Rollins provided Jackson with no other evidence of race discrimination. Jackson talked with Grellner and Propst on the night shift and found no evidence of racial discrimination. She also spoke with Johnson and he noted that Hohman was probably afraid of Rollins because of Rollins' behavior toward Hohman. After her investigation, Jackson concluded that she could not identify any evidence of racial discrimination by Hohman. She further concluded that Rollins did not like Hohman and did not like accepting orders from Hohman.

### 5. Complaint to Hofstetter at Dismissal

Hofstetter indicates that Rollins voiced a complaint when he was dismissed. (Pl. Questionnaire for Gary Hofstetter (hereinafter "Ex. H.").) Hofstetter asserts that this is the only time Rollins discussed discrimination with him. He said,

Mike indicated years ago another employee used an ethnic term to Mike [Rollins]. This occurred before I came to MDC and I didn't have any ... history regarding this incident. Mike also stated at the time of his dismissal that he thought Clarence Hohman was prejudiced and a racist. Mike also mentioned he complained to Debbie Goff and Dave Erickson about Melvin Beck's use of a racist word. Again this was prior to my starting to work for MDC. I was told that the incident was investigated and there was not any conclusive proof that the incident did or did not occur. (Ex. H.)

### 6. After Dismissal: Administrative Appeal of Disciplinary Action

Rollins filed an administrative appeal of his dismissal with the Department. (Pl. Dep't Admin. Appeal (hereinafter "Ex. I").) In this appeal, he wrote that his supervisor was discriminating against him on the basis of race.

## II. Summary Judgment Legal Standard

[2][3] A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A defendant who moves for summary judgment bears the burden of showing that there is no genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party and the nonmoving party "must be given the benefit of all reasonable inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.,* 950 F.2d 566, 569 (8th Cir.1991) (citation omitted). The main purpose of a motion for summary judgment is to identify factually unsupported claims. If a plaintiff has the burden of proof at trial on a claim and the defendant has filed a motion for summary judgment, the plaintiff must identify admissible evidence sufficient to make a submissible case at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the plaintiff cannot identify such facts, the defendant is entitled to judgment as a matter of law. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 884, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (quoting *Celotex,* 477 U.S. at 322)).

*8 To establish a genuine issue of fact sufficient to warrant trial, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing there is a genuine issue for trial. *Anderson,* 477 U.S. at 248.

## III. Discussion

### A. Motion for Summary Judgment [Doc. # 25]

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

[4] Rollins has asserted four claims: 1) a race discrimination claim under Title VII and the Missouri Human Rights Act ("MHRA"); 2) a retaliation claim under Title VII and the MHRA; 3) a hostile environment claim under Title VII and the MHRA; and 4) a violation of 42 U.S.C. § 1983. [FN11]

1. Race Discrimination Claim

[5] Rollins argued that there is "direct" evidence of discrimination in this record. However, after the United States Supreme Court's Opinion in *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), the distinction between direct and circumstantial evidence has evaporated. In that case, the Supreme Court held that 42 U.S.C. § 2000e-2(m) does not require direct evidence of discrimination. A plaintiff need only show, by direct or circumstantial evidence, that defendant has engaged in a forbidden employment practice.

[6] The full import of *Desert Palace,* is not yet clear, but it is settled that if an adverse employment action was motivated because of a plaintiff's race, gender, pregnancy, etc., even in part, a plaintiff is entitled to judgment, at least on the issue of liability. Thus, the focus should be on all evidence that supports a finding in this case that Rollins' termination was motivated in part because of his race. What is not clear is the continuing validity of the *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), burden-shifting paradigm at the summary judgment stage. *See Allen v. City of Pocahontas,* 340 F.3d 551 (8th Cir.2003); *Dare v. Wal-Mart Stores, Inc.,* 267 F.Supp.2d 987 (D.Minn.2003); *Dunbar v. Pepsi-Cola Gen. Bottlers of Iowa, Inc.,* 285 F.Supp.2d 1180 (N.D.Iowa 2003); *Griffith v. City of Des Moines,* 2003 WL 21976027 (S.D.Iowa July 3, 2003); *cf. Davis v. Emery Worldwide Corp.,* 267 F.Supp.2d 109, 120 n. 2 (D.Me.2003). While this Court seriously questions the continued validity of the *McDonnell Douglas* burden-shifting paradigm, it will use it to analyze this case because the outcome would be the same whether it is used or not used at the summary judgment stage.

Rollins argues that he has met the three-stage burden-shifting paradigm first set forth in *McDonnell Douglas Corp.,* 411 U.S. at 802-04. Under this framework, Rollins must first establish a prima facie case of race discrimination. *Putman v. Unity Health Sys.,* 348 F.3d 732, 735 (8th Cir.2003). If Rollins satisfies these initial burdens, the burden then shifts to the Defendants to rebut the *prima facie* case by articulating legitimate, nondiscriminatory reasons for terminating Rollins. If the case reaches that stage, Rollins then assumes the burden of producing evidence that the proffered reason was merely a pretext for discrimination.

a. *Prima Facie* Showing

*9 [7][8] To establish a *prima facie* showing of race discrimination, Rollins must show that: (1) he belongs to a protected class; (2) he was qualified for the job; (3) he was discharged; and (4) after his discharge, he was replaced by a person with similar qualifications. *Putman,* 348 F.3d at 736. If, as here, a plaintiff is not replaced, then he must "present some other evidence that would give rise to an inference of unlawful discrimination." *Id.* A common form of evidence giving rise to an inference of unlawful discrimination is to show that similarly situated employees were more favorably treated. The Eighth Circuit has also held that evidence of pretext, which is normally considered only at step three of the burden shifting analysis, satisfies the fourth element of a plaintiff's *prima facie* case. *Id.*

The first three elements are met in this case. At issue is the fourth element. As discussed below, Rollins has not presented evidence that similarly situated employees were more favorably treated, nor has he shown pretext for his termination. Thus, he has failed to establish a *prima facie* case. Even assuming that he has established a *prima facie* case, he has failed to rebut the Defendants' nondiscriminatory reason for his termination.

b. Non-Discriminatory Reasons

The Defendants have met their burden of presenting legitimate, non-discriminatory reasons for terminating Rollins. The Defendants terminated Rollins because of his inability to control his temper and unwillingness to follow his supervisor's orders. (See Ex. 8.)

c. Pretext for Discrimination

[9][10] Rollins has the burden of producing evidence that the Defendants' proffered reason is

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2004 WL 944811
(Cite as: 2004 WL 944811, *9 (W.D.Mo.))

merely a pretext for discrimination. *Williams v. St. Luke's-Shawnee Mission Health Sys., Inc.,* 276 F.3d 1057, 1059 (8th Cir.2002). Rollins must show:

> by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence.

*Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 143-44, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

[11][12] In part, Rollins argues that the Department's reasons are unworthy of credence because of his subjective belief that Hohman was racist (Rollins Dep. at p. 88), and because Hohman was afraid of African Americans, particularly Rollins. A plaintiff's general, subjective belief that the Defendants treated him differently because of his race is insufficient evidence to show that the legitimate, nondiscriminatory reasons for terminating Rollins were lies used to cover the real reason for the termination. *Rose-Matson v. NME Hosps., Inc.,* 133 F.3d 1104, 1109 (8th Cir.1998) (a plaintiff's unsubstantiated, general, and conclusory allegations are insufficient to support an inference of pretext).

*10 Further, after a review of the entire record, the Court finds no evidence to support Rollins' theory that Hohman was afraid of African Americans. The record shows that Hohman and Rollins did not like each other. (Jackson Aff. ¶ 9; Ex. G.) There is one suggestion that Hohman was afraid of Rollins because of Rollins' behavior toward Hohman. (Ex. G.) But there is nothing in the record to suggest that Hohman was afraid of Rollins because of any reason connected to race. Rollins argues that Hohman's discriminatory animus is shown by Hohman giving Rollins less desirable job duties, criticizing him behind his back, and not consulting him regarding a Christmas party. Yet, Hohman criticized both Caucasian and African American employees. As Johnson stated, Hohman was simply a poor supervisor. (Def. Johnson Aff. ¶ 1.) Hohman made both Caucasian and African American employees cover Beck's job duties when he was gone. The fact that Hohman was treating both Caucasians and African Americans the same suggests that he was not motivated by race. Hohman's questioning of Propst and Grellner about a Christmas party, but not

Johnson or Rollins, and Hohman's directive to Rollins to use a checklist when cleaning carpets, may create a theoretical inference that Hohman harbored a discriminatory animus. However, this thread of evidence is insufficient as a matter of law to rebut the Defendants' legitimate, nondiscriminatory reasons for Rollins' termination or to show pretext, particularly, given the strength of that evidence.

Rollins also argues that the disciplinary warnings he received leading up to his termination were fabricated to obscure the unlawful racially motivated reason he was terminated. Rollins asserts this is so because the supervisors that investigated the incidents, McDaniel, Hofstetter, and Jerry Goff, believed Hohman's version of the facts over Rollins' version. However, Rollins does not question the 1996 written warning, given by Jerry Goff, for physically threatening a summer employee.

[13][14][15] As an initial matter, employers have wide latitude to make business decisions. *LaCroix v. Sears, Roebuck, & Co.,* 240 F.3d 688, 692 (8th Cir.2001). When federal courts examine an employer's articulated reasons, they "do not sit as super-personnel departments to second-guess the business decisions of employers [rather] the threshold question is ... whether [the employer's] reasons for its employment actions are true, not if they are wise, fair, or correct." *Dorsey v. Pinnacle Automation Co.,* 278 F.3d 830, 837 (8th Cir.2002). When an employer articulates a reason for disciplining a particular employee, it is not the court's "province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason." *Wilking v. County of Ramsey,* 153 F.3d 869, 873 (8th Cir.1998).

Rollins attempts to establish pretext by saying that the incidents were not as the supervisors found them. At the November 1998 meeting, Rollins argues that no one at the meeting felt threatened, and, therefore, the discipline is a cover. However, the evidence, with all inferences in Rollins' favor, shows that at least two employees felt uncomfortable and Rollins was disciplined for being "somewhat disruptive" and displaying traits of a temper control problem initially shown in 1996. (Ex. 2.) The Court finds no evidence concerning this incident from which a jury could infer that the stated reasons in the memorandum were not the real reasons for the discipline.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**\*11** [16] Next, Rollins argues the August 2000 discipline, issued by Hofstetter, shows racial discrimination in that Rollins was given a written warning for calling his supervisor a fool while Hohman was only given an oral warning, a less serious disciplinary action, for calling Rollins silly. Yet, Rollins has produced no evidence that Hohman and Rollins were similarly situated for comparison purposes. From the evidence in the record, Rollins had previously been placed on disciplinary probation and had already received an oral warning for the November 1998 meeting. Whereas, the record does not show that Hohman had previously incurred any disciplinary warnings. Similarly situated employees can form a basis for establishing pretext, but they must be "similarly situated in all relevant respects." *Ghane v. West,* 148 F.3d 979, 982 (8th Cir.1998); *see also Clark v. Runyon,* 218 F.3d 915, 918 (8th Cir.2000). Rollins has not met that burden here.

Rollins argues that the June 2001 incident that led to his termination is a pretext because Hofstetter did not credit his explanation that "nothing happened." From the record, it is unclear exactly what Hofstetter's conclusions about the incident were. The letter in which he recommends termination to Erickson merely says that there was an incident involving Rollins and Hohman. Hofstetter then attaches Hohman's documentation of the incident and a memorandum summarizing Hofstetter's interview with Rollins about the incident. Hofstetter makes no conclusion as to what occurred between the two. Assuming that Hofstetter believed Hohman's version of the incident and that Hohman's version of the facts is incorrect, this disbelief of Rollins, without more, does not show that Hofstetter disbelieved Rollins because he was intentionally discriminating against him based on his race. There is no allegation that Hofstetter was racially biased, no conduct or statements by Hofstetter from which a jury could infer racial bias, and Rollins did not complain of discrimination to Hofstetter until after his termination. Hofstetter's disbelief could be based on any number of reasons (*e.g.,* the fact that Rollins only told Hofstetter that nothing happened instead of telling his version of the facts as now set out in his affidavit). Rollins has not met his burden of producing evidence from which a reasonable jury could infer Hofstetter's disbelief was based on race and that the real reason for his termination was race.

Rollins may also be arguing that the Defendants' tolerance of a racial epithet in the workplace prior to

Rollins' employment shows that the reasons given for his termination were pretextual. Yet, Jerry Goff investigated the incident at the time, and Beck was orally disciplined for using the inappropriate word. Erickson also investigated the use of the word when Rollins reported it to him. Jackson also investigated when Rollins complained to her of racial discrimination based on the racial epithet being used in the workplace. Rollins has not produced any evidence that connects the use of the racial epithet to the reasons he was terminated. No person in the chain of command is alleged to have made such a statement and when they learned of it, they investigated and took action.

**\*12** Finally, assuming for the moment that Hohman was afraid of Rollins because of his race, Hohman did not make the decision to terminate him, contrary to what Rollins asserts. Hofstetter, not Hohman, decided to recommend to Erickson that Rollins be terminated. [FN12] In fact, Hohman recommended that Rollins only be given an oral warning. (Pl. Draft June 28, 2001, Memorandum (hereinafter "Ex. J").) Hofstetter did not agree and instead recommended that Rollins be terminated.

When looking at the record as a whole, Rollins has not presented evidence from which a reasonable jury could conclude that the real reason for his termination was discrimination based on race. Accordingly, the Court grants the Defendants' request for summary judgment on this claim.

2. Retaliation

[17] To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show: (1) he engaged in activity that is protected under Title VII; (2) an adverse employment action was taken against him; and (3) a causal connection between the two events. *Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1136 (8th Cir.1999). Rollins meets the first two elements of the *prima facie* case: he complained about racial harassment and the Department terminated him. The issue is whether there is a causal connection between these two events. Because the Court has found that no reasonable jury could conclude that the Defendants' legitimate, nondiscriminatory reasons for the termination were pretextual, it also grants summary judgment on the retaliation claim.

3. Hostile Work Environment

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

[18][19][20][21][22] To establish a race based hostile environment harassment claim, a plaintiff must demonstrate the following elements: 1) he is a member of a protected class; 2) he was subjected to unwelcome race-based harassment; 3) there is a causal nexus between the harassment and his race; and 4) the harassment affected a term, condition, or privilege of employment. *Elmahdi v. Marriott Hotel Services, Inc.*, 339 F.3d 645, 652 (8th Cir.2003). The complained of conduct must be sufficient to create a hostile environment, both as it would be viewed objectively by a reasonable person and as it was actually viewed subjectively by the victim. *Elmahdi*, 339 F.3d at 652; *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Relevant factors for determining whether conduct rises to the level of abusiveness include: (1) the frequency of the conduct; (2) its severity; (3) whether the conduct is physically threatening or humiliating, or merely an offensive utterance; and (4) whether the conduct unreasonably interferes with an employee's work performance. *Duncan v. General Motors Corp.*, 300 F.3d 928, 934 (8th Cir.2002), *cert. denied*, 538 U.S. 994, 123 S.Ct. 1789, 155 L.Ed.2d 695 (2003); *Bradley v. Widnall*, 232 F.3d 626, 631 (8th Cir.2000). The standards for judging the hostility of the working environment must be sufficiently demanding to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (internal quotation omitted). The evidence must establish more than a few isolated incidents, and there must be proof that the alleged harassing conduct "was so intimidating, offensive, or hostile that it 'poisoned the work environment.' ' *Scusa v. Nestle U.S.A. Co., Inc.*, 181 F.3d 958, 967 (8th Cir.1999).

*13 [23] Rollins has failed to show that the harassment affected a term, condition, or privilege of employment. The conduct Rollins complains of includes the isolated use of derogatory terms in the workplace, and the Department's failure to investigate Rollins' complaints. These items, when considered separately and in conjunction with each other, do not come close to showing a hostile work environment.

As for the use of the racial epithet, the term was used by Beck, a co-worker, at least once prior to Rollins' employment. When it became known to the Department, Jerry Goff investigated. Jerry Goff concluded that Beck did use the racial epithet, and Jerry Goff admonished Beck for engaging in the conduct as it was strictly against the Department's policy. However, Beck's use of the word prior to Rollins' employment with the Department could not have had an impact on a term or condition of his employment. On one other occasion, Beck again used the term in a way that Rollins overheard. Thus, at most, the term was used once in a way that Rollins overheard. While the use of the word is offensive, the record does not show that Rollins was physically threatened or humiliated. The use of the word did not interfere with his work performance as it was only said in his presence once.

This case is similar to *Elmahdi*, 339 F.3d at 652. The plaintiff in *Elmahdi* was called "boy" and "black boy" on a few occasions over a period of years, and a supervisor once referred to Africans as having big penises. *Id.* at 652-53. While offensive, the Eighth Circuit held that the statements did not constitute a "steady barrage of opprobrious racial comment" sufficient to support a section 1981 hostile work claim and affirmed the entry of judgment as a matter of law. *Id.* at 653.

Rollins' case is also analogous to *Burkett v. Glickman*, 327 F.3d 658 (8th Cir.2003). Ir *Burkett*, the plaintiff alleged she was subjected to a hostile work environment because she was present when racially prejudicial remarks were made. *Id.* at 661. The plaintiff could not establish, however, when the remarks were made or where they were made. *Id.* Although a co-worker testified the plaintiff's supervisor occasionally used the derogatory word "Nigger," the Eighth Circuit concluded that such remarks were "off hand," "isolated," and insufficient to establish a hostile work environment.

Rollins also argues that the frequency of his complaints about racial discrimination and the lack of investigation shows that racial discrimination permeated the work environment. Rollins complained four times (to Hohman, Hoskins, Erickson, Jackson) over his six years of employment. When he complained to Hohman and Hoskins, it is unclear from the record whether an investigation was undertaken. The Court presumes one was not done. When Rollins complained to Erickson and Jackson, they investigated and determined that no racial discrimination occurred. In

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

his complaints to Jackson and Erickson, Rollins' example of racial discrimination was Beck's use of the racial epithet. Given the paucity of complaints and the lack of specificity and support for the complaints, the Department's response to the complaints is not sufficient to establish a hostile environment.

*14 The Court concludes that no reasonable jury could find that Rollins' allegations are sufficient to show that a term, condition, or privilege of employment were affected. Accordingly, the Court grants the Defendants' request for summary judgment on Rollins' hostile environment claim.

4. 42 U.S.C. § 1983 Against Hohman

[24][25] The Fourteenth Amendment prohibits intentional discrimination on the basis of race or gender by a state actor. *Okruhlik v. Univ. of Ark. ex rel. May,* 255 F.3d 615, 625 (8th Cir.2001). The elements of a claim of intentional discrimination are essentially the same under Title VII and the Constitution. *Id.* Rollins claims that his equal protection rights were violated by Hohman's intentional racial discrimination, retaliation, and creation of a racial hostile work environment.

Hohman is entitled to qualified immunity from civil liability if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' *Tuggle v. Mangan,* 348 F.3d 714, 720 (8th Cir.2003). When ruling on qualified immunity, a Court must answer two questions. One, do the facts, when viewed in the light most favorable to Rollins, establish that Hohman violated a constitutional or statutory right? Two, was the right clearly established?

[26] As to Rollins' claim that Hohman intentionally discriminated against him based on race, the Court concludes that Hohman's conduct does not violate a clearly established statutory or constitutional right. Hohman never said any derogatory statements in front of Rollins. Nowhere in the record does anyone accuse Hohman of saying anything racially derogatory. Instead, the record is full of evidence that Hohman was a poor supervisor. Hohman criticized Rollins and Johnson behind their backs but also criticized the other employees, who were white, behind their backs. Hohman made Rollins and Johnson take over Beck's work, but he also made Propst, a white employee, do Beck's work. Even

Rollins indicated at one time that he believed the extra work was based on Hohman's familial relationship with Beck. Hohman's treatment of every employee, both Caucasian and African America, suggests that he did not treat Rollins differently and that his treatment of Rollins was not based on his race.

In addition, Hohman never disciplined Rollins. Hohman's supervisors always issued the discipline. Hohman did not terminate Rollins. Thus, it is even unclear to the Court what actions Hohman took to meet the third element of his *prima facie* race discrimination case. Rollins' subjective belief that Hohman's actions were racially motivated is insufficient to show that a constitutional or statutory right was violated. Hence, the Court concludes that Hohman's conduct did not violate Rollins' constitutional or statutory rights.

As to Rollins' claim for retaliation, there is no evidence to show either retaliation or that Hohman terminated Rollins.

As to Rollins' race harassment claim, the Court has already concluded that the combined actions of everyone in the Department, not simply Hohman's actions, were insufficient as a matter of law to support a harassment claim in the Eighth Circuit.

*15 Because Rollins has failed to produce sufficient evidence to show that Hohman violated Rollins' statutory or constitutional rights, Hohman is entitled to qualified immunity.

B. Motion for Partial Summary Judgment [Doc. # 21]

The Defendants have also sought partial summary judgment on Rollins' request for back pay and medical expenses because Rollins cannot establish that he made a reasonable effort to mitigate his damages after his termination and Rollins cannot establish that he is entitled to medical expenses as he did not see a physician after his termination. Because the Court has granted Defendants' Motion for Summary Judgment, their Motion for Partial Summary Judgment is denied as moot.

IV. Conclusion

Accordingly, it is hereby

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2004 WL 944811
(Cite as: 2004 WL 944811, *15 (W.D.Mo.))

Page 129

ORDERED that the Defendants' Motion for Summary Judgment [Doc. # 25] is GRANTED. It is further

ORDERED that the Defendants' Motion for Partial Summary Judgment [Doc. # 21] is DENIED as moot.

FN1. The Court includes the race of the individuals if the record makes clear that information. The Court includes this information only because it may be pertinent to the race discrimination claims at issue in this lawsuit.

FN2. Hohman's Affidavit and the July 19, 1996, Memorandum discussing this incident lay out a different version of the facts. The memorandum states: "Recently, on the evening of July 9, you stouied [sic] into a closed-door meeting between Clarence Hoh[m]an, your supervisor, and a night shift summer employee. Upon entering[ ] the room, you began cursing the summer employee and removed your belt threatening 'to whip the employee. ['] After Clarence asked you to go back to work, you left briefly but returned with more verbal abuse and physical threats against the summer employee. At that point, your supervisor had to ask you to go home for the remainder of the shift." (Ex. 1.) Hohman's affidavit states, "On July 9, 1996, I was in a closed-door meeting with another employee. Rollins interrupted my meeting, came into the room, and began cursing at and threatening the employee. I told Rollins to leave but he came back and continued threatening and verbally abusing the employee. After he came back into the office I asked Rollins to go home for the remainder of his shift." (Hohman Aff. ¶¶ 4-7.) Given the posture of this motion, the Court accepts the Plaintiff's version of the facts.

FN3. Both the Plaintiff and the Defendants have submitted affidavits from Johnson. The Defendants' affidavit from Johnson was executed prior to the Plaintiff's.

FN4. The oral warning was documented in a memorandum on December 29, 1998.

FN5. As with the previous "oral" warnings given to Rollins, this oral warning to Hohman was memorialized in writing. (Ex. 5.)

FN6. Certain allegations of race discrimination have not been addressed by the Court. In his affidavit, Rollins asserts that for six years he was allowed to go to lunch off the premises but in the

fall of 2000, Hofstetter told him that he could no longer leave the property for his lunch hour. (Rollins Aff. ¶ 24.) Rollins states that, as far as he knows, he was the only employee forbidden to leave the property during lunch. (Rollins Aff. ¶ 24.) This paragraph contradicts Rollins' sworn deposition testimony when he stated that he had discussed all of the actions he thought showed race discrimination and the lunch had not been discussed. (Rollins Dep. at p. 97.) Since a party may not contradict prior sworn deposition testimony via a subsequent affidavit, except in limited circumstances that do not apply here, the Court does not consider this allegation. See Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361 (8th Cir.1983). The same is true of Rollins' allegations concerning not being asked if he wanted to go skeet shooting. (Rollins Aff. ¶ 25.)

FN7. The timing of Grellner telling Rollins of Beck's comment is uncertain but at least prior to July 1999, two years before Rollins left the Department in July 2001. (Rollins Dep. at p. 47.)

FN8. Whether or not Rollins actually overheard the comment is confusing. In Rollins' deposition testimony and affidavit, Rollins never says that he actually heard the racial epithet used. (See, e .g., Rollins Aff. 8; Rollins Dep. at pp. 46-52.) Yet, Erickson's questionnaire implies that Rollins overheard a co-worker using the term. In an abundance of caution, the Court assumes Rollins overheard the word used.

FN9. Rollins' affidavit places this incident in December 2001. The Court believes this is a typographical error since Rollins was terminated in July 2001. The Court assumes this was in 2000, as Hohman's affidavit states.

FN10. In his affidavit, Rollins asserts that he complained to Jerry Goff that he thought Hohman was harassing him. This affidavit contradicts Rollins' prior deposition testimony. In his deposition, Rollins did not include Jerry Goff as a person to whom he complained about harassment. As stated before, sworn deposition testimony cannot be contradicted by a subsequent affidavit to create a genuine issue of material fact. Camfield Tires, Inc., 719 F.2d 1361. For this reason, the fact that the Court finds no other evidence in the record that suggests that Rollins complained to Jerry Goff, and that Jerry Goff's affidavit at paragraph 16 states that Rollins never complained to him about harassment, the Court does not include a complaint to Jerry Goff in this section.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21976027 (S.D.Iowa))
▷

Page 1

Only the Westlaw citation is currently available.

United States District Court,
S.D. Iowa, Central Division.

David GRIFFITH, Plaintiff,
v.
CITY OF DES MOINES, Ronald Wakeham and
Jerry Cohoon Defendants.

No. 4:01-CV-10537.

July 3, 2003.

ORDER

LONGSTAFF, Chief J.

**\*1** The Court has before it defendants' motion for summary judgment, filed March 6, 2003. Plaintiff resisted on May 1, 2003, and defendants replied on May 9, 2003. Plaintiff filed a supplemental resistance on June 24, 2003, to which defendants replied on June 25, 2003. The matter is now fully submitted.

I. BACKGROUND

The following facts are undisputed or viewed in a light most favorable to plaintiff.

Plaintiff, David Griffith, is a Hispanic male of Mexican descent. He began working for the City of Des Moines Fire Department in January 1989. Plaintiff's App. (Ex. 13). Until December 1999, Griffith was stationed at Fire Station 8, where he worked as a firefighter and emergency medical technician. *Id.* (Ex. 51) (Griffith Dep.). Plaintiff alleges that he and other minority employees were subjected to a racially tense environment at the Fire Department.

The Fire Department has been charged with excluding minorities in the past. In 1982, a Consent Decree was entered ordering the Des Moines Fire Department to hire African Americans. *Id.* Until that time, only one African American had been employed by the Fire Department. *See* Plaintiff's App. (Ex. 8 at 2) (Consent Decree, Civil No. 82-460-D). There have been more recent charges of discrimination as well. In 1998, the EEOC made a probable cause finding that the Fire Department had

again discriminated against African American applicants in the hiring process. *Id.* (Ex. 60) (EEOC Letter).

. Racially-Charged Language Plaintiff Heard

Plaintiff alleges that Fire Department employees have made derogatory remarks about Hispanics. For example, in 1997 or 1998, plaintiff responded to a fire at apartment buildings predominately inhabited by Hispanics located on Indianola and Park Avenues. Defendant's App. at 245 (Griffith Dep.). *Id.* While at the scene, firefighter Gary Lathrum (Lathrum) said, "Boy, if this isn't as close [sic] you can get to a barrio in Des Moines, I'll kiss your ass for that." *Id.* at 245. Griffith asked Lathrum what he meant by "barrio." *Id.* Lathrum replied, "Isn't it the place that you'd like to live in [sic] a place with a bunch of low-rent Mexicans?" *Id.* at 246. Firefighter Larry Van Baale (Van Baale), who had not yet been promoted to lieutenant at the time, chuckled at Lathrum's remark. *Id.* at 64 (Van Baale Declaration, ¶ 1). Plaintiff told Lathrum that he did not appreciate the downgrading comment, but did not document the incident or tell anyone about it *Id.* at 246-47.

In 2000 or 2001, while using the computer in the Captain's office at the Fire Department, plaintiff overheard Lathrum talking to firefighters Curlee Ware and Sam Jacob in the kitchen. [FN1] Lathrum stated, "David Griffith, because he's Latino, he thinks he can get by with everything and that the rules aren't held to the same standard for him as they are for us." [FN2] *Id.* at 252 (Griffith Dep.). Plaintiff then walked into the kitchen and asked Lathrum, "Who do you know or what do you know that I've ever done to try to get away with anything because of my nationality?" *Id.* at 258-59. Lathrum replied, "I was just trying to get Curlee Ware hyped up to go in and give you shit." *Id.* at 259. Plaintiff responded, "Well, I still want to know. Obviously, you feel that way." *Id.* After this exchange Lathrum left the room. *Id.* Later, he returned and told plaintiff that he was "sorry and wrong." *Id.* Plaintiff did not report this incident. *Id.*

FN1. Plaintiff could not see the kitchen from the Captain's office. Defendants' App. at 257.

FN2. According to plaintiff, Lathrum did not know plaintiff was in the Captain's office when he made

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21976027, *1 (S.D.Iowa))

his remark. *Id.* at 252-53.

*2 Plaintiff alleges that on May 5, 2001, while working in the Captain's office, he overheard another conversation taking place in the kitchen between Van Baale and Lathrum about the recent closing of a local packing plant. *Id.* at 252, 256-57. [FN3] Van Baale stated, "Why do we need all the spics here? We ought to send them all back to Mexico." *Id.* at 251-52. Lathrum responded, "I'm tired of paying for their welfare and their medical help." *Id.* at 252. Plaintiff did not document or tell anyone about this episode. *Id.* at 259. Van Baale denies having the conversation and denies being at work on May 5, 2001. *Id.* at 64 (Van Baale Declaration, ¶ 2). Fire Department records show that Van Baale was on sick leave that day. *Id.* at 65 (Fire Department Duty Roster for May 5, 2001).

FN3. [missing text].

Plaintiff has heard firefighters make derogatory comments about non-Hispanic minorities. In 1998, while watching a movie at Station 6, Lathrum referred to African Americans as "niggers." *Id.* at 238-41. When an orangutan appeared on the movie, Lathrum said, "If that ain't the fucking link between the blacks and the apes, I'll kiss your ass." *Id.* In 1999, plaintiff heard another fire fighter, Billy Burt, say, "You put a basketball in those niggers' hands, they know what to do, but you ask them to do something on the fire ground, and they don't know what to do." [FN4] *Id.* at 242. In 2000 or 2001, while on a call to a house owned by Asians, plaintiff told Lathrum, "That's a strong, strong smell." *Id.* at 261 (Griffith Dep.). Lathrum replied, "The whole fucking country smells like that. I should have shot all their fucking asses in Vietnam when I had the chance." *Id.*

FN4. In his deposition, when asked who made this remark, plaintiff stated, "I cannot remember who it was. It sticks in my mind that it was Billy Burt ... He was constantly making some type of derogatory remark towards some nationality, towards some person of the fire department." *Id.* at 242-43.

Plaintiff has never personally heard Chief Ronald Wakeham make any comments that disparaged plaintiff's ethnicity. *Id.* at 304. Chief Wakeham denies ever discriminating against plaintiff on the basis of his race and denies ever observing anyone else discriminate against plaintiff on the basis of his

race. *Id.* at 151 (Wakeham declaration, ¶ 2).

. Racial Comments Heard By Other Employees

In addition to plaintiff's allegations, the record contains testimony given by other firefighters who have heard racial comments at the Fire Department. In his deposition, firefighter Patrick Daughenbaugh (Daughenbaugh) stated, "We definitely have issues of racism on this job." *Id.* at 383. He recalls that someone at Station 2 once called plaintiff a "stupid Mexican." *Id.* at 383 (Daughenbaugh Dep.). [FN5] Daughenbaugh stated that he heard what he believed to be racially derogatory remarks about Hispanics when called to a trailer park on the south side of Des Moines, an area another firefighter referred to as "Little Mexico." *Id.* at 389-90. He stated, "Any time you go to those south side trailer parks, you're going to hear something, whether it's quiet or, you know, nod-nod, wink-wink, or this or that. Yeah, you hear that stuff all the time." *Id.* at 390. Daughenbaugh specifically recalled hearing the following comments: "thank God we keep them all in one place;" "they should go back to their own country;" "they're sucking our resources;" and "see where your tax money is going." *Id.* at 389, 394-95. As the Court understands Daughenbaugh's Deposition., he also once heard a firefighter refer to a Hispanic person as a "beaner." *Id.* at 394. Daughenbaugh could not identify which firefighters made these remarks. *Id.* at 394-95.

FN5. Daughenbaugh does not recall who made the remark and does not recall whether plaintiff was on his leave of absence at the time the remark was made. *Id.* at 384, 387-88.

*3 David Bernal, another Hispanic firefighter, stated that he heard racial remarks that were "kind of off" on a monthly basis when assigned to Station 8. *Id.* at 431-32. For instance, sometime in 2001 or 2001, he heard another firefighter, whose nickname was Nature Boy, make the following comment: "They ought to take all them fucking wetbacks and send them all back over the border where they belong." *Id.* 418-19 (Bernal Dep.). Nature Boy then used some other racially derogatory words, including "greasers." *Id.* at 419. Bernal told Nature Boy that as a Hispanic, he was offended by Nature Boy's remarks. *Id.* at 419. Nature Boy replied, "Go ahead. Sue me. Do what you want to do. Go ahead, Bernal, are you going to sue me? Take me downtown. Are you going to take me downtown

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21976027, *3 (S.D.Iowa))

about it?" *Id.* at 421-22. Bernal did not report the incident to anyone, does not know if any supervisor heard it, and cannot recall which supervisors were at the station at the time. *Id.* at 422-23.

Bernal also told plaintiff about a comment he heard in about January 2002 by his Acting Captain, Timothy Hartman. Hartman asked Hispanic District Chief Chia, "What kind of self-respecting Mexican doesn't go around carrying a stiletto?" *Id.* at 416-17 (Bernal Dep.). According to Bernal, Chia did not appear offended at all, but took the question as a good-humored joke. *Id.* at 417, 427. Bernal stated: "Chia is probably the one who gets most of the racial jokes and things said to him, because he takes it and it's a fun thing for him and the people that do it to him. They enjoy it." *Id.* at 427.

Firefighters have complained of non-Hispanic racially derogatory language being used at the Fire Department as well. In his deposition, firefighter Kevin Carroll stated that he had been called "nigger" by another firefighter. Plaintiff's App. (Ex. 50a) (Carrol Dep. at 86-87). Firefighter Robert Stanton complained that on January 18, 2002, firefighter Rick Fite publicly called him a "nigger" and his children "half breeds." Plaintiff's App. (Ex. 53). Stanton reported the incident to Chief Wakeham, and Fite received a written reprimand for his behavior. *Id.* (Exs.54, 55).

Other Fire Department employees have complained that Chief Wakeham himself has made inappropriate racial remarks at work. On June 6, 2002, Assistant Chief Douglas Rubin sent a letter to Human Resources Director, Tom Turner, concerning "off-color comments" made by Wakeham. Plaintiff's App. (Ex. 56). Rubin generally stated that the off-color remarks from Chief Wakeham "are numerous, ongoing, and cross all protected classes" and have placed Rubin in an "untenable position." *Id.* Rubin gave four examples of offensive comments Wakeham allegedly made. Of the four, two statements contained gender-based slurs; one involved the use of, or at least the suggestion of, profanity; [FN6] and one included the term "nigger." The comment including the term "nigger" was not made in the context of an employment decision. [FN7] Rubin stated that he had been advising the City of Wakeham's behavior for four years. *Id.*

FN6. Rubin complained that Wakeham gave the

following introduction at a senior staff meeting: "Well, let me tell you a little bit about myself ... I come from Norfolk, Virginia. You know how that's pronounced, no drink, no smoke, No Fulk."

FN7. Rubin recalled the following incident:
On May 8, 2002, [Wakeham] and I went to Nolen Plaza for the Mayor's Spring Bash. We spoke with our personnel there then grabbed some ice cream and walked around. When it got to be around 11:30 a.m ., I asked [Wakeham] if he wanted to stick around ... or go to lunch. He turned his head in the direction of Amelia Hamilton-Morris who had a table set up and said: 'Well, I guess we could always throw the nigger in the pool.'

**\*4** On February 25, 2003, Rubin signed a declaration stating that he has "never heard [ ]Wakeham say anything racially derogatory about David Griffith." Defendant's App. at 158 (Rubin Declaration). He further stated that he has "never heard [ ] Wakeham say anything racially derogatory about Hispanics generally." *Id.* Rubin's statements were made under penalty of perjury. *Id.*

In addition to Rubin, three others have complained about Wakeham. Barbara Rodgers, an Administrative Analyst for the fire department, stated that Wakeham made racially derogatory remarks, including "nigger." (Ex. 57) (Rodgers Letter). Ahman Douglas, an African American firefighter, complained that Wakeham told him to be part of a television interview, because "they need some color." *Id.* (Ex. 59, at 3). David Keenan stated that during a meeting about the importance of interpreting the different types of smoke at a structure fire, Wakeham made a reference to Indians. *Id.* (Ex. 58, at 1). None of these three remarks were made in connection with any adverse employment action. *See Id.* (Exs.57-59). Like Rodgers and Ahman, Keenan documented his complaint with Tom Turner of Human Resources. *Id.*

. Criminal Charges Against Plaintiff

In October 1999, plaintiff was arrested and pled no contest to a charge of simple assault for a non-work-related incident that took place between him and a woman at Drake University. Defendant's App. at 503-04, 507 (Griffith Dep.). At the time, plaintiff feared that he might lose his job due to the assault charge that was filed against him. *Id.* at 505-06.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Two months later, a warrant was issued for plaintiff's arrest on three counts of 3rd Degree Sexual Abuse. *Id.* at 4 (12/13/99 Arrest Warrant). One day, a Des Moines police officer arrived at Station 8 and told several firefighters that plaintiff was going to be charged with "serious sexual acts towards a minor." *Id.* at 351 (Carrol Dep.) Plaintiff was arrested on December 14, 1999. *Id.* at 5 (Warrant Return of Service). His arrest was reported in The Des Moines Register. *Id.* at 15 (12/15/99 The Des Moines Register). [FN8] After plaintiff's arrest, his lawyer, Kent Balduchi, contacted Assistant City Attorney, Carol Moser, in order to determine whether the criminal charges would affect plaintiff's employment with the Fire Department. *Id.* at 318-19 (Balduchi Dep .). Moser informed Balduchi that plaintiff would receive a pretermination hearing, and that he would continue to receive his pay until that hearing was held. *Id.* She further advised that the City had a policy allowing it to terminate an employee when felony charges had been brought against the employee. *Id.* at 320

> FN8. The Des Moines Register article provided:
> Three counts of third-degree sexual abuse have been filed against a Des Moines firefighter for incidents dating back several years. David Lee Griffith ... was arrested Tuesday by Des Moines police. Officials allege Griffith fondled a teen-age girl who was under the legal age of consent. Later, when she was an adult, Griffith is alleged to have forcibly fondled the woman. The complaint was filed by the woman, now 22, on Saturday.
> *Id.*

Balduchi understood that a pretermination hearing would not necessarily result in plaintiff's termination, but he feared plaintiff's employment was in jeopardy. *Id.* at 319. On December 15, 1999, he sent a letter requesting a leave of absence for plaintiff. The letter stated, in relevant part:
*5 [Plaintiff] is aware of the public concerns which may be raised regarding his service as a firefighter, whether founded or not. In an effort to allay those fears, [plaintiff] is requesting a leave of absence until these charges are resolved or for one year, whichever is less. We believe a leave of absence will protect the City's interest and thereby avoid the pressure to take any premature punitive measures such as suspension or termination of [plaintiff's] employment.
*Id.* at 17. In a second letter sent on the same date, plaintiff's lawyer stated that he was under the

impression that the Fire Department was planning to terminate plaintiff, and that plaintiff's request for leave of absence was an offer of compromise. *Id.* at 18.

In a letter dated December 16, 1999, Fire Chief Ronald Wakeham ("Wakeham") granted plaintiff a 90-day leave of absence, beginning on December 17, 1999. *Id.* at 21. Wakeham advised that he would review the leave status after 60 days. *Id.* During the short period of time between their arrest and Wakeham's grant of the 90-day leave of absence, plaintiff was placed on paid administrative leave. *Id.* at 334-35 (Balduchi Dep.).

On January 20, 2000, plaintiff was charged with three counts of Sexual Abuse in the 3rd Degree. *Id.* at 7 (Trial Information). The charges were based upon information gathered by the Des Moines Police Department, including a tape- recorded interview with the victim, and a tape-recorded telephone call between the victim and Griffith. *Id.* at 434-55 (Des Moines Police Report). Defendants claim that this evidence of plaintiff's alleged misconduct was sufficient to support a discharge from employment under Iowa Code Section 400.19.

On March 13, 2000, Balduchi wrote Moser a letter requesting a copy of the City's policy regarding leave for employees facing felony charges. *Id.* at 22. Moser informed Balduchi that the City did not have a written policy, but that it had been the City's practice "to place similarly situated employees on leave pending the outcome of the criminal charges." *Id.* at 23 (3/17/00 Moser Letter). She indicated that "[t]here were other circumstances when discipline ha[d] occurred immediately without waiting for the outcome of criminal charges." *Id.* Moser further advised:
While your client requested the leave of absence granted by the fire chief, it is likely that he would have been put on leave without his request and it is my understanding that the leave will continue until the sex abuse charge is resolved. Public employees particularly those in the public safety arena are held to a high standard of conduct and continued leave is in the public interest.
*Id.* Finally, Moser acknowledged that plaintiff could use his vacation time during his leave of absence. *Id.*

Plaintiff did not appeal his leave of absence to the Des Moines Civil Service Commission. *Id.* at

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21976027, *5 (S.D.Iowa))

321-22 (Balduchi Dep.).

In May 2000, Balduchi informed Moser that a plea agreement had been reached in plaintiff's criminal case, and that plaintiff's charges would be reduced to a misdemeanor level. *Id.* at 323-24 (Balduchi Dep.) Moser represented that the City would allow plaintiff to return to work in anticipation of the plea. *Id.* at 24, 325. Upon his return, plaintiff was assigned to 8-hour workdays at Station 1 in Des Moines, Iowa. *Id.* at 216-18 (Griffith Dep.).

*6 On May 16, 2000, plaintiff pled guilty to the charges of Assault with the Intent to Inflict a Serious Injury and Harassment in the First Degree. *Id.* at 10-12 (Petition to Plead Guilty and Order of Conviction). The court suspended the sentence of imprisonment and placed him on probation for two years. *Id.* at 13 (Order of Conviction). The conditions of probation included attending assaultive behavior classes and a prohibition on coaching, training, or running with any persons under the age of 18. [FN9] *Id.*

> FN9. Plaintiff's relationship with his victim began when the victim was 15 years-old. Plaintiff gave his victim running instruction.

. Plaintiff's Post-Plea Employment

Plaintiff continued to work for the Des Moines Fire Department after he pled guilty to the criminal charges against him. On or about May 18, 2000, Assistant Chief Cohoon granted plaintiff's request to ride a fire truck at Station 5. *Id.* at 219-20 (Griffith Dep.). He worked as a firefighter, rather than a medic, on that assignment. *Id.* On May 21, 2000, plaintiff was assigned to work as an acting medic at Station 9. *Id.* at 224. Plaintiff thought that his skills were inadequate for that assignment, since he had not been on a medic squad for six months. After sharing his concern with District Chief Douglas, plaintiff was reassigned to the ladder truck at Station 9, a non-medic assignment. *Id.* at 224-27.

In the weeks that followed, plaintiff received instruction on how to operate extrication equipment that had been installed on the fire trucks. *Id.* at 231-32.

On or about July 24, 2000, Acting District Chief Sanders assigned plaintiff to drive the medic squad at Station 3. *Id.* at 227. When plaintiff arrived at Station 3, he informed the Paramedic on duty that his assistance would be limited, as he had not used his EMS skills for more than six months. *Id.* at 277. After Griffith stated his concern, he was given a different assignment. *Id.* at 277, 306. In an effort to officially notify the Fire Department that he did not believe his medic skills were adequate, plaintiff wrote Assistant Chief Cohoon a memorandum stating that the Fire Department "had done nothing with helping [him] regain the training that [he] lost during [his leave of absence]." Plaintiff's App., Exhibit 21 (Des Moines Fire Department Official Report); and *Id.*, Exhibit 48 (Cohoon Dep. at 33-35).

The next day, plaintiff went to Station 1 to speak with Cohoon about whether he had to maintain his chauffeur's license and EMT-B certification. [FN10] *Id.* at 199-200. During the discussion with Cohoon, plaintiff said that he did not want to be put in "acting" positions, and he asked Cohoon to sign a memo that plaintiff had drafted. [FN11] *Id.* at 203-04. Cohoon did not sign the memo, and he told plaintiff that the license and certification were mandatory. Plaintiff then asked Cohoon to produce documentation regarding the certification and licensing policy. *Id.* at 207. Cohoon told plaintiff to put his request in writing, and that he would look for the documentation later. *Id.* When Cohoon said he was too busy to immediately look for the documentation, plaintiff replied, "You're always too busy." *Id.* at 207-08. Plaintiff then questioned whether he had received sufficient training to be put in an acting medic position. *Id.* Cohoon stated that either he had, or he would, make arrangements for plaintiff to ride "third man" on a medic squad to get additional training. *Id.* Plaintiff then sarcastically commented that Cohoon was a "great leader" and "a joke." *Id.* at 208-09. Cohoon stated, "Don't you push me, mister." *Id.* at 209. Plaintiff then exclaimed, "He just threatened me. He just assaulted me. I want to call the police." *Id.* Afterwards, plaintiff left Cohoon's office. *Id.*

> FN10. Plaintiff secretly tape-recorded the July 25, 2000 discussion between him and Cohoon. *See* Defendant's App., at 433 (Compact Disc, Griffith & Cohoon Conversation).

> FN11. The nature of plaintiff's memo was not made clear in the record. The Court assumes that this memo was the one drafted the day before concerning plaintiff's medic training.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21976027, *6 (S.D.Iowa))

Page 6

*7 Cohoon reported this incident to Chief Wakeham. *Id.* at 339 (Wakeham Dep.) Plaintiff received a pre-disciplinary hearing on August 23, 2000. *Id.* at 35, 339-40. At the hearing, Balduchi argued on behalf of plaintiff that "an appropriate outcome to [the] situation may be a letter of reprimand or discipline to [plaintiff]." *Id.* at 327 (Balduchi Dep.). Following the hearing, Chief Wakeham found that plaintiff "did not exhibit the acceptable level of decorum and respect for the position of Assistant Chief[,]" and that [plaintiff's "aggressive demeanor [was] not conducive to the required order to safely and efficiently extend fire services to the public." *Id.* at 35 (9/5/00 Wakeham Letter). Plaintiff received an oral reprimand and was referred to the Employee Assistance Program for an evaluation and consultation regarding his anger manifestations. *Id.*

In August 2000, District Chief Stookey developed a training program for plaintiff. *Id.* at 278-80 (Griffith Dep.). He asked plaintiff to make a prioritized list of the things on which he needed additional training. *Id.* Plaintiff did so and requested training on "standard operating procedures" and "equipment familiarization on apparatus." *Id.* at 36 (8/23/00 Griffith Request). Stookey subsequently assigned plaintiff to ride as a "third man" on a medic squad, and he allowed plaintiff to drive the squad in a non-emergency situation for practice. *Id.* at 236-37 (Griffith Dep.).

On September 28, 2000, plaintiff sent Chief Wakeham a letter in which he addressed his concern that "for months the Administration of the Des Moines Fire Department attempted to force me into hazardous tasks without complete training and re-certification." *Id.* at 37. That same day, Chief Wakeham called a meeting, attended by plaintiff, Stookey, Cohoon, and a union representative *Id.* at 39 (Disciplinary Meeting Notes), 281 (Griffith Dep.). Plaintiff was reassigned to a 40-hour work week, 8-hour day shift, for the purpose of "up to date training in all aspects of fire disciplines." *Id.* at 39.

Plaintiff went through training for about a month and was then reassigned to his station. *Id.* at 306-07. He believed he was fully skilled in his position by about October 2000. *Id.* at 309-10. In November or December 2000, plaintiff was assigned to work on a ladder truck. *Id.* at 232-33. For several weeks, plaintiff worked without incident. In January 2001,

he received a favorable job evaluation from Lieutenant Van Balle and Captain Williams, with only the area of "driving ability" evaluated as "needing improvement." *Id.* at 70.

. Fire Scene Misconduct

On July 31, 2001, plaintiff was called to the scene of a house fire on Maury Street. *Id.* at 284 (Griffith Dep.). Jack Kamerick, a Fire/Arson investigator from the police department, and Dave Knutzen, a Fire Inspector from the Fire Department, were also at the scene investigating a juvenile's involvement with the cause of the fire. *Id.* at 46. At the scene, plaintiff overheard Kamerick talking with the juvenile's parents and learned that Kamerick planned to interview the juvenile without his parents present. *Id.* at 288-89 (Griffith Dep.). After plaintiff overheard Kamerick, he walked by the juvenile's parents with firefighter Dave Thompson. *Id.* at 288. According to plaintiff, the following exchange took place between him and Thompson:

*8 I asked [Thompson] if we were allowed to question minors without a parent, because on the squad we can't get permission from a minor, we have to get hold of a parent, and [Thompson] said, you know, "I don't know." And I said, "Well, that's because if it was my kid, I'd want somebody there." *Id.*

Plaintiff was aware at the time that the juvenile's parents would probably hear his remarks. *Id.* at 290-91.

According to Kamerick and Knutzen, the juvenile's father attempted to stop the investigators' interview of the juvenile, citing plaintiff's remarks as the reason. *Id.,* at 41 (Kamerick report), and 41 (Knutzen Report). Knutzen interviewed the juvenile's parents the following day. *Id.* at 43 (Transcript of 8/1/01 statement of parents). They identified plaintiff from a group of photographs and said that he made the remarks directly to them. *Id* .

On August 24, 2001, a pre-disciplinary hearing was held regarding plaintiff's conduct at the fire scene. *Id.* at 55 (Wakeham Letter). Plaintiff's union representative read a statement plaintiff prepared that included the following comment: "Firefighters were discussing among themselves if juveniles could be questioned without parents being present.' *Id.* at 50 (Hearing Transcript). Plaintiff did not name the firefighters who allegedly were having this discussion. *Id.*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21976027, *8 (S.D.Iowa))

After the hearing, the City and union representatives interviewed the firefighters that were present at the July 31, 2001 fire on Maury Street. *Id.* at 55 (9/12/01 Wakeham Letter); 52 (Turner Dec. ¶ 3). None of the firefighters recalled hearing the discussion plaintiff claimed took place. *Id.*

The Fire Department Administration concluded that plaintiff had interfered with a potential criminal investigation at the fire scene, and that he subsequently provided a "less than candid" version of the events that took place at the fire scene. *Id.* at 55 (9/12/01 Wakeham Letter). As a result, plaintiff received a written reprimand and was suspended without pay for 24 hours. *Id.* at 56.

. Refusal to Sign Check List

As part of their duties with the Des Moines Fire Department, fire fighters are assigned to inspect rescue equipment on a regular basis. On October 2, 2001, Lieutenant Larry Van Baale discovered that the EMS equipment check list had not been signed on several days in September, though the check list indicated that the equipment had been inspected. *Id.* at 67, 69. Plaintiff admitted to Van Baale that he had inspected the EMS equipment on the days where no signature appeared on the check list form. *Id.* at 295. Van Baale asked plaintiff to sign the form, but plaintiff refused. *Id.* at 72 (Griffith Written Statement). Plaintiff's reasons for not signing the sheet upon Van Baale's request were two-fold: first, he stated that he "didn't trust the City," second, he stated:

"I didn't want to sign something that had been-had 20 days or 22 days, whatever, had lapsed, because if I check off that [something] was there but the City knew that it wasn't there, then they would say that ... I'm forging something, or whatever, and try to fire me."

*9 *Id.* at 293 (Griffith's Dep.). Ultimately, plaintiff told Van Baale, "I would sign the sheet if I am required to do so, but if I am not required to do so, I would prefer to not sign the sheet." *Id.* at 72 (Griffith Written Statement). Plaintiff told Van Baale that he would sign the form if Van Baale would provide him with a written copy of the inventory signature policy. *Id.* at 67 (Van Baale Report).

On October 11, 2001, a pre-disciplinary hearing was held regarding plaintiff's refusal to sign the inventory form. *Id.* at 57 (Wakeham Letter). The

Fire Department Administration concluded that plaintiff's behavior was unacceptable, noting that the inventory signature policy was issued in writing in December 2000; that plaintiff previously complied with the policy; and that plaintiff admitted he was the person who failed to sign the form on the days in question. *Id.* The Administration stated: "Refusal to follow an order from a superior officer is intolerable in the fire service. Immediate compliance with instructions and orders is critical in saving lives of citizens and other firefighters." *Id.* As a result of this incident, plaintiff was suspended for 48 hours without pay. *Id.*

. Comments Regarding Plaintiff's Criminal Charges

While plaintiff was on leave of absence, many fire fighters at the Fire Department commented on plaintiff's criminal charges. Kevin Carrol told plaintiff about the Billy Burt's remarks. *Id.* at 223 (Griffith Dep.). According to Carrol, Burt said that plaintiff was a pedophile, a child molester, a rapist, and was guilty of three felony sexual crimes. *Id.* at 274-75. Carrol stated that he heard Burt make these and similar comments about plaintiff's criminal situation almost every day at work while plaintiff was on leave. *Id.* at 358-60 (Carroll Dep.). Kent Balduchi, plaintiff's attorney at the time, stated that he heard critical comments about plaintiff's pending criminal charges on an average of once a week. *Id.* at 332 (Balduchi Dep.). Neither Carroll or Balduchi ever heard anyone say anything racially derogatory about plaintiff. *Id.* at 330 (Balduchi Dep.), 354-55 (Carroll Dep.). In his Deposition., Carroll stated that he did not recall hearing any racially derogatory terms at work about Hispanics. *Id.* at 370-71.

Captain Morris and Chief Wakeham also made comments about plaintiff's criminal charges. *Id.* at 360-61 (Carroll Dep.), and 376 (Daughenbaugh Dep.). In March or April 2000, Chief Wakeham commented to Firefighter Daughenbaugh, "I've got two child molesters on this job." *Id.* at 376-77 (Daughenbaugh Dep.).

. Griffith's Complaints to the Iowa Civil Rights Commission

On August 18, 2000, plaintiff filed a complaint with the Iowa Civil Rights Commission (ICRC). *See id.* at 77 (8/18/00 ICRC complaint). Plaintiff alleged that the Fire Department and the City of Des Moines were prejudiced against him because of his race, and

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

that the Fire Department assigned him to positions which he was not qualified to perform. *Id.* He described the incident that took place on July 24,2000, when he was assigned to drive the medic squad at Station 3. *Id.*

**\*10** On or about October 4, 2001, plaintiff sent a written complaint to the City's EEO officer, Willie Robinson, about the EMS Inspection Sheet episode that took place on October 2, 2001. *Id.* at 130 (10/4/01 Griffith letter). Robinson conducted an investigation, and on January 18, 2002, he issued a report in which he concluded that plaintiff had not been discriminated against or harassed in that situation. *Id.* at 127-29 (1/18/02 Robinson Report).

On January 23, 2002, plaintiff filed a second complaint with the ICRC. *See id.* at 82 (1/23/02 ICRC complaint). Plaintiff's complaint identified two of his disciplinary hearings and the denial of paid leave for workers' compensation and disability as the discriminatory acts. *Id.* at 85.

. Plaintiff's Application for Disability Benefits

On October 8, 2001, Dr. Garfield, a clinical psychologist, diagnosed plaintiff with a "Major Depressive Episode" and suggested medical leave for at least four weeks. Plaintiff's App., (Ex. 43) (10/8/01 Garfield Letter). Shortly thereafter, plaintiff applied for disability retirement with the Municipal Fire & Police Retirement System of Iowa (MFPRSI). [FN12] Defendant's App., 475-67 (Application for Disability Retirement). On or about October 24, 2001, the City obtained an evaluation from Dr. Peterson regarding the work- relatedness of plaintiff's condition. *Id.* at 488-91. (10/24/01 Peterson Letter). Dr. Peterson concluded: "Unless Mr. Griffith has omitted important facts to me or has misinterpreted the events he has described, it is my opinion that he has experienced significant stress related to the atmosphere of criticism in his workplace and to the difficulty he has had receiving training he has requested." *Id.* at 490-91.

> FN12. Plaintiff signed the application on October 5, 2001, but Chief Wakeham did not sign the application until October 9, 2001. The Court presumes plaintiff did not submit the request until after he was examined by Dr. Garfield on October 8, 2001.

On January 22, 2002, the Medical Board of the

MFPRSI opined that plaintiff's disability was "likely to be permanent based on the impression that it will be of at least one year's duration." *Id.* at 493 (1/22/02 letter from University of Iowa College of Medicine). On February 8, 2002, the City sent MFPRSI a letter arguing that plaintiff's condition qualified as an "ordinary disability," rather than an "accidental disability." [FN13] On February 27, 2002, the MFPRSI Executive Director denied plaintiff's application for disability benefits. *Id.* at 499 (2/27/01 Jacobs Letter). The Director stated:

> FN13. Although the parties have not addressed the difference between "accidental disability" and "ordinary disability," the Court assumes that plaintiff would receive more benefits if he qualified for the former.

The basis for the denial is Iowa Code section 411.6(16)(a)(2). That section provides that a member otherwise eligible to receive a disability pension under chapter 411 shall not be eligible if "the disability is a mental disability proximately caused by appropriate disciplinary actions taken against the member or by conflicts with a superior or coworker if the superior or coworker was acting legally and appropriately toward the member when the conflicts occurred.
*Id.* In March 2002, plaintiff appealed the MFPRSI's denial of disability retirement. *Id.* at 500 (3/26/02 Jacobs letter).

. Labor Union's Quest for Injury Leave

**\*11** On January 3, 2002, plaintiff's labor union filed a grievance with the City regarding the City's placement of plaintiff on sick leave rather than injury leave. *Id.* at 58 (1/3/02 TeKippe Letter). In order to determine whether plaintiff qualified for injury leave, the City had to determine the following: (1) whether plaintiff was injured in actual performance of duty; and (2) whether plaintiff's misconduct contributed to the injury. *Id.* at 60 (1/15/02 Turner Letter) (citing Article 18, Fire Labor Agreement). Because these issues were pending before the MFPRSI, the City informed the labor union that it would withhold ruling on plaintiff's grievance. *Id.* On February 1, 2002, the labor union submitted the sick leave/injury leave controversy to arbitration pursuant to the labor contract. *Id.* at 62 (2/1/02 (TeKippe Letter).

. City's Termination of Another Fire Department

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21976027, *11 (S.D.Iowa))

Employee Charged With Abuse

In June 1998, Fire Department employee Terry Wollesen was charged with two counts of felony sexual abuse. *Id.* at 138 (6/23/98) (Wollesen Trial Information). On July 1, 1998 a No Contact Order issued instructing Wollesen to stay away from all minor children. *Id.* at 139 (No Contact Order). Wollesen subsequently agreed to enter the Intra-Family Sexual Abuse Treatment Program. *Id.* at 140. On February 23, 1999, a new No Contact Order was issued instructing Wollesen to "make every attempt to not be present around children under the age of eighteen during his on-duty hours at the Des Moines Fire Department." *Id.* at 143 (2/23/99 Wollesen No Contact Order).

Cohoon and Wakeham first learned of Wollesen's sexual abuse charges shortly after February 23, 1999. *Id.* at 151 (Wakeham Declaration), 149 (Cohoon Declaration). On March 9, 1999, Wollesen was placed on sick leave. [FN14] *Id.* at 148 (Wollesen Time Record). Wollesen applied for disability retirement under Iowa Code Chapter 411. *Id.* at 153 (3/16/99 Wakeham Letter).

> FN14. Sick leave is paid leave that the employee accrues over time. *Id.* at 176-77 (Labor Agreement).

Wollesen was terminated on May 10, 1999. *Id.* at 154 (5/13/99 Termination Letter). He appealed his termination to the Des Moines Civil Service Commission. On May 2, 2000, the Commission ordered Wollesen reinstated from May 10, 1999 through August 10, 1999, the date of his "normal disability retirement." *Id.* at 156-57 (Civil Service Commission Ruling and Decision).

On May 30, 2000, Wollesen plead guilty to amended criminal charges of lascivious acts with a child. *Id.* at 145 (5/30/00 Wollesen Amended Trial Information).

. The Present Action

Plaintiff filed this lawsuit in Polk County District Court on August 22, 2001, and it was removed to this Court on September 6, 2001. Plaintiff alleged the following causes of action against all defendants: (1) intentional discrimination based on race in violation of Iowa Code § 216 (Count I); (2) retaliation in violation of Iowa Code § 216.(Count

I); (3) violation of contractual rights in violation of 42 U.S.C. § 1981 (Count III); and (4) violation of 42 U .S.C. § 1983 (Count IV). Plaintiff also brought the following claims against the City Defendant: (1) unequal treatment in violation of Title VII (Count II); (2) retaliation in violation of Title VII (Count II); and (3) failure to pay wages due in violation of Iowa Code § 91A (Count V).

II. APPLICABLE LAW AND DISCUSSION

A. Summary Judgment Standard

*12 Summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Walsh v. United States,* 31 F.3d 696, 698 (8th Cir.1994). The moving party must establish its right to judgment with such clarity there is no room for controversy. *Jewson v. Mayo Clinic,* 691 F.2d 405, 408 (8th Cir.1982). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248. "As to materiality, the substantive law will identify which facts are material.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

At the summary judgment stage, the court should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Instead, the court's function is to determine whether a reasonable jury could return a verdict for the nonmoving party based on the evidence *Id.* at 248. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in the nonmovant's favor. *Quick v. Donaldson Co.,* 90 F.3d 1372, 1377 (8th cir.1996). "Because discrimination cases often turn on inferences rather than on direct evidence," the court is to be particularly deferential to the nonmovant. *EEOC v. Woodbridge Corp.,* 263 F.3d 812, 814 (8th Cir.2001) (citing *Crawford v. Runyon,* 37 F.3d

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1338, 1341 (8th Cir.1994)). "Notwithstanding these considerations, summary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of her case." *Id.*

B. Title VII Race Discrimination

Plaintiff alleges that defendant City of Des Moines discriminated against him because of his race in violation of 42 U.S.C. §§ 2000e *et seq.* Title VII provides that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." Civil Rights Act of 1965, Title VII, § 701, 42 U.S.C. § 2000e(m) (as amended by Civil Rights Act of 1991, Pub.L. No. 102-166, § 107(a), 105 Stat. 1071 (1991)). Traditionally, plaintiff's claim would be analyzed under the burden-shifting framework of *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), or the burden- shifting framework of *McDonnell Douglas v. Green,* 411, U.S. 792, 802 (1973). In the Eighth Circuit, the *McDonnell Douglas* framework applied where plaintiff's claim was primarily supported by circumstantial evidence; the *Price Waterhouse* framework applied where plaintiff presented direct evidence of discrimination. *See Mohr v. Dustrol, Inc.,* 306 F.3d 636, 639-40 (8th Cir.2002). This dichotomy was recently called into question by the Supreme Court's decision in *Desert Palace v. Costa,* --- U.S. ----, 123 S.Ct. 2148, 156 L.Ed.2d 84, 2003 WL 21310219 (2003), which interpreted the 1991 amendments to Title VII. *See also Costa v. Desert Palace, Inc.,* 299 F.3d 838, 855 *affirmed by Desert Palace v. Costa,* --- U.S. ---- , 123 S.Ct. 2148, 156 L.Ed.2d 84, 2003 WL 21310219 (2003). ("[N]othing compels the parties to invoke the *McDonnell Douglas* presumption. Evidence can be in the form of the *McDonnell Douglas* prima facie case, or other sufficient evidence-direct or circumstantial-of discriminatory intent."). In *Dare v. Walmart,* 2003 WL 21382493, at *3-*4 (D.Minn.2003), the federal district court held that in light of the 1991 amendments to Title VII and the Supreme Court's decision in *Desert Palace,* courts are no longer obliged to apply the *McDonnell Douglas* framework when considering a motion for summary judgment on a "single motive" Title VII claim. This Court agrees with the well-reasoned opinion in *Dare* and finds that a plaintiff may bring his Title VII claim "according to the

burdens articulated in [the] Civil Rights Act of 1991," without being confined to the strictures of the *McDonnell Douglas* burden-shifting framework. *Dare,* 2003 WL 21382493 at *4. *See also Wells v. Colorado Dept. of Transp.,* 325 F.3d 1205, 1221 (10th Cir.2003) (Hartz, J. *dissenting* )("The *McDonnell Douglas* framework only creates confusion and distracts courts from the ultimate question of discrimination *vel non. McDonnell Douglas* has served its purpose and should be abandoned.")(internal quotation omitted). Thus, to survive summary judgment, plaintiff must simply demonstrate that a genuine issue of material fact exists as to whether or not race was a motivating factor in an adverse employment action defendant suffered. *See Dare v. Wal-Mart Stores, Inc.,* 2003 WL 21382493, *4 (D.Minn.2003) (permitting a plaintiff to proceed under the allocations of burdens articulated in Civil Rights Act of 1991 with a "single-motive" claim); *Costa,* 299 F.3d at 848 ("[I]f the employee succeeds in proving only that a protected characteristic was one of several factors motivating the employment action, an employer cannot avoid liability altogether, but instead may assert an affirmative defense to bar certain types of relief by showing the absence of "but for" causation.").

1. Adverse Employment Action

*13 According to the Eighth Circuit, "[t]o establish a prima facie case for discrimination, [the plaintiff] ha[s] to present evidence showing that [he] suffered an adverse employment action and some evidence of discriminatory motive behind that action." *Kerns v. Capital Graphics, Inc.,* 178 F.3d 1011, 1016 (8th Cir.1999). In describing the first element of a plaintiff's prima facie case, the Eighth Circuit has stated:

The adverse employment action must be one that produces a material employment disadvantage. Termination, cuts in pay or benefits, and changes that affect an employee's future career prospects are significant enough to meet the standard, as would circumstances amounting to a constructive discharge. Minor changes in duties or working conditions that cause no materially significant disadvantage do not meet the standard of an adverse employment action, however.
*Kerns,* 178 F.3d at 1016-17.

Plaintiff argues that the following constitute adverse employment actions: 1) he did not receive the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21976027, *13 (S.D.Iowa))

training he requested; and 2) he was disciplined for alleged infractions of Fire Department policy. *See* Plaintiff's Memorandum In Support of Resistance To Defendant City Wakeham And Cohoon Motion For Summary Judgment, at 16.

### a. Training

Upon his return to the Fire Department, plaintiff was asked to drive the medic squad twice: first on May 21, 2000 at Station 9, and then again on July 24, 2000 at Station 3. Defendants' App. at 224, 227. Plaintiff expressed his concern that his medic skills were inadequate on both occasions, and each time he was reassigned to a non-medic task. Plaintiff has not offered any evidence suggesting that he documented his concern or requested additional medic training after the May 21st occasion. After the July 24th occasion, plaintiff documented his concern and discussed it with Assistant Chief Cohoon. *See* Plaintiff's Exs. 22 (Des Moines Fire Department Official Report) and 48 (Cohoon Dep. at 33-35). Cohoon told plaintiff that he would make arrangements for him to get additional training. Defendant's App. at 207-08. In the weeks that followed, District Chief Stookey developed a training program and gave plaintiff additional training in the areas plaintiff requested training. *Id.* at 236-37, 278-80 (Griffith Dep.); and 36 (Griffith Request).

On September 28, 2000, plaintiff sent Chief Wakeham a letter stating, "For months the Administration of the Des Moines Fire Department attempted to force me into hazardous tasks without complete training and re-certification." *Id.* at 37. That day, Chief Wakeham reassigned plaintiff to receive comprehensive training, which plaintiff completed in about one month. *Id.* at 39.

There is nothing in the record to support plaintiff's allegations that he was forced to perform tasks for which he felt unqualified, or that he did not receive the training he requested. To the contrary, the Fire Department granted each of plaintiff's two requests to be reassigned from medic positions, and he ultimately received training which allowed him to be "fully skilled" in his employment position. *Id.* at 39 (Disciplinary Meeting Notes); *Id.* at 309- 310 (Griffith Dep.).

### b. Discipline

*14 Plaintiff argues that the discipline he received for alleged infractions of Fire Department policy constitutes adverse employment action. The City concedes, for purposes of this motion, that the oral reprimand and the disciplinary suspensions of 24 hours and 48 hours that plaintiff received in September 2000, September 2001 and October 2001, respectively, would qualify as adverse employment actions. Defendants' Brief In Support of Summary Judgment, at 36. The Court will assume, without deciding, that plaintiff's leave of absence from December 1999 to May 2000 also constitutes an adverse employment action.

### 2. Discriminatory Motivation

Having found that plaintiff suffered adverse employment actions, the Court will next turn to the second element of plaintiff's prima facie case. Specifically, the Court will determine whether there is a genuine issue of material fact as to whether race was a motivating factor in the adverse employment actions. Stated another way, viewing the record in a light most favorable to plaintiff, the Court will determine whether a reasonable juror could find that, more likely than not, race was a motivating factor in defendant's employment actions. The Court will answer this question by considering each of the four adverse employment actions in turn.

### a. September 2000 discipline

The City claimed that the discipline plaintiff received in September 2000 was the result of a heated conversation plaintiff had with Cohoon. After reviewing Griffith's deposition and listening to the recording plaintiff made of Cohoon and Griffith's conversation, the Court concludes that no reasonable juror could find plaintiff did not display anger and disrespect toward Cohoon during the conversation. It is undisputed that during that conversation, plaintiff sarcastically called Cohoon a "good leader" and "a joke ." Defendant's App. at 208-09 (Griffith Dep.). Plaintiff has not alleged that Cohoon used racist remarks during that conversation, and nothing in the record suggests that the conversation had anything to do with race. In fact, plaintiff admitted that he has never heard Cohoon disparage anyone's ethnicity, and he presented no other evidence that Cohoon exhibited racist behavior at work or elsewhere. Defendant's App. at 305 (Griffith Dep.). The Court finds that nothing in the record supports the notion that Cohoon acted with racial animus

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21976027, *14 (S.D.Iowa))

during the September 2000 discussion.

Plaintiff has similarly failed to show a genuine issue of material fact on whether Wakeham acted with racial animus in disciplining plaintiff. First, the Court reiterates that the undisputed facts show that plaintiff exhibited anger and disrespect toward his supervisor. Second, the Court notes that plaintiff has not argued that the discipline he received-an oral reprimand and an order to attend anger management counseling-was unusually severe. Third, plaintiff concedes that he has never heard Wakeham make any comments that disparage plaintiff's ethnicity. *Id.* at 304 (Griffith Dep.). Finally, although there is evidence that Chief Wakeham made some racially derogatory remarks, [FN15] nothing in the record indicates that any of those remarks were made to plaintiff, that any of the remarks were about plaintiff, or that the remarks were connected to any decisionmaking process involving an adverse employment action, much less an adverse employment action plaintiff experienced. *See* Defendant's App. at 158 (Rubin Dec.); Plaintiff's App. (Ex. 57)(Rodgers Letter); *Id.* (Ex. 58) (Keenan Letter). *See Weems,* 220 F.Supp.2d at 988 ("Not every prejudiced remark made at work supports an inference of discrimination ... [;] statements by decisionmakers unrelated to the decisionmaking process have been carefully distinguished from comments which demonstrate a discriminatory animus in the decisional process ....") (internal citations omitted). The Court finds that without such evidence, no reasonable juror could find that racial animus motivated Wakeham's decision to discipline plaintiff. [FN16]

FN15. In a letter written to the Human Resources Director, Assistant Chief Rubin stated that Wakeham used offensive language. Of the four examples Rubin provided, only one involved a racially derogatory remark. This remark was not related to a decisionmaking process involving an employment action, much less an adverse employment action that involved plaintiff. *See supra,* n. 7. Although in his letter Rubin generally alleged that Wakeham's "off-color" remarks were "numerous, ongoing, and cross[ed] all protected classes," he did not state that Wakeham had ever been motivated by race in making an adverse employment decision. *See* Plaintiff's App., Ex. 56. Rubin later signed a sworn declaration stating that he had never heard Wakeham use racially derogatory language about plaintiff or Hispanics generally. *See* Defendant's App. at 158. The Court finds that in this case, Rubin's generalized

statement is insufficient to allow submission of plaintiff's disparate treatment claim to a jury.

FN16. In his brief, plaintiff generally alleges that "nonmembers of the protected class who were similarly situated were not disciplined for infractions of fire Department Policy." Plaintiff's Memorandum at 16. However, plaintiff did not explain who the similarly situated members were, or what alleged infractions went unpunished. Having reviewed the record, the Court finds no evidence to support plaintiff's general assertion.

b. September 2001 discipline

*15 The City alleged that the 24-hour suspension plaintiff received in September 2001 was a result of plaintiff's misconduct at a fire scene. Specifically, the City alleged that plaintiff told the parents of a juvenile not to allow the fire investigators to interview the juvenile in private. Plaintiff alleged that the parents overheard a discussion he was having with other firefighters. However, all the firefighters on the scene of that fire were interviewed, and none recalled having such a conversation. *Id.* at 55 (9/12/01 Wakeham Letter); 52 (Turner Dec. ¶ 3). Furthermore, the parents of the juvenile told an investigator that plaintiff made the remark about interviewing juveniles directly to them. *Id.* at 43 (Transcript of 8/1/01 statement of parents).

The relevant inquiry when defendant claims it took an adverse employment action because of employee misconduct, is whether the employer believed the employee was guilty of conduct justifying the adverse employment action. *See Cronquist,* 237 F.3d at 928 (citing *Harvey v. Anheuser-Busch, Inc.,* 38 F.3d 968, 972 n. 2 (8th Cir.1994). In the disciplinary letter Wakeham wrote, he stated that discipline was in order because plaintiff: (1) engaged in conduct that disrupted an investigation of a fire; and (2) gave a "less than candid" recollection of the events. Defendant's App. at 55. Whether the events at the fire scene transpired as plaintiff alleges, the record contains no evidence suggesting that Wakeham did not believe defendant engaged in misconduct for which discipline was warranted. The Court finds that no reasonable juror could find that the discipline plaintiff received in September 2001 was motivated by racial discrimination.

c. October 2001 discipline

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21976027, *15 (S.D.Iowa))

The City alleged that the 48-hour suspension plaintiff received in October 2001 was the result of plaintiff's failure to comply with a rescue equipment checklist policy. Plaintiff admitted that he indeed failed to sign the checklist. *Id.* at 295. When Van Baale asked plaintiff to sign the checklist, plaintiff said he would if Van Baale would provide him with a written copy of the inventory policy. *Id.* at 67. Chief Wakeham found that discipline was in order for this episode, because "immediate compliance with instructions and orders is critical in saving lives of citizens and other firefighters." *Id.* at 57. It noted that the checklist policy was in writing; plaintiff had previously complied with the policy; and plaintiff admitted he failed to sign the checklist. *Id* . at 57.

Plaintiff has not cited any facts in the record indicating that the discipline he received in October 2001 was motivated by racial animosity. Plaintiff does not allege that Van Baale used racially derogatory language when he asked plaintiff to sign the checklist. Although Van Baale made a racially disparaging remark about Hispanics to firefighter Lathrum in May 2001, this single remark made by Lathrum in May 2001 is too attenuated to the action taken in October 2001 to allow it to serve as a basis for inferring discriminatory motive for the October 2001 episode. *See Clearwater v. Independent School Dist.*, 231 F.3d 1122, 1126 (8th Cir.2000) ("Stray remarks are not sufficient to establish a claim of discrimination.") (internal citation omitted)). Furthermore, although Van Baale may have asked plaintiff to sign the checklist, the record does not suggest that Van Baale was a decisionmaker in the discipline plaintiff received. Instead, it appears that Wakeham was responsible for the adverse employment decision. *See id.* at 57. Plaintiff has not cited to evidence in the record showing that Wakeham's decision was motivated by racial animosity.

### d. leave of absence

*16 Plaintiff took a leave of absence from the Fire Department after he was arrested and charged with three counts of sexual abuse. Assuming, *arguendo*, that plaintiff's December 1999 to May 2000 leave of absence constituted an adverse employment action, the Court finds that plaintiff has failed to create a genuine issue of material fact that this employment action was motivated by race.

The City contends that had plaintiff not voluntarily

taken a leave of absence, it would have been justified in discharging plaintiff pursuant to Iowa Code § 400.19. Iowa Code § 400.19 provides, in relevant part:

[T]he chief of the fire department [ ] may peremptorily suspend, demote, or discharge a subordinate then under the ... chief's direction for neglect of duty, disobedience of orders, misconduct, or failure to properly perform the subordinate's duties.

In discussing this code provision, the Iowa Supreme Court has stated:

In determining whether [a] dismissal was warranted ..., we must remember that the primary objective of section 400.19 is to protect the public interest. Firefighters have a duty to maintain the public trust and confidence, and they run afoul of this duty when they exercise a lack of judgment and discretion. This heightened duty extends to a firefighter's off-duty conduct. Thus, the determinative factor is whether [the firefighter's] conduct was sufficiently detrimental to the public interest.

*Dolan v. Civil Serv. Comm. of the City of Davenport*, 634 N.W.2d 657, 664 (Iowa 2001) (citations omitted) (firefighter discharged for the following off- duty misconduct: struggling with police officers before his arrest for operating a vehicle while intoxicated, and sexually harassing a woman).

The Court finds that the factual information gathered by the police regarding plaintiff's three separate sexual assaults would support a determination that plaintiff committed "misconduct" under Iowa Code § 400.19. *See* Defendant's App. at 434-462. Thus, had plaintiff not left voluntarily, the Court finds that the City could have lawfully discharged him pursuant to § 400.19.

In response to the City's argument, plaintiff argues that the circumstances surrounding plaintiff's criminal charges were not known by the City at the time plaintiff took his leave of absence. The record is unclear as to whether Chief Wakeham had access to the information gathered by the police. Even assuming that Chief Wakeham did not have access to the police reports, the Court finds that plaintiff has nevertheless failed to create a genuine issue of material fact that his leave of absence was based on racial animosity. The undisputed facts show that (1) a policeman came to the fire station and announced to several firefighters that plaintiff was facing

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

charges for sexually abusing a minor; (2) The Des Moines Register reported that plaintiff was arrested on three counts of third-degree sexual abuse for fondling his victim when she was underage and for forcibly fondling his victim when she was an adult; and (3) on the same day The Des Moines Register Article was published, plaintiff's attorney sent the City Attorney a written request for leave of absence due to the "public concerns which may be raised regarding [plaintiff's] service as a firefighter." Id. at 349-51 (Carol Dep.); 15 (12/15/99 The Des Moines Register; 17 (12/15/99 Balduchi Letter). Based on these undisputed facts, no reasonable juror could find that the City did not believe plaintiff was guilty of misconduct warranting the adverse employment action. See Cronquist, 237 F.3d at 928 ("the relevant inquiry in an employee misconduct pretext case is whether the employer believed [the] the employee [was] guilty of conduct justifying [the adverse action].") (citing Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972 n. 2 (8th Cir.1994). The Court concludes that plaintiff has failed to create a genuine issue of material fact as to whether his leave of absence was race-based. [FN17]

> FN17. The Court notes that another firefighter, Terry Wolleesen, also took a leave of absence after he was charged with two counts of felony sexual abuse in 1998. Defendant's App. at 138 (Wolleesen Trial Information); 148 (Wolleesen Time Record). Unlike plaintiff, Wolleesen was placed on paid sick leave. Id. at 148 (3/15/99 Wakeham Letter); 176-77 (Labor Agreement). The record contains no evidence suggesting that Wolleesen's leave of absence was in any way based upon his race. In fact, the record contains no evidence of Wolleesen's race. Because the record is silent as to Wolleesen's race, it follows that the disparate treatment between Wolleesen and plaintiff cannot be attributed to race.

*17 In summary, the Court concludes that plaintiff has not created a genuine issue of material fact that racial animus was a motivating factor in the adverse employment actions he experienced. Therefore, the Court enters summary judgment on plaintiff's Title VII racial discrimination claim. [FN18]

> FN18. The Court notes that it would reach the same result using the McDonnell Douglas framework. Under that analysis, plaintiff has not meet his burden of showing that defendants' proffered legitimate reasons for taking the adverse employment actions were pretext.

## B. Discrimination Under Iowa Code § 216

Plaintiff also alleges violations of the Iowa Human Rights Act, Iowa Code § 216. "The analysis for both the federal and state claims is the same under Iowa law." Moschetti v. Chicago, Cent. & Pac. R.R., 119 F.3d 707, 709 n. 2 (8th Cir.1997). See also Valline v. Murken, 2003 WL 21361344, * 2 (Iowa Ct.Ap.2003). For the same reasons set forth in the previous section of the Court's Order, summary judgment is granted in favor of defendants on plaintiff's Iowa law race discrimination claim.

## C. Title VII Retaliation

Plaintiff alleges that defendants retaliated against him in violation of Title VII. In the Eighth Circuit, a plaintiff's retaliation claims traditionally have been analyzed under the burden-shifting framework of McDonnell Douglas. See Moschetti v. Chicago, Central and Pac. RR. Co., 119 F.3d 707, 709 (8th Cir.1997). However, this analysis has also been called into question by the Supreme Court's interpretation of Title VII in Desert Palace v.. Costa, --- U.S. ----, 123 S.Ct. 2148, 156 L.Ed.2d 84, 2003 WL 21310219 (2003) See Gonzalez v. City of Minneapolis, 2003 WL 21383760, at *6 (D.Minn.2003) (applying the allocations of burdens set forth in 42 U.S.C. § 2000e-2(m) and § 2000e-5(2)(B) to plaintiff's Title VII retaliation claim). This Court agrees with the well-reasoned decision in Gonzalez and finds that plaintiff's retaliation claim need not be analyzed under the McDonnell Douglas burden-shifting framework.

Regardless of which framework the Court applies, plaintiff must show the following in order to survive summary judgment on his retaliation claim: (1) "he participated in protected conduct;" (2) "he suffered an adverse action;" and (3) "the adverse action had a causal connection to the protected activity." Id. See also, Buettner v. Arch Coal Sales Co., Inc., 216 F.3d 707, 713-14 (8th Cir.2000). Upon his return to the Fire Department, plaintiff took the following actions: (1) filed a complaint with the Iowa Civil Rights Commission August 18, 2000; (2) complained of discrimination at a pre- disciplinary hearing in August 2000; (3) complained of discrimination to Wakeham in writing on September 28, 2000; (4) filed his lawsuit on August 22, 2001; (5) filed an internal complaint of discrimination on October 4, 2001; and (7) filed a second ICRC/ EEOC complaint alleging retaliation on January 23,

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21976027, *17 (S.D.Iowa))

2002. The Court finds that these actions constitute protected activities.

The record also contains evidence showing that plaintiff suffered three adverse employment actions- the discipline he received in August 2000, August 2001, and October 2001. However, for the reasons that follow, the Court finds that plaintiff has failed to set forth facts from which a reasonable juror could conclude that any of these adverse employment actions were retaliatory.

**\*18** Plaintiff received a predisciplinary hearing on August 23, 2000, five days after he filed his complaint with the Iowa Civil Rights Commission. Although the predisciplinary hearing itself took place shortly after the filing of plaintiff's ICRC complaint, the hearing was in regard to an undisputedly heated conversation plaintiff had with Cohoon on July 25, 2000. Plaintiff does not dispute that he called his superior, Cohoon, "a joke" during that conversation. Defendants' App. at 208-09 (Griffith Dep.). Under these circumstances, the Court finds that plaintiff cannot solely rely on the proximity in time between the adverse action and the protected activity to prove that defendants intended to retaliate against him. *See Kipp v. Missouri Highway and Transp. Comm'n,* 280 F.3d 893, 897 (8th Cir.2002) ("[A] mere coincidence of timing can rarely be sufficient to establish a submissible case of retaliatory discharge."). *See also Cronquist,* 237 F.3d at 928 (relevant inquiry when defendant claims it took an adverse employment action because of employee misconduct, is whether the employer believed the employee was guilty of conduct justifying the adverse employment action.)

Plaintiff also received a predisciplinary hearing on August 24, 2001, two days after he filed his lawsuit. However, the predisciplinary hearing was in regard to the episode that took place at the Mary Street fire scene on July 31, 2001. As previously discussed, defendants claimed that plaintiff told two parents not to allow the fire investigators to privately interview their child. Defendant denied telling the parents this, and claimed that the parents overheard him in a conversation with other firefighters. The record shows that the other firefighters at the scene did not recall having any such conversation with plaintiff, and that the parents of the child did recall plaintiff telling them not to allow their child to be privately interviewed. *Id.* at 43, 55. Plaintiff has presented no evidence suggesting that defendants did not really

believe that a predisciplinary hearing was warranted in this situation, and that instead, defendants were retaliating against plaintiff. *See Cronquist,* 237 F.3d at 928. Under these circumstances, the Court finds that the mere proximity in time between the adverse action and the protected activity is insufficient to allow a reasonable juror to infer that defendants were retaliating against defendant. *See Smith v. Allen Health Sys.,* 302 F.3d 827, 834 (8th Cir.2002) (in light of the legitimate, nondiscriminatory reasons proffered by defendant, "the sole fact that [plaintiff] was fired at about the same time family leave cannot support an inference of pretext" for retaliation); *Sprenger v. Federal Home Loan Bank,* 253 F.3d 1106, 113-14 (8th Cir.2001) (temporal proximity sufficient to create a prima facie case of disability discrimination, but not to show that defendant's proffered reason was pretextual).

**\*19** Finally, plaintiff filed an internal complaint of discrimination on October 4, 2001. One week later, plaintiff received a predisciplinary hearing regarding plaintiff's failure to comply with the fire department's equipment checklist policy. It is undisputed that plaintiff admitted his failure to follow the checklist policy on October 2, 2001, two days *before* he engaged in a protected activity. *Id.* at 295. Plaintiff has offered no evidence that defendants did not believe he violated his admission that he violated the checklist policy. The Court finds that under these circumstances, the temporal proximity between the October 4th protected activity and the subsequent adverse employment action is insufficient to allow an inference of a retaliatory motive. *See Smith,* 302 F.3d 827, 834 (8th Cir.2002); *Sprenger,* 253 F.3d 1106, 113-14 (8th Cir.2001).

The Court grants summary judgment in favor of defendants on plaintiff's retaliation claims.

D. Iowa Code § 216 Retaliation

For the same reasons articulated in Part C of the Court's order, the Court grants summary judgment in favor of defendants on plaintiff's claim of retaliation in violation of Iowa Code § 216.

E. 42 U.S.C. § 1981

To establish a violation of 42 U.S.C. § 1981, plaintiff must allege facts in support of the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21976027, *19 (S.D.Iowa))

following: "(1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute...." *Thomas v. St. Lukes Health Sys., Inc.,* 869 F.Supp. 1413, 1432 (N.D.Iowa 1994). As noted in *Thomas,* "Section 1981 requires proof of intentional discrimination, as does a disparate treatment claim under Title VII. Therefore, the elements of § 1981 claims and Title VII disparate treatment claims are the same." *Id.* at 1432-33 (internal citations omitted). Traditionally, in the absence of direct evidence of discrimination, courts have analyzed § 1981 claims under the burden-shifting framework of McDonnell Douglas. *Id.* There is a question as to whether this framework still applies post-*Desert Palace. See Skomsky v. Speedway SuperAmerica, L.L.C.,* 2003 WL 21382495 (D.Minn.2003) ("Federal anti-discrimination laws such as the ADA are patterned after Title VII, and as such should be evaluated similarly[;][t]he interests of uniformity require the Court to extend the burden-shifting paradigm articulated in 42 U.S.C. § 2000e-2(m) and § 2000e-5(2)(B) to ADA disparate treatment claims.") The Court need not make that determination in the case at bar. For the same reasons articulated in the Title VII section of this order, the Court finds that summary judgment should be entered in favor of defendants on plaintiff's § 1981. [FN19]

FN19. The Court would reach the same conclusion applying the *McDonnell Douglas* framework, because plaintiff has not created a genuine issue of material fact that defendant's proffered reasons were pretextual.

## F. Hostile Work Environment

Title VII of the Civil Rights Act of 1964 provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a violation of Title VII by proving that the discrimination based on race created a hostile or abusive work environment. *See Ross v. Kansas City Power & Light Co.,* 293 F.3d 1041, 1050 (8th Cir.2002). Hostile work environment violations occur where "the workplace is permeated with discriminatory

intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295. In determining whether the harassment is sufficiently "severe or pervasive," courts consider the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787-88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). In addition to showing "severe and pervasive" harassment, plaintiff must show the employer knew or should have known of the harassment and failed to take prompt and effective remedial measures to end the harassment. *Ross* 293 F.3d at 1050.

*20 Plaintiff filed a complaint of race discrimination with the Iowa Civil Rights Commission and orally complained of harassment at a predisciplinary hearing in August 2000. Plaintiff also wrote Wakeham a letter in which he complained of "harassment and discrimination on September 28, 2000. Plaintiff's App. (Ex. 28). Thus, the Court finds defendants were on notice of the allegedly hostile work environment plaintiff experienced.

Reviewing the record in a light most favorable to plaintiff, the Court finds that after he complained of harassment, plaintiff heard two racially derogatory comments. [FN20] On May 5, 2001, plaintiff overheard Van Baale ask someone, "Why do we need all the spics here? We ought to send them back to Mexico." Defendant's App. 251-52 (Griffith Dep.). On another occasion, plaintiff heard Lathrum make the following comment: "David Griffith, because he is Latino, he thinks he can get by with everything and that the rules aren't held to the same standard for him as they are for us." Defendant's App. at 252. Neither of these two comments were directed at plaintiff. In fact, it is undisputed that plaintiff was not in the same room with the speakers when these comments were made. Plaintiff conceded that Lathrum did not know plaintiff was nearby when he made his remark. *Id.* at 252-53.

FN20. Plaintiff concedes he did not report the two racially derogatory comments he heard. Defendants' App. at 259 (Griffith Dep.).

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21976027, *20 (S.D.Iowa))

Daughenbaugh and Bernal heard some racially derogatory remarks about Hispanics while they were working at the Fire Department. Plaintiff did not testify that he heard these remarks in his deposition. In fact, it is unclear from the record whether plaintiff was even working at the Fire Department when Daughenbaugh and Bernal heard the derogatory remarks. The record is also unclear whether these remarks continued after the time plaintiff complained of harassment. The Court finds that under these circumstances, plaintiff has failed to show that he experienced harassment that was "severe or pervasive" enough to affect a term, condition, or privilege of his employment. [FN21] *See Wallin v. Minnesota Dept. of Corrections,* 153 F.3d 681 (8th Cir.1998) ( "Because the discrimination laws are not a 'general civility code,' 'offhand comments [ ] and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.") (quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 2283-84, 141 L.Ed.2d 662 (1998)). Summary judgment is entered in favor of defendants on plaintiff's hostile work environment claim.

> FN21. The Court notes that the record contains evidence that other firefighters heard remarks that disparaged other races. Plaintiff has not offered evidence that he was at work when those remarks were made and has not otherwise explained how those remarks affected a term or condition of his employment. *See* 42 U.S.C. § 2000e-2(a)(1) ("It shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of *such individual's* race ....) (emphasis added).

H. 42 U.S.C. § 1983

In his fourth cause of action, plaintiff alleges that Wakeham, Cohoon, and the City violated 42 U.S.C. § 1983. "To establish a claim under 42 U.S.C. § 1983 [a plaintiff] must show a deprivation of a right, privilege, or immunity secured by the constitution or laws of the United States." *Dunham v. Wadley,* 195 F.3d 1007, 1009 (8th Cir.1999). Plaintiff alleges that the City, Cohoon, and Wakeham violated 42 U.S.C. § 1981 and § 2000e. As previously discussed in this Order, the Court finds that plaintiff has failed to show violations of 42 U.S.C. §§ 1981 and 2000e. It follows that defendants are not liable under § 1983

on those grounds.

*21 In addition to his § 1981 and § 2000e claims, plaintiff alleges that the City is liable under § 1983 for violating his procedural due process rights. Plaintiff first argues that his procedural due process rights were violated, because "[t]he City has not put individuals on notice through a written policy that it will exercise termination proceedings on individuals who have been *arrested* and *charged,* but not convicted of a crime." Plaintiff's Brief at 26. (emphasis in the original). The Court is unconvinced by this argument. First, plaintiff has offered no case law in support of his proposition. Second, the Court finds that although the City's policy may not have been in writing, plaintiff should have known that if he was arrested and charged with committing sexual abuse against a minor, the Fire Department would have an obligation to the community to suspend defendant from his firefighter duties until the charges were resolved.

Plaintiff also claims that the City's practice of terminating individuals who have been arrested and charged with a crime "before they have had an opportunity to clear their name in a court of law" violates procedural due process. Plaintiff's Brief at 26. Plaintiff concedes that after a firefighter has been terminated, he would have the right to appeal that decision through the Civil Service. *Id.*

Courts apply the familiar balancing test outlined in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), to determine what process is due in a particular situation. *See Brewster v. Bd. of Ed. of Lynwood Unified School Dist.,* 149 F.3d 971, 983 (9th Cir.1998). *Mathews* requires courts to balance the following three factors:

> [f]irst, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Mathews,* 424 U.S. at 335. The Court finds that the government's interest in protecting the public by suspending or terminating a firefighter who has been charged and arrested for committing a sexual assault outweighs plaintiff's interest in receiving a hearing prior to his suspension or termination. *See FDIC v.*

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21976027, *21 (S.D.Iowa))

Page 18

*Mallen,* 486 U.S. 230, 240, 108 S.Ct. 1780, 100 L.Ed.2d 265 (government's interest in immediately suspending indicted bank officers outweighed the officers' interests in retaining their positions and therefore justified dispensing with predeprivation process). Therefore, the Court finds that the City's policy does not violate plaintiff's due process rights.

The Court enters summary judgment in favor of all defendants on plaintiff's § 1983 claims.

I. Iowa Code 91A

The Court has dismissed all other claims in this controversy over which it has jurisdiction.

Exercising the discretion granted by 28 U .S.C. § 1367(c), the Court declines to exercise supplemental jurisdiction over plaintiff's Iowa Code 91A claim.

III. CONCLUSION

*22 The Clerk of Court is ordered to dismiss plaintiff's Iowa Code 91A claim. The Clerk of Court is ordered to enter judgment in favor of defendants on all the other claims.

IT IS ORDERED.

2003 WL 21976027 (S.D.Iowa)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                    **Page 40**
(Cite as: 2004 WL 540452 (E.D.Pa.))
**H**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.

David LLOYD, Plaintiff
v.
CITY OF BETHLEHEM and Dana B. Grubb,
Defendants

No. Civ.A. 02-CV-00830.

March 3, 2004.

Donald P. Russo, on behalf of Plaintiff.

Paul G. Lees, on behalf of Defendants.

*OPINION*

GARDNER, J.

*INTRODUCTION*

*1 This matter is before the court on Defendants, City of Bethlehem and Dana B. Grubb's Motion for Summary Judgment filed August 15, 2003. Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment was filed September 18, 2003. For the reasons expressed below, we grant in part and deny in part defendants' motion for summary judgment.

*PROCEDURAL HISTORY*

On February 19, 2002 plaintiff David Lloyd filed a Complaint. On April 29, 2002 defendants City of Bethlehem ("City") and Dana Grubb ("Grubb") filed a motion to dismiss. Subsequently, on May 24, 2002 plaintiff filed an Amended Complaint asserting five causes of action.

Count I of plaintiff's Amended Complaint asserts a federal cause of action pursuant to the Age Discrimination in Employment Act of 1967 ("ADEA"). [FN1] Count II asserts a pendent state law cause of action pursuant to the Pennsylvania Whistleblower Law. [FN2] Count III asserts a state law cause of action for breach of implied contract. Count IV asserts a federal cause of action for retaliation pursuant to 42 U.S.C. § 1983 by virtue of an alleged violation of the First Amendment to the

United States Constitution as the underlying basis of a Section 1983 claim. Finally, in Count V plaintiff brings a cause of action based upon Sections 955 and 962 of the Pennsylvania Human Relations Act. [FN3]

> FN1. 29 U.S.C. §§ 621-634.
>
> FN2. Act of December 12, 1986, P.L. 1559, No. 169, §§ 1-8, as amended, 43 P.S. §§ 1421-1428.
>
> FN3. Act of October 27, 1955, P.L. 744, No. 222, §§ 1-13, as amended, 43 P.S. §§ 951-963.

On June 7, 2002 defendants filed a motion to dismiss plaintiff's Amended Complaint. By Memorandum and Order dated October 16, 2002 our colleague Senior United States District Judge Herbert J. Hutton [FN4] denied defendants' motion to dismiss. [FN5]

> FN4. At the time of his October 16, 2002 Memorandum and Order, Judge Hutton was an active United States District Judge. Since then, he has transferred to senior status.
>
> FN5. As noted in Judge Hutton's October 16, 2002 Memorandum and Order, plaintiff voluntarily dropped Count V (alleged violations of the Pennsylvania Human Relations Act) and agreed that the official capacity claim against defendant Dana Grubb merged into the claims against defendant City of Bethlehem. Thus, the remaining claims against defendant Grubb were claims against him in his individual capacity only. Moreover, plaintiff withdrew his claim for punitive damages against the City of Bethlehem.

*BACKGROUND*

Based upon the pleadings, record papers, depositions, affidavits and exhibits, the pertinent facts are as follows. Plaintiff David B. Lloyd began working for the City of Bethlehem in 1972 as an ambulance driver. Subsequently, he worked his way up through the ranks. At the time of his forced resignation on August 22, 2001 plaintiff worked as the Director of Emergency Medical Services ("EMS") for the City. Plaintiff was replaced as EMS Director by Gordon Smith, a man nearly two years, nine months younger than plaintiff.

In September 2000 plaintiff attended a meeting with

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

City administrators including defendant Grubb, Deputy Director of Community Development; Tony Hanna, Director of Community Development; and Jean Zweifel, Director of Human Resources, concerning personnel complaints in the EMS about plaintiff. What took place at this meeting is in dispute.

Plaintiff contends that the meeting was informal and that he was told to be less intense with his personnel, but he was not given any specific direction or given any specific task. Defendants contend that the meeting was the first step in a policy of a progressive discipline utilized by the City.

In December 2000 plaintiff met again with the same administrators. Defendants contend that a number of additional complaints were brought to plaintiff's attention at this meeting. Plaintiff contends that it was another informal meeting and that he was not specifically disciplined or advised what was required of him to improve relations with his subordinates. Plaintiff characterized the two meetings as "strange and bizarre".

*2 In October, 1999 plaintiff was interviewed for a newspaper article under the headline "Bethlehem EMS has a medical emergency". The article was published on October 19, 1999 in the Bethlehem edition of the Express Times. In that article, plaintiff was quoted as stating that Bethlehem's EMS was inadequately equipped and understaffed. Moreover, plaintiff reportedly said that he was only able to handle 90% of the calls and EMS was missing 500 calls a year. In the article, plaintiff questioned how a police or fire commissioner would feel if he could not respond to that many calls.

In July 2001 plaintiff was again interviewed by the press. In an article under the headline "Ambulance corps hanging on for dear life", published July 14, 2001 in The Morning Call, an Allentown newspaper. Plaintiff was quoted as stating that the EMS division was approaching a crisis because it was losing people as a result of low pay and high work demands. Plaintiff also reportedly said that it may get much worse before it gets better.

Plaintiff was interviewed for The Morning Call article after he reported the same information during a meeting of the Bethlehem Board of Health. Plaintiff contends that defendants retaliated against

him after the second article in violation of his First Amendment rights by forcing his resignation.

Plaintiff asserts that comments made by former Mayor Donald Cunningham evidence a bias against older people. At a speaking engagement at a Jaycee's convention, Mayor Cunningham (a man in his 30's) allegedly commented on how good it was to be interacting with people his own age. (Plaintiff is a man in his late 40's.) Plaintiff, who attended the Jaycee's convention as a presenter, further alleges that Mayor Cunningham commented on the benefits of having a younger workforce.

Plaintiff contends that prior to his termination, he inquired about a local newspaper article which indicated that the City was considering offering an early retirement package to its employees. Specifically, plaintiff asserts that one of the proposed options was that eligible employees who by the combination of years of service plus their age attained 75 (Rule of 75) were going to be offered early retirement packages similar to those offered to former workers at the Bethlehem Steel plant.

Plaintiff asserts that his 29 years of service plus his age, qualified him for early retirement under the proposed plan. He contends that he spoke to Tony Hanna about the early retirement option. Plaintiff avers that Mr. Hanna told him, "Dave, no one under 50 will be offered any retirement package", or words to that effect. Plaintiff further asserts that in October 2001, after his termination, the City offered a Rule of 75 package to its employees, including those under 50 years of age. Plaintiff maintains that this is evidence of age bias against him.

Finally, plaintiff asserts that the City has a Personnel Manual which includes a progressive discipline policy. Plaintiff contends that he was not provided with progressive discipline. He argues that the Personnel Manual is an implied contract between the City and its employees, notwithstanding the doctrine of at-will-employment in Pennsylvania. Defendant contends its Personnel Manual is only advisory and is not an implied contract which supplanted plaintiff's status as an at-will employee.

*Standard of Review*

*3 In considering a motion for summary judgment, the court must determine whether "the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Federal Home Loan Mortgage Corporation v. Scottsdale Insurance Company*, 316 F.3d 431, 433 (3d Cir.2003). Only facts that may affect the outcome of a case are "material". Moreover, all reasonable inferences from the record are drawn in favor of the non-movant. *Anderson, supra.*

Although the movant has the initial burden of demonstrating the absence of genuine issues of material fact, the non-movant must then establish the existence of each element on which it bears the burden of proof. *See Watson v. Eastman Kodak Company*, 235 F.3d 851, 857-858 (3d Cir.2000). A plaintiff cannot avert summary judgment with speculation or by resting on the allegations in his pleadings, but rather must present competent evidence from which a jury could reasonably find in his favor. *Ridgewood Board of Education v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir.1999). *Woods v. Bentsen*, 889 F.Supp. 179, 184 (E.D.Pa.1995).

## Discussion
### Age Discrimination Claim

An ADEA case is traditionally analyzed under the 3-step, burden shifting test established by the United States Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Fakete v. Aetna, Inc.*, 308 F.3d 335 (3d Cir.2002). Under *McDonnell Douglas* and its progeny a plaintiff must initially establish a prima facie case of discrimination. Upon a prima facie showing, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the adverse employment action. After defendant has met its burden of production, the burden shifts back to plaintiff to demonstrate that defendant's articulated reason was not the actual reason, but rather a pretext for discrimination. *Simpson v. Kay Jewelers*, 142 F.3d 639, 644 (3d Cir.1998).

To establish a prima facie case in an ADEA matter a plaintiff must show that he: (1) is a member of the protected class (i.e. he is at least 40 years of age); (2) is qualified for the position; (3) suffered an adverse employment decision; and (4) in the case of

demotion or discharge, was replaced by a sufficiently younger person to create an inference of age discrimination. *Simpson, supra.*

Plaintiff claims, in the alternative, that he may maintain a claim of discrimination under the ADEA if he demonstrates by a preponderance of the evidence that age was considered and impacted upon the employer's decision making. This type of claim requires a "mixed-motives analysis".

On June 9, 2003, by unanimous decision in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), the United States Supreme Court eliminated the requirement of direct evidence of discrimination in order for a plaintiff to proceed on a mixed-motives theory. Prior to *Desert Palace* a plaintiff could only proceed under a mixed-motives analysis if he provided direct evidence of discrimination. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring). As a result of the change in the law enunciated in *Desert Palace*, district courts around the country have wrestled with how to apply the decision within the existing framework of *McDonnell Douglas*.

*4 The burden-shifting analysis articulated in *McDonnell Douglas* provided courts with a systematic way to analyze the entire spectrum of discrimination claims (gender, race, age, disability, and so forth). To the contrary, prior to *Desert Palace* the analysis of a mixed-motive claim was far more ambiguous. For example, courts have found that the mixed-motive standard is overall more generous to plaintiff than the pretext analysis. However, there is a heightened evidentiary burden at the onset of a mixed-motive case, as compared with the *McDonnell Douglas* prima-facie analysis. *See Overall v. Dunham*, No. Civ.A. 02-1628, 2003 U.S. Dist. LEXIS 23892 at * 17 (E.D.Pa.Dec.19, 2003); *Campetti v. Career Education Corporation*, No. Civ.A. 02-1349, 2003 U.S. Dist. LEXIS 12202 at *7 (E.D. Pa. June 25, 2003).

Specifically, employees were previously required to offer stronger evidence in a mixed-motive theory than that which was needed to establish the first prong of a *McDonnell Douglas* analysis. *See Weston-Smith v. Cooley Dickinson Hospital, Inc.*, 282 F.3d 60, 64 (1st Cir.2002). In the past, to warrant a mixed-motive analysis at the summary judgment stage, a plaintiff was required to "to

produce a 'smoking gun' or at least a 'thick cloud of smoke' to support his allegations of discriminatory treatment." *Raskin v. The Wyatt Company*, 125 F.3d 55, 60-61 (2d Cir.1997). Thus, the pre-*Desert Palace* mixed-motive analysis at the summary judgment stage was an inexact science.

Since the Supreme Court's decision in *Desert Palace*, two lines of decision have emerged. In *Dare v. Wal-Mart Stores, Inc.*, 267 F.Supp.2d 987 (D.Minn.2003), United States District Court Judge Paul A. Magnuson predicted the demise of the *McDonnell Douglas* burden-shifting analysis and advocated a "same decision test" in place of *McDonnell Douglas*. The same decision test requires plaintiff to demonstrate that an impermissible consideration was a motivating factor in the employer's adverse employment decision. Thereafter, defendant must assert as an affirmative defense that it would have taken the adverse employment action absent the impermissible consideration.

Alternatively, in *Dunbar v. Pepsi-Cola General Bottlers of Iowa*, 285 F.Supp.2d 1180 (N.D.Iowa 2003), Chief United States District Court Judge Mark W. Bennett advocates modifying *McDonnell Douglas* in light of *Desert Palace*. In *Dunbar* the court split the third element of the burden-shifting analysis to accommodate both pretext and mixed-motive cases. In a pretext case, step three requires plaintiff to prove by a preponderance of the evidence that defendant's articulated reason is not true but is instead a pretext for discrimination. In a mixed-motive case, step three requires that defendant's reason for the adverse employment action, while true, is only one of the reasons for its conduct, and that another motivating factor is plaintiff's protected characteristic. 285 F.Supp.2d at 1198.

**5** If plaintiff prevails in a mixed-motive analysis, but defendant is able to prove that it would have taken the same action in the absence of the of the impermissible motivating factor, then plaintiff's remedies are limited to injunctive relief, attorneys' fees and costs. Otherwise, plaintiff will be able to receive monetary damages as well. *Id.* For the following reasons, we adopt the test set forth in *Dunbar*.

On December 2, 2003 the United States Supreme Court issued its unanimous   [FN6] decision in *Raytheon Company v. Hernandez*, ___ U.S. ___,

124 S.Ct 513, 157 L.Ed.2d 357 (2003). In that case the Supreme Court applied the *McDonnell Douglas* framework to a post-*Desert Palace* case, and indeed, did not mention *Desert Palace* in its Opinion. Thus, contrary to the district court's determination in *Dare*, we conclude that *McDonnell Douglas* is still valid precedent. Moreover, we find persuasive the comprehensive analysis and reasoning of the district court in *Dunbar*. Thus, we apply the modified *McDonnell Douglas* test enunciated in *Dunbar* to the facts of the within matter.

> FN6. Justice Souter took no part in the decision and Justice Breyer took no part in the consideration or decision of the case.

### Application to the Facts

The ADEA makes it unlawful for an employer to discharge, or otherwise discriminate against, an individual with regard to compensation and other terms and conditions of employment on the basis of age. 29 U.S.C. § 623(a)(1). The ADEA protects persons forty years or older. 29 U.S.C. § 631.

As noted above, initially plaintiff must establish a prima facie case of discrimination by showing that he; (1) is a member of the protected class (i.e. is at least 40 years of age); (2) is qualified for the position; (3) suffered an adverse employment decision; and (4) in the case of demotion or discharge, was replaced by a sufficiently younger person to create an inference of age discrimination. *Simpson, supra.*

Plaintiff was 47 years old at the time of his termination. Thus, he satisfies the first factor. Moreover, defendant does not dispute that plaintiff's qualifications. Hence, he satisfies the second factor. Next, plaintiff suffered an adverse employment action because he was forced to resign. Therefore, plaintiff satisfies the third factor. However, for the following reasons, we conclude plaintiff fails to satisfy the fourth prong of the prima facie test.

Plaintiff concedes that he was replaced by Gordon Smith, a 44-year-old man who was approximately two years and nine months younger than plaintiff. Plaintiff contends that this age gap is enough to satisfy his burden of showing that he was replaced by a sufficiently younger person to create an inference of age discrimination. In support of his contention, plaintiff relies on the decision in

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                          **Page 44**
(Cite as: 2004 WL 540452, *5 (E.D.Pa.))

*Nembhard v. Memorial Sloan-Kettering Cancer Center*, 918 F.Supp. 784 (S.D.N.Y.1996), aff'c 104 F.3d 353 (2d Cir.1996).

On the other hand, defendants contend that it is generally accepted as a matter of law that a six or seven year difference is not significant at any position or age. *Bernard v. Beth Energy Mines, Inc.*, 837 F.Supp. 714, 717 (W.D.Pa.1993). aff'd 31 F .3d 1170 (3d .Cir.1994). For the following reasons we agree with defendants.

**\*6** The caselaw in this Circuit consistently holds that an age gap of less than five years is, as a matter of law, insufficient to establish fourth element of the prima facie test. *Reap v. Continental Casualty Company*, No. Civ.A. 99-1239, 2002 U.S. Dist LEXIS 13845 (D. N.J. June 28, 2002); *Martin v. Healthcare Business Resources*, No. Civ.A. 00-3244, 2002 U.S. Dist. LEXIS 5117 (E.D.Pa.Mar.26, 2002); *Gutkrecht v. SmithKline Beecham Clinical Labs*, 950 F.Supp. 667, 672 (E.D.Pa.1996); *Bernard, supra*.

Based upon the caselaw on point in this district and Circuit, we conclude, as a matter of law, that two years and nine months is not a sufficient age difference for plaintiff to satisfy his burden of demonstrating that he was replaced by a sufficiently younger person to create an inference of age discrimination.

Accordingly, because we conclude that plaintiff fails to establish a prima facie case under *McDonnell Douglas*, we grant defendant's motion for summary judgment on Count 1 of plaintiff's Amended Complaint.

*Violation of the Pennsylvania Whistleblower Law*

In Count II of plaintiff's Amended Complaint he seeks recovery under the Pennsylvania Whistleblower Law. [FN7] Specifically, plaintiff contends that the request for his resignation on August 22, 2001 was in retaliation for his good faith report of the improper administration of the City's EMS services. More specifically, plaintiff asserts that he was asked to resign because of the two instances in which he spoke to the press. In one of the instances (the July 14, 2001 article) plaintiff contends he spoke to the press after making a good faith report to the Board of Health about the EMS department's failure to comply with the Health

Bureau's written standards, in particular, those which require certain levels of rapid response to all emergency calls.

FN7. Act of December 12, 1986, P.L. 1559, No. 169, §§ 1-8, as amended, 43 P.S. §§ 1421-1428.

Defendants contend that plaintiff does not qualify under the Whistleblower Law because plaintiff is not an employee as defined under the law. Moreover, defendants contend that because plaintiff did not produce any evidence of either waste or wrongdoing, he cannot prove his cause of action. For the following reasons, we agree with defendant in part, disagree in part and grant defendants' motion for summary judgment on Count II of plaintiff's Amended Complaint.

Section 1423(a) of the Pennsylvania Whistleblower Law [FN8] provides:

FN8. Act of December 12, 1986, P.L. 1559, No. 169, § 3(a), as amended, 43 P.S. § 1423(a).

No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste.

43 P.S. § 1423(a). The definitions of "employee", "waste" and "wrongdoing" contained in Section 1422 [FN9] are pertinent to this discussion.

FN9. Act of December 12, 1986, P.L. 1559, No. 169, § 2, as amended, 43 P.S. § 1422.

Employee is defined as: "A person who performs a service for wages or other renumeration under a contract of hire, written or oral, express or implied, for a public body." 43 P.S. § 1422.

**\*7** Waste is defined as: "An employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources." 43 P.S. § 1422.

Wrongdoing is defined as: "A violation which is not

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer. 43 P.S. § 1422.

Initially, defendants contend that under the definition of employee stated above, plaintiff does not come under the definition because he has no contract with the City of Bethlehem. For the following reasons, we disagree.

It is firmly established that Pennsylvania is an at-will employment jurisdiction. *McLaughlin v. Gastrointestinal Specialists, Inc.,* 561 Pa. 307, 750 A.2d 283 (2000). Defendant contends that plaintiff does not fall under the definition of an employee. However, defendant's position belies the employer/employee relationship in the at-will employment context; specifically, that there is an implied employment contract upon the terms that the employer may discharge the employee at any time with or without cause, and the employee may leave his employment at any time.

Thus, there is an implied contract between the parties in this case. To hold otherwise would abrogate the language of Pennsylvania Whistleblower Law as it relates to almost any employee of any state, county, city, township or subdivision of an agency in this Commonwealth. Accordingly, we conclude that plaintiff is an employee for purposes of the Whistleblower Law.

In his Amended Complaint, plaintiff contends that he was terminated for making a good faith report to the Board of Health. However, in his response to defendants' motion for summary judgment, plaintiff fails to cite any specific provision of a "Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer" 43 P.S. § 1422, about which he allegedly reported in good faith. Moreover, plaintiff has not identified any "employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources", 43 P.S. § 1422, about which he reported.

In applying the standard of review for summary judgment to the record facts of this case, plaintiff

cannot avert summary judgment with speculation or by resting on the allegations in his pleadings, but rather must present competent evidence from which a jury could reasonably find in his favor. *Ridgewood, supra.* By failing to present any competent evidence, (i.e. a specific Board of Health regulation he asserts was violated or any argument in his brief on the issue of waste) plaintiff merely rests on the allegations of the pleadings, which is impermissible.

**\*8** Accordingly, because plaintiff failed to produce evidence to support his claims of alleged waste and wrongdoing, we grant defendants' motion for summary judgment on Count II of plaintiff's Amended Complaint.

*Plaintiff's Claim of Breach of an Implied Contract*

Count III of plaintiff's Amended Complaint asserts a state law cause of action for breach of an implied contract. Specifically, plaintiff contends that the City issued a Personnel Manual which creates an implied contract that abrogates the at-will employment doctrine in Pennsylvania. Plaintiff asserts that the Personnel Manual provides for progressive discipline which he was not afforded in this matter.

Plaintiff further contends that the Personnel Manual does not contain a disclaimer indicating that it is not to be construed as a contract of employment. Plaintiff asserts that Pennsylvania law is clear that the provisions of a personnel manual or employee handbook can constitute a unilateral offer of employment which the employee accepts by continuing to perform his duties. Plaintiff further asserts that as Director of EMS he was required to provide progressive discipline to his subordinates and that he assumed that the same protections applied to him.

In support of his contentions, plaintiff relies on the decision of the Superior Court of Pennsylvania in *Bauer v. Pottsville Area Emergency Medical Services, Inc.,* 758 A.2d 1265 (Pa.Super.2000). In addition, plaintiff avers that this issue was previously decided by Judge Hutton in his October 16, 2002 Memorandum and Order and is the law of the case. Moreover, plaintiff contends that this exact Personnel Manual was reviewed by our colleague United States District Judge Petrese Tucker in the case of *Donchez v. City of Bethlehem,* No. Civ.A. 02-8460 (E.D.Pa. May 15, 2003) and that Judge

Tucker ruled that the personnel manual could be construed as creating an implied contract of employment.

Initially, the City contends that as a political subdivision, it is not empowered to create an implied contract that supplants the at-will employment doctrine in Pennsylvania. In addition, if the court determines that the City is empowered to create such an implied contract, it has not specifically abrogated the at-will doctrine in any provision contained in its Personnel Manual. For the following reasons, we agree with defendant City of Bethlehem.

As a general rule, municipal employees in Pennsylvania are at-will employees. *Stumpp v. Stroudsburg Municipal Authority*, 540 Pa. 391, 658 A.2d 333 (1995). Therefore, municipal employees accept employment subject to the possibility of summary removal by the municipal employer for any reason or no reason at all. *Ballas v. City of Reading*, No. Civ.A. 00-2943, 2001 U.S. Dist. LEXIS 657 (E.D.Pa. Jan. 25, 2001); *Scott v. Philadelphia Parking Authority*, 402 Pa. 151, 166 A.2d 278 (1961).

The City does not have the power to enter into contracts, express or implied, written or oral, which contract away the right of summary dismissal absent express enabling legislation. *Stumpp, supra, Scott, supra.* "Tenure in public employment, in the sense of having a claim to employment which precludes dismissal on a summary basis is, where it exists, a matter of legislative grace." *Scott*, 402 Pa. at 154, 166 A.2d at 281.

**\*9** Plaintiff contends that we should follow the decision of the Superior Court of Pennsylvania in *Bauer* which held that a employee handbook could be enforceable against an employer if a reasonable person in the employee's position would interpret the provisions as evidence that the employer would supplant the at-will employment doctrine. For the following reasons, we find *Bauer* inapplicable to this case.

Initially, we note that *Bauer* did not deal with a municipal employer. Thus, the Superior Court was not presented with the question here: can the City as a municipal employer abrogate the employment at-will doctrine absent specific enabling legislation? We conclude it cannot.

If the Pennsylvania Supreme Court has not addressed a precise issue, a prediction must be made taking into consideration "relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *Nationwide Mutual Insurance Company v. Buffetta*, 230 F.3d 634, 637 (3d. Cir.2000) (citation omitted). "The opinions of intermediate state courts are 'not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court in the state would decide otherwise." ' 230 F.3d at 637 citing *West v. American Telephone and Telegraph Co.*, 311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139 (1940).

In this case, neither party cites any decision authored by the Supreme Court of Pennsylvania. The Superior Court's *Bauer* decision is not directly on point with regard to the factual circumstances here (a municipal employer versus a private employer). Therefore, we conclude that the *Bauer* decision is not controlling.

The City can choose to employ its progressive discipline policy or not with regard to at-will employees. The Personnel Manual does not create any rights for at-will employees, because absent enabling legislation, the City has no authority to bind itself. Where a municipality contracts for tenured employment in the absence of enabling legislation, the contract is invalid and unenforceable. *Scott, supra.*

Based upon well-settled precedent of the Supreme Court of Pennsylvania we determine that the City's policy of progressive discipline, as it relates to at-will employees   [FN10] is nothing more than advisory and predict that the Supreme Court of Pennsylvania would similarly find.

> FN10. We note that certain City employees may have contract rights as civil service employees or other contract rights that the Legislature has approved. However, plaintiff does not assert, nor is there any evidence to support a finding, that plaintiff was anything other than an at-will employee.

Finally, because the summary judgment stage of a proceeding is a different stage of the proceeding than a motion to dismiss, we find unpersuasive

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

plaintiff's contention that Judge Hutton's October 16, 2002 Memorandum and Order is the law of the case. At summary judgment, the court must do more than just address whether plaintiff has set forth a set of facts consistent with the allegations from which he could obtain relief. Rather, plaintiff must come forward with evidence that presents material issues of fact from which a jury could conclude that plaintiff is entitled to relief.

**\*10** Because we conclude defendant is not empowered to enter into the implied contract that plaintiff asserts exists, defendant could not have breached that contract. We note that this issue was not specifically addressed by Judge Hutton because defendant did not raise the issue at the motion to dismiss stage of the proceeding. That did not preclude defendant from raising the issue at the summary judgment stage.

Moreover, Judge Tucker's decision in *Donchez* was also decided on a motion to dismiss. There is no indication that the City raised the issue of capacity to create an implied contract in that case. Thus, we conclude that *Donchez* is not instructive on the issue presently before the court.

Accordingly, we grant summary judgment in favor of defendants on Count III of plaintiff's Complaint.

*Plaintiff's Claim of First Amendment Retaliation*

In his October 16, 2002 Memorandum and Opinion Judge Hutton determined that Count IV of plaintiff's Amended Complaint set forth a claim for First Amendment retaliation, through the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983. However, at the summary judgment stage, plaintiff must establish the existence of each element on which he bears the burden of proof. *Watson, supra.* For the following reasons, we conclude that there are material issues of fact which preclude the grant of summary judgment on Count IV.

In assessing plaintiff's claim for retaliation we must apply a three-step, burden shifting analysis. *Baldassare v. New Jersey,* 250 F.3d 188, 194 (3d Cir.2001). Initially, plaintiff must show that he engaged in conduct or speech which is protected by the First Amendment. *Watters v. City of Philadelphia,* 55 F.3d 886, 892 (3d Cir.1995). Next, "plaintiff must show that defendant responded with retaliation, and that the protected activity was a

substantial or motivating factor in the alleged retaliatory action." *Ballas,* 2001 U.S. Dist. LEXIS 657 at \*21. Finally, defendant may defeat plaintiff's claim by demonstrating by a preponderance of the evidence that it would have taken the same action even in the absence of the protected conduct. *Watters,* 55 F.3d at 892.

Reviewing plaintiff's claim, we note that defendant's only contention is that there is a lack of causation because plaintiff's discussions with newspaper reporters and the subsequent request for his resignation on August 22, 2001 are not sufficiently close in time to suggest a causal connection between plaintiff's statements to the press and the request for his resignation. For the following reasons, we disagree with defendants and deny their motion for summary judgment on Count IV of plaintiff's Amended Complaint.

Initially, we agree that the statements made by plaintiff in 1999 are too far removed. However, the comments made by plaintiff on July 14, 2001 are close enough to his resignation to warrant scrutiny.

Plaintiff contends that after the initial newspaper article in October 1999, he was directed not to comment to the press. After the July 2001 comments he was advised that the City administration, including Mayor Cunningham, was very upset about his comments to the press. Indeed, defendant Grubb authored a letter to Mayor Cunningham two days after the July 14, 2001 newspaper article explaining that the situation at EMS was not as dire as reported in the newspaper. [FN11]

> FN11. Exhibit D to plaintiff's Amended Complaint.

**\*11** A review of the Exhibits I and K attached in support of defendants' motion indicate that soon after plaintiff spoke to the press on each occasion, the City, through either defendant Grubb or Director of Human Resources Jean A. Zweifel, began soliciting comments on plaintiff's performance from the people in his department. Specifically, on November 9, 1999, Jean Zweifel sent out an evaluation form to the full-time personnel of the EMS division seeking comment on the policies, procedures and operations of the EMS department. [FN12]

> FN12. Exhibit I in support of defendants' motion.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                Page 48
(Cite as: 2004 WL 540452, *11 (E.D.Pa.))

In addition, it appears that after the July 14, 2002 article, defendant Grubb began soliciting comments from EMS personnel regarding plaintiff. [FN13] The reasonable inference in favor of plaintiff is that defendants were attempting to fabricate a reason to terminate him as a pretext to retaliate for his comments to the press.

FN13. Exhibit K in support of defendants' motion.

We conclude that, there is evidence, taken in the light most favorable to plaintiff, a reasonable jury could conclude from Exhibits I and K that the request for plaintiff's resignation was in retaliation for his speaking to the press. Because it appears that defendant engaged in a course of conduct that was quite similar in both instances, we conclude that evidence of the October 1999 incident is relevant to the City's conduct in the July 2001 incident, despite the passage of nearly two years between those incidents.

Accordingly, we deny defendants' motion for summary judgment on Count IV of plaintiffs' Amended Complaint.

*Qualified Immunity of Dana Grubb*

In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) the United States Supreme Court observed that governmental officials performing discretionary functions are generally shielded from liability from civil damages where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

The court must consider two questions as a matter of law: (1) taken in the light most favorable to plaintiff, do the facts show that defendant Grubb's conduct violated a known constitutional right of plaintiff?; and (2) was the right clearly established-- meaning were the contours of the right "sufficiently clear that a reasonable official would understand that what he was doing violates that right." *Saucier v. Katz,* 533 U.S. 194, 201-202, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272, 281-282 (2001).

In this case, plaintiff contends that defendant Grubb played a significant role in the request for his resignation. Specifically, Grubb collected the alleged evidence that was used as the basis for plaintiff's forced resignation. In addition, Mr. Grubb was at the meeting where plaintiff's resignation was requested. Finally, plaintiff contends that the request for his resignation was in retaliation for his comments to the press.

In *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed .2d 315 (1987) the United States Supreme Court stated:

*12 It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech.

* * *

The determination whether a public employer has properly discharged an employee for engaging in speech requires "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

* * *

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."
483 U.S. at 384-385, 107 S.Ct. at 2896-2897, 97 L.Ed.2d at 324-326. (Internal citations omitted). Thus, for the following reasons, we conclude that plaintiff's comments to the press constitute a matter of public concern and that the right was sufficiently clear that defendant Grubb should have understood that retaliating against plaintiff by requesting his resignation would violate plaintiff's First Amendment rights.

Plaintiff's comments about the situation at EMS clearly involve matters of public concern. The response time and ability of an EMS to be properly staffed to respond to emergencies are the type of information which raises awareness of potential threats to the public health and safety of the community at large. *Charvat v. Eastern Ohio Regional Wastewater Authority,* 246 F.3d 607, 617-618 (6th Cir.2001). The citizens of the City of Bethlehem rely on the services provided by the EMS every day. The employees of the EMS constantly deal with life-and-death situations. Thus, we conclude plaintiff's comments to the press raise a matter of public concern, and Dana Grubb's alleged role in requesting plaintiff's resignation in retaliation for those comments violated plaintiff's First

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Amendment constitutional rights.

In addition, the matters involved in *Rankin* are not new or novel legal principles. The Supreme Court's decision in *Rankin* is over 15 years old. Thus, we conclude that this is an issue that is well-settled and sufficiently clear such that defendant Grubb should have known, as an upper level administrator in City government, that he was not permitted to violate plaintiff's protected First Amendment right to speak publically about alleged problems in the EMS department by retaliation in the form of requesting his resignation or terminating him for that speech. We conclude that viewing the evidence in the light most favorable to plaintiff, a reasonable jury could conclude that is what happened in this case.

Accordingly, defendant Dana Grubb is not entitled to qualified immunity in this case.

### CONCLUSION

For all the foregoing reasons, we grant in part and deny in part Defendants, City of Bethlehem and Dana B. Grubb's Motion for Summary Judgment.

2004 WL 540452 (E.D.Pa.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works